## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

JOSEPH AND URSY A. VITALE        :
                                   :     NO. 2:15-cv-01815-RAL
         v.                          :
                                   :     JURY TRIAL DEMANDED
ELECTROLUX HOME PRODUCTS, INC.   :

---

## DEFENDANT, ELECTROLUX HOME PRODUCTS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF MICHAEL R. STODDARD, JR. AND WILLIAM J. VIGILANTE, JR., PH.D.

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………...3

I.  INTRODUCTION……………………………………………………………...4

II.  STATEMENT OF THE FACTS…...…………………………………………...5

III.  LEGAL ARGUMENT………………………………………….…………...7

    A.  Standard for Admissibility of Expert Testimony…………………….…...7

    B.  Mr. Stoddard is not qualified to render expert opinions in this matter…..…….8

        1.  Mr. Stoddard is not qualified to render expert opinions concerning clothes dryer design………………………………………………..9

        2.  Mr. Stoddard is not qualified to render expert opinions regarding the composition and use of the plastics in the dryer…………………10

        3.  Mr. Stoddard is not qualified to render expert opinions concerning the adequacy of the warnings and instructions associated with the subject dryer…………………………………………………...10

        4.  Mr. Stoddard is not qualified to render expert opinions concerning Electrolux's internal corporate policies and procedures…………………11

    C.  Mr. Stoddard's opinion regarding the plastics used in the subject dryer is unreliable and does not meet the fit requirement under *Daubert*………………..13

    D.  Mr. Stoddard's opinion that Electrolux's ball-hitch dryer design causes excessive lint accumulation is unreliable and does not meet the fit requirement under *Daubert*…………………………………………………………………………15

    E.  Dr. Vigilante's opinion regarding an "adequate warning system" is unreliable and does not meet the fit requirement under *Daubert*………………………………17

IV.  CONCLUSION……………………………………………………………….23

CERTIFICATE OF SERVICE……………………………………………………...24

# TABLE OF AUTHORITIES

**Cases**

*Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316 (3d Cir. 2003)…………………………………18

*Curry v. Royal Oak Enters., LLC.*, 2013 U.S. Dist. LEXIS 88760 (E.D. Pa 2013)……………..21

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)……………………….7, 8, 14, 15, 18

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995)……………………………8

*Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820 (E.D. Pa. 2002)…………………………….8

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)…………………………………………………...8

*In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994)…………………………15

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)………………………………….....7, 8

*Mause v. Global Household Brands, Inc.*, 2003 U.S. Dist. LEXIS 18958 (E.D. Pa. 2003)……..22

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000)…………………………………18, 21

*Ortiz v. Yale Materials Handling Corp.*, 2005 U.S. Dist. LEXIS 18424 (D.N.J.)………………12

*Pappas v. Sony Elec., Inc.*, 136 F. Supp. 2d 413 (W.D. Pa. 2000)……………………………18

*Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008)………………………………………8

**Rules**

Fed. R. Evid. 702…………………………………………………………………………...7, 15

**DEFENDANT, ELECTROLUX HOME PRODUCTS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF MICHAEL R.
STODDARD, JR. AND WILLIAM J. VIGILANTE, JR., PH.D.**

Defendant, Electrolux Home Products, Inc. ("Electrolux"), by and through its counsel,

Nicolson Law Group LLC, submits the within Memorandum of Law in Support of its Motion to

preclude the testimony of Plaintiffs' experts, Michael R. Stoddard, Jr. and William J. Vigilante,

Jr., Ph.D.  Electrolux respectfully requests oral argument.

I.     **INTRODUCTION**

Plaintiffs have designated Mr. Stoddard[1] from the Wright Group as an expert in this

matter, who will offer expert testimony regarding alleged design defects in Electrolux dryers and

purported warning inadequacies.  Mr. Stoddard will offer opinion testimony regarding his theory

that the subject dryer's design allows excessive lint to accumulate behind the dryer drum near the

heat source, an alleged defect arising from Electrolux's use of plastic components, and the

warnings and instructions accompanying the subject dryer.  Mr. Stoddard will also offer opinion

testimony regarding the inadequacy of Electrolux's internal product safety standards and

training.  Mr. Stoddard is not qualified to render any of these opinions, as he does not have the

requisite expertise in product design, the composition and use of the plastics in the dryer, the

adequacy of the warnings and instructions, or internal corporate policies and procedures.

Moreover, even if Mr. Stoddard is deemed qualified, his opinions regarding the plastics in the

subject dryer and propensity of the ball-hitch dryer design to accumulate lint near the heat source

are unreliable and Mr. Stoddard has failed to tie his opinions to the facts of this case in any

---

[1] Mr. Stoddard's report was co-authored by Ronald E. Parsons from the Wright Group.  Plaintiffs designated both
Mr. Stoddard and Mr. Parsons in their expert disclosures in this matter.  It is Electrolux's understanding that only
Mr. Stoddard's testimony will be presented at trial.  Accordingly, in the instant motion, Electrolux will not address
Mr. Parsons' qualifications to render expert opinions in this matter, but reserves its right to do so if Plaintiffs intend
to present Mr. Parsons as an expert at trial.

meaningful way.  Mr. Stoddard's testimony is therefore inadmissible and should be excluded at trial.

