# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONEGAL MUTUAL INSURANCE** : | |
| **COMPANY a/s/o VANESSA SCHANTZ,** : | 1:08-cv-2171 |
|     Plaintiff : | |
| v. : | (Chief Judge Kane) |
| : | |
| **ELECTROLUX NORTH AMERICA,** : | |
|     Defendant : | |

## MEMORANDUM

Before the Court is Defendant Electrolux Home Products Inc.'s[1] motion in limine to exclude the expert opinion testimony of Michael R. Stoddard, Jr. ("Stoddard") under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). (Doc. No. 81.) Oral argument was heard on the motion on September 27, 2010. For the following reasons, the motion will be granted in part.

## I.     BACKGROUND

Plaintiff Donegal Mutual Insurance Company ("Donegal") has instituted this subrogation action against Defendant Electrolux Home Products Inc. ("Electrolux") for a fire that occurred on November 12, 2006, involving a dryer manufactured by Electrolux. Donegal has asserted causes of action sounding in Negligence, Strict Liability, and Warranty/Breach of Contract. Donegal alleges that the electric clothes dryer manufactured by Electrolux was defective and caused a fire in the home of its insured, Vanessa Schantz. Presently, the parties dispute whether Donegal's expert Stoddard should be allowed to give his opinions regarding a design defect and warning labels of the dryer involved in the fire.

---

[1] In its motion, Defendant notes that it has been previously identified improperly as Electrolux North America. (See Doc. No. 81 at 1.)

1

## II. STANDARD OF REVIEW

A trial court has a special obligation to ensure that expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). Accordingly, the admission of scientific, technical, or other specialized knowledge is within the trial court's discretion. See General Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997). A court's inquiry is controlled by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained, these requirements represent a "trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

## III. DISCUSSION

In the present case, Stoddard co-authored a report for Donegal which concludes that "the design of the subject electric clothes dryer was defective and that the warnings on the subject dryer were defective." (Doc. No. 81 ¶ 7.) Electrolux has challenged the following opinions to be offered by Stoddard at trial:

> 1. **Design:** The design of the dryer is defective. Heat is required as part of the drying process and lint is a known by-product of the drying process. Electrolux's design inefficiently manages the lint produced during the drying process. The design allows for lint to accumulate in areas where [it] can come in close proximity or direct contact with the heat source of the dryer (gas flame in a gas fired

2

>dryer, or resistive heating coil in an electric dryer). Other manufacturers' dryers also produce lint, but the lint does not collect at or near the heat source. Furthermore, the lint that is produced collects in areas that are not visible to, or serviceable by, the average user. . . .
>
>There was a design defect that directly contributed to the ignition scenario in this case. This fire was a direct result of the failure of the bearing pivot/ball-hitch assembly that allowed the drum to detach and contact the energized heating element during operation, resulting in the ignition of the lint and/or clothing load by molten metal slag emitted during the ground fault event. In the case of electric dryers, there are additional fire hazards related, including a bearing failure and foreign objects contacting the heating element. The defective design allows for both of these failure scenarios to occur and result in a competent ignition scenario that can ignite any lint accumulated within the dryer and/or the combustible clothing in the drum, as these failures always occur during the operation of the dryer. Should the dryer fail; it should NEVER fail into a fire generating condition.
>
>In addition, there is an inherent defect in the design of these dryers having to do with the materials the dryer is constructed of. The use of plastic components adds a significant quantity of secondary fuels to the appliance and also allows for fire to more easily spread out of the cabinet. . . .
>
>2.   **Warnings:** The warnings on the dryer are defective. . . . The warnings in the User's Guide are inadequate and vague. . . . The warnings on the dryers themselves are inadequate . . . .

(Doc. No. 82, Ex. A-3 at 75-77.) Electrolux has challenged Stoddard's opinion on the basis of qualification, reliability, and fit. (Doc. No. 81 ¶ 9.)