Plaintiffs have designated Dr. Vigilante as an expert in this matter.  Dr. Vigilante will offer expert testimony claiming that the warnings and instructions that accompanied the subject dryer were defective and consequently caused the subject fire.  Dr. Vigilante opines that Electrolux's failure to provide an adequate warning system, which includes on-product warnings, was unreasonably dangerous and rendered the dryer defective.  Dr. Vigilante's opinion regarding an "adequate warning system" is unreliable, and he has failed to tie his opinions to the facts of the instant case in any meaningful way.  Dr. Vigilante's testimony is therefore inadmissible and should be excluded at trial.

## II.    STATEMENT OF THE FACTS

This lawsuit arises out of a fire that occurred on September 4, 2014 at the home of Joseph and Ursy Vitale in Maple Glen, Pennsylvania.  At the time of the fire, the Vitales owned a General Electric brand, free-standing gas dryer, Model No. DVL223GB8WW, which was manufactured in July 2004.  The dryer was approximately 10 years old at the time of the fire. The Vitales purchased their home June 2010 and they acquired the subject dryer along with the purchase of their home.

Allstate Insurance Company filed a lawsuit[2] against Electrolux Home Products, Inc. on March 2, 2015 in the Philadelphia County Court of Common Pleas and Electrolux removed this matter on April 8, 2015.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1332 and 28 U.S.C. §1441.

---

[2] While the lawsuit was filed in the name of the insureds, Joseph and Ursy Vitale, Allstate Insurance Company is the real party in interest and seeks to recover the money it paid to its insureds pursuant to their homeowners' insurance policy as a result of the fire.

Plaintiffs allege that Electrolux's ball-hitch design dryer contained a design defect and that Electrolux failed to adequately warn of any defect or dangerous condition.  While the parties agree that the fire originated within the dryer, Electrolux denies Plaintiffs' claims of product defect and maintains that a hazardous accumulation of lint does not occur unless the dryer is misused and/or improperly installed after it leaves Electrolux's control.

The dryer was designed, manufactured and tested in accord with the voluntary safety standards set forth in ANSI Z21.5.1 and was accompanied with clear warnings and instructions for installation, use and maintenance to prevent excess lint accumulation and the risk of fire.  The Owner's Manual and Installation Instructions for the subject dryer provided the following warnings and instructions:

- The interior of the machine and the exhaust duct connection inside the dryer should be cleaned at least once a year by a qualified technician.  See the *Loading and Use the Dryer* section.

The Owner's Manual and Installation Instructions further provided: "Have a qualified technician vacuum the lint from the dryer once a year."

The Owner's Manual and Installation Instructions for the subject dryer warned against the use of flexible foil venting to exhaust the dryer.  The Instructions provided the following:

- This dryer must be exhausted to the outdoors using only rigid metal or flexible metal 4" diameter ductwork for inside the dryer cabinet or exhausting.

- Never use plastic or other combustible ductwork.  See Exhausting section.

- Use only 4" (10.2 cm) diameter (minimum) rigid metal duct for best performance, or flexible metal duct.

- DO NOT use plastic flexible duct to exhaust the dryer.  Excessive lint can build up inside exhaust system and create a fire hazard and restrict air flow.  Restricted air flow will increase drying times.  If you present system is made up of plastic duct or metal foil duct,

> replace it with rigid or flexible metal duct.  Ensure the present duct
> is free of any lint prior to installing dryer duct.

Despite the warning that the interior of the machine and the exhaust duct connection inside the dryer should be cleaned at least once a year by a qualified technician, the Vitales did not hire a qualified service personnel to clean the interior of the dryer or the venting from the time they acquired the dryer until the fire.  In addition, the dryer was installed in violation of the Installation Instructions with flexible foil venting.

## III.   LEGAL ARGUMENT

### A.   Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify . . . if (1) the
> testimony is based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts
> of the case.

Fed. R. Evid. 702.  Under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to all expert testimony).  Plaintiffs bear the burden of proving, by a preponderance of the evidence, the admissibility of their experts' testimony.  *See Daubert I*, 509 U.S. at 592-93.  The testimony of the expert, who must be "qualified as an expert by knowledge, skill, experience, training, or education," is only relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert I*, 509 U.S. at 588, 591.  Another aspect of relevancy is the concept of "fit" – i.e., whether the proffered testimony

"is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. (citation omitted).