### A.   Factor 1 (Qualification)

"Qualification requires 'that the witness possess specialized expertise.'" Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (citation omitted). This requirement is to be interpreted liberally, such that a "broad range of knowledge, skills, and training" will allow an expert to be found qualified. Id. (citation omitted). "The basis of this specialized knowledge

3

'can be practical experience as well as academic training and credentials.'" Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998) (citations omitted). However, the Third Circuit has also "set a floor with respect to an expert witness's qualifications." Elcock v. Kmart Corp., 233 F.3d 734, 742 (3d Cir. 2000).

In providing guidance as to whether the qualification "floor" has been passed, the Third Circuit has previously pointed to two separate decisions to help illustrate the contours of the qualification standard. See id. at 742-44. An examplar case of where the liberal qualification standard was not met is Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110 (3d Cir. 1987). In Aloe, the Third Circuit found that the district court abused its discretion by allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. Id. at 114. The appellate court stated:

> After carefully reviewing Mr. Drewnoski's credentials, we conclude that the district court abused its discretion by allowing the witness to testify regarding the cause of the tractor shovel fire. Drewnoski was not an engineer. He had no experience in designing construction machinery. He had no knowledge or experience in determining the cause of equipment fires. He had no training as a mechanic. He had never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.
>
> We are well aware of "the liberal policy of permitting expert testimony which will 'probably aid' the trier of fact." But, at a minimum, a proferred expert witness on causation must possess skill or knowledge greater than the average layman in determining causation.

Id. at 114 (internal citations omitted). Thus, an individual was not qualified to opine as an expert on causation where that individual lacked: formal academic training in the field of engineering; on-the-job experience either as a designer, mechanic, or fire investigator; and any other tangential

4

experience aside from sales.

In contrast, an examplar case where the qualification standard was narrowly met is Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998). In that case, the district court qualified an individual named Rizzo to testify as a vocational expert, despite the fact that the individual lacked any formal academic training in that field. Id. at 626. In affirming the district court's decision to qualify Rizzo, the Third Circuit reasoned:

> We hold that the district court did not abuse its discretion in qualifying Rizzo as an expert witness. Even though Rizzo did not possess formal academic training in the area of vocational rehabilitation, he did have experience in the field through his employment at the Developmental Disabilities Council in attempting to provide jobs for disabled individuals. During this time, Rizzo also became familiar with the relevant literature in the field. Even if his qualifications are, as the district court described, "a little thin," he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals. In the circumstances, we cannot say that the district court abused its discretion in determining that Rizzo possessed the minimum qualifications necessary to testify as an expert.

Id. at 627. Thus, in Waldorf, even though formal academic training was lacking, the individual approved as an expert had sufficient on-the-job experience and familiarity with literature in the field to raise his understanding above that of the average layperson. This, as the Third Circuit has opined, is the "outer limit" of expertise – a point at which that Court has noted its suspicion that "had the district court in Waldorf ruled the witness unqualified, the [appellate] panel would have affirmed." Elcock, 233 F.3d at 744.

Here, Electrolux concedes that Stoddard is qualified to opine that the cause of the fire in this case was the dryer, and for good reason. (See Hearing Tr., Sept. 27, 2010, at 4-5.) Stoddard earned a Bachelor in Science degree in Arson Investigation from the University of New Haven,

5

Connecticut, in 1999. (Doc. No. 84, Ex. F.) Since that time, he has been employed as a fire analyst for the majority of his professional career. (See id.) As such, Stoddard has investigated approximately 300 to 500 dryer fires. (Doc. No. 81 ¶ 23.) He therefore has the necessary qualification to give his opinion as to the cause and origin of the fire.