To be deemed reliable, the expert's testimony "must be supported by appropriate validation – i.e., 'good grounds,'" – not mere "subjective belief or unsupported speculation." *Daubert I*, 509 U.S. at 589-90.   "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"   *Kumho*, 526 U.S. at 149 (citing *Daubert I*, 509 U.S. at 592).   "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" is likewise inadmissible.   *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Fed .R. Evid. 702 advisory committee notes (2000 amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*")).

**B.     Mr. Stoddard is not qualified to render expert opinions in this matter.**

For an expert witness to be deemed qualified, the witness must possess specialized knowledge relating to the area of testimony.   *See Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820, 827 (E.D. Pa. 2002).   While the United States Court of Appeals for the Third Circuit interprets this requirement "liberally," allowing for a "broad range of knowledge, skills, and training," the party offering the expert must nonetheless demonstrate that the expert has the requisite expertise.   *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

**1.     Mr. Stoddard is not qualified to render expert opinions concerning clothes dryer design.**

Plaintiffs' expert, Mr. Stoddard opines that the "Electrolux's Ball-Hitch design inefficiently manages the lint produced during the drying process and allows for lint to

accumulate in areas where it is in close proximity or direct contact with the heat source of the dryer . . . ." *See* Report of Michael R. Stoddard, Jr. at 181, which is attached hereto as Exhibit "A".

While Mr. Stoddard has investigated fires for many years, fire investigation does not create expertise in clothes dryer design.  Mr. Stoddard earned a Bachelor of Science degree in Arson Investigation from the University of New Haven and an Associates of Science degree in Electromechanical Technology from Quinsigamond Community College.  *See* Curriculum Vitae of Michael R. Stoddard, Jr., which is attached hereto as Exhibit "B".  Mr. Stoddard does not have any degrees relating to product design.  *See id*.  In fact, Mr. Stoddard does not even have any degrees in the field of engineering.  *See id*.  Mr. Stoddard has been employed as a fire analyst, which is a position that involves the determination of the origin and/or cause of fires, for the majority of his professional career.  *See id*.

Mr. Stoddard's experience as a fire analyst does not sufficiently qualify him as an expert regarding clothes dryer design.  Although Mr. Stoddard's experience in investigating fires could render Mr. Stoddard qualified to offer opinions as a fire investigator, it does not render him any more qualified than the average layperson to offer an opinion in the area of clothes dryer design.  Mr. Stoddard does not have the requisite expertise required by Rule 702 to offer expert opinions in the field of clothes dryer design.  *See id*.  Accordingly, Mr. Stoddard's testimony on this subject is therefore inadmissible and should be excluded in its entirety.

Mr. Stoddard has been found unqualified to render any opinion as to whether a fire was the result of a design defect or otherwise.  *See* Memorandum Opinion, *Donegal Mutual Insurance Co. a/s/o Vanessa Schantz v. Electrolux North America, Inc.*, No. 1:08-cv-2171 (December 22, 2010 M.D. Pa.), which is attached hereto as Exhibit "C".  At issue before the

*Schantz* Court was Electrolux's Motion to preclude the opinions and testimony of Plaintiff's expert witness, Mr. Stoddard, who had co-authored a report with Mr. Parsons regarding the design of Electrolux's ball-hitch dryer and the dryer's warnings and instructions.  The report that Judge Kane considered in *Schantz* contained some identical language and the same lint accumulation theory that Mr. Stoddard offers in this matter.  Judge Kane precluded Mr. Stoddard from offering any opinion that the dryer design was defective and held that Mr. Stoddard was not sufficiently qualified by education, training, or experience to provide an opinion related to a design defect in the dryer.  *See id*. at 2-3.

> **2.     Mr. Stoddard is not qualified to render expert opinions regarding the composition and use of the plastics in the dryer.**

Mr. Stoddard opines that subject dryer is defectively designed because "[t]he use of plastic components adds a significant quantity of secondary fuels to the appliance and also allows for fire to more easily spread out of the cabinet."  *See* Exhibit "A" at 182.  Mr. Stoddard does not have any formal education in polymer science.  *See* Exhibit "B".  Mr. Stoddard has not had any training in the composition and use of plastics.  *See id*.  Mr. Stoddard does not have the requisite expertise required by Rule 702 to offer expert opinions regarding the composition and use of plastics in the dryer.  *See* Exhibit "B".  Accordingly, Mr. Stoddard's testimony on this subject is therefore inadmissible and should be excluded in its entirety.

> **3.     Mr. Stoddard is not qualified to render expert opinions concerning the adequacy of the warnings and instructions associated with the subject dryer.**

Mr. Stoddard opines that Electrolux's warnings and instructions are defective and unreasonably dangerous.  *See* Exhibit "A" at 182-84.  Mr. Stoddard also opines regarding how users understand the product warnings and what their tendency is to follow them.  *See*

Deposition Testimony of Michael J. Stoddard, Jr., taken April 28, 2016[3], at 121:2-9, which is attached hereto as Exhibit "D".  Mr. Stoddard does not have any formal education in psychology, human factors, or product warnings and instructions.  *See* Exhibit "B".  Mr. Stoddard has not had any training in the human factors field of product warnings and instructions.  *See id*.