The point of contention is whether Stoddard is qualified to comment on the Electrolux dryer design and warning labels. See Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."). Electrolux argues that because Stoddard does not have "any training, education or experience in the fields of engineering, product design or product warnings and instructions" he is not "any more qualified than the average layperson to offer an opinion" in those areas. (Doc. No. 81 ¶¶ 21, 24.) For example, as Electrolux's counsel pointed out at the Daubert hearing, there are multiple factors that could precipitate a drum bearing failure, including overloading, the heaviness of the drum, or misuse by the homeowner. (Hearing Tr., Sept. 27, 2010, at 15-16). Stoddard has pointed to no relevant experience with regard to manufacturing or engineering that would allow him to rule out these other potential triggers to the bearing assembly failure. (See id. at 15.)

In response, Donegal's counsel asserted at oral argument that Stoddard's theory is not that "the bearing assembly failed because of a defective design." (Hearing Tr., Sept. 27, 2010, at 8.) Donegal's counsel continued:

> That's not [Stoddard's] theory. The failure of the bearing has nothing to do with the design of the dryer. The bearing failed because it reached its end of life. And we don't expect products to last forever, but we do expect them to fail safely and not create a fire hazard situation.

6

(Id.) In support of this "fail-safe" design argument, Donegal cites to Stoddard's extensive experience in investigating fires, especially in relation to appliance fires. (Doc. No. 84 at 10-11.) Donegal's counsel argued at the Daubert hearing that Stoddard "has essentially created a niche and developed a specialized knowledge over the last several years in dryer cases, dryer design, dryer construction, dryer operation" which allows him to be "qualified to speak to design." (Hearing Tr., Sept. 27, 2010, at 11.)

The Court agrees with Donegal that Stoddard has sufficient experience in dealing with dryers and fire investigation to opine that the design of the dryer allowed it to fall into a fire hazard condition when the bearing assembly failed. As a cause and origin expert, Stoddard is qualified to give his opinion that the design of the bearing assembly allowed it to fall into a fire-causing condition; that the bearing assembly failure was the source of the fire; and that lint or the load served as fuel for the fire. However, Donegal has not shown Stoddard to be sufficiently qualified to give his opinion as to why the bearing assembly failed. Donegal has not pointed to sufficient academic training or on-the-job experience which would qualify Stoddard to provide an opinion as to whether the bearing assembly failed as a result of a design defect or otherwise.

Furthermore, the Court finds that Stoddard is not qualified to give his opinion as to the adequacy of the warnings at issue. There is nothing before the Court that would indicate that Stoddard has any specialized experience in human factor engineering that would allow him to give an opinion beyond that of the average layperson. At the Daubert hearing, Donegal's counsel stated that Stoddard "would simply be testifying that the manual and the troubleshooting guide [that came with the Electrolux dryer] are silent on the bearing . . . failure issue." (Hearing Tr., Sept. 27, 2010, at 14.) When asked whether it was necessary for an expert to make that point,

7

Donegal's counsel conceded that it was not. (Id. at 14-15.)

B.  Factor 2 (Reliability)

Even if the Court found that Stoddard was qualified to opine as to why the bearing assembly failed, the Court would still find that his opinion on that issue was unreliable. Furthermore, although Stoddard's opinion that lint may have served as a first fuel is reliable, any opinion offered by Stoddard that the dryer design was defective in terms of lint accumulation is not reliable.

The Court's gatekeeping responsibility requires it to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. In this way, the Daubert factors[2] "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150 (citation omitted). "[T]rial courts should focus 'solely on principles and methodology, not on the conclusions they

---

[2] When evaluating the reliability of a witness's methodology, a court is guided by the following Daubert factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Calhoun, 350 F.3d at 321 (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994)). The Rule 702 inquiry is a flexible one, and the Court should also take into account any other relevant factors. Id.

8

generate.'" Montgomery Cnty. v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003) (quoting Daubert, 509 U.S. at 595).

In explaining the testing he performed, Stoddard's report states:

> The Wright Group has conducted a large amount of testing on the Electrolux/GE designed dryers. . . . All of the testing conducted by the Wright Group has been thoroughly documented using video, photographs, measurements, thermocouples, volumeters, etc. The data has been analyzed and has been the basis through which our initial hypotheses were validated. All of the opinions of Wright Group, Inc., in regards to the cause of the fires in the dryers manufactured by Electrolux, are a result of the thorough understanding of these appliances through baseline testing and actual fire testing.