In the *Schantz* case, Judge Kane also determined that Mr. Stoddard was not qualified to give opinions as to the adequacy of the warnings and instructions associated with Electrolux's dryer.  Judge Kane noted, "there is nothing before the Court that would indicate that Stoddard had any specialized experience in human factor engineering that would allow him to give an opinion beyond that of the average layperson."  Exhibit "C" at 7.  Ultimately, Plaintiff's counsel in *Schantz* conceded that Mr. Stoddard was not qualified to opine as an expert on the adequacy of the labels and instructions.  *See id*. at 12, footnote 3.

> **4.      Mr. Stoddard is not qualified to render expert opinions concerning Electrolux's internal corporate policies and procedures.**

Mr. Stoddard is critical of Electrolux's internal product safety standards and training and concludes that "Electrolux's engineer[s] failed to make any attempt to reduce the risk of fire" or "improve the fire containment properties of the clothes dryers."  Exhibit "A" at 173.  He concludes that "Electrolux was not only negligent in failing to attempt any such engineering improvements, but that they failed to take any action at all."  *Id*.  Mr. Stoddard does not have any formal education in corporate management.  *See* Exhibit "B".  With the exception of attending a three day course at Whirlpool, Mr. Stoddard has not had any training in the field of corporate management.  *See* Exhibit "D" at 163:8-13.

---

[3] While Mr. Stoddard's cited testimony was given in the matter of *Emil and Sharon Cloud v. Electrolux Home Products, Inc.* (the "Cloud matter"), No. 2:15-cv-00571 (E.D. Pennsylvania), Mr. Stoddard's opinions in this matter are essentially the same as in the Cloud matter.

In *Ortiz v. Yale Materials Handling Corp.*, Plaintiff's expert, John B. Sevart personally investigated over 600 forklift accidents involving all types of forklifts.  *See Ortiz v. Yale Materials Handling Corp.*, 2005 U.S. Dist. LEXIS 18424, at *18 (D.N.J.).  However, Mr. Sevart was ultimately deemed unqualified to offer opinions in the field of biomechanics because he did not possess the specialized knowledge in that field.  *See id.* at *35.  In *Ortiz*, the Plaintiff brought suit against the Defendant forklift manufacturer for injuries sustained while operating the forklift, which Plaintiff maintained was defectively designed.  In support of Plaintiff's theory, Plaintiff offered Mr. Sevart as an expert to testify regarding the dynamics of the accident involving Plaintiff and to testify regarding the forces acting on Plaintiff at the time of the accident.  Mr. Sevart had been a licensed engineer for approximately 30 years and taught college-level mechanical design classes for 20 years.  *See id.* at *18.  However, Mr. Sevart was "not a statistician, an expert in biomechanics as a science, or an expert in human factors as a science."  *Id.*  In fact, during the *Daubert* hearing, Sevart conceded that Plaintiff's attorney should retain a biomechanical engineer to reconstruct the dynamics and kinematics of the accident because he was not an expert in that area.  *See id.* at **18-19.  In light of this testimony, the Court found that Sevart was not qualified to offer testimony as to the dynamics of the accident at issue or the forces acting on Plaintiff at the time of the accident.  *See id.* at *35.

Mr. Stoddard is not qualified to render an expert opinion as to clothes dryer design, plastics, product warnings and instructions, or internal corporate policies and procedures.  Like the challenged expert in *Ortiz*, while Mr. Stoddard may possess specialized knowledge in the field of fire investigation, this knowledge in no way qualifies him to offer expert opinions concerning clothes dryer design, plastics, product warnings and instructions, or internal corporate policies and procedures.  Despite looking at hundreds of dryers during his career, Mr. Stoddard

possesses no greater skill or knowledge than the average layperson in the fields of clothes dryer design, the composition and use of the plastics, warnings and instructions, and internal corporate policies and procedures.   To be deemed qualified, Mr. Stoddard must have specialized knowledge in the areas in which he intends to offer expert testimony and he simply does not.  As such, Mr. Stoddard should be precluded from testifying, as he lacks the requisite qualifications to offer expert testimony in the fields of clothes dryer design, the composition and use of the plastics, product warnings and instructions, and internal corporate policies and procedures.

### C.   Mr. Stoddard's opinion regarding the plastics used in the subject dryer is unreliable and does not meet the fit requirement under *Daubert*.