(Doc. No. 81, Ex. A-2 at 36-37.) The report further addresses the "Design Analysis" that Stoddard went through to arrive at his design defect opinion:

> This fire originated due to a mechanical failure of the bearing assembly, allowing the drum to shift and contact the energized heating element, which created an electrical arcing event. This electrical event resulted in the generation of sparks and hot molten metal to be discharged from the heating element and come into contact with first fuels, which is lint accumulated within the dryer cabinet, and/or the clothing load in the drum. There are two contributing factors to the cause and development of this fire:
>
> 1) <u>Bearing Assembly</u>: The failed bearing assembly compromised the shaft of the drum pivot and allowed the drum, which was filled with a clothing load, rotating during operation and under tension by the drive belt to shift and contact the heating element. Regarding the entire pivot and bearing assembly . . . this design is still prone to failure if the nylon bearing surface is compromised due to contamination, breakdown of grease/lubricant, or other outside physical damage. . . .
>
> 2.) <u>Heating Element</u>: The heating element in its current location within the heater housing, between the rear of the drum and rear wall of the cabinet, allows for the metal drum to contact the heating element if the bearing assembly supporting the rear of the drum fails.

. . .

(Doc. No. 81, Ex. A-2 at 37-38.) Donegal's proffer regarding the reliability of Stoddard's testimony is based almost exclusively on the fact that Stoddard's review adhered to the tenets set forth by the National Fire Protection Association in its publications NFPA 921 and 1033. (See Hearing Tr., Sept. 27, 2010, at 8-13.)

In challenging the reliability of Stoddard's testimony, Electrolux concedes that Stoddard's chosen method of review is largely accepted as the standard for a "cause and origin" analysis. As this Court has previously opined, several courts have found NFPA to be the professional bar that fire analysts are expected to meet. See Hoang v. Funai Corp., 652 F. Supp. 2d 564, 567 (M.D. Pa. 2009). However, to the extent that Donegal seeks to use Stoddard's testimony to extend beyond "cause and origin" to the design of the dryer, Electrolux challenges that Stoddard "did not use any discernable methodology to conclude that Electrolux's dryer design is defective." (Doc. No. 81 ¶ 42.) Electrolux points out that there are over 8 million Electrolux dryers in use in the United States on a yearly basis, but Stoddard only looked at 144 "absent any facts as to their maintenance, installation, service or usage." (Id. ¶¶ 44-45.) Electrolux contends that Stoddard "can no sooner testify that the failure in the Schantz dryer was from a defective design than from misuse or abuse of the product." (Id. ¶ 60.)

In addressing reliability, "the question is 'whether an expert's data is of a type reasonably relied on by experts in the field . . . [and] whether there are good grounds to rely on this data to draw the conclusion reached by the expert.'" Jaasma v. Shell Oil Co., 412 F.3d 501, 514 (3d Cir. 2005) (quoting In re TMI Litig., 193 F.3d 613, 697 (3d Cir. 1999)). Here, the dispute between the parties again appears to be the extent to which Stoddard can stretch his expertise and

10

accompanying methodology. After reviewing Stoddard's report, the Court agrees with Donegal that Stoddard's opinion that a bearing assembly failure caused the fire in this case is reliable. As Donegal points out, pursuant to the NFPA 921 guidelines,