Even if Mr. Stoddard is deemed qualified to offer opinion testimony regarding the plastics in the subject dryer, his testimony would nonetheless be inadmissible.  Mr. Stoddard opines that the subject dryer was defectively designed because certain components were composed of HB-rated plastics in lieu of fire proof or fire resistant materials.  *See* Exhibit "A" at 182.   Based on testing of the burn characteristics of HB and 5V-rated plastics after short exposure to direct flame and fire containment testing, Mr. Stoddard concludes that "the use of alternative materials would be effective in containing the fire to the cabinet in most conditions, particularly in the Electrolux Ball-Hitch dryer fires where the fire transfers to the lint collected in and around the air duct and blower assembly located at the right front corner of the Ball-Hitch dryer."  *Id*. at 175.   However, Mr. Stoddard has not shown that the tests the Wright Group performed are in any way relevant to real-world dryer fires.  He has not conducted any testing of the differences in the burn characteristics of these plastics under real-world conditions let alone provide any support for his opinions that using a different type of plastic would have resulted in a different outcome in this case.

The opinions being offered in this case by Mr. Stoddard regarding the plastics were the same opinions offered by Mr. Stoddard in the case of *American Family Mutual Insurance Co. v. Electrolux Home Products, Inc.*, No. 11-cv-678 (W.D. Wisconsin).  There, Judge Crocker noted,

> [T]he relevance of Stoddard's opinion regarding fire containment (as opposed to fire ignition) is not clear.  Without knowing the specific facts of each fire at issue in this case, the court cannot determine if testimony regarding fire containment would assist the jury in determining any fact at issue in this case.

*See* Memorandum Opinion, *American Family Mutual Insurance Co. v. Electrolux Home Products, Inc.*, No. 11-cv-678 (June 26, 2014 W.D. Wisconsin), which is attached hereto as Exhibit "E".

Mr. Stoddard's opinions are not based on any reliable methodology and do not meet the requirement under *Daubert* that they fit the facts of this case.  *See Daubert I*, 509 U.S. at 590-91. Mr. Stoddard has not relied on any testing he has demonstrated to be relevant to the conditions of this case.  Mrs. Vitale testified that she opened the dryer door after she noticed a haze in the laundry room.  *See* Deposition Testimony of Ursy Vitale, taken on December 23, 2015, at 32:7-13 and 16-17, which is attached hereto as Exhibit "F".  Mr. Stoddard's testing does not account for the dryer door being opened after the fire started, and as a result, he cannot rule out that the opening of the door contributed to the fire escaping the containment of the dryer cabinet.

Mr. Stoddard's testimony regarding the plastics and fire containment are completely irrelevant given that Mrs. Vitale opened the door after the fire started.  As such, testimony from Mr. Stoddard regarding the plastics and fire containment would not assist the jury in determining any fact at issue in this case.  Mr. Stoddard's opinion that the subject dryer is defectively designed because "[t]he use of plastic components adds a significant quantity of secondary fuels

to the appliance and allows fire to more easily spread out of the cabinet" and any related testimony should therefore be excluded.  *See* Exhibit "B" at 182.

> **D.** **Mr. Stoddard's opinion that Electrolux's ball-hitch dryer design causes excessive lint accumulation is unreliable and does not meet the fit requirement under *Daubert*.**

Even if Mr. Stoddard is deemed qualified to offer opinion testimony regarding the allegedly defective design of the subject dryer, his testimony would nonetheless be inadmissible. Mr. Stoddard's opinion regarding the propensity for lint accumulation in Electrolux's ball-hitch dryers is unreliable and does not meet the admissibility standards of *Daubert*.  Under Rule 702, an expert must testify to "scientific, technical or other specialized knowledge."  Fed. R. Evid. 702.  The Supreme Court, in interpreting this requirement, has concluded that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."  *Daubert*, 509 U.S. at 589.  To be "reliable," the expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief . . . In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity."  *In re Paoli Railroad Yard PCB Litigation ("Paoli II")*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590).

Mr. Stoddard opines that the "Electrolux's Ball-Hitch design inefficiently manages the lint produced during the drying process and allows for lint to accumulate in areas where it is in close proximity or direct contact with the heat source of the dryer . . . ."  *See* Exhibit "A" at 181. Mr. Stoddard's opinion is based on his observations of lint accumulation in an infinitesimally small fraction of unburned and burned Electrolux exemplar dryers to which the Wright Group has been exposed, which are not representative of the relevant population of Electrolux dryers.

The exemplar dryers include dryers the Wright Group purchased used from appliance stores and dryers involved in fires that they have investigated as consultants for plaintiff litigants. *See id*. at 63-64.

These dryers were examined in a vacuum absent any facts as to their maintenance, installation, service, or usage. As Mr. Stoddard admitted in his report, for many of the exemplar dryers, the Wright Group, "ha[d] no understanding of the operational history, installation or maintenance of the dryers," making it "impossible for [them] to document the information of how they were installed, how they were used and how they were maintained." *Id*. at 64. Mr. Stoddard's examination of the exemplar dryers did not account for the variety of factors that can impact airflow. It is undisputed that a variety of factors, including the type of venting used to install the dryer, can have an impact on airflow, which, in turn, can impact lint accumulation. In addition, lint accumulation can depend on whether the user routinely cleaned the lint screen or whether the dryer was ever professionally serviced.