> Mr. Stoddard <u>recognized the need</u> – a fire had occurred which originated in the dryer and caused damage. He <u>defined the problem</u> – as to determine the cause of the fire and to determine whether the subject Electrolux dryer was involved in the fire cause and/or to identify a sub-component within the Electrolux that is related to the fire cause. <u>He collected data</u> – from this particular fire, reviewed depositions, photographs, fire reports, other expert reports, he gathered industry research, information on defendant's dryers in general, conducted an examination of the physical evidence, etc. He <u>analyzed the data</u> – took measurements and evaluated corresponding evidence of electrical arcing which indicated that there was a ground fault between the drum of the dryer and the energized heating element. He <u>developed a hypothesis</u> – that a mechanical failure of the bearing and hitch assembly would permit the dryer drum to shift to such a degree that the metal rear of the drum would contact the electrical heating element and cause a ground fault and fire. He <u>tested the hypothesis</u> – he reviewed drawings, part's schematics, physical evidence, took measurements, ruled out other potential causes within the dryer, in order to prove that the bearing failure caused the fire. He also developed a simple design change which would eliminate the danger associated with a bearing failure fire. He also conducted testing on his proposed alternative design and determined that the dryer did not lose any discernable efficiency using the new design. He <u>developed a final hypothesis</u> – that the defendant's . . . dryer was defective because its bearing assembly did not fail safe and can potentially fail into a fire causing condition.

(Doc. No. 84 at 14-15 (emphasis as in original).) Therefore, Stoddard will be allowed to offer his opinion that a bearing assembly failure caused the fire in this case and that the design of the dryer was defective in that it allowed the bearing assembly to fall into such a fire-causing condition.

However, the Court agrees with Electrolux that Stoddard points to no hypothesis which allows him to rule out the multiple reasons <u>why</u> the bearing assembly failed. Stoddard might

11

suggest that the bearing assembly failed as the result of a design defect. But, in showing his methodology to arrive at this point, "he used little, if any, methodology beyond his own intuition." Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000).[3] Therefore, Stoddard will not be allowed to offer his opinion as to why the bearing assembly initially failed.

Likewise, in regard to Stoddard's opinion that the design of the dryer defectively allowed lint to accumulate, Stoddard points to no methodology beyond his own intuition. As Donegal's counsel conceded at the September 27, 2010 hearing, Stoddard's primary theory of the cause of the fire was that the bearing assembly failed. (Hearing Tr., Sept. 27, 2010, at 7.) Stoddard "[did not] know whether lint for certain was the first thing ignited. It was either lint, the clothing inside the drum, or a combination thereof." (Id.) Therefore, the Court finds unreliable any opinion to be offered by Stoddard that there was a design defect in terms of the dryer's lint accumulation.

C.      **Factor 3 (Fit)**

Although Electrolux also challenges Stoddard's opinion in terms of fit, the Court finds its challenge unpersuasive. The fitness prong requires that "the expert's testimony . . . be relevant for the purposes of the case and [that it] . . . assist the trier of fact." Id. (quoting Schneider, 320 F.3d at 405). "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Here, Stoddard's opinion that the bearing assembly failure caused the fire in this case fits the facts of the case and will assist the trier of fact in their determination. Therefore, the Court finds that

---

[3] Given Donegal's concession that Stoddard is not qualified to opine as an expert on the adequacy of labels, the Court need not address the reliability of his opinion on that matter.

12

Stoddard's testimony should not be deemed inadmissible on that ground.

IV.     **CONCLUSION**

The Court will grant in part Electrolux's motion in limine in accordance with the foregoing analysis.

**ACCORDINGLY**, this 22nd day of December 2010, it is **HEREBY ORDERED THAT** Defendant Electrolux's motion is **GRANTED** to the following extent:  Donegal's expert, Michael Stoddard, may offer his expert opinion that the subject dryer's design allowed the dryer to fall into a fire-causing condition when the bearing assembly failed.  However, Stoddard may not opine as to why the bearing assembly failed.  Although Stoddard may offer an opinion that lint served as a first fuel in the fire, Stoddard may not offer any opinion that the dryer design was defective in terms of lint accumulation.  Finally, Stoddard may not offer any opinion as to the adequacy of the warning labels.

s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

C:\WINDOWS\Temp\notes878D36\daubert order (FINAL).wpd