While Mr. Stoddard has referred to the exemplar dryers as a "random sample," they are no such thing. A random sample is meant to be representative of a given population, an objective achieved by ensuring that every member of the population under study has an equal chance of being selected. This haphazard inventory of dryers is not a "random sample" in any statistically meaningful sense. Therefore, Mr. Stoddard has no scientific basis for extrapolating his observations of the exemplar dryers and conclusions purportedly based on those observations even if they were valid.

In further support of this opinion, Mr. Stoddard relies on lint accumulation testing performed by the Wright Group. The lint accumulation testing does not support Mr. Stoddard's theory that, under normal operating conditions, the Electrolux dryer design promotes lint

accumulation in the heater pan in close proximity to the heat source.  In the testing, the dryers were run with loads comprised solely of 10 brand-new cotton bath towels.  Ten brand-new towels were dried 10 times.  Then, the towels were replaced with 10 brand-new towels and were dried 10 times.  Repeated washing and drying of brand-new towels is not representative of consumer usage, which would involve the laundering of a variety of fabrics and clothing items.

Mr. Stoddard's opinions cannot be reasonably applied to the facts of this case because he is ignorant of the installation, operational, or maintenance history of the exemplar dryers and as such, those facts cannot be compared to the characteristics of the dryer involved in this matter.  The dryer cabinet was never cleaned during the 4 years the Vitales owned the dryer.  Further, the dryer loads used in the lint accumulation testing are not representative of the loads dried in the subject dryer by the Vitales.  The Vitales did not repeatedly wash brand-new cotton towels.  The testing does not replicate the Vitale's usage of the dryer whatsoever.

As such, there is no "fit" between Mr. Stoddard's analysis of the exemplar dryers and the lint accumulation testing because Mr. Stoddard has not – and cannot – compare the characteristics relevant to lint accumulation to the subject dryer.  There is too great an analytical gap between Mr. Stoddard's observation and testing of the exemplar dryers and his opinion that Electrolux's dryer design is defective for that opinion to be admissible.  For these reasons, Mr. Stoddard's design defect opinion is unreliable and would not assist the trier of fact to understand the evidence or determine a fact in issue and should therefore be precluded.

     **E.**     **Dr. Vigilante's opinion regarding an "adequate warning system" is unreliable and does not meet the fit requirement under *Daubert*.**

While the subject dryer was accompanied with clear warnings and instructions for installation, use, and maintenance to prevent excess lint accumulation and the risk of fire, Dr. Vigilante criticizes the adequacy of the warnings and instructions.  Dr. Vigilante is critical

because, in his opinion, "Electrolux failed to provide an adequate warning system, which included conspicuous and explicit on-product warnings . . . ."  *See* Report of William J. Vigilante, Jr. at 38, which is attached hereto as Exhibit "G".  Dr. Vigilante proposes on-product warnings, which are contained in his report.  *See id*. at 31-32.  He proposes Illustration 1 (page 31) to be used in conjunction with the service indicator light proposed by Mr. Stoddard and Illustration 3 (page 32) to be used without the service indicator light.  *See id*.  He proposes that these labels be placed on the front console of the dryer.  He proposes Illustration 4 to be placed on the rear of the dryer cabinet.  *See* Exhibit "G" at 32.  He opines that, "[h]ad an adequate warning system, including two conspicuous, explicit, and specific on-product warnings, been provided, Electrolux would have ensured that Joseph and Ursy Vitale were provided with the information they needed to make an informed decision as to their use and maintenance of the incident dryer and avoided the fire."  *Id*. at 39.

To be admissible, an expert's testimony must be based on reliable methodology.  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (citing *Daubert I*, 509 U.S. at 593).  As one court put it, "If *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert."  *Pappas v. Sony Elec., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000).  An expert's opinion must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief."  *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal quotations omitted).

At his deposition, Dr. Vigilante testified that he used a "heuristic evaluation" to assess the adequacy of his proposed on-product warnings; however, he did not conduct an experiment where he brought in "live subjects to interact with the warning."  *See* Deposition Testimony of

Dr. Vigilante, taken August 31, 2016[4], pgs. 126:16-20; 129:13-131:10, which is attached hereto

as Exhibit "I".  He explained that the heuristic evaluation involved the following:

> Again, I start with an understanding of what the hazard is, and
> where it falls in the risk assessment of the product, and what
> people know, or don't know, and what people do, and don't do.  So
> based upon that information, I came to the conclusion that it
> needed to be on the product as opposed to solely in the manual.
> Secondly, what I did is I looked at what information, or safeguards,
> were going to be provided in conjunction with the warning, and
> that gets back to what Mr. Stoddard was doing with the indicator
> light, or lights, as the case may be.  I also looked at the area in
> which the warning could be provided.  So some of these dryers,
> that I have worked on, are front consoles.  This one happened to be
> a top console.  So, that would affect whether or not I was
> concerned particularly about the placement issues.  Next, I looked
> to make sure that I am identifying a specific hazard, and that I am
> providing explicit information regarding the hazard, and how to
> avoid it, and so forth.  And then I draft the label consistent with
> good formatting practices, including use (sic) bullet points, use of
> white spacing, ensure that the text size is sufficient from both a
> legibility standpoint, and from a readability standpoint, and at
> distances at which it would be encountered.  So the warning's
> going to be within about two feet of the user's eyes, so maybe
> three feet, tops.  So, as long as the warning is, you know .10 font
> and above, it shouldn't be a problem.

*                    *                    *                    *

> Well, I used it in conjunction with comparing it, and being
> consistent with the standard, ANSI Z535.4 standard, and the
> recommendations, and guidelines, in the Human Factors and
> Warnings Literature.  That was adequate to develop a warning for
> what I was doing.

*Id.* at 130:3-131:10 and 132:20-133:1.  While Dr. Vigilante gave lengthy testimony regarding the

evaluation he performed in conjunction with assessing the adequacy of his proposed on-product

warnings, his evaluation amounts to no more than a "thought experiment," which is not a reliable

---

[4] While Dr. Vigilante's cited testimony was given in the matter of *Emil and Sharon Cloud v. Electrolux Home Products, Inc.* (the "Cloud matter"), No. 2:15-cv-00571 (E.D. Pennsylvania), Dr. Vigilante's opinions in this matter are essentially the same as in the Cloud matter.

methodology to support his conclusion regarding an adequate warning system that would have changed the Vitale's behavior.

Dr. Vigilante makes the speculative leap that the Vitales would have followed his proposed on product warnings and avoided the subject fire.   He testified that the basis for his opinion is as follows:

> Two things: One, is the warnings and human factors literature that shows if you provide a warning system, like I described it, it will be effective in informing people, and changing behavior towards safety, that is, avoiding fire.   And two, Ursy Vitale testified that had a conspicuous warning been placed on the front of the dryer, she would have seen it, and heeded it.

*See* Deposition Testimony of Dr. Vigilante, taken April 26, 2016, pgs. 194:24 and 195:1-7, which is attached hereto as Exhibit "K".   While Mrs. Vitale testified "yes" in response to Plaintiffs' counsel leading question that "[i]f there was a sticker, or some type of warning on the dryer in a conspicuous place that told you that if you didn't have a qualified technician, or if you didn't have the dryer completely disassembled, and cleaned out, that lint could accumulate near the dryer's heat source, and cause a fire, would you follow that instruction", she also testified that she did not notice the on-product labels on the subject dryer before the fire.   *See* Exhibit "F" at 41:13-20 and 29:22-24.   There is no evidence to suggest that the Plaintiffs would have seen Dr. Vigilante's proposed warnings, read the warnings, heeded the warnings and complied with the warnings.

Dr. Vigilante's proffered warnings and corresponding opinions are speculative and unreliable because they lack any application of human factors methodology whatsoever.   Dr. Vigilante's claim that different warnings would have resulted in the Vitales acting differently is conjecture and an untestable hypothesis.

In *Curry v. Royal Oak Enters., LLC.*, the Eastern District Court concluded that Plaintiff's human factors expert's opinions were unreliable. *See Curry v. Royal Oak Enters., LLC.*, 2013 U.S. Dist. LEXIS 88760, at *14 (E.D.Pa 2013). The Plaintiff suffered injuries after an alleged flash fire occurred while she was using a "smoker" appliance. *Id.* at *2. Plaintiff's claims against Defendants were grounded upon "inadequate warnings and instructions" allegations. *Id.* In formulating an opinion to support Plaintiff's allegations, her human factors expert "reviewed the owner's manual for the smoker, warning labels on the products, deposition testimony from the Plaintiff and witnesses, and photographs taken at the deposition . . . He also reviewed documents that show the relative vapor density of air and lighter fluid." *Id.* at **13-14. In their Motion to Preclude Plaintiff's expert's testimony, Defendants argued "that his failure to test . . . the safety of any of his proposed instructions/warnings render [his] opinions unreliable." *Id.*

Specifically disallowing Plaintiff's expert's recommended or proposed alternative warnings, the Court explained, [H]e used little, if any, methodology beyond his own intuition." *Id.* at *15 (internal quotation omitted). Importantly, the Court stressed that Plaintiff's human factors expert "conducted no test to determine whether his recommendations would or would not result in a flash fire . . . Such unsupported speculation is not enough to render [Plaintiff's expert's] opinion reliable." *Id.* at **15-16 (internal quotations omitted). *See also Oddi*, 234 F.3d at 146, 156 (finding proffered opinion unreliable where engineer engaged in "haphazard, intuitive inquiry," made no calculations, and did not test his hypotheses).

Here, Dr. Vigilate's "recommendations" or suggested, alternative warnings present an identical degree of unreliability as the *Curry* expert. Dr. Vigilante did not conduct any tests or

surveys that support his assumption that alternative warning labels would protect consumers from dryer fires allegedly caused by lint accumulation.

In *Mause v. Global Household Brands, Inc.*, Plaintiff claimed that she suffered injuries after using a cleaning product; her human factors/warnings expert made three recommendations that specifically suggested alternative warnings and instructions on the cleaning product's labels. *See Mause v. Global Household Brands, Inc.*, 2003 U.S. Dist. LEXIS 18958, *12 (E.D. Pa. 2003). Notably, the Eastern District Court held, "There are several problems with [Plaintiff's expert's] opinion which leads the Court to find his testimony to be unreliable. [He] does not demonstrate that he utilized any reliable methodology in coming to his conclusions. He generally explained the field of human factors in his report, but he did not explain how that methodology was used in this case or leads to the conclusions he reached in this case." *Id.* at *12. Further, the Court emphasized that Plaintiff's expert "did not survey any other consumers or otherwise test this assertion at all . . . Other than looking at the Plaintiff's deposition transcript, there is no basis for his opinion." *Id.* at *13.

Similar to Dr. Vigilante's mention of a "heuristic analysis," the *Mause* expert suggested that certain additions and alterations to the product's warning label would have prevented Plaintiff's injuries. When asked how he applied human factors analysis in concluding that the label at issue should have included additional information, the *Mause* expert "responded that he believed that, if warned, almost every person using the product would use a respirator because they would know of the risks." *Id.* at **14-15. In discrediting the expert's opinion, the Court found "no analysis or methodology . . . [and] only his subjective belief . . . With no methodology offered in [the] expert report, the Court is left only with unsubstantiated opinions . . . . Several courts have ruled that a warnings expert needs to provide some evidence, rather than merely an

assumption, of a causal link in order to substantiate his opinions." *Id.* at **15-16 (internal citations omitted).

Dr. Vigilante's opinions cannot be reasonably applied to the facts of this case.  He opines that "[h]ad an adequate warning system, including two conspicuous, explicit, and specific on-product warnings, been provided, Electrolux would have ensured that Joseph and Ursy Vitale were provided with the information they needed to make an informed decision as to their use and maintenance of the incident dryer and avoided the fire." *Id*. at 29.  There is no basis for this conclusion because Mrs. Vitale testified that she did not notice the on-product labels on the subject dryer.  *See* Exhibit "F" at 29:22-24.  There is no evidence to suggest that the Plaintiffs would have seen Dr. Vigilante's proposed warnings, read the warnings, heeded the warnings and complied with the warnings.  As such, there is no "fit" between the Vitale's actions pre-fire and Dr. Vigilante's opinion that different warnings would have resulted in the Vitales acting differently.  For these reasons, Dr. Vigilante's opinion is unreliable and would not assist the trier of fact to understand the evidence or determine a fact in issue and should therefore be precluded.

## IV.    **CONCLUSION**

As a result of the foregoing, Electrolux requests that this Honorable Court grant its Motion to preclude the testimony of Plaintiffs' experts, Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D.

Respectfully submitted,

NICOLSON LAW GROUP LLC

BY:   /s/ Melissa L. Yemma
       CHERYL M. NICOLSON, ESQUIRE
       Attorney I.D. No. 57422
       MELISSA L. YEMMA, ESQUIRE
       Attorney I.D. No. 92194
       Rose Tree Corporate Center II

1400 N. Providence Road, Suite 6035
Media, PA 19063
(610) 891-0300
nicolson@nicolsonlawgroup.com
yemma@nicolsonlawgroup.com

Attorneys for Defendant,
Electrolux Home Products, Inc.

DATE: March 20, 2017

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

JOSEPH AND URSY A. VITALE     :
                                  :      NO. 2:15-cv-01815-RAL
          v.                        :
                                  :      JURY TRIAL DEMANDED
ELECTROLUX HOME PRODUCTS, INC.   :

---

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Defendant, Electrolux Home Products, Inc.'s Memorandum of Law in Support of Motion to preclude the testimony of Plaintiffs' experts, Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D. was served electronically on the date stated below, upon the following:

Raymond E. Mack, Esquire
Patrick A. Hughes, Esquire
de Luca Levine, LLC
Three Valley Square
512 E. Township Line Road, Suite 220
Blue Bell, PA  19422

NICOLSON LAW GROUP LLC

BY:   /s/ Melissa L. Yemma
           CHERYL M. NICOLSON, ESQUIRE
           Attorney I.D. No. 57422
           MELISSA L. YEMMA, ESQUIRE
           Attorney I.D. No. 92194
           Rose Tree Corporate Center II
           1400 N. Providence Road, Suite 6035
           Media, PA 19063
           (610) 891-0300
           nicolson@nicolsonlawgroup.com
           yemma@nicolsonlawgroup.com

           Attorneys for Defendant,
           Electrolux Home Products, Inc.

DATE: March 20, 2017