# EXHIBIT "H"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:15-cv-00571-GJP

JURY TRIAL DEMANDED

EMIL and SHARON      )
CLOUD                )
                     ) DEPOSITION UPON
                     )
                     ) ORAL EXAMINATION
                     )
     vs.             )      OF
                     )
ELECTROLUX HOME      )  WILLIAM J. VIGILANTE, JR.,
PRODUCTS, INC.       )  Ph.D., CPE

- - -

TRANSCRIPT OF ORAL DEPOSITION, taken by
and before DONNA HUNTER, Registered Professional
Reporter and Notary Public, at the Offices of deLUCA
LEVINE, LLC, Three Valley Square, 512 E. Township
Line Road, Suite 220, Blue Bell, PA, on Wednesday,
August 31, 2016, commencing at 10:00 a.m.

ERSA Court Reporters
30 South 17th Street
United Plaza, Suite 1520
Philadelphia, PA  19103
(215) 564-1233

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

**2**

1  A P P E A R A N C E S :
2
3  deLUCA, LEVINE, LLC
   By:  KENNETH T. LEVINE, ESQUIRE
   Three Valley Square
4  Suite 220
   512 E. Township Line Road
5  Blue Bell, PA  19422
6  Counsel for Plaintiffs
7
   NICOLSON LAW GROUP
8  BY:  MELISSA YEMMA, ESQUIRE
   Rose Tree Corporate II - Suite 6035
9  1400 North Providence Road
   Media, PA  19063
10
   Counsel for Defendant,
11 Electrolux Home Products, Inc.
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1
           I N D E X
2
   WITNESS:  WILLIAM J. VIGILANTE, JR., Ph.D., CPE
3
   BY MS. YEMMA....................PAGE 4
4
       E X H I B I T S
5           PAGE     PAGE
   NUMBER  DESCRIPTION   MARKED  ATTACHED
6
   Vigilante-1  Notice of Deposition   5     175
7
   Vigilante-2  CD with file materials  17    176
8     (Retained my Ms. Yemma)
9  Vigilante-3  Dr. Vigilante's Report  17    177
10 Vigilante-4  11/1/15 CV       20    178
11 Vigilante-5  7/18/16 Updated CV   29    179
12 Vigilante-6  History of Expert
       Testimony       56    180
13
   Vigilante-7  Notes from Teleconference
14     with Mike Stoddard  77    181
15 Vigilante-8  Skinny Warning Label  95    182
16 Vigilante-9  Updated version of
       warning corresponding
17     to Illustration 1   121   183
18 Vigilante-10 Updated version of
       warning corresponding
19     to Illustration 3   122   184
20 Vigilante-11 Manufacturer's Guide  159   185
       To Developing Consumer
21     Product Instructions
22 Vigilante-12 Excerpt from Chapter 36
       Handbook of Human
23     Factors and Ergonomics 159  186
24 Vigilante-13 Owner's Guide      164   187

**4**

1       (It was stipulated by and between
2  counsel that sealing, and certification be
3  waived: and that all objections, except as
4  to the form of the question, are reserved
5  until the time of trial.)
6       . . .WILLIAM J. VIGILANTE, JR.,
7  Ph.D., CPE, having been duly sworn, was
8  examined and testified as follows:
9       THE REPORTER:  Usual stipulations?
10      MR. LEVINE:  Except for reading and
11 signing.
12 BY MS. YEMMA:
13 Q.    Good morning, Dr. Vigilante.
14 A.    Good morning.
15 Q.    We've met before today, but for the record,
16 my name is Melissa Yemma.  I represent the defendant
17 in this lawsuit that has been brought by Allstate
18 Insurance Company, and the Clouds.  And this matter,
19 I'm sure you're familiar with, arises out of a fire
20 that happened back on December 19th of 2013.  And,
21 we're here today to take your deposition.
22      I know you've had other depositions in the
23 past.  Do you need me to review the rules for a
24 deposition?

**5**

1  A.    I don't believe so.
2  Q.    I'll just remind you if you need to take a
3  break, just let me know.  Okay, sound good?
4  A.    Okay.
5  Q.    I am going to mark as Vigilante-1, a copy of
6  the Deposition Notice for today's deposition.  I'm
7  handing that to you.
8       (Third Amended Notice of Deposition
9       marked Vigilante Exhibit No. 1 for
10      identification.)
11 BY MS. YEMMA:
12 Q.    Have you seen a copy of that document before
13 today?
14 A.    Yes.
15 Q.    Okay.  And if you would turn to, I believe
16 it's the last page of the document -- it says
17 Exhibit A.  Have you had an opportunity to review
18 that exhibit?
19 A.    I believe so.
20 Q.    Have you brought with you materials
21 responsive to Exhibit A?
22 A.    I have.
23 Q.    Okay.  And before the deposition, you handed
24 me a CD.  Is that correct?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

**6**

1    A.    Yes.
2    Q.    Okay.  And if you could, for the record,
3    identify generally what is on that CD.
4          THE WITNESS:  Oh, that report
5    for Purswell is on that CD.
6          MR. LEVINE:  I thought you had a
7    thumb drive?
8          THE WITNESS:  The thumb drive is
9    for me.  The CD was for --
10         MR. LEVINE:  Do you want to give
11   her the thumb drive, and take back the disk?
12         THE WITNESS:  The thumb drive
13   doesn't have -- I can put everything on it.
14   How about if I take that back, and I'll give
15   you a thumb drive at the end of the
16   deposition?
17         MS. YEMMA:  That's perfectly fine.
18         THE WITNESS:  I can put more files
19   on thumb drives.
20         MS. YEMMA:  That's okay.
21         Let's go off the record.
22         (Discussion held off the record.)
23         MS. YEMMA:  Okay, back on the
24   record.

---

**7**

1    BY MS. YEMMA:
2    Q.    We took a short break.  So with regard to
3    the CD, I realize there's a copy of Dr. Purswell's
4    report, and it's plaintiff's position that that will
5    not be included in your file.  But other than that
6    report, what else is contained on that CD?
7    A.    There's also a report, that's not on that
8    CD, for Mr. Crabtree, the defense expert,
9    Mr. Crabtree.  So, they're on there, but we're going
10   to remove them.
11   Q.    Okay.
12   A.    But, that contains all of my electric file.
13   So there's discovery material in there.  There's my
14   invoices in there, three invoices in there, for this
15   case; my four-year testimony list; the multiple
16   notices of deposition; the engagement letters for
17   Mr. Hughes, and the one I sent for the deposition to
18   your office, the Notice of Deposition Scheduling
19   Order -- I'm just going through to make sure I know
20   what's in there -- my CV, and there is a cover
21   letter from your office to Mr. Hughes, that I was
22   copied on, or sent a copy of, regarding the
23   scheduling of depositions for Mr. Stoddard, myself,
24   and someone else.  I don't remember who it is.

---

**8**

1          The deposition transcripts of David Fuller,
2    Mr. Brown, Mr. and Mrs. Cloud, Carl King.  And, it
3    looks like there's two copies of Steven Brown's
4    deposition.
5          The dryer literature, that is contained in
6    tab 4 of my notebook, that I produced last time.
7    And then the cleaning calls that I -- whether we
8    discussed them at the Vitale matter, so a copy of
9    those are in there, as well.
10         The manuals for the Exemplar indicator
11   lights, that we spoke about in the Vitale matter,
12   Example:  Flex Foil Ducting.
13         Then I have the other deposition summaries
14   of the prior or other case depositions, including
15   Carl King's testimony in Neucum, Shelley Clausen,
16   David Fuller, in this matter, Steve Joeger; Carl
17   King, in the Gianferri matter; Carl King in the
18   Marquette matter; Carl King in the Shannon matter;
19   Carl King in the Vitale matter; Carl King in this
20   matter.  Rae Creiger in the Gianferri matter;
21   Michael Ricklefs in the Gargiulo matter,
22   G-A-R-G-I-U-L-O; Michael Ricklefs in Gianferri;
23   Brian Ripley in Gargiulo; Brian Ripley in Marquette;
24   Brian Ripley in State Farm, June 1st, 2012 in a

---

**9**

1    State Farm matter; Steven Brown in this matter.
2          My depo summaries from the Power case, which
3    includes Carl King, and then Carl King's testimony,
4    trial testimony in Tyrell.
5          And, then there's two other summaries in
6    there, but they were specific to another case, to
7    the Power case.
8          Then I have a summary for Mr. and
9    Mrs. Vitale in there.  So, it's a duplicate.
10         I have the references I cited in my report.
11   I have a PDF and JPEG of the Exemplar warnings that
12   are in my -- actually, the cleaning graphic, the
13   cleaning graphic that's used in my report.  The
14   warnings PDF are my updated warnings.  So, the
15   warnings in Cloud, I changed in a later report.  So,
16   I put a copy of that in the file, as well.
17   Q.    Okay.  Is there a -- not to interrupt you,
18   but is there a hardcopy of that?
19   A.    No.
20   Q.    Could we get a hard copy?
21         MR. LEVINE:  Okay.
22         THE WITNESS:  It's just one PDF.
23         MR. LEVINE:  Okay.  Are you
24   connected to our WiFi?

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

10

1      THE WITNESS:  I am not, but I could
2   be.
3      MR. LEVINE:  All right.  Well, if
4   you want to just hand me your thumb drive,
5   and I'll pop it onto my computer.
6      MS. YEMMA:  Is it on the CD?
7      THE WITNESS:  It's on the CD.
8      MS. YEMMA:  It's on the CD.
9      MR. LEVINE:  Oh, okay.  But, I
10  mean, if you want a physical copy for this
11  deposition, I'd be happy to give it to you.
12      Where does it go on the CD,
13  folder-wise?
14      THE WITNESS:  It should be under
15  Depo Folder, Warnings.
16      MR. LEVINE:  Okay.
17      THE WITNESS:  I'm actually
18  connected to your WiFi as a visitor.
19  BY MS. YEMMA:
20  Q.    All right.  Are we done?
21  A.    No, I've got a few more.
22  Q.    Okay.  Then, keep going.
23  A.    I got the transcript for Carl King in this
24  matter, the Cloud matter; the Electrolux's Answers

11

1   to the Complaint, and the Bates documents
2   EHP-Cloud 25 and 26, which were labels that were on
3   the dryer, or alleged to be on the dryer -- "claim"
4   is a better word.
5      My notes from a teleconference I had with
6   Mike Stoddard on January 14th, 2005; the report of
7   Rob Buckley; a copy of the Amended Complaint; my
8   report.
9      And then also on the CD is more of the
10  discovery information that was sent to me, including
11  the discovery responses of Electrolux, and the
12  report of Mike Stoddard.
13      And, the scene photographs, or site
14  photographs, from Crabtree; the opposing expert
15  reports of Gerry Piombino, P-I-O-M-B-I-N-O, and John
16  McHenry, and, the expert -- Electrolux Expert
17  Disclosure -- two Electrolux disclosures, Bates
18  numbers -- discovery documents Bates numbers
19  EHP-Cloud 558 through 592, which are the two
20  articles by the Morrison guys.
21  Q.    By Trey Morrison?
22  A.    I'll get their names.  Trey Morrison -- and
23  I can't remember who the other guy is --
24  McDonald/Ogle from Exponent.

12

1      Then, there's 121 DVRs, which is Electrolux
2   Bates number 76 through 557; the airflow diagram,
3   which is Bates number Electrolux 75; the Bill of
4   Materials, which is Electrolux 40 through 45.
5      As I mentioned earlier, the Electrolux
6   Disclosures -- discovery documents Bates numbers 593
7   through 5613.
8      And, then the depositions of Sergeant
9   Johnson, Michael Johnson, and then the incident
10  report from the fire department that responded.
11      And, that should be all.
12      MS. YEMMA:  Okay.  Ken, can you
13  also have printed out the notes from the
14  call with Mike Stoddard?
15      MR. LEVINE:  Sure.
16      Okay, and because I was doing
17  this -- I wasn't listening to it -- what was
18  the context of the conversation with Mike
19  Stoddard?
20      THE WITNESS:  Typically, I call
21  Mike on all these cases before I get his
22  report so I know what he found.
23      MR. LEVINE:  Did you have a
24  conversation before you prepared your

13

1   report?
2      THE WITNESS:  Yes.
3      MR. LEVINE:  All right.  Then, I
4   would be happy to give it to you.
5      MR. YEMMA:  Okay, thank you.
6      MR. LEVINE:  And, where would I
7   find it under this?
8      THE WITNESS:  It would be under
9   Depo Folder, and then it says, Mike
10  Stoddard, T-C PDF.
11      MR. LEVINE:  All right.  This one?
12  (Indicating)
13      THE WITNESS:  Yes, under Mike
14  Stoddard.
15      MR. LEVINE:  Mike Stoddard,
16  telephone call?
17      THE WITNESS:  Yes.
18      MR. LEVINE:  All right.
19      MS. YEMMA:  Thank you.
20  BY MS. YEMMA:
21  Q.    We had a conversation before we went on the
22  record this morning.  In addition to the CD, you
23  also brought your notebook, which is in a white
24  three-bound binder, and there are some documents in

**4 (Pages 10 to 13)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

**14**

1  that binder, correct, which is open in front of you?
2  A.   Yes.
3  Q.   Are there any documents in that binder, that
4  are not on the CD?
5  A.   Yes.
6  Q.   Okay.  And, if you could just identify what
7  they are for the record?
8  A.   The transcripts of Sharon Cloud, Emil Cloud,
9  and Michael Johnson, that I've highlighted.  So,
10 there's a different version on the CD.
11     And then I have a copy of the signed
12 engagement letter, that you sent yesterday, or the
13 day before.
14     A cover letter dated July 7th, 2015 from
15 Patrick Hughes just listing the information he sent
16 me on a thumb drive.
17     And then another cover letter from
18 Mr. Hughes' office on August 13th, 2005, stating
19 that he enclosed the deposition transcript of
20 Michael Johnson.
21 Q.   When you mentioned the deposition
22 transcripts, that are in your notebook, you said
23 there's a different version on the CD.
24     And, you mean by that there's a highlighted

---

**15**

1  version in your notebook, but not on the CD?
2  A.   Yes.
3  Q.   Okay.  Other than the documents that are
4  contained in your notebook, and that are on the
5  CD -- and, actually, let's mark that -- we'll mark
6  it as Vigilante-2, once you're finished with it,
7  Ken, if that's okay.
8      Are there any documents, apart from what's
9  in the notebook, and on the CD, that you relied on
10 in forming your opinions in this matter?
11 A.   Specifically, no.
12 Q.   Okay.  When you say "specifically",
13 generally, are there documents that you are relying
14 on, that aren't contained in either the CD, or the
15 notebook?
16 A.   I would say there was, generally, my
17 education, and training, and experience encompasses
18 a whole lot of different written treatises, and
19 textbooks, and training, that I relied upon that I
20 didn't specifically reference for this case.
21     And, then, of course, I've had a number of
22 Electrolux cases in the past, that I relied upon in
23 having an understanding of what the issues are, the
24 history of the issues, and so forth.

---

**16**

1      So I think that would be the two areas that
2  would fall within that area of your question.
3  Q.   When you say you've had a number of
4  Electrolux cases, can you approximate for me how
5  many Electrolux cases you've had?
6  A.   I'm going to say about 12.
7  Q.   And I know sometimes experts are the last to
8  know, but do you know whether those are all open
9  cases?
10 A.   Some are open; some are settled.
11 Q.   Can you approximate how many are open, or
12 how many are settled?
13 A.   I would say about half are opened; half are
14 closed.
15 Q.   And, how many depositions have you given in
16 Electrolux cases?
17 A.   I would say, at least, five.
18 Q.   And, all the Electrolux cases involve
19 clothes dryers?
20 A.   Yes.
21 Q.   And, are they all subrogation cases?
22 A.   Yes.
23 Q.   What insurance carriers have you been
24 retained by in those cases?

---

**17**

1  A.   I know State Farm, and Allstate.  I'm not
2  sure if there's others.
3  Q.   I'm going to mark a copy of your report.
4  So, Vigilante-2 will be the CD, with the file
5  materials, and Vigilante-3 will be a copy of your
6  report.
7      MS. YEMMA:  Ken, do you need a copy
8  of the report?
9      MR. LEVINE:  No.
10     MS. YEMMA:  And, Dr. Vigilante, do
11 you want to work off of the copy in your
12 notebook?
13     THE WITNESS:  Please.
14     MS. YEMMA:  Okay.
15     MR. LEVINE:  And, the other
16 document is on its way, as well.
17     MS. YEMMA:  And, here it is.
18     (CD with file materials marked
19 Vigilante Exhibit No. 2 for identification,
20 and retained by Ms. Yemma;
21     Dr. Vigilante's report dated
22 1/20/16 marked Vigilante Exhibit No. 3 for
23 identification.)
24 BY MS. YEMMA:

---

**5 (Pages 14 to 17)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**18**

1    Q.    Dr. Vigilante, we just marked, as
2    Vigilante-3, a copy your report in this matter.
3        And, when did you issue that report?
4    A.    January 20, 2016.
5    Q.    Have you been asked to, or are you planning
6    to, issue any supplemental reports in this matter?
7    A.    I have not been asked to, and at this point
8    I don't have an intention to write a supplemental
9    report.
10   Q.    And the report, that we have marked as
11   Vigilante-3, that's the only report you've issued in
12   this matter; is that correct?
13   A.    Yes.
14   Q.    So since writing your report, or issuing
15   your report on January 20th of 2016, have you
16   received any materials in connection with this
17   matter?
18   A.    Yes.
19   Q.    What materials have you received?
20   A.    The defense expert reports.
21   Q.    Other than defense expert reports, anything
22   else?
23   A.    Nothing else is coming to mind.
24   Q.    And, I'll represent to you Electrolux has

**19**

1    produced additional discovery in this matter
2    pursuant to a Court Order, and I can generally
3    characterize it as materials related to
4    investigations that Carl King has performed with
5    regard to dryer fires.
6        Have you seen any of those materials?  They
7    were produced in the last six weeks.
8    A.    I don't believe so.
9    Q.    Are there any documents, or materials, that
10   you reviewed in preparation for today's deposition,
11   that aren't included either in your notebook, or on
12   the CD?
13   A.    No.
14   Q.    You indicated that you have been provided
15   copies of the defense expert reports in this matter;
16   is that correct?
17   A.    Yes.
18   Q.    And, did you have an opportunity to review
19   those reports?
20   A.    Yes.
21   Q.    And, does reviewing those reports change the
22   opinions that you have expressed in your report
23   marked as Vigilante-3?
24   A.    No.

**20**

1        MS. YEMMA:  Okay.  I'm marking, as
2    Vigilante-4, a copy of your CV.
3        Ken, do you need a copy?
4        MR. LEVINE:  No, I don't need a
5    copy unless I demand one.
6        MS. YEMMA:  Oh, okay.
7        MR. LEVINE:  You're doing great
8    over there.  I don't want to get in the way.
9        MS. YEMMA:  Okay.
10       (Dr. Vigilante's Curriculum Vitae
11   dated 11/1/15 marked Vigilante Exhibit No. 4
12   for identification.)
13   BY MS. YEMMA:
14   Q.    Dr. Vigilante, I've just handed you a
15   document that I've marked as Vigilante-4.
16       Is that is a copy of your CV?
17   A.    It is a copy.
18   Q.    And, is that a current copy?
19   A.    It is not.
20   Q.    It is not.  Okay.
21       Do you have a current copy with you?
22   A.    Yes.
23   Q.    And, maybe I can short circuit some
24   questioning.

**21**

1        Can you identify what the difference would
2    be between Vigilante-4, and what your current CV is?
3    A.    Specifically I cannot without going through
4    it, but generally I think I just made some editing
5    changes.
6    Q.    Okay.  So, if we could have a copy of that,
7    and --
8        MR. LEVINE:  Where is your most
9    current CV?
10       THE WITNESS:  It's on the CD, too,
11   under Administration.
12       MR. LEVINE:  Clearly, my highest
13   and best use has been found.  It's under
14   Administration under --
15       THE WITNESS:  It's under Depo
16   Folder, Administration, CV.
17       MR. LEVINE:  Okay.  And, this is
18   the most recent version, Dr. Vigilante?
19       THE WITNESS:  Yes.  It's got a July
20   date on the bottom.
21       MR. LEVINE:  Okay, fair enough.
22       So, we will have it copied, and it
23   will be here shortly.
24       MS. YEMMA:  Okay, great.  Thank

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

22

1      you.
2  BY MS. YEMMA:
3      Q.    Dr. Vigilante, I last deposed you in, what
4  we will refer to as the Vitale matter -- you're
5  familiar with that case?
6      A.    Yes.
7      Q.    Okay.  And, that would have been on
8  April 26th of 2016.
9      A.    Yes.
10     Q.    Have you had any depositions since that
11 date?
12     A.    In Electrolux matters, or --
13     Q.    In general.
14     A.    Yes.
15     Q.    Okay.  Do you have an updated copy of your
16 testimony history?
17     A.    Yes.
18           MS. YEMMA:  And, can you copy that,
19     too, Ken.  I won't bother marking what I
20     have because that's the older version.
21           MR. LEVINE:  Where can I find that,
22     sir, where your testimony was as of
23     August 17th?
24           THE WITNESS:  Yes.

---

23

1            MR. LEVINE:  All right.
2            MS. YEMMA:  Okay.  And, we'll come
3      back to that.
4  BY MS. YEMMA:
5      Q.    Dr. Vigilante, you still have your own
6  company, Vigilante Forensic?
7      A.    Yes.
8      Q.    Any employees?
9      A.    Not yet.
10     Q.    Okay.  Working on it?
11     A.    Working on it.
12     Q.    Okay.  With regard to this matter, have you
13 had an opportunity to examine the Cloud dryer?
14     A.    No.
15     Q.    Have you seen any photographs of the dryer?
16     A.    I believe so, yes.
17     Q.    Have you asked to see the Cloud dryer in
18 person?
19     A.    In person, no.
20     Q.    Any reason why not?
21     A.    It's not necessary.
22     Q.    Why isn't it necessary?
23     A.    For the information I need, the photographs
24 of the incident dryer post fire, and then

---

24

1  photographs of Exemplar dryers, and the material
2  provided with the dryer, the manuals, et cetera,
3  were sufficient.
4      Q.    Okay.  So in terms of, you mentioned,
5  Exemplar dryers.  Have you seen photographs of
6  Exemplar Electrolux dryers?
7      A.    I have seen photographs, and I have seen
8  them in person.
9      Q.    Okay.  So, what photographs have you seen?
10     A.    Hold on a minute.  I didn't produce those in
11 the files, so I have to go back into my own file.
12           MR. LEVINE:  Sir, are you saying
13     it's on the disk, or not on the disk?
14           THE WITNESS:  Not on the disk.  I
15     didn't use it for this case.
16           MR. LEVINE:  Oh, okay.
17           Off the record.
18           (Discussion held off the record.)
19           THE WITNESS:  I can't seem to find
20     my folder of Exemplar Electrolux,
21     Frigidaire, and Kenmore dryers, that I have
22     collected over the years.
23 BY MS. YEMMA:
24     Q.    How have you collected those materials?

---

25

1      A.    Various cases that I have been involved
2  with.  Sometimes Mike Stoddard has them in stock,
3  and he sends me pictures of them, when I want them.
4  Sometimes I pull them off the web.  I think that's
5  the three main ways.
6      Q.    Do you have an understanding where the
7  labels, the on-product labels, were located on the
8  Clouds' dryer prefire?
9      A.    Generally, yes.
10     Q.    Okay.  And, what's your general
11 understanding?
12     A.    There was a label on the inside door frame.
13 I don't know what you want to call that one, but
14 it's a -- kind of a tall skinny one.
15           And then there was a label on the back of
16 the dryer adjacent to the -- this one was a gas
17 dryer, so it's typically in the middle -- kind of
18 middle center of the back of the dryer on a gas
19 dryer.
20           There is also, typically, a model serial
21 number label that is, again, on the inside door
22 frame.
23           And, then there's sometimes a mobile home
24 warning, that's on the inside frame, but I'm not

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

**26**

1  listing that in this report.  So, it may not have
2  been on this particular model.
3  Q.     So, we have the label inside the door frame?
4  A.     Two labels inside the door frame.
5  Q.     Two labels inside the door frame.
6  A.     Maybe, a third.
7  Q.     Maybe, a third.  So, there would be the one
8  that's long and skinny?
9  A.     That's the warning label.
10  Q.     And, then we have the model and serial
11  number, we'll call it, plate.
12  A.     Sometimes it's a plate; sometimes it's a
13  label.  I've got it noted in my report as a label.
14  Q.     Okay.  I'll use your word.  So, the model
15  and serial number label.
16       And, then what would be the third?
17  A.     The third one is, at times there's a
18  statement regarding installation in mobile homes.
19  But, it's not always listed as a -- see, the problem
20  is that the labels are destroyed in the fire quite
21  often, so we know what's generally on there.  But
22  then Electrolux produces what they say was on there,
23  and sometimes they produce the mobile home label,
24  and sometimes they don't.  So, I don't know if it's

**27**

1  an issue with the litigation process, or if it's
2  something that they don't put on all the dryers.
3  But it wasn't produced in this case, that I'm aware
4  of.
5  Q.     Okay.  Have you seen a color -- I'll refer
6  to it as a color version of the label inside the
7  door frame?
8  A.     That's kind of a trick question.  So, I have
9  seen colored versions of it, and I have seen
10  black-and-white versions of it.  And, again,
11  Electrolux has used, over the years, different
12  versions of that label.
13       I've got it noted in my report that the
14  majority of the label was printed in black text on a
15  white background.  However, there were signal words
16  "warning" in French and Spanish, along with the
17  words "do not" were printed in white text on a black
18  background.  And, then there is an 800 number also
19  provided in white text on a black background.
20       So it's my understanding the label, that was
21  on this dryer, did not have any color other than
22  black and white.
23  Q.     Okay.  And how about the label on the back
24  of the dryer, did that have any color, if you know?

**28**

1  A.     To my understanding, that one was also black
2  and white.
3  Q.     And with regard to both labels, where did
4  your understanding that they were black and white
5  come from?  Is that from seeing the unburned
6  Exemplar dryers?
7  A.     Well, they were off the -- I'm sorry.  It
8  would have been through the Electrolux information
9  produced in discovery, and my conversations with
10  Mike Stoddard regarding the timeframe of when the
11  dryers were manufactured.
12  Q.     And, what's your understanding of when the
13  Clouds' dryer was manufactured?
14  A.     June, 2003.
15  Q.     Okay.  Dr. Vigilante, have you written any
16  articles, or published any work, regarding warnings
17  on clothes dryers?
18  A.     Not specifically to clothes dryers.
19  Q.     Generally as to clothes dryers?
20  A.     Well, I have done a number of research
21  studies, and published that data, in respect to how
22  to present warnings, and the factors that affect the
23  adequacy of product warnings, which would be
24  applicable to clothes dryers, but nothing specific

**29**

1  for clothes dryers.
2  Q.     Okay.  Is that listed on your CV?
3  A.     Yes.
4            MS. YEMMA:  Okay.  So I will mark
5       this as Vigilante-5.
6            (Current CV dated 7/18/16 marked
7       Vigilante Exhibit No. 5 for identification.)
8  BY MS. YEMMA:
9  Q.     And, you have a copy in front of you; right?
10  A.     Yes, Ma'am.
11  Q.     So if you could point out the articles you
12  were just referencing, I would appreciate it.
13  A.     Sure.  Starting on Page 5, the second
14  article, the third article, the fourth article, and
15  the fifth article, would be generally related to the
16  topic of presenting more information for dryers.
17  Q.     Are those articles, 2 through 5, are they
18  pubically available?
19  A.     Yes.
20  Q.     I can search them on Google?
21  A.     Yes.
22  Q.     Okay.  Any other articles on your CV?
23  A.     On Page 6.
24  Q.     Okay.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

30

1  A.    Starting from Vigilante 1998, Vigilante
2  1997 -- I think those are the two on Page 6.
3       There's two other articles on Page 6, but I
4  just can't remember what they were.  They dealt with
5  hazard perceptions of consumer products.  They may
6  be related, but I just can't remember what's in
7  those articles at this moment.
8  Q.    Okay.
9  A.    Page 7, Vigilante/Wogalter, '99;
10 Vigilante/Wogalter, '98; Vigilante/Wogalter, '97;
11 Vigilante/Wogalter, '96.
12 Q.    They're two articles 1997.
13 A.    I'm sorry.
14 Q.    Is it both of those?
15 A.    Yes.
16 Q.    Okay.  And --
17 A.    No.  I'm sorry, the first one.
18 Q.    Okay.
19 A.    On the Prioritization of Safety Warnings in
20 Product Manuals.
21      Vigilante/Wogalter, '96, again the ordering
22 of safety warnings in product manuals; Wogalter,
23 Conzola and Vigilante both 2006, and 1999.
24      Page 8, all of the publications and

---

31

1  presentations listed on the top of Page 8 prior to
2  the Technical Reports.
3  Q.    On Page 7, the article that's called "On the
4  Prioritization of Safety Warnings in Product
5  Manuals," and I guess there are two parts.  There's
6  also one in 1996 that has a similar title, "The of
7  Safety Warnings in Product Manuals," do see that?
8  A.    Yes.
9  Q.    Can you sum up in a nutshell what those
10 articles say?
11 A.    Yes.  I did a string of studies related to
12 presenting safety information and warnings in
13 product manuals.  And, basically, what the studies
14 find is that the manner in which you present
15 critical safety information will affect the
16 likelihood and chance that a user, a product user,
17 will see it, rate it, and then have a chance to
18 comply with it.
19      So one of the recommendations was that you
20 need to put the most important, and least likely to
21 be of known information, that is not open and
22 obvious, first in your presentation of safety
23 warnings.  Otherwise, you run the risk of readers --
24 users reading being presented with open and obvious

---

32

1  information that they already know, and then
2  dismissing the rest of the list.
3       So, this happens a lot with products that
4  fall under some standard, like a UL standard, or an
5  ANSI standard, where there's a list of warnings that
6  are required for all products that meet that
7  standard.
8       What generally happens is the agencies, that
9  built that list through the years, and it always
10 starts off, particularly with electrical products,
11 "Do Not Get Wet", "Don't Expose to Water", and
12 things of that nature.  And, what the manufacturer
13 ends up doing is putting that list in there in the
14 manner in which the standards body presented it, and
15 then putting their unique, unknown hazards later in
16 the list.
17      So, of course, when a user gets it, and they
18 start seeing stuff that's open and obvious, they
19 just dismiss the rest of the list, and never get to
20 those unique and non open and obvious hazards.
21 Q.    In conjunction with those articles, did you
22 do any testing?
23 A.    They were based upon running subjects
24 through an experiment.

---

33

1  Q.    So when you say "running subjects through an
2  experiment," we're talking about live people; right?
3  A.    Yes.
4  Q.    Okay.  And, can you explain the experiment?
5  A.    There are multiple experiments that were
6  done.  Some of them looked at having the subjects --
7  if I remember correctly, we provided individual
8  statements from product manuals.  We had them rank
9  them by obviousness, rank them by hazardous, and
10 then rank them by preferred way of being presented
11 with the information.
12      And, then we compared it to what the -- the
13 preferred way of ranking it to what the
14 manufacturers had done.
15      And then later studies, the experiments were
16 set up where we took the manuals for the products,
17 and manipulated the way in which the warning lists
18 at the front of the manuals were presented, and
19 looked at the amount of time that people spent
20 reading the manuals, and the warnings, the amount of
21 information they were able to recall, and recognize,
22 from the manual, and then self-reported behavior, I
23 believe, of how much of the warnings, and
24 information, they read.

---

**9 (Pages 30 to 33)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

34

1  Q.    What type of product, or products, are
2  involved in those studies?
3  A.    They were mostly power tools.
4  Q.    And, were you directly involved in
5  conducting the studies?
6  A.    Yes.
7  Q.    And, were you working with others in
8  carrying out the studies, or working by yourself?
9  A.    I had help.
10 Q.    Okay.  Is this when you were in graduate
11 school, that timeframe?
12 A.    Yes.
13 Q.    What conclusions, if any, did you draw after
14 conducting those studies with regard to the
15 Prioritization of Warnings in Owner's Manuals?
16 A.    Again, you need to present the important non
17 open, and obvious, hazards first.  If you present
18 product users with well-known, or open and obvious
19 hazards in your list of warnings, they're going to
20 stop reading them, and they'll never get to the
21 unique non open and obvious hazards associated with
22 the product.
23 Q.    So with regard to power tools, what would be
24 an example of a not open and obvious hazard, if you

---

35

1  remember?  I know we're going back.
2  A.    I can't think of anything offhand.  There
3  might be, for example, a potential for a spark,
4  maybe.  But a non open and obvious is easier.  It's
5  something like, don't use in -- don't expose to
6  water, or something like that.  But, I don't recall
7  exactly what the non open and obvious ones were.
8  Q.    So the studies that you performed, it seems
9  like they were focused solely on the information
10 contained in the manual as opposed to on-product
11 labels; is that correct?
12 A.    For that series of studies, it was.
13 Q.    Okay.  Have you conducted any studies having
14 to do with the adequacy of on-product labels?
15 A.    Yes.
16 Q.    Okay.  And, what studies have you performed?
17 A.    In graduate school, I've done studies on the
18 factors that affect readability, reading
19 comprehension, likelihood of seeing the information.
20       When I was with IBM, I looked at, again,
21 adequacy of on-product warning labels, and how to be
22 sure that I was providing a warning that would grab
23 people's attention, and would get them to change
24 their behavior towards the direction I wanted them

---

36

1  to go.
2  Q.    Was that, in Vitale, we talked about the
3  IdeaScan?
4  A.    Yes.  That would be an example.
5  Q.    Okay, an example.
6        Were there other products at IBM that you
7  worked on with regard to the adequacy of on-product
8  warnings?
9  A.    Yes.
10 Q.    Okay.  What were some other examples?
11 A.    I think we also, maybe -- I don't remember
12 what else we talked about in Vitale, but the
13 scanners.  I did work on warnings for keyboards;
14 warnings for computer monitors; warnings for tape
15 drives, for wireless PCM cards; warnings for our
16 storage systems.
17       I did work on the QuickStart guides for
18 computers, and a bunch of the peripherals that are
19 attached to computers, like input devices, mice
20 keyboards, monitors, cameras, things like that.
21       I don't recall anymore at the moment.
22 They're the ones that are easily popping into my
23 mind.
24 Q.    So with regard to products at IBM, did any

---

37

1  of them involve a risk of fire?
2  A.    Most of them were risk -- no, I don't
3  believe any of them were risk of fire.
4  Q.    Okay.  Let's go back to when you were in
5  grad school, and you talked about doing studies with
6  regard to on-product warnings.
7        Were there any articles published as a
8  result of that research?
9  A.    Yes.
10 Q.    Okay.  Can you point me to those in your CV?
11 A.    Sure.  We went through a bunch of it
12 earlier.
13       On Page 5, the first is Joyce, 1999.  On
14 Page 6, -- none on Page 6 were on-product warnings
15 in graduate school.  There is one dealing with
16 on-product warnings, but it was done last year.
17 Q.    Which one is that?
18 A.    The Nemire and Vigilante.
19 Q.    The one at the top, okay.  That would be
20 2015.
21 A.    Page 7, Vigilante/Wogalter, '99;
22 Vigilante/Wogalter, '98; Vigilante/Wogalter, '97,
23 The Preferred Order of Over-the-Counter
24 Pharmaceutical Label Components.  The next one,

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

38

1  Vigilante/Wogalter, '96 is related to that set of
2  studies.
3       1999, Vigilante, Conzola, and Vigilante was
4  in grad school.  And, 2006 was a continuation of
5  that work in 2006 after graduate school.
6  Q.      So the one in 1999, "Applying Usability
7  Engineering Principles", the last one on the page --
8  A.      Yes.
9  Q.      -- that one is related to 2006, Chapter 38?
10  A.      Yes.  The '99 was a result of a -- it was
11  one of my preliminary examination questions from one
12  of my committee members.  And after I put it
13  together, my advisor asked me to publish it.  So, we
14  submitted it for publication to ANSI Z535 as an
15  addendum to the Z535.4 standard.  It was not
16  accepted in the form.  So I went, and with the help
17  of Mr. Conzola, presented it, and published it, at
18  the Human Factor and Ergonomics Annual Meeting.  And
19  then for the 2006 textbook chapter, we just expanded
20  upon the original work that was published in '99.
21  Q.      So, in conjunction with that work, were you
22  looking at specific products?
23  A.      There was guidelines for designing warnings
24  for all different types of products, consumer and

39

1  commercial.
2  Q.      General, not specific to any product?
3  A.      Correct.
4  Q.      Okay.
5  A.      They're techniques and tools that are
6  applicable to all warnings.
7  Q.      Anything on Page 8 with regard to on-product
8  warnings?
9  A.      On Page 8, the top one was associated with
10  the ANSI headers.  So, like, warning, danger,
11  caution.  But, it wasn't specific to on-product.  It
12  could be on-product, or it could be solely a safety
13  sign, as well.
14       2006 was not during grad school.  2003 was
15  after grad school.  2001 was finishing grad school.
16  So, they were all related to -- the 2003 and 2001
17  were related to formatting label information to
18  facilitate knowledge acquisition and readability by
19  both younger and older adults.
20  Q.      Okay.  What type of products were involved
21  in that article?
22  A.      In that study, they were over-the-counter
23  medication labels.
24  Q.      It looks like a lot of the articles have to

40

1  do with over-the-counter medications.
2  A.      The three main lines of research I was
3  responsible for were the product manuals, and the
4  ordering of information product manuals; the
5  formatting of warning labels for over-the-counter
6  medications, and then the presentation of risk and
7  benefit information websites for direct consumer
8  advertisements of prescription pharmaceuticals.
9       So, that's why there's a lot of articles
10  related to those topics.
11  Q.      So with regard to the second category of
12  formatting the labels for the over-the-counter
13  medication, are we talking about, like, what's
14  directly on the bottle, or what's on the packaging,
15  or both?
16  A.      So the studies involve -- when they were
17  products, actual products used, the studies involved
18  the bottles.
19       Some of the studies, I believe, were more
20  mockup, paper/pencil mockup of labels, so there
21  wasn't an actual container involved.
22       But when a physical container or product was
23  involved, it was the actual product.
24  Q.      Okay.  And, what type of studies did you

41

1  perform with regard to the on-product labels for
2  over-the-counter medications?
3  A.      There were multiple over the years.  They
4  looked at presentation of information on the product
5  labels, preferred presentation of information.  And,
6  the results were very similar to the work on the
7  product manuals where people were looking for stuff
8  that they didn't know, and stuff related to usage
9  that they didn't know, to be given higher priority,
10  and how it's presented on the product than
11  information that was not relevant to them, or stuff
12  that they didn't care about, or already knew.
13       Two, the other big line of that research was
14  how to present information on the labels to make
15  sure people are able to notice it's there, be able
16  to facilitate reading.  So, particularly with
17  elderly, or older users, smaller prints create big
18  problems.  The use of wide spacing, and bulleted
19  lists, again facilitates reading.  And anytime you
20  can facilitate reading of a product label, product
21  warning label, you are going to increase the number
22  of people that actually read the entire label.
23       So if you do not provide those facilitation
24  techniques, people either ignore, or they stop

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

42

1  reading the label, or they can't read the label.
2  Q.      How did you go about evaluating that?  I
3  mean, there are people involved in the study;
4  correct?
5  A.      Most of them were experiments that involved
6  live subjects.
7  Q.      Okay.  If we can imagine a bottle of
8  medication, there is less real estate, for lack of a
9  better description, than on a power tool, for
10  example.  Do you agree?
11  A.      Well, yes.  Typically, the medication
12  product containers vary in size.  So, there's
13  small -- as the Advil container -- travel size, up
14  to, maybe, a gallon jug, depending upon what it is.
15  So one of the things that we looked at and then
16  recommended based upon the study was to use, what
17  are called, pullout labels now.  And, it's not
18  really relevant to something as large as a dryer
19  where you have a lot of label space.  But if we're
20  looking at smaller containers, whether they be
21  medications, or chemicals, that you find at Home
22  Depot, or Lowe's, places like that, if you use a
23  pullout label, you can greatly expand the amount of
24  real estate you have to present the information, and

---

43

1  present it, and format it, in a way that will
2  facilitate reading, and knowledge acquisition, and
3  compliance.
4  Q.      The pullout label, is it in any way attached
5  to the bottle?
6  A.      Yes.
7  Q.      How is it attached?
8  A.      The ones that we were using, it was as easy
9  as taking a sheet of paper, folding it, and
10  laminating, and then putting a little bit of
11  tacky glue on the corner to keep it closed.
12      Manufacturers now have more, I've seen both
13  prescription, and not prescription, medication and,
14  again, products sold at Home Depot and Lowe's,
15  whether they're paints, chemicals, stains, glues,
16  adhesives, what have you, where they're more of,
17  like, an accordion style where, again, they're
18  initially, with a little bit of glue, glued closed,
19  and then the user just -- there's usually an
20  indicator that says "pull here," or "expand label
21  here," or what have you, a direction where to pull,
22  and then you pull the label out, and it'll accordion
23  out.
24      Typically, when they are using the accordion

---

44

1  labels like that, it's because they're presenting
2  both the information in better format, but it's also
3  because they're also providing it in Spanish and
4  English -- or Spanish and French -- so, multiple
5  languages.  So, the pullout gives them greater real
6  estate to present the information in three, or
7  multiple languages.
8  Q.      So if there's a pullout label, would there
9  still be instructions, or warnings, on the actual
10  bottle?
11  A.      It is the bottle.  So, it's a label is
12  attached to the bottle.
13  Q.      I'm sorry, I misunderstood.  So the label
14  would encompass the whole bottle, but there would
15  also be, I guess, a pullout section?
16  A.      Typically, the way it's used is there is a
17  label on the front, a branding label, marketing
18  label, with some warning information.  And then the
19  back label, that's affixed to the container, will
20  pull out from the back of the container.  But, the
21  last page of the pullout is glued to, or adhered to,
22  the container.  So it just accordions out from the
23  container.  And then when you're with it, you can
24  put it back in, and reattach it.

---

45

1  Q.      Can you tear off the pullout label?
2  A.      Sure, you can, yes.
3  Q.      Again, if you tore off the label, there are
4  no warnings that are left on the bottle; is that
5  correct?
6  A.      Whatever is on the front, and then whatever
7  is on the back page that is still stuck to the
8  label.
9      But if you tear off the label, it would be
10  missing.
11  Q.      Okay.  Are there any studies that you
12  participate in, or articles that you published, that
13  have to do with on-product warnings, not on
14  over-the-counter medication, either in grad school,
15  or after?
16  A.      Yes.
17  Q.      Okay.  And, what would those be?
18  A.      I can do it chronologically.  In grad
19  school, we looked at on-product warnings for such
20  things as car seats, file cabinets, keyboards,
21  battery jumper cables.  Those are ones that are
22  popping to mind from grad school.
23      At IBM, we went through those earlier.  They
24  ran the gamut from scanners to wireless PC cards,

---

**12 (Pages 42 to 45)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

46

1    tape drives, the monitors, the keyboards, the mice,
2    tape drives to storage systems.
3    Q.    And then after IBM, anything?
4    A.    After IBM, I haven't done -- after IBM, the
5    studies I've done have been more heuristic testing,
6    more hallway testing, on-product labels.
7          So I have been retained on behalf of several
8    manufacturers to look at, and assess, and provide,
9    recommendations to either their on-product
10   labelling, or their accompanying literature.
11   Q.    Can you list those companies for me?
12   A.    I did a railing, a decorative railing, for a
13   company that was -- I don't remember the name of the
14   company, but they were sold at Home Depot.  And, I
15   got involved with it as a forensic case.
16         And then after the forensic case, the
17   manufacturer asked me for recommendations on redoing
18   their literature.
19   Q.    Were you retained by the manufacturer in --
20   A.    In that case?
21   Q.    Right.
22   A.    Yes.
23   Q.    Okay.
24   A.    I did a horse training bridle for a company

47

1    a number of years ago.  I did warnings for a
2    trailer-based tree chipper machine.  I did the
3    packaging warnings for a kitty litter product.  I
4    did warnings for a snow removal device, that's
5    attached to a forklift, for removing snow from the
6    top of tractor-trailers.
7          I assessed warnings for an amusement ride
8    involving UTV's.  I did warnings for a shooting
9    target.
10   Q.    I think we talked about that in Vitale, the
11   target, a reusable target?
12   A.    Yes, reusable target.
13   Q.    Anything else, that you can think of?
14   A.    Nothing else is coming to mind at the
15   moment.
16   Q.    So the list that you just gave me, starting
17   with the decorative railing through the reusable
18   target, are these all situations where you have been
19   retained by a product manufacturer?
20   A.    Yes.
21   Q.    Now, I know you mentioned the decorative
22   railing initially started with in conjunction with
23   litigation.
24   A.    Yes.

48

1    Q.    What about with regard to the others, did
2    they have anything to do with litigation, or outside
3    of litigation, if you can recall?
4    A.    The only one I recall is the shooting
5    target.  I got that as a referral from a client that
6    I did work for on a personal injury case.
7          And the guy, who developed the reusable
8    target system, was a friend of his, maybe a
9    friend-client, and that's how I got referred to that
10   case.
11   Q.    But the reusable target wasn't at issue in a
12   lawsuit?
13   A.    No.
14   Q.    Okay.  So when you were retained by the
15   manufacturers, what were you asked to do, in
16   general?
17   A.    Generally is assess the warnings for
18   products, give recommendations on how to improve
19   them, point out where their shortcomings were.
20   Q.    So, these were all products that had
21   on-product warnings?
22   A.    Had them, or were going to have.
23         The decorative railing, it was the company
24   material.  The railing, itself, didn't have any

49

1    warnings.
2          And, then the training bridle for the horse
3    was also the company literature; it, itself, didn't
4    have any on-product warnings.
5    Q.    Okay.  Let's talk about the railing.
6          So, you said that it did not have any
7    on-product warnings?
8    A.    Not that I recall.
9    Q.    And the lawsuit, that you were initially
10   involved in, did that involve an injury to someone,
11   if you recall?
12   A.    I don't recall, but I imagine it did.
13   Q.    Do you remember how the person was injured
14   with regard to the railing, or allegedly injured?
15   A.    Yes.  They used the railing as a support
16   structure, and it was intended for a decorative, non
17   elevated use.  So if you go out to a balcony at a
18   hotel, let's say, and there's a railing in front of
19   you, it should be designed for load bearing to use
20   as a guard to keep people from falling off the
21   elevation.
22         The railing -- part of the problem with the
23   railing was that it looked like a railing, it looked
24   like a railing you put up on a porch, or a balcony,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

50

1  but it wasn't designed to be load bearing.  So if
2  there was any pressure put against it, it would
3  fail.  And I think what happened in the case is that
4  somebody bought it, and used it in an elevated
5  position as a barrier, and it failed.
6  Q.      And the work you did after the litigation,
7  did you recommend that an on-product label be added
8  to the decorative railing?
9  A.      I don't recall.
10  Q.      Okay.  How about the training bridle, that
11  product did not have an on-product warning at the
12  beginning of your retention?
13  A.      It didn't.
14  Q.      Okay.  And, what were you asked to do by the
15  manufacturer with regard to that product?
16  A.      They were in the process of designing, and
17  developing, the product.  It was the first of its
18  kind.  So they asked me to come in, and look at the
19  material that they were planning on providing with
20  it, both with the -- I can't remember exactly how it
21  was sold, but it was sold in a container, a
22  packaging.  I don't remember exactly if it was
23  rigid, or nonrigid, but there were instructions that
24  went with the package.

51

1          And then there was marketing material that
2  they were looking at, how they were going to market
3  it.  And, they asked me to look at both the
4  instructions and warnings in the literature that was
5  provided with the product, and also the marketing
6  information.
7  Q.      So with regard to the items that you looked
8  at, the instructions, and warnings, and the
9  marketing material, did you make any recommendation,
10  or any changes, with regard to those materials?
11  A.      I did.
12  Q.      And, were they accepted by the manufacturer?
13  A.      As far as I know.
14  Q.      Okay.  Do you know if the products were in
15  use?
16  A.      I do not.
17  Q.      Okay.  And, what were your recommendations?
18  A.      I don't remember specifically.  I can tell
19  with the --
20  Q.      Generally is fine.
21  A.      -- with the marketing stuff, they were
22  making -- they were making claims that weren't
23  realistic.  And, so, I had concerns that they would
24  be setting people up for misperceiving the hazard

52

1  associated with the product, and the simplicity of
2  the product.
3  Q.      How did you reach that conclusion with
4  regard to marketing materials?
5  A.      Specifically, I don't recall.  Generally, it
6  would be in conjunction with having an understanding
7  of how the product was used, who was going to use
8  the product, who it was intended to be used by,
9  where it was intended to be used by.  And, then
10  looking at what the intentions of the product
11  designer and seller were to the way they were
12  marketing the product.
13          So, the product was intended for use by
14  experienced trainers.  But the way they marketed the
15  product, it gave the impression that it could be
16  used by inexperienced people.  And if it's a product
17  that is meant for folks having a certain level of
18  training and experience, you can't market it as
19  something that anybody can go and pick up and train
20  a horse with.
21  Q.      Did you conduct any studies with the last
22  subject in conjunction with your retention by the
23  product manufacturer?
24  A.      If I did any, it would have been hallway

53

1  testing at Robson.
2  Q.      How do you define hallway testing?
3  A.      Basically, taking the information you're
4  assessing, either existing, or your proposed
5  changes, and running by colleagues that are
6  accessible in the next office, down the hallway, and
7  so forth.
8  Q.      In your profession, is that an acceptable
9  method of evaluating a warning, the adequacy of a
10  warning?
11  A.      Sure.  It's a tool.
12  Q.      What other tools are available to assess
13  adequacy of a warning?
14  A.      There's heuristic testing, which is
15  essentially a review of the material by a person
16  trained in the subject matter.  So if it's a
17  warnings issue, someone who's got a warnings
18  background that train in the issues related to
19  warnings.
20          There's comparison with standards, and the
21  guidelines and literature that are out there related
22  to warnings, if it's a warning, and the product at
23  issue.
24          There's hallway testing.  There's paper and

14 (Pages 50 to 53)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

54

1  pencil, or mockup testing, where you're creating
2  mockups with basically a sheet of paper with some
3  thoughts and drawings on it.
4      There is more formal experimentation with
5  live subjects, as in usability testing, where you're
6  bringing folks into a usability lab, or a lab, and
7  presenting them with a product and/or warnings.
8      There's focus group assessments that can be
9  done.  There's competitive evaluation where you're
10 evaluating your product, or your warning, against
11 those provided by competitors.
12     There's benchmark evaluation where you set a
13 set of requirements at the start of development, and
14 then at the end of development determine whether or
15 not you've met those requirements.
16     So, there's multiple different ways to go
17 about assessing both product design, and warnings.
18 Q.    Do you have a favorite?
19 A.    It just depends on what's applicable to the
20 situation.
21 Q.    How do you decide that?
22 A.    It's decided based upon the material that's
23 being assessed.  It's probably based upon timeframe.
24 It could be based upon resources.  There's multiple

55

1  things that can come into play.
2  Q.    Are there advantages, and disadvantages, of
3  each method?
4  A.    Sure.
5  Q.    Okay.  So with regard to the horse -- am I
6  calling the right -- horse training bridle?  That's
7  what I wrote down.
8  A.    Yes.
9  Q.    Okay.  The horse training bridle, you chose
10 to do the hallway testing; is that right?
11 A.    I may have if I did a live testing, a live
12 person testing.
13     MR. LEVINE:  Yes, not live horses.
14     THE WITNESS:  No.
15     MR. LEVINE:  Please, be specific.
16     MS. YEMMA:  That's very important,
17 yes.
18 BY MS. YEMMA:
19 Q.    And if you had chosen to do the hallway
20 testing, because I know you're not sure, do you know
21 why you would have chosen to do that over one of the
22 other methods you just listed for me?
23 A.    Convenience is often a reason to use them.
24 So, that might have come into play.

56

1  Q.    Okay.  With regard to any of the other
2  products that we talked about, did you use any
3  usability testing?
4  A.    Not for the ones that we just went through.
5  Q.    Have you used usability testing to assess
6  the adequacy of on-product labels?
7  A.    Sure.
8  Q.    When have you used usability testing?
9  A.    When I was with IBM.
10 Q.    Okay.
11     MR. LEVINE:  Since you paused for a
12 second, it is 11:35, and I have a lunch menu
13 here.
14     MS. YEMMA:  Sure.  We can take a
15 few-minutes break.
16     (Short recess.)
17     MS. YEMMA:  Dr. Vigilante, before
18 we go any further, I'm going to mark your
19 current testimony list as Vigilante-6.  And,
20 that's dated August 17th, 2016.
21     And, I will show it to you.
22     (Dr. Vigilante's current testimony
23 list dated 8/17/16 marked Vigilante Exhibit
24 No. 6 for identification.)

57

1  BY MS. YEMMA:
2  Q.    Is that your current testimony list.
3  A.    It is not.
4  Q.    It is not?
5      MR. LEVINE:  The one I printed up
6  was not?
7      THE WITNESS:  Oh, sorry.  There was
8  one more deposition I added.  And, you know
9  what I did -- I know what I did.  Here you
10 go.  It is this page.  So, there's a page 7
11 of 7.
12     MS. YEMMA:  Yes, I think it's
13 missing a page because it's 6 of 7.  So, is
14 it just missing the last page?
15     THE WITNESS:  I think so, yes.
16     MS. YEMMA:  Okay.  So we just need
17 to copy that page, and attach it to the
18 exhibit.  So, let's do that.
19     THE WITNESS:  Now, the electronic
20 copy you have, I think only has 6 pages of
21 text.
22     MS. YEMMA:  Even though it says 6
23 of 7?
24     THE WITNESS:  Yes.  There might

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

58

1   have been, like, a -- I mean, the page
2   number is put on there automatically so I
3   think there was, like, an extra space
4   because my PDF has 6 of 7, too.
5        So, I don't know what happened.  I
6   think it's just a formatting issue.
7        MS. YEMMA:  Okay.  Ken, would you
8   be so kind to copy that last page for us?
9        MR. LEVINE:  Sure.
10       THE WITNESS:  Sorry about that.
11       MS. YEMMA:  That's okay.
12       MR. LEVINE:  You can keep going.
13       MS. YEMMA:  Okay.
14  BY MS. YEMMA:
15  Q.    Dr. Vigilante, so for the record, we have
16  marked as Vigilante-6 the last four years of your
17  testimony; is that correct?
18  A.    With the addition of Page 7, yes.
19  Q.    Right.  So when Mr. Levine gets back with
20  that Page 7, we will have a complete copy; is that
21  correct?
22  A.    Yes.
23  Q.    Okay.  So, I deposed you in April of 2016 in
24  the Vitale case.  It looks like there were six times

59

1   you gave testimony since then; is that correct?
2   A.    Yes.
3   Q.    Okay.  Did any of those cases involve
4   clothes dryers?
5   A.    No.
6   Q.    Were you retained by the plaintiffs in all
7   those cases?
8   A.    No.
9   Q.    In which cases were you retained by the
10  defendant?
11  A.    The last one on Page 6.
12  Q.    And, that's Timothy Brugger versus Board of
13  County Road of Commissioners?
14  A.    Yes.
15  Q.    Okay.  And, what did that case involve, if
16  you know, or remember?
17  A.    That one involved a single vehicle
18  motorcycle crash on a rough road at night somewhere
19  in the state of Michigan.
20  Q.    And, what was the product at issue, a
21  motorcycle?
22  A.    The roadway.  It wasn't really a products
23  case.  It was a crash case, and there was issue
24  related to warnings for the condition of the road.

60

1   But, it was a roadway case.
2   Q.    Other than the cases that have involved
3   Electrolux dryers, have you ever given testimony,
4   whether in deposition, or at trial, in a case
5   involving a clothes dryer?
6   A.    Yes.
7   Q.    And, are those cases on your testimony list?
8   A.    No.
9   Q.    Do you remember the names of any of those
10  cases?
11  A.    No.  I know -- yes and no.  One of the
12  cases, I think it was either a Maytag, or a
13  Whirlpool, I think, and it involved spontaneous
14  combustion.
15  Q.    And, who were you retained by in that case,
16  if you recall?
17  A.    I wasn't working for a manufacturer, so I
18  don't recall if it was the property owner,
19  subrogation company, another defendant.
20  Q.    Okay.  So it could have been a codefendant?
21  A.    It might have been.
22  Q.    Okay.  But, it wasn't the product
23  manufacturer?
24  A.    That's correct.

61

1   Q.    Okay.  So was that the only time you have
2   been retained, other than in an Electrolux case, in
3   a case involving clothes dryers?
4   A.    That I gave testimony in?
5   Q.    Yes, I'm sorry, that you have given
6   testimony in?
7   A.    I believe so.
8   Q.    And, I don't think I have asked you this:
9   Have you ever been retained, other than the case
10  involving Maytag, or Whirlpool, in a spontaneous
11  combustion, in a case involving a clothes dryer,
12  other than the Electrolux cases?
13  A.    Yes.
14  Q.    And, how many cases?
15  A.    I'm going to say less than six.
16  Q.    And in those cases, who were you retained
17  by?
18  A.    I'm going to say either the property owner,
19  subrogation insurance company, or a third-party
20  defendant.
21  Q.    In other words, you were not retained by the
22  product manufacturer?
23  A.    That's correct.
24  Q.    In those cases, did they all involve fires?

16 (Pages 58 to 61)

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

62

1    A.    I believe so.
2    Q.    What was your role in those cases, if you
3    can generalize?
4    A.    I don't recall all of the cases, but I'm
5    going to imagine that there was some warnings
6    aspect.
7    Q.    Do you recall if you were advocating for an
8    on-product warning in any of those cases?
9    A.    I don't recall.
10   Q.    Do you know whether those cases involved, or
11   allegedly involved, the ignition of lint as the
12   cause of the fire?
13   A.    I think they were -- they would have been
14   spontaneous combustion cases.
15   Q.    Were they all spontaneous combustion?
16   A.    I believe if any of them would be, they
17   would be spontaneous combustion.
18   Q.    In those cases, you have not given -- I'm
19   sorry.
20   A.    I was going to say, yes, I haven't given any
21   testimony in those cases.  I'm not sure that the
22   dryer manufacturer was a defendant in all of those
23   cases, if any of them.
24   Q.    Who do you think was the defendant in those

63

1    cases, as you sit here, if you recall?
2    A.    The ones I recall, at least one of the
3    defendants, or the defendant I was focused on, would
4    have been the manufacturer of the product that had
5    the spontaneous combustion, or self-heating
6    properties associated with it.
7    Q.    What type of products were involved, if you
8    remember?
9    A.    I've done a couple involving, like, a
10   vegetable oil or a linseed seed oil based product.
11   Typically, oily rags, that have been laundered, and
12   then dried, and then either left in the dryer, or
13   folded, and stacked on top of the dryer.  I remember
14   those two scenarios.
15   Q.    So, was the manufacturer of the vegetable,
16   or linseed oil, sued?
17   A.    That's my belief, yes.
18   Q.    Okay.  Any other scenarios, that you can
19   recall, with regard to spontaneous combustion, as to
20   who the defendant was in those cases?
21   A.    Not offhand.
22   Q.    But, you don't believe it was the dryer
23   manufacturer?
24   A.    Like I said, I don't know if the dryer

64

1    manufacturer was a defendant in any of the cases, or
2    if they were a codefendant in some of the cases.  I
3    just don't recall.
4    Q.    So where the vegetable oil, or the linseed
5    oil, was involved, were you assessing the adequacy
6    of the warnings on the vegetable oil, or the linseed
7    oil?
8    A.    Or the chemical product, yes.
9    Q.    Or the chemical product.  So, you weren't
10   assessing the warnings on the dryer?
11   A.    I don't recall doing that.
12   Q.    Okay.  Since I took your deposition in April
13   of 2016, you have given testimony at trial; is that
14   correct?
15   A.    Yes.
16   Q.    In two cases?
17   A.    Yes.
18   Q.    And, was your testimony limited, or
19   excluded, in any way in either of those cases, that
20   you're aware of?
21   A.    It was limited in one.
22   Q.    And, was that in the Yazdani case?
23   A.    Yes.
24   Q.    And, were you retained by deLuca Levine in

65

1    that case?
2    A.    Yes.
3    Q.    And, that case involved a motorcycle?
4    A.    Yes.
5    Q.    What's your understanding of your opinions
6    that were limited?
7    A.    I had multiple opinions, and some of them
8    dealt with the suitability, or the reasonableness, of
9    the defendant to rely upon an owner's manual to
10   communicate critical and atypical safety information
11   for the bike because the defendant knew that
12   multiple many users would purchase the motorcycle
13   secondhand, or thirdhand, without the manual, or
14   would ride the motorcycle without being provided
15   with the manual.
16          In the specifics of the case, the homeowner
17   testified that he did receive the manual, and did
18   read at least parts of the manual.  So, the judge
19   felt that it would be -- what's the word I'm looking
20   for -- it would be unfair to be able to talk about
21   the fact that BMW knew that many of their users
22   weren't reading the manual, were not receiving the
23   manual, and so forth, because in this case, the
24   homeowner did receive the manual.

**17 (Pages 62 to 65)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

66

1    So any opinions related to the fact that BMW
2  knew that people were not receiving the manual, or
3  not given the manual, or did not have the manual, I
4  wasn't allowed to talk about.
5  Q.    And the owner of the motorcycle, he was a
6  secondhand user?
7  A.    He was actually the third owner of the
8  motorcycle.
9  Q.    Okay.  In other words, he wasn't the
10  original owner?
11  A.    Correct.
12  Q.    But, he had received a manual?
13  A.    Yes.
14  Q.    It's my understanding that there was a fire
15  in that case?
16  A.    Yes.
17  Q.    Can you explain the underlying facts any
18  more specifically than that, at least your
19  understanding of them?
20  A.    Sure.  There is a defect in the design of
21  the bike.  They use an oil sight glass that's
22  located at the bottom left corner of the crank case
23  where it's in close vicinity to the exhaust header.
24  And it is exposed to very high temperatures, that

67

1  are excessive of the deflection point, and failure
2  point, of the glass that's sealed.
3    When the bike is left idling, I believe at
4  high idle, or elevated idle, the heat from the
5  exhaust header, and the oil itself, can cause the
6  oil sight glass to fail, allowing the oil, and the
7  oil vapor, to escape, and ignite on the exhaust
8  header.
9    The length of time necessary to reach that
10  failure point had varied from anywhere from 10
11  minutes to I believe the homeowner in this case
12  testified that he may have left the bike idle for
13  over a half hour.
14    To address the issue, BMW claimed that they
15  had placed two statements in their -- I think it was
16  an 82-page, or 85-page, manual that didn't
17  specifically, or explicitly, address the hazard.
18    And, the homeowner, bike owner, testified
19  that when he read the manual, he doesn't recall if
20  he had read those two pages of the manual; if he had
21  read those two pages of the manual, if he had read
22  those statements, and if he had read those
23  statements, if he understood what the actual hazard
24  was.

68

1    But, in any case, at the time after reading
2  the manual, and the two years he owned the bike, he
3  wasn't aware that leaving the bike idling at a
4  standstill can result in the oil sight glass
5  failing, and the bike catching on fire.
6  Q.    Apart from the opinions you just testified
7  to, were there any other opinions of yours that were
8  excluded at trial?
9  A.    No.
10  Q.    And, you were allowed to testify at trial
11  subject to the Court's ruling?
12  A.    Yes.
13  Q.    Were your qualifications challenged in that
14  case?
15  A.    I believe they were.
16  Q.    In the other case that you gave testimony
17  in, the one in Maryland, Malone versus K&G Men's
18  Company, was there any challenge to your testimony
19  in that case, that you're aware?
20  A.    I'm not aware of any.
21  Q.    Have you ever given testimony either at
22  trial, or in deposition, in support of a
23  manufacturer's warnings?
24  A.    I would have to go through my list to see.

69

1  Nothing is coming to mind.
2    If you'd like, I can go through the list.
3  Q.    Okay.
4  A.    I don't remember all the cases.  I'm only on
5  Page 3, but on Page 3, in October of 2014, I don't
6  recall if I was retained by the leasing company, or
7  the manufacturer.  That had to do with the alarm, a
8  warning on a skid loader.
9  Q.    I'm sorry.  You're on Page 3?
10  A.    Yes.
11  Q.    Okay.  What case?  What's the name?
12  A.    Rual Nunez versus Martin Leasing, et al.
13  Q.    Okay.  And, what type of product was at
14  issue in that case, if you recall?
15  A.    A skid loader.
16  Q.    What's a skid loader?
17  A.    It's kind of like a forklift.  Typically, it
18  has tracks, as opposed to wheels.
19  Q.    Okay.  And, do you recall --
20  A.    It's also called a Bobcat.  Sometimes it's
21  called a Bobcat.
22  Q.    That sounds more familiar to me.  Okay.
23    And, you were retained by one of the
24  defendants in that case?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

70

1    A.    Yes.
2    Q.    And, was the manufacturer a defendant
3    because it just says "et al" after Martin Leasing?
4    A.    Yes.  I don't recall if it was just the
5    leasing company, or if it was the leasing company
6    and manufacturer.  I just don't recall.
7    Q.    Okay.  And, do you recall what your opinion
8    was in that case, even generally?
9    A.    It had to do with the audible warnings on
10   the skid loader.
11   Q.    And, was it your opinion that audible
12   warnings were adequate, if you remember?
13   A.    I don't remember.  I don't remember what my
14   opinions were in that case.
15   Q.    But, you remember it was an audible warning
16   that was at issue?
17   A.    Yes.
18   Q.    Okay.  Was it that the plaintiff didn't hear
19   the warning?
20   A.    Yes.  The plaintiff was struck by the back
21   of a skid loader -- I'm sorry -- he was hit by the
22   back of a skid loader.  It was a residential street,
23   and they were doing some work, leaf cleanup work, I
24   believe.  A truck had stopped -- a civilian truck

71

1    had stopped.  One of the ground hands went over to
2    talk to the truck that had stopped, the pickup truck
3    that had stopped, and the skid loader reversed, and
4    struck the ground hand.
5         And, I can't remember if he was at the
6    truck, or if he was near the truck.  I don't
7    remember.
8    Q.    Any other cases, in addition to the Nunez
9    case?
10   A.    I don't see any other ones on the list, that
11   were on behalf of the defense manufacturer.
12        There's a couple that involved -- I was
13   retained on behalf of defense to determine whether
14   the plaintiff had adequate warning, but they were
15   not for a manufacturer.
16        One of them was for a vehicle, and two of
17   them were vehicle cases.
18   Q.    So, in the vehicle cases, you were retained
19   by the defendant in the case?
20   A.    Yes.
21   Q.    And, you were evaluating warnings in the
22   vehicle?
23   A.    Warning to the approaching plaintiff driver
24   as to the presence and state of the defendant

72

1    driver.
2    Q.    Okay.  What cases were those?
3    A.    Air Carter versus United States of America
4    in August of 2014.
5    Q.    And, what page is that on?
6    A.    Page 3, the top of Page 3.
7    Q.    Okay.
8    A.    And then I saw one on Page 2.  I believe
9    it's January, 2004, Chalrie Mae Wade versus James C.
10   Townley, et al.
11   Q.    And, what were your opinions, if you recall,
12   in either of those cases?
13   A.    That the defendant vehicle provided
14   sufficient and adequate warning to alert a
15   reasonably attentive driver to the presence of the
16   defendant vehicle.  And, I take that back.  I don't
17   think Townley was the -- I don't think that was
18   the -- I don't remember what Townley was.  I take
19   that back.
20   Q.    So, just the Carter case?
21   A.    Yes.  And, then there is one on Page 4 where
22   it's a defendant driver, but I don't think that was
23   really a warnings case.  It was more a visibility
24   case.

73

1    Q.    So in the Carter case, I understand
2    generally what was at issue, but can you be more
3    specific?
4         What was it about the vehicle, that provided
5    an adequate warning to the oncoming driver?
6    A.    The collision happened in a work zone on a
7    multilane freeway down in the Norfolk area, I think,
8    Norfolk, Virginia.
9         It was early in the morning before sunup.
10   The defendant was an employee of the United States
11   Government.  He was a military employee driving a
12   U.S. Government car.  And, it happened at an
13   interchange.  And, the defendant driver had meant to
14   get off of an interchange to go to the airport, and
15   the construction crews had closed the interchange
16   for whatever work they were doing.  And, he stopped
17   on the travel lane, through travel lane, the right
18   travel lane adjacent to the closed off ramp next to
19   the construction truck, that was doing work there.
20   And, he stopped to ask him about how to reroute
21   himself to get rerouted to the airport, I think.
22   And he was stopped there for a minute, or so.
23        The plaintiff came up from behind, and
24   without responding, hit the back of the car, and

**19 (Pages 70 to 73)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

74

1   killed himself.
2        So it was a question as to whether or not
3   there was enough visibility, whether or not there
4   was enough warnings.
5        The driver did have his brakes on, and his
6   four-ways, on at the time.  The construction truck,
7   that was next to him, had his flashing lights on,
8   and his beacons on.
9        And, so, there's a question as to whether or
10  there was enough information and warning for the
11  plaintiff driver to have -- a reasonably attentive
12  approaching driver to see, and avoid, the stopped
13  car.
14  Q.   All right.  Let's turn our attention to the
15  Cloud case.
16       Do you recall when you were retained in this
17  matter, even generally, just like a ballpark?
18  A.   Yes.  From a Vigilante Forensic standpoint,
19  I was retained on, I believe, October 1st of last
20  year.
21  Q.   So, October 1st of 2015, were you initially
22  retained while you were still at Robson?
23  A.   Yes, on April 22nd, 2015.
24  Q.   April 22nd?

---

75

1   A.   Yes.
2   Q.   And, I meant to ask you this earlier:  You
3   identified that there were three invoices on the CD.
4   A.   Yes.
5   Q.   And, are those all the invoices that either
6   your company, or Robson, had generated for this
7   matter?
8   A.   They're all the invoices that I've generated
9   through Vigilante Forensic.  I don't know if Robson
10  Forensic had generated any invoices.
11  Q.   Do you have access to those invoices?
12  A.   I do not.  But I don't think that they would
13  have, given the scope of work that's on the first
14  invoice I generated.  And, I don't have a memory of
15  doing any work prior to November of last year on the
16  case.  So, I'm going to -- if I had to provide a
17  guess, I would think that Robson did not send any
18  invoices.
19  Q.   And you were retained in April 2015, but you
20  don't believe that you did any work on the Cloud
21  matter until November of 2015?
22  A.   I believe so.  That's my best memory.
23  Q.   Okay.
24  A.   But, you know what, I can take that back.  I

---

76

1   have a -- I have letter from Mr. Hughes.
2        MR. LEVINE:  Patrick Hughes?
3        THE WITNESS:  Yes.  So, it looks
4   like he did send me documents both in July
5   and August of 2015.  But, at least from the
6   document he sent me of August, 2015, I
7   didn't review that until November 2nd of
8   2015.
9        So, there was possibly an invoice
10  from Robson.
11       MS. YEMMA:  Okay.  And, I can
12  followup with Pat about that.  He should
13  have a copy, if you don't.
14       THE WITNESS:  Yes, I don't.
15       MR. LEVINE:  I will look while I'm
16  sitting here.
17       MS. YEMMA:  Okay, thanks.
18  BY MS. YEMMA:
19  Q.   What were you retained to do in this matter?
20  A.   Well, I was retained to assess the warnings
21  and instructions provided by Electrolux, and look at
22  the foreseeability, and actions, of the homeowners.
23  That's kind of a general way to put it.
24  Q.   And the material that you were provided in

---

77

1   this case, they're all contained on either the CD,
2   or in the notebook, is that correct, and also what's
3   in your report?
4   A.   Yes.
5   Q.   And, does your report contain all of the
6   opinions that you have in this matter, all the
7   affirmative opinions that you intend to offer at
8   trial?
9   A.   What do you mean by "affirmative"?
10  Q.   Well, as opposed to, like, a rebuttal
11  opinion?
12  A.   Yes.
13  Q.   Okay.  And, at least as we sit here today,
14  you don't have any plans to issue a supplemental, or
15  rebuttal, report; is that correct?
16  A.   I haven't been asked to at this point.
17       MS. YEMMA:  Okay.  These are the
18  notes, what I believe to be the notes from
19  your conversation with Mike Stoddard.  And,
20  we will mark that as Vigilante-7.
21       (Notes from Dr. Vigilant's
22  telephone conversation with Mike Stoddard
23  marked Vigilante Exhibit No. 7 for
24  identification.)

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

78

1    BY MS. YEMMA:
2    Q.    And, I have just handed you that two-page
3    document.  And, if you would, Dr. Vigilante, just
4    identify that for the record.
5    A.    These are the notes that I made during my
6    telephone conference with Mike Stoddard on January
7    14th, 2015.
8    Q.    And, did you have one telephone conversation
9    with him, with Mr. Stoddard?
10   A.    Regarding this case?
11   Q.    Yes -- I'm sorry, I should be more
12   specific -- regarding this case.
13   A.    I believe so.
14   Q.    And, that was on January 14th, 2015?
15   A.    Yes.  Now, I've got to take that back.  I
16   may have talked to Mr. Stoddard about this case on
17   other occasions, either prior, or after, the 14th of
18   January, 2015.  And, that's a typo.  That should be
19   January 14th, 2016.
20   Q.    Okay.
21   A.    But I don't recall if I did, or did not, so
22   it's possible.  I don't want to rule it out.
23   Q.    And the document, that's been marked as
24   Vigilante-7, is that a document that you created?

79

1    A.    Yes.
2    Q.    And, you created that contemporaneous with
3    your conversation with Mr. Stoddard, or at a
4    different time?
5    A.    No.  I was taking notes, writing notes,
6    while I spoke with Mike Stoddard.
7    Q.    And, did you take the written notes, and
8    type them up?
9    A.    I was typing them up as I spoke with him.
10   Q.    Okay.
11   A.    I may have went back after I got off the
12   phone with him, and fixed the grammar.  Sometimes, I
13   misspell when I type.
14   Q.    Yes, I do, too.  So, you said you had other
15   conversations with Mr. Stoddard regarding the Cloud
16   case.  Did you take any notes?
17   A.    I did not.
18   Q.    What was the purpose of the call with Mike
19   Stoddard on January 14th, 2016?
20   A.    Typically, I talked to Mr. Stoddard when --
21   typically, I talk to the engineer, or subject matter
22   expert, in these cases to get an idea of what
23   happened, what their findings were during their
24   inspection of either the site and/or the product,

80

1    and then what kind of analysis they're doing, and
2    what their findings, and conclusions, are based upon
3    their analysis.
4         I typically do that if my report's due at or
5    about the same time that the subject matter expert's
6    report is dated.
7         So I think Mike Stoddard's, and my report,
8    were both generated on the 20th of January.  So I
9    would have wanted to know what he was going to be
10   saying prior to getting his report.
11   Q.    So, did you have an opportunity to review
12   Mr. Stoddard's report before you finalized yours?
13   A.    Yes.
14   Q.    Are you relying on any of Mr. Stoddard's
15   opinions in this matter?
16   A.    Sure.
17   Q.    What opinions of Mr. Stoddard's are you
18   relying upon?
19   A.    Specifically that it was reasonable and
20   feasible to include the indicator lights, and cycle
21   timers, as discussed on Page 24 of my report.
22        And, also, with respect to the ignition and
23   cause of the fire -- the origination and cause of
24   the fire, as noted on Page 6 of my report.

81

1    Q.    Do you have an opinion with regard to the
2    design of the dryer?
3    A.    Other than with respect to the indicator
4    lights, and the cycle counter, airflow monitor
5    device, I do not.
6    Q.    And I realize some consider the warnings
7    part of the design, but did you understand I
8    excluded that?
9    A.    I thought you were excluding it.
10   Q.    Okay.  I just wanted to make sure, and give
11   you the benefit of that, that I was excluding it.
12   Okay.
13        And, I remember this came up in the Vitale
14   deposition:  In connection with the Cloud matter,
15   have you done any surveys of appliance stores, or
16   vent cleaning companies, in the Cloud matter since
17   April of 2016?
18   A.    I don't think I have done any specifically
19   for the Cloud matter.
20   Q.    Have you done anything in general since I
21   deposed you in Vitale?
22   A.    I had my dryer and vent system cleaned since
23   then, I believe.
24   Q.    Okay.  When was that?  When did you have

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

82

1    that done?
2    A.    It was springtime, and it was, I believe,
3    after the Vitale deposition.
4    Q.    So, maybe May or June -- May, in the spring?
5    A.    May or June.
6    Q.    Okay, May or June.  And, what type of dryer
7    do you have?
8    A.    I have a Kenmore H4, maybe.
9    Q.    H?
10   A.    H4.
11   Q.    H4, okay.  Like, high efficiency?
12   A.    I don't know.  The dryer is about 10 years
13   old.
14   Q.    Okay.
15   A.    It's a bulkhead style dryer, gas dryer.
16   Q.    How do you know it's a bulkhead style dryer?
17   A.    One of the engineers I worked with in these
18   cases walked me through looking at it, to see
19   whether it was a bulkhead, or a ball-hitch.  And,
20   then I think they confirmed it by looking up the
21   model number, and year.
22   Q.    Were you interested to know whether you had
23   a bulkhead, or a ball-hitch dryer?
24   A.    Absolutely.

83

1    Q.    How long have you been in your current home?
2    A.    A little over six years.
3    Q.    So, did you acquire the dryer from the prior
4    owners?
5    A.    No.  We had purchased the dryer in our past
6    house.
7    Q.    Okay.  And, where did you purchase the dryer
8    from, from Sears?
9    A.    Sears Outlet in Franklin Mills, I think.
10   Q.    I'm familiar with that.
11              MS. YEMMA:  And, if I could just
12   finish this line of questioning, and then we
13   can take a break for lunch.  Is that okay?
14              MR. LEVINE:  Yes, sure.
15              THE WITNESS:  The dryer vent
16   cleaning, and dryer cleaning, was done in
17   May.
18   BY MS. YEMMA:
19   Q.    Okay.  And, do you know the company that you
20   used?
21   A.    Lint Doctor from Glen Falls, PA. (Sic)
22   Q.    Lint Doctor, okay.
23         And, did they clean the venting?  They
24   cleaned the venting, and then did they clean

84

1    anything else?
2    A.    They did clean the venting, and similar to
3    the calls I made, I think it was prior to the Vitale
4    deposition, didn't want to, or know that he needed
5    to clean the interior of the dryer.  But, he was
6    nice enough to take the front panel off, and vacuum
7    under the dryer, and down through the lint trap.  He
8    was not able to get behind the drum -- or he may
9    have taken the top of the dryer off, but he didn't
10   take the drum out.
11   Q.    Were you present while he was cleaning?
12   A.    Partly.  I mean, I was home, but I wasn't
13   standing over him the entire time.
14   Q.    Okay.  Were you present when he was
15   disassembling the dryer?
16   A.    Part of it, yes.
17   Q.    Okay.  And, it's your understanding that he
18   removed the front and the top panel?
19   A.    I seen him take the front off.  I have a
20   memory of that.  I think he took the top off because
21   I think we discussed it, but I don't have a memory
22   of actually being there with the top off.
23   Q.    So when you moved into you current home with
24   the dryer you had purchased at a Sears Outlet, who

85

1    installed it at your current home?
2    A.    Probably, the movers.
3    Q.    And, how is your dryer vented currently?
4    A.    Well, the transition vent is a semirigid.
5    Q.    Okay.
6    A.    The house vent is rigid.  And, the house
7    vent goes from the side wall, right side wall of the
8    dryer, and there's like a 10-foot run directly
9    outside.  There may be about two elbows in the wall
10   to bring it down a little lower.  I don't know.
11   Q.    So when the gentleman from Lint Doctor came,
12   did he clean the entire length of the venting,
13   including the semirigid and rigid portion?
14   A.    Yes.  I had him take the transition duct
15   off, which he typically didn't do.  But I asked him,
16   and told him why, and he did it.
17   Q.    Did he tell you it was not his usual
18   practice to clean the transition duct?
19   A.    Yes -- well, I take that back.  He didn't
20   say it was his usual practice not to.  He said the
21   way he would clean it is he would go from the
22   outside with his brush, and go all the way through
23   into the dryer.  But, I highly doubt that he's able
24   to get into the dryer from outside on all of his

**22 (Pages 82 to 85)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

86

1    dryers.  So, he doesn't normally take the transition
2    duct off.
3    Q.      What was he using to clean the venting, if
4    you know?
5    A.      He had a brush, and a drill, and some type
6    of snake, I guess would be the best way to call it.
7    Q.      Was the brush motorized in any way?
8    A.      Yes.  It was attached to the snake, and
9    attached to the drill.
10   Q.      Was this the first time you had ever had
11   your venting cleaned?
12   A.      I get it done, like, every year, year and a
13   half.
14   Q.      How long have you done that?
15   A.      Since I started doing these Electrolux
16   cases.
17   Q.      So, when did you start doing the Electrolux
18   cases?  Was that 2015, or before that?
19   A.      No, I've been doing it before that.  At
20   least the last -- more than six years.
21   Q.      What was the first Electrolux case you had,
22   do you remember?
23   A.      I don't recall.  I think it was Matt Noone.
24   Q.      Was it the Marquette case?

87

1    A.      It was before Marquette.
2    Q.      Okay.  I'm familiar with Marquette because I
3    had that case.  That's why I was asking.  That had
4    to be, like, 2012, or '13, I think.
5            You don't have to look, it's okay.
6    A.      I did Power, and --
7    Q.      Okay.  That would have probably been before
8    Marquette.
9    A.      There was another one in between Power and
10   Marquette, too.
11   Q.      Okay.  And, so, for the last, you did you
12   say, six years, you've been getting your venting
13   cleaned?
14   A.      More than that.
15   Q.      Oh, more than that?
16   A.      Yes.  But, I have been in this house six
17   years.
18   Q.      Okay.  So, have you always used the Lint
19   Doctor to do the cleaning?
20   A.      No.
21   Q.      Was this your first time using Lint Doctor?
22   A.      Yes.
23   Q.      What other companies have you used, if you
24   know?

88

1    A.      I don't recall offhand.  There was another
2    like "Lint Doctor"; it may have been Mr. Lint, or
3    Mr. Dryer.  I remember using him twice.
4            Typically, when they come out, they don't
5    like to come back because I make them do things that
6    they typically don't do.
7    Q.      And, what would be an example of that?
8    A.      Typically, I ask them to take the transition
9    duct off, and they're hesitant to do that.
10           And, I ask them to clean inside the dryer.
11   Typically, they don't want to.
12           I think the year and a half before I had
13   this one done, I had to call a guy out to do the
14   vent, and then another guy out -- I had to call
15   Kenmore.  And, then Kenmore wouldn't do it, and I
16   had to call Sears.  And, Sears sent a guy that would
17   come out, and he opened the dryer, but he wouldn't
18   do the vent.  So I to call two guys.  It cost me
19   nearly $300 to do both.
20   Q.      How about this year with Lint Doctor, how
21   much did that cost?
22   A.      I had that up, and I brought it down --
23   $100.
24   Q.      On any of the times you've had your venting

89

1    and cabinet cleaned, did you happen to see whether
2    there was lint inside the cabinet, or the venting,
3    before the cleaning?
4    A.      Yes.  I know there's lint buildup in the
5    cabinet, in the vent.
6    Q.      And, were there any blockages?
7    A.      Not that I'm aware of.
8    Q.      Was there a lot of lint in the cabinet, or
9    the venting?
10   A.      A lot is relative.  I'm going to say that
11   there's not -- there's not, like, a two or
12   three-inch layer of lint under the drum, or anything
13   like that.
14   Q.      So, less than two to three inches on the
15   bottom of the cabinet?
16   A.      Yes.  I would say less than an inch.
17   Q.      And, how many people live in your household?
18   A.      There's three of us.
19   Q.      How about in the venting, can you describe
20   the lint that you saw?  Can you quantify it?
21   A.      Yes.  It didn't appear that there was that
22   much.
23           MS. YEMMA:  All right.  This is a
24   good stopping point.  We can take a break to

**23 (Pages 86 to 89)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

90

1      eat.
2              (Lunch recess from 12:30 to 1:00
3      p.m.)
4  BY MS. YEMMA:
5      Q.     Dr. Vigilante, did you speak with the Clouds
6  at anytime in connection with this matter?
7      A.     I don't believe I did.
8      Q.     Any reason why not?
9      A.     Typically, I don't speak with the homeowners
10 if everything I needed, and would like to have seen,
11 was discussed in the deposition transcript.
12     Q.     Okay.  And, was everything you discussed in
13 their deposition transcript, as far as you're --
14     A.     As far as I'm aware of, yes.
15     Q.     As far as you're aware of.  Okay.
16            Do you have an opinion as to whether the
17 subject dryer was installed in accord with
18 Electrolux's instructions?
19     A.     Are we talking specifically about the
20 venting, or is there issue with electrical, or
21 anything like that?
22     Q.     No.  I'm talking specifically with regard to
23 the venting.
24     A.     The venting they used for the transition

91

1  duct was flexible foil, and I wanted to see which --
2      Q.     Do you need a copy of the installation
3  instructions?
4      A.     No.  I've got it, as long as the one that
5  was attached to Mrs. Cloud's deposition is the
6  correct one.
7      Q.     That's the correct one.
8      A.     The use of the flexible foil transition duct
9  is contrary to the installation instructions noted
10 in the subject installation instructions.
11            And the reason I'm being careful with the
12 explanation is that in other Electrolux manuals,
13 they do allow flexible foil transition ducts.  But
14 in this particular Frigidaire install manual, I do
15 not see that language.
16     Q.     Okay.  So for the installation instructions
17 that apply to the Clouds' dryer, flexible foil is
18 not permitted; is that correct?
19     A.     The installation instructions that
20 Electrolux claims was shipped with this dryer does
21 not allow -- does not -- prohibits flexible foil
22 transition ducting.
23     Q.     Do you have any reason to doubt that the
24 installation instructions, that were produced by

92

1  Electrolux in discovery -- and I'll identify the
2  Bates number is EHP-Cloud 0011 through
3  EHP-Cloud 00019.
4      Q.     Do you have any reason to doubt that those
5  are the installation instructions for the Clouds'
6  dryer?
7      A.     I have no information either way, other than
8  what Electrolux is offering.
9      Q.     Were you assuming that's correct for your
10 analysis in this matter?
11     A.     I assume that was the manual that would
12 accompany the dryer, but I have no evidence either
13 way.
14     Q.     Was there anything else about the
15 installation, apart from the use of flexible foil,
16 that was not in accord with the installation
17 instructions?
18     A.     I think the only question I had was
19 the exhaust hood was a low profile exhaust hood.
20 But I think what Mike Stoddard told me, it still met
21 the area requirements.  I think that's my memory.
22            So, I don't know if that may have been a
23 question as to whether or not it meant Electrolux
24 requirement, as stated in the subject installation

93

1  instructions.
2      Q.     Did Mr. Stoddard tell you how many inches
3  the hood was from the ground?
4      A.     I do not have that noted.
5      Q.     Have you seen photographs, and do you have
6  an understanding of how many inches the hood was
7  from the ground?
8      A.     I don't think that was something I looked at
9  specifically.
10     Q.     Okay.  But, you just understand it's the low
11 profile vent hood?
12     A.     It's my understanding it was a metal low
13 profile opening hood with damper, pipe and damper
14 still four inches in diameter.
15     Q.     Do you know what the installation
16 instructions call for with regard to the clearance
17 between the vent hood, and the ground?
18     A.     I have to look it up.  I don't know offhand.
19     Q.     Okay.
20     A.     It looks like there's a minimum.  Electrolux
21 states in the manual, to avoid restricting the
22 outlet, maintain a minimum of 12 inches clearance
23 between the vent hood, and the ground, or any other
24 obstructions.

24 (Pages 90 to 93)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

94

1    Q.    And, do you know whether the vent hood was
2    at least 12 inches from the ground?
3    A.    Not offhand.
4    Q.    Okay.  Do you have an opinion as to whether
5    the dryer, and the venting, were maintained as
6    required by Electrolux's instructions?
7    A.    I think I do mention that in my report.
8    Mr. Cloud testified that he cleaned the venting once
9    a year.  So, that would be within the Electrolux
10   requirements for cleaning the venting.
11   Q.    Do you have an understanding of how
12   Mr. Cloud cleaned the venting?
13   A.    I'm going to have to look that up.
14   Q.    Actually, I am going to ask a different
15   question:  Do you know whether Mr. Cloud cleaned the
16   transition venting?
17   A.    I have to look it up, to see specifically
18   what he testified to.
19   Q.    Okay.
20   A.    He testified he never cleaned the transition
21   duct depicted in C-3.  He testified that he did
22   clean the house duct, as depicted in Exhibit C-4.
23   Q.    Do you know if the Clouds ever had an
24   authorized servicer clean the venting?

95

1    A.    I don't believe they ever had an authorized
2    servicer.
3    Q.    And, do you know whether Mr. and Mrs. Cloud
4    ever cleaned the dryer cabinet?
5    A.    The inside of it?
6    Q.    The inside of it.
7    A.    They had not cleaned the interior of the
8    dryer cabinet.
9    Q.    And, had they hired anyone to clean the
10   interior of the dryer cabinet?
11   A.    Not that I'm aware of.
12   Q.    Okay.  So with regard to the labels, that
13   were on the dryer, we talked earlier about the long
14   skinny label that's inside the door frame.
15   A.    Yes.
16         MS. YEMMA:  And, I'm going to mark
17   that as Vigilante-8.
18         (Skinny label inside door from
19   marked Vigilante Exhibit No. 8 for
20   identification.)
21   BY MS. YEMMA:
22   Q.    And, Dr. Vigilante, do recognize that label,
23   that's been marked as Vigilante-8, as the long,
24   skinny label that's inside the door frame?

96

1    A.    That's my understanding.
2    Q.    Okay.  Did you review the language on that
3    label?
4    A.    Yes.
5    Q.    Do you have any opinion as to whether that
6    label complies with ANSI Z21.5.1?
7    A.    It does not -- I'm sorry, 5.1, Z535. --
8    Q.    Z21.5.1, the gas dryer standard?
9    A.    It's my understanding it does.
10   Q.    It does comply?
11   A.    That's my understanding.
12   Q.    Okay.  How about the warning standard,
13   Z535.4?
14   A.    It does not.
15   Q.    Okay.  And, why doesn't it comply with that
16   standard?
17   A.    Multiple reasons:  There's no use of color
18   as the ANSI Z535.4 would require.
19         It also does not specifically list a
20   specific hazard, and how to avoid it, on the warning
21   label.
22   Q.    When you say "it doesn't list the hazard",
23   it does talk about a risk of fire.  Would you agree
24   with that?

97

1    A.    Generally, yes.
2    Q.    And, it talks about risk of injury with
3    regard to the use of the dryer, too, right, risk of
4    fire and injury?
5    A.    It does say to avoid fire hazard, personal
6    injury, or fire damage, including spontaneous
7    combustion.
8    Q.    Okay.  And when you said a moment ago that
9    it doesn't identify the hazard, what are you
10   referring to specifically?
11   A.    The hazard is the lint buildup near the heat
12   source that can potentially catch fire.
13   Q.    You would agree, though, that isn't the only
14   hazard that is associated with the use of the dryer?
15   A.    It's not.  It's the greatest hazard.
16   Q.    Okay.  Why do you believe it's the greatest
17   hazard?
18   A.    Because that's what Carl King testified to.
19   Q.    Okay.  Carl King has also testified that
20   personal injury, like electrocution, is one of the
21   greatest hazards, too.  Do you remember that
22   testimony?
23   A.    Carl King testified that the fire hazard
24   associated with lint buildup in the dryer, and a

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

98

1  lint dryer fire, was the greatest hazard that is
2  experienced with this type of dryer.
3      He was your corporate designee, which means
4  he is speaking on behalf of Electrolux.
5  Q.    I understand that.
6  A.    So, it's the greatest hazard.
7      There may be other be serious hazards.  But
8  the greatest hazard, according to Carl King, is a
9  lint dryer fire hazard.
10  Q.    Would you agree that the warnings that are
11  on the label inside the door frame have to do with
12  day-to-day operation of the dryer as opposed to
13  maintenance?
14  A.    Yes.  I think that if you're talking about,
15  like, a scheduled maintenance, it doesn't deal with
16  scheduled maintenance.
17      If you're talking about regular maintenance,
18  it does deal with regular maintenance.
19  Q.    When you say "regular maintenance", what do
20  you mean?
21  A.    Well, cleaning the lint screen is part of
22  regular maintenance.
23  Q.    But, that would also have to do with
24  day-to-day operation.  Right?

99

1  A.    Sure.
2  Q.    Okay.  The venting, and the cabinet, don't
3  need to be cleaned on a daily basis.  Right?
4  A.    Not that I'm aware of.
5  Q.    Okay.  So, isn't it reasonable to put
6  information, that the user doesn't need to be aware
7  of on a daily basis, in the manual as opposed to on
8  the product?
9  A.    It depends on the information.
10  Q.    Okay.
11  A.    I have to clarify one thing.  It also fails
12  to meet the Z535.4 standard, and the fact that it
13  wasn't located when, and where, the information was
14  needed, and was not readily visible.
15  Q.    Okay.  And, I was going to actually come
16  back to that.  So, I appreciate that.
17      So, can you expand on that more?
18  A.    Sure.
19  Q.    In terms of the location, where should it
20  have been, in your opinion?
21  A.    Well, at that point, or the warning they
22  should have provided?
23  Q.    Well, let's just stick with this right now,
24  and then we will get into your proposed warnings.

100

1  A.    Well, I don't have an opinion with respect
2  to the other stuff on here with regard to
3  spontaneous combustion --
4  Q.    Okay.
5  A.    -- and drying rubber-like products.  So,
6  that isn't part of my analysis, or opinions.  My
7  analysis and opinion deal specifically with the lint
8  fire hazard.
9  Q.    And, I understand that, and we're going to
10  get to that.  I just want to understand with regard
11  to the warning that was on the dryer, that we've
12  marked has Vigilante-8, you did say that you find
13  that it was in violation of Z535.4.  Is that
14  correct?
15  A.    Yes.
16  Q.    Okay.  Is that only in terms of -- I think I
17  wrote down that no use of color on the label?
18  A.    Failed to meet the ANSI requirements for
19  color highlighting of the signal or panel.
20  Q.    You said that much more coherently than I
21  did.
22      So, apart from that criticism, is there any
23  other criticism with regard to that label when you
24  compare it to the standard?

101

1  A.    Yes.
2  Q.    What are they?
3  A.    It does not provide a specific hazard
4  associated with the dryer lint fire hazard.  So if
5  this label is not intended to address that hazard,
6  then, of course, that wouldn't be a criticism.  But
7  my understanding is, is that it's part of
8  Electrolux's argument that it does address that
9  hazard, or intended to address the hazard.
10      So, also, it does not provide explicit
11  information as to the hazard, and how to avoid it,
12  again related to the lint dryer hazard.
13      It's not located where, and when, the
14  information is needed, or where it would be readily
15  visible.
16      So, my understanding is they put this on the
17  inside door frame of the dryer, and that depending
18  upon how the dryer user had the door installed, it's
19  either going to be on the hinge side, or it's going
20  to be on the latch side.
21      If it's on the latch side, it's going to be
22  more readily visible than on the hinge side.  But in
23  either case, about 95 percent of the life, 90 to 95
24  percent of the life of the dryer, it's going to be

**26 (Pages 98 to 101)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

102

1   hidden by the closed door.
2   Q.      The Clouds' dryer, where was this label
3   located -- and when I say "this", Vigilante-8 --
4   label located in relation to the door hinge, do you
5   know?
6   A.      It's my understanding it was on the hinge
7   side.
8   Q.      And, it's your understanding the label is
9   located on the hinge side unless the consumer, or
10  user, reverses the door?
11  A.      Well, yes.  If they reverse the door to the
12  other side, it would be on the latch side.
13  Q.      In other words, it comes from the
14  manufacturer on the hinge side?
15  A.      It comes on one side.  I don't know if it's
16  always on the hinge side when it's manufactured.
17  But, typically, Electrolux makes the doors
18  reversible.
19         Yes, so on Page 6 of the Installation
20  Instructions, Electrolux notes that the door has a
21  reversing door swing.  And, I think it comes from
22  the factory with the door on the right side looking
23  at the front.  At least, that's the way it's
24  depicted in the manual.

---

103

1   Q.      Dr. Vigilante, in conjunction with your work
2   in the Cloud case, or in any of the other Electrolux
3   cases you have been retained in, have you compared
4   Electrolux's product literature with that from any
5   other dryer manufacturer?
6   A.      Not directly for the Cloud matter.
7   Q.      Okay.  But for other matters, have you?
8   Have you done that comparison?
9   A.      I have looked at other material provided by,
10  for example, Whirlpool, and Maytag.
11  Q.      Okay.  And, are copies of those manuals
12  within your materials.  Is it on the CD?
13  A.      I didn't rely upon them specifically in this
14  case, so they are not.
15  Q.      Okay.  And, why did you compare to the other
16  dryer manufacturers' literature?
17  A.      I don't know that I -- one of the things I
18  looked at was this issue about the indicator light,
19  and whether or not they had an indicator light.  So,
20  I would have looked at -- I take that back.  There
21  may be some manuals from -- I'm sorry.
22         Yes, so I do have, like, a Fisher & Pakel
23  dryer manual, and a Maytag Bravos XL manual -- I'm
24  sorry, that's a washer; not a dryer.

---

104

1   Q.      The Maytag?
2   A.      Yes.
3   Q.      Okay.
4   A.      And, Whirlpool is a refrigerator.  So, I
5   think it was just the Fisher & Pakel dryer manual is
6   the only one that I disclosed.
7          But, I disclosed that to deal with the
8   indicator light, not necessarily how they're
9   presenting other written warnings.
10  Q.      The Fisher & Pakel dryer, do you know what
11  year that dryer was manufactured, that's associated
12  with the manual that you have?
13  A.      It was published in November, 2005.
14  Q.      And, that dryer had an indicator light, as
15  far as you know?
16  A.      It has a lid lock indicator light that comes
17  on solid, or flashing, to indicate the state of the
18  lid.
19         And, it has a beeping and auto sensing
20  light, that flashes to indicate there is an airflow
21  restriction, and your clothes will take longer to
22  dry.  And, then it gives some reasons why you might
23  have restricted airflow.
24         And, then it also has a continuing beeping

---

105

1   and one, or more, progress lights flashing to
2   indicate a fault that requires repair from a service
3   agent.
4   Q.      Okay.  So going back to my original
5   question, you have not done any comparison of
6   Electrolux's literature to the Owner's Guide
7   Installation Instructions to any other dryer
8   manufacturer's literature.  Is that correct?
9   A.      Specifically, for this case?
10  Q.      Just in general, in terms of your work on
11  Electrolux, on cases involving Electrolux dryers?
12  A.      I think I would say that I didn't do an
13  analysis to directly compare how Electrolux
14  describes the fire hazard associated with lint
15  buildup, and/or the need to have the dryer cleaned
16  every 18 months, specifically.
17  Q.      Okay.  How about, have you looked at other
18  dryers, manufactured by other manufacturers, to
19  assess if they present cleaning information on the
20  product, or warnings regarding the cleaning
21  requirement?
22  A.      I know Electrolux sells a Laundry Center
23  that has that information on the dryer.  But, I
24  don't know if I've looked at, or found, other dryers

---

**27 (Pages 102 to 105)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

106

1   that have similar information on them.
2   Q.    You didn't look, or you didn't find any?
3   I'm sorry, I just want to clarify.
4   A.    I never did, like, a survey in the field to
5   determine it.  But, I don't recall ever seeing one.
6   Q.    Does the dryer you have, does it have
7   on-product labels?
8   A.    It does.
9   Q.    Okay.  And, do you know what type of
10  information is conveyed on those labels?
11  A.    I would have to guess.  At one point, I did
12  know, but specifically if it's on there, I don't
13  recall.
14  Q.    Do you know who manufactured your dryer?
15  A.    I don't know who manufactured Kenmore, but
16  it wasn't Electrolux.
17  Q.    Right.
18  A.    So, I don't know if it was Maytag, or some
19  other Japanese company, or what have you.
20  Q.    Okay.  In the literature for your dryer,
21  have you had an opportunity to review that
22  literature?
23  A.    I probably, maybe, scanned it when I first
24  got it, but I haven't seen the literature in a

107

1   number of years.
2   Q.    Do you know if there is a periodic cleaning
3   requirement, that's set forth in the literature?
4   A.    My guess is there is because it's required
5   under -- I don't remember if it was the ANSI code,
6   or the UL code, but my guess is there is.  But, I
7   don't recall.
8   Q.    Do you know if there is a cleaning
9   requirement, do you know if it is communicated on
10  any of the dryer labels?
11  A.    I don't know.
12  Q.    And, how many on-product labels are on your
13  dryer?
14  A.    There's one on the front of the dryer, and
15  at least one in the back.  Other than that, I don't
16  know.
17  Q.    So, on the front of the dryer, where on the
18  front of the dryer?
19  A.    It's in the door frame.
20  Q.    In the same spot as the long skinny label,
21  that is Vigilante-8, or in a different place?
22  A.    Somewhere in that general area.  I don't
23  remember if it's on the right side, or the left
24  side.

108

1   Q.    So if we are facing your dryer, is the right
2   side the hinge side?
3   A.    It is now.
4   Q.    Did you reverse the door?
5   A.    Yes.
6   Q.    Okay.  So, do you know where the label is?
7   A.    I don't recall.
8   Q.    Okay.  How would you define adequate with
9   regards to warnings?
10  A.    Adequate would be located when and where the
11  user is likely to see it, notice it.
12        Adequate would be a warning that would grab
13  a user's attention.
14        Adequate would provide a message that the
15  user understands to be able to identify the specific
16  hazard, and how to avoid it, and the consequences
17  for not avoiding it.
18        An adequate warning would motivate a user to
19  comply with the statement in the warning.
20        An adequate warning would have a cost of
21  compliance that does not outweigh -- or isn't -- is
22  outweighed by the benefits of complying.
23  Q.    Say it again, cost of compliance is not --
24  A.    You have to have a reasonable cost of

109

1   compliance.
2   Q.    A reasonable cost of compliance.  Okay.
3         And, how would you define effective with
4   regard to warning, an effective warning?
5   A.    The same thing.  The only thing I would say
6   is that the difference between adequate and
7   effective is that you can never have an adequate
8   warning if there's a design, or guarding solution,
9   to mitigate the hazard that's not used.  But in lieu
10  of the guard, or the design solution, you chose to
11  use the warning instead.
12        So, in that case, you can provide effective
13  warning, but it would not be adequate if there's a
14  design or guarding solution, that could be
15  implemented, that's feasible, and economical, and so
16  forth.
17  Q.    So if there is a feasible design solution to
18  eliminate the hazard, a warning can't be effective?
19  A.    A warning should never we used in that
20  instance.  And, if it is, it's inappropriate and
21  improper.
22  Q.    For a warning, or instruction, to be
23  adequate -- oh, sorry.
24  A.    I'm sorry, just to clarify:  My statement is

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

110

1  from a manufacturing perspective.  So if you're a
2  designer of the manufacturer, you should never
3  relegate safety to a warning that you can -- you
4  should never relegate a hazard safeguarding to a
5  warning, when you can eliminate it through design
6  feasibly and economically, and so forth.
7  Q.     We talked earlier in your deposition about
8  times you were retained on behalf of a product
9  manufacturer to look at warnings, to assess
10  warnings.  And we talked about the horse bridle, and
11  the reusable target.  Do you remember that?
12  A.     Yes.
13  Q.     In any of those situations, did you
14  recommend a design change?
15  A.     I don't believe so.  The only one that I had
16  question of was the reusable target, was to make
17  sure there was no -- I think the issue was to make
18  sure there was nothing toxic about the substances
19  used to create the target.  So, that was one of the
20  issues.
21         I remember that was one of the issues, that
22  I talked to the manufacturer about, to make sure he
23  knew what was used to make the product because it
24  had a residue that would come off in handling it.

111

1  But, I don't believe that there was anything of a
2  toxic nature either from skin contact, or
3  respiratory-wise, associated with the components of
4  the product.
5  Q.     So the basis for your opinion that you
6  should never relegate to warnings what can be
7  designed out in the product, where does that come
8  from?  Is that just the design hierarchy?
9  A.     That is the safety hierarchy.
10  Q.     Safety hierarch.
11  A.     So it's been the prevalent thought in
12  product safety, and occupational workplace safety,
13  for decades.
14         The first time I have seen it specifically
15  laid out in paper, I think was in the 1950's edition
16  of the National Safety Council of Accident
17  Prevention Manual.
18  Q.     For a warning to be adequate, do you have to
19  have 100 percent compliance?
20  A.     No.
21  Q.     What percentage of compliance would be
22  acceptable to you?
23  A.     A reasonable percentage.
24  Q.     So, what would that be?

112

1  A.     It depends on the project, and it depends on
2  the hazard, and it depends upon the risk of
3  encountering that hazard.  So, it's a multifactor
4  decision that has to be made.
5  Q.     Can you give me an example, using any of the
6  products that you consulted on, that we talked about
7  earlier in the deposition, as to what would be a
8  reasonable percentage of acceptance?
9  A.     Well, for example, I think a vivid example
10  would be, maybe, the tree chipper.  There are pinch
11  points, and other places, where the body can get
12  mangled, as you can imagine being a large piece of
13  machinery.  So between the design of the guard, and
14  the warning, you would hope for, and would desire,
15  100 percent safety.  That should be the goal.
16         If you experience one out of a million
17  times, that is, the user does something on purpose,
18  you wouldn't blame the warning for it.  But you
19  would expect, from an overall safety standpoint, to
20  be capturing just about all of the potential
21  inadvertent contacts with that hazard.
22  Q.     Okay.  The standard that you cite in your
23  report, the warning standard, Z535.4, that doesn't
24  specifically apply to clothes dryers; is that

113

1  correct?
2  A.     It doesn't specifically apply to clothes
3  dryers.  It applies specifically to product
4  warnings.
5  Q.     Is it mandatory that Electrolux comply with
6  that standard, in your mind?
7  A.     In my mind, or in the world?
8  Q.     In your world.
9  A.     Yes.  So, in my opinion, it's a minimum
10  standard that manufacturers should be striving to
11  meet.
12         From a regulatory standpoint, or code
13  standpoint, it is not required.  It's a voluntary
14  minimum consensus standard.
15  Q.     We talked about the label, marked as
16  Vigilante-8, with regard to the dryer standard, the
17  ANSI Z21.5.1.
18         Did you do any analysis with regard to the
19  product literature, and whether it complied with
20  ANSI Z21.5.1?
21  A.     Yes.  So, I'm not aware of it not complying.
22  Essentially, if the standard says that there's
23  certain information that has to be provided on the
24  label, and the manual, that doesn't give all that

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

114

1  much guidance on how to present the information, how
2  to format the information, or where specifically to
3  put it.
4         UL has a -- which is also applicable to this
5  dryer -- it does have a requirement that operation
6  and maintenance should be visible at the point of
7  operation and maintenance.  And that's one of the
8  standards that I note in my report, that were not
9  met by Electrolux with regard to a lint fire hazard.
10  Q.     And, I understand that this dryer was a gas
11  dryer.  Right?
12  A.     This is a gas dryer, but according to Mr.
13  King, and Mr. Ripley, they applied the UL 2158
14  standard to it.
15  Q.     So if you were hired by a dryer manufacturer
16  to create on-product labels, and literature, what
17  would you use?
18  A.     Well, it depends on the product.  So using
19  the dryer as an example, I would ask the
20  manufacturer what standards are specifically
21  applicable to the dryer, to the product.
22         So, for example, if Electrolux had hired me
23  back in 2003, they would have told me the ANSI
24  Standard, again, the gas standard, and the UL 2158

---

115

1  Standard.  So I would have looked through them to
2  make sure that the items, that were covered in
3  there, were done.
4         I would have also asked Electrolux what
5  hazards have they identified through their hazard
6  analysis.
7         I would have asked them what hazards that
8  they identified through their incident reporting,
9  their warranty, and service data.
10        And then I would have asked them how they
11  were dealing with those hazards, and if they were
12  relegating warnings, then I would have included that
13  in my decision making.
14  Q.     So, with regard to the hazards you identify,
15  would you have suggested to Electrolux that they
16  design that out, or would it have been appropriate
17  to warn on an on-product label?
18  A.     I'm not sure -- I'm sorry, I'm not following
19  you.
20  Q.     Okay.
21  A.     First of all, if I'm hired by Electrolux,
22  they're hiring me as a warnings consultant.  I
23  wouldn't be identifying the hazard.  I would be
24  relying upon them to identify the hazards through,

---

116

1  like I said, the standards, through what the
2  competition has done, or recognized what they have
3  recognized through their hazard analysis, what they
4  have recognized through their service data, their
5  warranty data, their incident data.
6         Then, you look at hazards that have been
7  identified.  I would want to know which ones have
8  been relegated to warnings, and I would ask them if
9  there was a way to design out a guard in any of the
10  warnings.
11        If I was left with hearing the warnings that
12  cannot be designed out, or guarded against, I would
13  look to see how, and where, it was best to go about
14  providing that information to the user.
15  Q.     And, how would you go about figuring that
16  last part out?  How do you communicate that to the
17  consumer and user?
18  A.     It depends on multiple things.  So, first,
19  if it's a hazard that you couldn't address higher in
20  the safety hierarchy, and you were going to be
21  relying upon warnings, I would want to look at the
22  severity of the hazard.  I would want to look at the
23  likelihood of encountering it, and the number of
24  people exposed.  And, I would want to look at

---

117

1  whether or not the hazard is something that is
2  readily recognized by the user population.  And,
3  that would factor into how, and where, I present the
4  information.
5         So, for example, if it's a greatest hazard
6  associated with the use and operation of the dryer,
7  that everyone who used it is potentially exposed,
8  and that there was a fairly high likelihood that an
9  event would occur, and no one knows that the fire
10  hazard exists, or can exist, or the prevalence of
11  it, or the other characteristics of it, then I would
12  want to make sure that information was on the dryer.
13  And, I would want to make sure that information was
14  readily visible, and readily available, that it
15  specifically called out the hazard, and explicitly
16  described what was necessary to deal with it.
17  Q.     Then, what would you do, if anything?
18  A.     That would be my recommendation.  Then if I
19  have to work with the manufacturers, designers,
20  engineers in designing, and developing, the warning,
21  I would certainly do that.
22         The other thing I would also ask is whether
23  or not there could be an active warning implemented
24  into the design.

---

**30 (Pages 114 to 117)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

118

1    Q.    When you say "active warning," like an
2  indicator light, or --
3    A.    Or a beeper, audible, or an indicator light.
4    Q.    You are familiar with the concept of over
5  warning.  Right?
6    A.    Sure.
7    Q.    Okay.  And, what do you understand that to
8  be?
9    A.    Well, the issue is that if you provide too
10  many warnings, much like too much information -- and
11  one of the reasons why we don't rely upon manuals
12  for critical safety information is that it can
13  overload people.  That is, it can be so much
14  information that they are not motivated to read it.
15  It could be that there's so much information, that
16  they can't retain it all.  There's so much
17  information that it just gets lost in the shuffle.
18  So much information that is irrelevant, or
19  unimportant, that the rest of the information is
20  ignored because it also seems to be irrelevant.
21        The other side of over warning is, again,
22  with respect to the safety hierarchy.  If you're
23  doing your job correctly from a design and
24  manufacturing standpoint, there shouldn't be a risk

119

1  of over warning because you should be capturing
2  these hazards, and mitigating them through design
3  and through guarding issues.
4        If, at the end of the day, when you are done
5  with your design process, and you've got too many
6  warnings, that you're worried about over warning,
7  there's likely something wrong with your development
8  processing and design.  And, they really should go
9  back to the drawing board to figure out how they can
10  eliminate, and mitigate, these hazards from a higher
11  level of the safety hierarchy.
12    Q.    Is there, in your mind, an ideal number of
13  on-product warnings?
14    A.    Yes.  It depends on the situation, the
15  product, and the hazards.
16    Q.    Is there any research, that is that you have
17  done, or that you're aware of, or studies, that
18  address how many such warnings should be on a
19  product?  Or, does it really just depend on the type
20  of product.
21    A.    Again, it depends on the product.  It
22  depends on the hazards.  It depends on people's
23  knowledge, and it depends upon what other safety
24  measures were taken to protect the user.

120

1    Q.    Do you agree that a consumer has a
2  responsibility to read, and comply, with the
3  manufacturer's warnings, and instructions?
4    A.    If they're provided in an adequate fashion,
5  they should.
6    Q.    And, you agree that consumers have
7  responsibility to maintain their product in accord
8  with how a manufacturer instructs?
9    A.    If it's reasonable, and they're adequately
10  warned, and informed.
11    Q.    Do you agree that it's reasonable for a
12  manufacturer to expect that consumers are going to
13  read, and comply with their warnings?
14    A.    If they provide adequate warnings in the
15  requirements, and comply is reasonable.
16    Q.    I would like to turn to your proposed
17  warnings in this matter, if that's okay with you.
18  And, you indicated earlier in your deposition that
19  there were some changes to the warnings that are in
20  your report.  Is that right?
21    A.    Yes.  The warnings, that are in my report, I
22  had updated in later reports.  So the printout you
23  have in your hand is the copy of the warning, I
24  believe, from Vitale.  That was based upon the

121

1  scheduling.  The Vitale report was done after the
2  Cloud report.
3    Q.    Okay.  Actually, I will mark the copies you
4  have.  So I am going mark each one of them, so
5  there's no confusion.
6        Before I mark this, is this the warning that
7  corresponds with Illustration 1 in your report?  Is
8  this the updated version?
9    A.    Yes, it's updated -- I'm sorry.  Let me see
10  it one more time.
11    Q.    Okay.  I just want to make sure.
12    A.    Yes.  That is the updated version of
13  Illustration 1.
14        MS. YEMMA:  Okay.  We're going to
15    mark that as Vigilante-9.
16        (Updated version of warning
17    corresponding to Illustration 1 marked
18    Vigilante Exhibit No. 9 for identification.)
19        MS. YEMMA:  And, the document I'm
20    holding, is that the update to Illustration
21    3?
22        THE WITNESS:  Yes.
23        MS. YEMMA:  All right, we will mark
24    that as 10.

31 (Pages 118 to 121)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

122

1           (Updated version of warning
2       corresponding to Illustration 3 marked
3       Vigilante Exhibit No. 10 for
4       identification.)
5   BY MS. YEMMA:
6   Q.      Dr. Vigilante, the document I am holding up,
7   this is the update to Illustration 4, or --
8   A.      I dont know that I updated number four.  Do
9   you mind if I take a look?
10  Q.      Yes, that's fine.  I am not going to mark it
11  if it's not, so...
12  A.      Yes, I did not update Illustration 4 in my
13  report.
14  Q.      Okay.  Then, I am not going to mark that.
15  A.      Okay.
16  Q.      So, I'm going to hand you the marked copies
17  of Vigilante 9, and 10.  And if you would for the
18  record, -- I think you just did -- but for
19  completeness sake, if you can confirm, Vigilante-9,
20  that's the update to Illustration 1.  Right?
21  A.      Yes.
22  Q.      And, if you could identify, for the record,
23  what are the differences between what's been marked
24  as Exhibit 9, and Illustration 1?

123

1   A.      I essentially rewrote the first bullet
2   point, and the sub bullet points for that warning.
3   Q.      And, why did you rewrite those bullet
4   points?
5   A.      Part of it was the fact that I think Mike
6   Stoddard changed his -- or updated his opinions with
7   regard to the indicator light.
8           Initially, he was advocating a single light,
9   and then he eventually went to a red and yellow
10  light.
11  Q.      And, what's your understanding as to how the
12  red and yellow light would work?
13  A.      The yellow service indicator light flashes.
14  It's indicating to the user to have the machine
15  service cleaned by an authorized, qualified, et
16  cetera, technician.
17          When the red service light would come on
18  when the drying heating source, either the gas or
19  electric, burn would be shut off.
20          So yellow indicator light -- I don't
21  remember the exact numbers offhand -- would trigger
22  before the 18-month cleaning cycle, which was
23  approximately 625 cycles.  So, I don't remember,
24  offhand, exactly what cycle Mr. Stoddard used -- it

124

1   was, like, 575 or 600 -- for the yellow light to
2   come on, to indicate that it needs to be cleaned.
3   Then once it hits 625 cycles, the heating source
4   would shut down, the red light would come on, and
5   the warning would tell them to get the thing
6   cleaned; this is why it's not working.
7   Q.      Any other reason for the update on the
8   warning, other than Mr. Stoddard's opinion?
9   A.      I think that was it.  I think that was the
10  reason why I started updating it.
11  Q.      Okay.  And with regard to what's been marked
12  as Vigilante-9 -- and we'll just work off of the
13  exhibits as opposed to what's in your report because
14  it's -- well, essentially you're withdrawing that
15  label, that's in your report.  Is that right?
16  A.      Yes, because that begins my understanding
17  that Mike changed his opinions -- I should say
18  modified, or updated, his opinions with regard to
19  the indicator light.  So, I wanted to be consistent.
20  Q.      Okay.  And, you also removed the language in
21  Illustration 1 where it says "Service Indicator
22  Light:"  Do you see that?
23  A.      Yes.  I changed it.
24  Q.      Okay.  What was the reason for changing it?

125

1   A.      I thought it read better when I rewrote it.
2   Q.      How did you come up with the warning that we
3   see in Vigilante-9?
4   A.      It was based upon my understanding of the
5   lint buildup fire hazard that Electrolux has
6   identified as the greatest hazard associated with
7   their dryer.
8           And then based upon my understanding of what
9   Mike Stoddard opined, and concluded, was feasible
10  with regard to the cycle counter, and air exhaust
11  monitor.
12  Q.      So, in your opinion, the warning in
13  Vigilante-9, that's an adequate warning for the
14  Electrolux dryer at issue?
15  A.      Yes.  If it's used in conjunction with the
16  safeguard, it would be an adequate warning.
17  Q.      Would it be an effective warning?
18  A.      Yes.
19  Q.      And, how did you reach the conclusion that
20  the warning in Vigilante-9 is an adequate, and
21  effective, warning?
22  A.      It's adequate, again, because it's used in
23  conjunction with the feasible safeguarding cycle
24  counter, and airflow monitor devices.

32 (Pages 122 to 125)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

126

1    It's effective because it meets the
2    requirements of the ANSI Z535.4 standards, and it's
3    consistent with the guidelines, and recommendations,
4    laid out in the Human Factors and Warnings
5    Literature.  And, it's consistent with the
6    on-product warnings, that I have tested, personally,
7    in my professional career in designing, and
8    developing, on-product warnings.
9        Also, being used in conjunction with the --
10   I already covered that -- used in conjunction with
11   the indicator lights.
12   Q.    Right, right.  So this warning is intended
13   to be used with the indicator lights, the red and
14   the yellow.  Is that right?
15   A.    Yes.
16   Q.    Okay.  Have you tested the warning in
17   Vigilante-9 with any live subjects?
18   A.    I have not done an experiment where I have
19   brought in live subjects to interact with the
20   warning.
21   Q.    Any reason why not?
22   A.    Well, (a) it wasn't necessary; (b), there's
23   issues of costs, and time.  Not being a
24   manufacturer, I don't have deep pockets to bring

127

1    people in.
2    Q.    With regard to the first one, you said "not
3    necessary."  Why not?  Why is it not necessary to
4    experiment with live subjects with regard to this
5    label?
6    A.    It's not necessary because it's in
7    conjunction with the active warnings, being the
8    indicator lights, the safe features, the safeguards,
9    of the cycle counter, and the airflow monitor, and
10   the fact that it's designed consistent with the
11   standards, and guidelines, and recommendations, in
12   my prior experience.
13   Q.    Okay.  Let's turn to Illustration --
14   A.    One other point.  One other thing, too, it's
15   also in the fact that in the manner in which I
16   suggested it be presented on the dryer would make it
17   readily visible and conspicuous at all times.
18       So, it wasn't an issue of, you know, will a
19   user see it.  It's going to be readily visible.
20   Q.    And, what is your -- and I remember you did
21   give this testimony in Vitale.  But if you could,
22   just for this record, where do you propose that the
23   warning, Vigilante-9, be placed on the dryer?
24   A.    It should be placed adjacent to the

128

1    indicator lights.
2    Q.    And, where are the indicator lights supposed
3    to be located, or at least proposed to be?
4    A.    Give me one second.
5    Q.    Take your time.
6    A.    I just wanted to see where Mike Stoddard had
7    put the indicator light.
8        So, it should have been on the top of the
9    dryer towards the back of the console.  This is a
10   rear console dryer, so it would have been on the top
11   of the dryer, back under the light near the rear
12   console.
13   Q.    Okay.  So the label wouldn't be on the
14   console; right?
15   A.    For this one, it would be under it -- on top
16   of the dryer under the console.  Not directly under
17   it, in front of it, but on the base of the console
18   is probably a better way to put it.
19   Q.    Okay.  And, how big do you propose that the
20   label be?
21   A.    Vigilante-9 and 10 did not print out for the
22   size but, for whatever reason, they got moved.  But,
23   I did have a specific size in mind for them.
24   Q.    Is it the size that's in your report, or is

129

1    it larger?
2    A.    I have to go back into --
3    Q.    Okay.  Take your time.
4    A.    I don't have the size noted, but I believe
5    it was like on the order of about 5 to 6 inches
6    wide, by about 4 inches tall, if I'm not mistaken.
7    I wasn't too worried about the size of these two
8    because there's a lot of real estate up on the top
9    of the dryer.
10       So I think Illustrations 1 and 3 would be
11   the minimum size for the warnings.  And, the same
12   thing with Illustration 4.
13   Q.    When I deposed you in the Vitale matter, you
14   had testified that you used a heuristic evaluation
15   in conjunction with creating these warnings.  Is
16   that still true?
17   A.    Yes, in conjunction with the assessment of
18   the standards, recommendations, and practices
19   readout in the literature.
20   Q.    Can you take me step-by-step through your
21   heuristic evaluation with regard to these warnings?
22   A.    For the ones Electrolux provided, or the
23   ones I provided?
24   Q.    Let's talk about just what you provided.

33 (Pages 126 to 129)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

130

1  A.    Okay.
2  Q.    And, then we can talk about Electrolux.
3  A.    Again, I start with an understanding of what
4  the hazard is, and where it falls in the risk
5  assessment of the product, and what people know, or
6  don't know, and what people do, and don't do.
7       So based upon that information, I came to
8  the conclusion that it needed to be on the product
9  as opposed to solely in the manual.
10      Secondly, what I did is I looked at what
11  information, or safeguards, were going to be
12  provided in conjunction with the warning, and that
13  gets back into what Mr. Stoddard was doing with the
14  indicator light, or lights, as the case may be.
15      I also looked at the area in which the
16  warning could be provided.  So some of these dryers,
17  that I have worked on, are front consoles.  This one
18  happened to be a top console.  So, that would affect
19  whether or not I was concerned particularly about
20  the placement issues.
21      Next, I looked to make sure that I am
22  identifying a specific hazard, and that I am
23  providing explicit information regarding the hazard,
24  and how to avoid it, and so forth.

131

1       And then I draft the label consistent with
2  good formatting practices, including use bullet
3  points, use of white spacing, ensure that the text
4  size is sufficient both from a legibility
5  standpoint, and from a readability standpoint, and
6  at distances at which it would be encountered.
7       So the warning's going to be about
8  two feet of the user's eyes, so maybe three feet,
9  tops.  So, as long as the warning is, you know .10
10  font, and above, it shouldn't be a problem.
11  Q.    When you say "it shouldn't be a problem,"
12  what do you mean by that?
13  A.    From a visibility standpoint, a readability
14  standpoint.  So, it could be -- I'll give you an
15  example:  Electrolux has a Laundry Center, and they
16  put the warning for cleaning on a little label
17  that's on the top of the door frame.
18      When you look at the population of users,
19  you find out that that warning is some distance away
20  from where the viewer's going to be, several feet.
21  And you look at the legibility requirements for
22  print size for those distances for the expected
23  population, and the print is too small.
24      So I think a case where you have a little

132

1  lady that traditionally develop issues with visual
2  acuity as people age, that several feet from the
3  warning, that small font size that's used on the
4  label on the Laundry Center, is not going to be
5  legible to a certain segment of the population.
6       So when I was designing, and looking at,
7  warnings in Illustrations 1 and 3, there was a
8  minimum font size that I wanted to hit based upon
9  the expected viewing distance.
10      So we don't, as in the Laundry Center, we
11  don't have the issue of looking above us.  We have
12  it either being right in front of us, or right on
13  top of the top console.
14  Q.    So earlier in your testimony, you gave me a
15  list of all different types of evaluations that you
16  could pick from.  Heuristic was one of them; hallway
17  testing, experiments, live subjects, et cetera.
18      Why did you pick heuristic for this in
19  conjunction with designing these labels?
20  A.    Well, I used it in conjunction with
21  comparing it, and being consistent with the
22  standard, ANSI Z535.4 standard, and the
23  recommendations, and guidelines, in the Human
24  Factors and Warnings Literature.  That was adequate

133

1  to develop a warning for what I was doing.
2  Q.    Okay.  And, how did you learn to conduct
3  heuristic evaluations?
4  A.    Through graduate school training, and
5  experience.
6  Q.    What experience?
7  A.    Well, both, in the laboratory, you know, at
8  North Carolina State University, I did a lot of
9  those formatting papers we talked about earlier, the
10  prioritization papers we talked about earlier.  I
11  manipulated these variables for products, and then
12  set them in front of people, and see how they
13  reacted, and see how the performance differed based
14  upon how these variables were manipulated.
15      So I know, based upon my own firsthand
16  experience with manipulating these variables, how it
17  affects people's behavior of seeing, reading,
18  comprehending, and so forth.
19      When I was with the IBM Corporation, I used
20  all different types of techniques, depending upon
21  the project, the time, the resources, and et cetera.
22  And, the same thing, I know how developing and
23  designing things certain ways, the results of that
24  when I actually do bring people into a lab.

**34 (Pages 130 to 133)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

134

1   Q.     So, what type of variables are you talking
2   about?  Like, are you talking about the font, the
3   color?
4   A.     Yes.  You're looking at issues such as where
5   it's located, how it's located, what it's used in
6   conjunction with, the size of the font, the type of
7   message that you're giving, the type of white
8   spacing that you're using.
9         So, all those different types of formatting
10  and presentation of variables.
11  Q.     What variables have you found to increase
12  the likelihood that a warning will be noticed, and
13  read?
14  A.     Where it's located in conjunction with where
15  the operator is expected to be interacting with the
16  controls is one of them.
17        And (2), the size of the font, the use of
18  color, the use of the signal word.  So, those are
19  variables I know affects the likelihood of seeing
20  and reading.
21        Again, the use of white space, if you're
22  using a paragraph of pros, people aren't as likely
23  to read use if you're not using mix case.  It
24  reduces legibility and readability.

135

1         The use of bullet points to emphasize from
2   parts of the message can have an effect on
3   readability and comprehension.
4         All of the -- I should say most of the
5   formatting requirements in ANSI Z535.4 is based upon
6   research.  And, the guidelines and recommendations
7   in the Human Factors and Warnings Literature is
8   based upon research.  And, a lot of that research
9   was done at the time I was in North Carolina State
10  University.  A lot of that research was confirmed in
11  my own research, and a lot of those guidelines,
12  recommendations, and formatting standards, I
13  utilized, and tested, myself at IBM with those
14  products, user testing with other products.
15  Q.     You just talked about variables that would
16  increase the likelihood that the label's going to be
17  noticed, the label is going to be seen.  Right?
18  A.     Yes.
19  Q.     What about, are there variables that affect
20  whether a user is going to comply with what the
21  label says?
22  A.     Yes.
23  Q.     Okay.  They're separate, or --
24  A.     Some of them are overlapping; some of them

136

1   are separate.
2   Q.     Okay.  So can you tell me what those are,
3   the ones that overlap, and that are separate?
4   A.     Sure.  You've got to be able to communicate
5   the correct message.  So, that gets into the
6   specificity and explicitness.  So, you want them to
7   know what the issue is.  You want them to know what
8   the consequences are.  You want them to know what it
9   takes to avoid it.
10        If you're not specific, and you're not
11  specific, in those messages, it reduces
12  understanding, and it can reduce motivation to
13  comply.
14        Motivation to comply is also associated with
15  cost of compliance.  So one of the things that helps
16  with Illustration 1 is the fact that it's used in
17  conjunction with safeguards.  You are forcing
18  compliance.
19        We talked about, earlier, what is the best
20  compliance rate for a warning.  Again, it's
21  dependent upon a hazard, and dependent upon a whole
22  host of things.  But if you can provide a warning in
23  conjunction with a safeguard, that forces the
24  compliance, or at least forces you out of a

137

1   dangerous condition, the warning is used as a
2   supplement so that you understand what that safety
3   feature is doing, why it exists, and what you need
4   to do to keep the machine, or the product, in a safe
5   range, i.e., in this case, get it serviced.
6         One of the problems that I have with not
7   using a design change, or an active safety guard, is
8   that a portion of the population of users having to
9   call out a service guy every year and a half, and if
10  you have to call out two service guys every year and
11  a half, because one guy won't clean the vent, and
12  the other guy won't clean the dryer, you are going
13  to be having these people pay almost as much as they
14  paid for the dryer every other year.
15        You know, a lot of folks are strapped for
16  cash, and that can be a barrier for them having, or
17  giving them the ability, or having the ability to
18  comply with the warning.
19        So, that's a drawback, or that's a
20  limitation of Illustration 3.  There is going to be
21  a segment of the population that the cost of
22  compliance is just going to be too high.  They are
23  not going to be able to afford to bring the dryer
24  guy out, and bring the vent guy out, every other

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

138

1    year.
2    Q.    Anything else?
3    A.    I think that's it.
4    Q.    Okay. Let's talk about Illustration 2 in
5    your report.
6          How did you go about creating this
7    illustration, this graphic for the manual?
8    A.    I took that from a service bulletin from
9    Electrolux. So, this is an Electrolux produced, and
10   provided, illustration.
11   Q.    And, you are proposing that this be included
12   in the manual, and not on the product?
13   A.    Yes.
14   Q.    And, why is that?
15   A.    It's too much information for the product,
16   but in the manual, it provides the user with greater
17   context as to what's going on.
18         So, one of the things I mention in the
19   report is that the way Electrolux worded their
20   warning regarding a qualified, or authorized,
21   servicer, Electrolux never defined it, and
22   Electrolux was aware that some users may think that
23   they were qualified.
24         In conjunction with not telling them what

---

139

1    needed to be cleaned, or what "interior of the
2    machine" means, users could very well think that
3    they were qualified to clean the interior of the
4    machine.
5          So, Illustration 2 in the manual, in
6    conjunction with the warning, would give the user an
7    indication that this is much more complicated than
8    the regular product user is going to be able to do.
9    And, it needs more credence into the fact that you
10   need a professional to come out, and do it.
11         The other benefit is, of course, when a
12   professional comes out to do it, like Lint Doctor,
13   he knows what's required, or the Sears' service
14   technician, or Boscov's service technician.
15   Because, as you know through discovery, a lot of
16   your technicians don't know what needs to be
17   cleaned.
18         I think one of the Sears corporate guys
19   testified that when they send their out to clean the
20   dryer, they don't take the drum out; that they
21   weren't aware that they needed to take the drum out,
22   or the propensity for lint to build up behind the
23   drum.
24         So if you provide it in the manuals, it

---

140

1    gives the guys actually coming out to do the dryer
2    cleaning, more information as to what needs to be
3    done.
4    Q.    With regard to Illustration 3, let's look at
5    Vigilante-10.
6          So, this is the updated version of
7    Illustration 3. Is that right?
8    A.    Yes.
9    Q.    Okay. And, if you could explain what's the
10   difference between Vigilante-10, and Illustration 3?
11   A.    I changed the wording of the first two
12   bullets.
13   Q.    Why did you do that?
14   A.    Because I changed the wording in
15   Illustration 1.
16   Q.    So, it's just merely to make it consistent
17   with the update to Illustration 1. Is that a fair
18   way --
19   A.    Yes.
20   Q.    Okay. And, you're adding -- and, please
21   correct me if I'm wrong. So, you're adding "near
22   the heat source" in bullet one?
23   A.    Yes.
24   Q.    Okay. And, then the same with regard to

---

141

1    bullet two, right, you're saying -- oh, no, it's
2    already there -- no -- in the parenthesis "near the
3    heat source" --
4    A.    Yes.
5    Q.    -- that's the addition?
6    A.    Yes.
7    Q.    Okay. With regard to the warning on
8    Vigilante-10, did you perform any experiments with
9    live subjects to assess this warning you proposed?
10   A.    I did not.
11   Q.    And, did you use the same evaluation, the
12   heuristic evaluation, as you did with the warning on
13   Vigilante-9?
14   A.    Yes, in conjunction with the comparison to
15   the standards, guidelines, and recommendations.
16         THE WITNESS: Can we take a
17   five-minute break?
18         MS. YEMMA: Yes, absolutely.
19         (Brief recess.)
20   BY MS. YEMMA:
21   Q.    Dr. Vigilante, do you believe that the
22   Clouds would have followed any of your proposed
23   warning labels?
24   A.    Yes.

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

142

1  Q.     Why do you believe that?
2  A.     (A), their testimony that they would have
3  followed a warning consistent with what I proposed.
4         (B), I didn't see anything in their behavior
5  that would suggest that they were irrational, or
6  different, than the normal population.
7         (C), the research has shown that if you
8  provide effective warnings, warnings such as the
9  ones I created, people will, in fact, see them, read
10 them, heed them, and comply with them.
11        And then, finally, the Clouds were taking
12 steps to clean their dryer.  So, it just would have
13 been another step in that direction had they known
14 about the potential fire hazard, and the need to
15 clean the interior of the dryer.
16 Q.     Are you making any assumptions as to whether
17 the Clouds read the labels that were on their dryer?
18 A.     I am not.
19 Q.     Do you know whether they did read the labels
20 on the dryer?
21 A.     I think their testimony was they don't
22 recall warnings being on the dryer.
23 Q.     And, that's my understand, too, that that's
24 what they testified to.

143

1         So, in light of that testimony, why do you
2  believe that would have, first of all, seen your
3  proposed label, and followed what it said?
4  A.     My label, unlike the label Electrolux put on
5  there, would have been readily visible, and
6  conspicuous, as opposed to a black and white label
7  attached to the inside of a door frame near the
8  hinges of the door where is was only visible when
9  the door was open, and you were looking inside there
10 at that side of the door frame.
11        My warning would have been visible each and
12 every time they went to turn the dryer on.  It would
13 have been visible while the dryer was operating, and
14 so forth.
15 Q.     So, you propose putting the label on the top
16 of the dryer.  But, what if -- and I can't remember
17 what the Clouds testified to, and we can talk about
18 that -- but, what's preventing a consumer from
19 putting things on top of the dryer, that would cover
20 up the label?
21 A.     They could, but it would be there initially
22 for them to see, and it would be there every time
23 they clean the top of the dryer off.
24 Q.     Do you know whether the Clouds stored

144

1  anything on top of their dryer?
2  A.     I referenced something about what they did
3  in my report.  I have to go back, and look.
4         The Clouds didn't testify -- at least I
5  don't have note of them testifying if they kept
6  anything on top of the dryer.
7         I am going to look through Mike Stoddard's
8  notes, if he noted anything.
9  Q.     My point is, if a user stores things on
10 their clothes dryer all the time, then that's going
11 to eliminate their ability to see your warning.
12 Wouldn't you agree with that?
13 A.     It would potentially interfere with their
14 ability to see the warning after the first use if
15 they immediately started putting stuff on there.
16        So it could be, if that's a concern, to put
17 it on the front of the dryer, on the front of the
18 dryer door, and you wouldn't have that problem.
19        But Illustration 1, because it's associated
20 with the indicator lights, should go on the top, and
21 then the indicator lights are going to provide the
22 information to the user, and eventually, if it shuts
23 off, the indicator light would tell them that it
24 shut off, and the warning underneath the indicator

145

1  light will tell them why.
2         The second thing is, is that Mrs. Cloud
3  didn't testify that she never read the label on the
4  dryer.  She testified she didn't recall whether
5  there was a label there, or not.  They're two very
6  different things.
7  Q.     I understand.
8  A.     The other thing I want to mention, too, is
9  that Carl King testified that Electrolux chose to
10 put their checklist, tape it to the top of the dryer
11 to "to be in your face."
12        So my proposal is not different than what
13 Electrolux itself stated they do, and the reason
14 they do it.
15 Q.     Dr. Vigilante, did you have an understanding
16 of whether the Clouds read the product literature
17 that came with the dryer?
18 A.     I just read my notes that Mr. Emil Cloud
19 said they received a packet, but he never read it.
20 Q.     How about Mrs. Cloud, or is that what you
21 are looking for?
22 A.     Yes, I am looking for that.  I'm sorry.
23 Q.     No, no, that's okay.
24 A.     On Page 40, he said that -- 38 to 39, he

37 (Pages 142 to 145)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

146

1  said that the installer left a bag of documents
2  after installing is the dryer.
3      Page 40:  He received a booklet with a lot
4  of papers in it.  He probably received, and read it,
5  but can't say for sure.  He always skims through
6  Owner's Guides for anything he buys.  He probably
7  would have the skimmed through the Owner's Guide
8  when they installed the dryer.  He never had a
9  reason to go back, and read, the Owner's Guide after
10  he initially skimmed through it.  He does not recall
11  any of the warnings in the Owner's Guide.
12      He did not read the Installation
13  Instructions because he paid a professional to do
14  it.
15      Mrs. Cloud testified she recalls getting a
16  booklet with the dryer -- Page 42 -- she does not
17  recognize the Owner's Guide for the dryer.
18      On 43:  She testified she does not recall if
19  she received one, or more, booklets.  She recalled
20  skimming through the booklet for the dryer.  She
21  does not recall anything in the booklet about how
22  the dryer was supposed to be cleaned, and could not
23  specifically recall any one thing she read in the
24  manual.

147

1      43 to 44:  She just recalls reading the
2  manual on one occasion when they got the dryer.
3      And on Page 44, she said she never had any
4  reason to look at the manual again.  She didn't have
5  any problems with the dryer.
6      And on 44 and 45, she does not recall the
7  Installation Instructions.
8  Q.      And, you agree that an owner of a dryer has
9  the responsibility to read the Owner's Manual.
10  Right?
11  A.      I don't know that I agree with that.  If
12  they don't know how to use the dryer, then they
13  should read the manual.
14      If they know how to read the manual -- I
15  don't know that they're required to read it, and I
16  don't know that it would be unreasonable not to read
17  it.
18      I think Mr. King, and Mr. Ripley, testified
19  they designed the dryer to be intuitive to use, and
20  they wanted it to be easy to use.  There's no
21  requirement to read the manual.
22      And, we know that if you're paying someone
23  to install it, there would be no reason the read the
24  Installation Instructions.

148

1  Q.      So it's your testimony that if a user
2  understands how to use the dryer, then they don't
3  have to read the Owner's Manual.  Is that right?
4  A.      That's correct, and Electrolux is well aware
5  of that.
6  Q.      Why do you say that?
7  A.      Because that's what they testified to.
8      I don't think Carl testified that users
9  didn't have to read the manual.  He testified that
10  it's an intuitive product.
11  A.      Yes.
12  Q.      And, I'm paraphrasing, but --
13  A.      He did, and Ripley testified they designed
14  it to be easy to use.
15  Q.      But, I don't think at any point did Carl, as
16  their corporate designee, or any other employee of
17  Electrolux, say that a user does not have to read
18  the manual?
19  A.      I didn't say that.
20  Q.      Okay.
21  A.      I said Electrolux was well aware that people
22  were not reading the manual.  So, Carl King
23  testified Electrolux was aware that installers and
24  users do not read the provided manuals.  Electrolux

149

1  knows that people can purchase and use dryers
2  without a manual, and Electrolux was well aware that
3  if users did not read the manual, they would
4  probably be unaware of the important 18-month
5  cleaning requirement.
6  Q.      Do you have an opinion as to what Electrolux
7  could have done to increase the number of users that
8  were reading the manual?
9  A.      I don't have an opinion as to what
10  Electrolux could have done to increase the number of
11  people that read the manual.
12      What I would say is that from a product
13  design standpoint, you would want to design the
14  product in such a way to reduce the need for people
15  to reference a manual.  And as part of that, you
16  would want to make sure that critical warnings and
17  safety information were on the product because (a),
18  you want to reduce people's reliance on the need to
19  read the manual.  And (b), you know that people
20  don't read the manual, and therefore any critical
21  safety information would need to be on the product.
22  Q.      What's the point to having a manual then?
23  A.      Manuals are for reference, and they're for
24  folks that either have a question about the product,

**38 (Pages 146 to 149)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

150

1    can't figure out how to use the product by just
2    trying to use it, or may be unfamiliar with the
3    product.
4         One other way manuals are appropriately used
5    is to provide a more full explanation of a
6    particular warning.
7         So, for example, it would be proper to put a
8    warning on a product that says "Warning: XYZ, bad
9    things can happen. See owner manual, Page 12 for
10   more information." That would be a perfectly
11   acceptable application, or use, of an Owner's
12   Manual.
13        One other caveat, too -- because I don't
14   want to make this too, too broad -- but we're
15   talking about a consumer product. We're not talking
16   about a heavy piece of industrial machinery that a
17   user doesn't have any experience with.
18        So, again, you've got to know your user
19   population, what their experiences are, what their
20   knowledge is, and what they are likely to do, and
21   not do, to determine whether or not a manual is
22   appropriate, or not appropriate, based on critical
23   safety information.
24   Q.    Is there ever a situation where it's

151

1    appropriate, or reasonable, for a manufacturer to
2    include critical safety information in the manual?
3    A.    Well, my opinion is that if it needs to be
4    on the product, it needs to be on the product, and
5    it should be repeated in the manual.
6         Maybe your question is whether or not it
7    should only be in the manual.
8    Q.    Right, should only be in the manual.
9    A.    So, again, it depends on the situation. If
10   you have, like, for example, a complicated piece of
11   industrial equipment, the warning related to a
12   maintenance item, the appropriate place may be the
13   manual as opposed to on the product. Because if the
14   maintenance guy, the guy who is running the
15   maintenance department, you know, may not have
16   exposure to the equipment, but he may have exposure
17   to the manual. So, it just depends on the product.
18   Q.    On dryers available on the market currently,
19   would we find any dryers that would have
20   substantially similar on-product labels to those
21   you're proposing?
22   A.    Currently on the market?
23   Q.    Currently on the market.
24   A.    I have not done a survey of all the dryers

152

1    on the market. I'm not aware if there's any other
2    manufacturers that are still making ball-hitch
3    dryers in the last several years since Electrolux
4    transitioned down to their bulkhead.
5         So, one of the things we haven't described
6    today, and I think we talked about in Vitale -- and
7    if we didn't, I apologize -- but the need for the
8    warranty has to do with the risk of fire due to the
9    design of this product.
10   Q.    Right.
11   A.    So, a bulkhead dryer doesn't have the same
12   risk. It doesn't have the same -- you don't get to
13   the same end when you do your analysis. So, a
14   warning may not be required for a bulkhead dryer
15   because of the risk level is so much lower.
16   Q.    And, that last question I wanted to get to
17   it currently. How about back to when this dryer was
18   manufactured in 2003?
19   A.    I didn't do a survey of the dryers in 2003,
20   but I do know that in 2005, Fisher & Pakel have
21   the indicator light on the dryer, and I know that as
22   of 2005-2006 timeframe, Electrolux, in their better
23   dryer lines, were using indicator codes, if not
24   codes and lights, to warn people of restricted

153

1    airflow.
2    Q.    Okay. So, that answers my question with
3    regard to indicator lights. But are you aware of
4    any dryers -- and we will just make it open-ended --
5    any dryers ever that had on-product labels that are
6    substantially similar to the ones you're proposing?
7    A.    Again, I'm not aware of any.
8    Q.    Okay. So earlier in your deposition, you
9    talked about the label -- well, at least the one
10   that was inside the door frame -- and you agree that
11   it did comply with the gas dryer standards.
12        We have not talked about whether you have
13   reviewed the Owner's Guide, and Installation
14   Instructions, and whether you have an opinion as to
15   whether they comply with ANSI Z21.5.1?
16   A.    We did.
17   Q.    We did talk about that?
18   A.    Yes.
19   Q.    Okay. And, you said that they did?
20   A.    I said that I had no information that they
21   didn't.
22   Q.    Okay. So other than the Fisher & Pakel, and
23   the Electrolux dryer, that you mentioned, are you
24   aware of any other dryers in 2003, until the

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

154

1   present, that are using indicator lights?
2   A.    Not dryers.
3   Q.    Other products?
4   A.    Other appliances.
5   Q.    Okay.  What types of appliances are using
6   indicator lights, that you're aware of?
7   A.    Washers, refrigerators, stoves, ovens,
8   microwaves, dehumidifiers, vacuums, toasters.
9   Q.    Okay.  You've named every appliance.
10   A.    A waffle maker.
11   Q.    Okay.  Do you have any --
12   A.    Griddle.
13          MR. LEVINE:  Sir, are you done with
14   your answer?
15          THE WITNESS:  Yes.
16          MR. LEVINE:  I'm just trying to
17   move on.
18   BY MS. YEMMA:
19   Q.    Okay.  Have you reviewed any studies, or
20   articles, to support compliance rate for indicator
21   lights?
22   A.    I have in the past.  I didn't cite anything
23   specifically other than the Woodson's textbook
24   regarding the use and need and benefits of indicator

155

1   lights.
2   Q.    So, what does that article say with regard
3   to indicator lights?
4   A.    The textbook?
5   Q.    Yes.  I don't expect you to be able to
6   recall the textbook, but in a nutshell, can you --
7   A.    It's one of the references that I cited.
8   Q.    Okay.
9   A.    The computer makes the paper easier, it just
10   takes me a little longer to open the files.  Sorry
11   about that.
12          So on Page 357 --
13   Q.    This is of the textbook?
14   A.    Yes, Woodson Textbook, he provided a
15   description of lights to display information.  And
16   one of the examples he provides is an indicator
17   light, either a -- it looks like a washer -- I would
18   say it's a washer.
19          And, then he says the use of lights to
20   display information changes in display status to
21   signify changes and functional status rather than
22   results of continued activation alone.  He just
23   provides some -- he provides some descriptions of
24   the different types of lights.

156

1          For example, he discusses a function active
2   lights, which are used to indicate that a particular
3   function is occurring.  He includes special hazard
4   condition lights that present hazards that the
5   operator may not be aware unless a warning light is
6   provided.  He gives some examples of where those
7   lights can be helpful.
8          He gives an example of malfunction lights,
9   the cue that some malfunction has occurred, or is
10   about to occur.  And, he gives the -- underneath
11   malfunction light, he gives the ubiquitous example
12   of a dummy light of a dashboard of a vehicle.
13          So, I think that's the only thing I
14   reference with regard to indicator lights.
15   Q.    Okay.  I think my question was about
16   compliance with indicator lights.
17          So, any studies to suggest how consumers
18   would respond to an indicator light?
19   A.    There are.  I didn't cite any specifically.
20   I didn't really think it was necessary.
21          Indicator lights have been used for decades
22   to indicate the status of a system, and shown to be
23   very effective in doing so.
24          As I mentioned a little bit earlier, their

157

1   use is ubiquitous amongst products, particularly
2   appliances.
3   Q.    In the Vitale deposition, we talked about
4   reading level assessments, and I believe it was in
5   conjunction with your view of Dr. Purswell's
6   opinion.
7          Do you remember that testimony, even
8   generally?
9   A.    Generally, I do.
10   Q.    Okay.  So, Dr. Purswell evaluates the
11   information in the manual using the Flesch-Kincaid
12   Reading Assessment.
13   A.    Yes.
14   Q.    Okay.  And, your response to his opinion
15   concerning that was that the text should be between
16   a fourth and sixth grade reading level.  Do you
17   remember that?
18   A.    Yes.
19   Q.    Okay.  He has a grade level higher.  I think
20   eighth grade he says in his report.
21   A.    He just provides -- this is my memory
22   because I don't have it.
23   Q.    I understand.
24   A.    He provides that the reading level was about

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

158

1  6.8, almost a seventh reading level.  So, that's
2  satisfactory.
3      My point in the Vitale deposition is that
4  typically, warnings instructions are written at no
5  greater than a sixth-grade level.  So, this is a
6  little bit higher.  But, the general recommendation
7  for general consumer use is to write between a
8  fourth and a sixth grade level.
9  Q.    Okay.  So that general recommendation, as
10  you put it, to write between a fourth and sixth
11  grade level, where does that come from?
12  A.    It comes from Human Factors Literature, and
13  I had brought two articles with me to the Vitale
14  deposition that explicitly stated that.  I brought
15  them with me today, but Ken pulled them from the
16  file.
17  Q.    He did?
18  A.    As far as the Purswell --
19          MR. LEVINE:  Oh, the things that
20  were attached at the end?
21          THE WITNESS:  Yes.
22          MR. LEVINE:  Do you want me to
23  bring them in?
24          THE WITNESS:  It's up to you.

159

1          MS. YEMMA:  Yes, do you mind?
2          MR. LEVINE:  No, no.
3          MS. YEMMA:  It was my understanding
4  only the report had been pulled, but...
5          MR. LEVINE:  Yes, I didn't even
6  realize there was something attached to
7  them.
8          MS. YEMMA:  Okay, no issue.
9          (Brief recess.)
10          (Documents marked Vigilante Exhibit
11  Nos. 11 and 12 for identification.)
12  BY MS. YEMMA:
13  Q.    Okay.  We just took a short break to make
14  some copies.  So, I just marked as Vigilante 11 and
15  12 two documents, and I'm going to hand them to you.
16      Do you recognize those documents?
17  A.    Yes.
18  Q.    Okay.  And if you would, for the record,
19  what is Vigilante-11?
20  A.    It's a reference guide call Manufacturer's
21  Guide Developing Consumer Product Instructions
22  published in October, 2003, for the U.S. Consumer
23  Product Safety Commission.
24  Q.    Okay.  And how about, if you would for the

160

1  record, identify Vigilante-12?
2  A.    Vigilante-12 is an excerpt from Chapter 36
3  in the textbook Handbook of Human Factors and
4  Ergonomics, Second Edition, published in 1997.
5  Q.    So before we took that short break, I
6  believe you had testified that the general
7  recommendation is that the reading level for a
8  warning should be between the fourth and fifth
9  grade.  Is that right?
10  A.    Yes.
11  Q.    And, you believe these articles would
12  support that?
13  A.    Yes.
14  Q.    And, if you would draw my attention to where
15  that is?
16  A.    On Exhibit 12, do you see where it's
17  highlighted on Page 1187 of the text?
18  Q.    I see that, "As noted earlier, a grade 4-6
19  range is usually recommended."
20  A.    Yes.
21  Q.    And, they're talking about with regard to
22  on-product warnings, literature, or both?
23  A.    This is with regard to warnings.  So, it's
24  for both on-product, and other manifestations of

161

1  warnings.
2  Q.    Okay.  And, is there anything in
3  Vigilante-11?
4  A.    Yes.  Page 30, under the section "What Makes
5  the Text Readable", it states, "A 6th to 8th reading
6  level is often considered suitable for the general
7  public, but an even lower level may be desirable for
8  critical information.  Higher reading levels might
9  be acceptable for more literate and educated
10  audiences.  When in doubt, write to the 6th grade
11  reading level."
12  Q.    Do you know the Clouds' educational
13  backgrounds?
14  A.    I think Mr. Cloud was a -- I know he was --
15  I believe he was either a college grad -- I don't
16  know if he was an advanced degree grad, or not.  I
17  don't recall.
18  Q.    How about Mr. Cloud?
19  A.    I don't recall.  I don't think they were
20  high school dropouts.
21  Q.    Have any of the opinions in your
22  report been peer-reviewed?
23  A.    In this particular report, I don't believe
24  they have been peer-reviewed.  And similar reports I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

162

1  have done in the past, they have been.
2  Q.      And, would those have been reports you did
3  at Robson?
4  A.      Yes.
5  Q.      And are the opinions you've offered in the
6  Cloud case, are they substantially similar to the
7  reports that you issued, while you were at Robson,
8  that had been peer-reviewed?
9  A.      Similar, yes.
10  Q.      In those earlier reports, had you -- and I'm
11  just going from my own memory -- were you proposing
12  the alternative warnings like you are in this case?
13  A.      How do you mean?
14  Q.      Like, the Illustrations 1, 2, 3 and 4, were
15  those included in the early reports like in the
16  Powers and Marquette matters?
17  A.      Something similar to 1 and 2 were.
18  Sometimes, if the installation instruction issue is
19  not relevant to the case, I don't provide it in the
20  report.  And, I think I started adding Illustration
21  No. 2 in more recent reports because it was
22  identified more recently in Electrolux's discovery
23  material.
24  Q.      I'm sorry, could you say that again with

163

1  regard to the last part?
2  A.      Illustration 2 --
3  Q.      Okay.
4  A.      -- I don't believe I had identified that in
5  the Electrolux discovery material in the years past.
6  It's only been within, like, the last year, or so,
7  that I identified that in Electrolux's literature.
8  Q.      Other than the articles, that are referenced
9  in your report, are there any other articles you are
10  relying on to form your opinions in this case?
11  A.      Specifically?
12  Q.      Specifically.
13  A.      No.
14  Q.      So with regard to the Owner's Manual, I know
15  you are proposing the inclusion of what's in the
16  illustration, that they be added to the manuals,
17  right, like Illustration 1, 2?
18  A.      Yes.
19  Q.      Is there anything else about the Owner's
20  Manual that you would change?
21  A.      Yes.  Using the warnings would certainly
22  make the information more conspicuous, and more
23  prominent on the pages.  The illustration would make
24  it more comprehensive because I think that's the

164

1  main things.
2        Of course, the warnings should be at the
3  front of the manual, or at the beginning of the
4  manual.
5  Q.      So if you were using Illustration 1 -- so
6  let's say it's a dryer that had an indicator light.
7  Where would Illustration 1 go in the manual?
8  A.      Well, I think it would go up front, and then
9  it would be repeated within the operations manual in
10  the section that describes, and talks about, the
11  service indicator lights.
12        MS. YEMMA:  So I am marking, as
13  Vigilante-13, the Owner's Guide.
14        (Owner's Guide marked Vigilante
15  Exhibit No. 13 for identification.)
16  BY MS. YEMMA:
17  Q.      So if you could just explain in context, now
18  that I have handed you the document, where would you
19  put Illustration 1?
20  A.      Certainly on the page that's marked Page No.
21  2.
22  Q.      Okay.
23  A.      And, then there would be a section related
24  to the service indicator lights.  So it's not

165

1  currently a section in the manual because there is
2  no service indicator light in the manual.
3  Q.      So you would like to see a section about the
4  indicator lights, in addition to what we see in
5  Illustration 1, in the Owner's Guide?
6  A.      Well, there had to be because you have to
7  describe the use.  So, for example, on Page 5,
8  there's a features list.  For example, the cycle
9  signal control, the drum light, reversible door,
10  drying rack, you would imagine a section dealing
11  with the indicator lights, too, whether you put it
12  under features, you make it its own section, you
13  know, whatever you want to do.
14  Q.      And with regard to Illustration 2, would you
15  include that in the Owner's Guide, and the
16  Installation Instructions, or just one of them?
17  A.      I think it needs to be in the Owner's Guide.
18  Installation Instructions, it may be redundant to
19  put it in there.  I don't think it can hurt, but it
20  needs to be in the Owner's Guide.
21  Q.      And then with regard to Illustration 3, you
22  propose that it be included in the Owner's Guide.
23  Right?
24  A.      Well, yes, it would be in the Owner's Guide.

42 (Pages 162 to 165)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

166

1    It would either be Illustration 1 and 2, or
2    Illustration 2 and 3.
3    Q.    And with regard to the proposed placement of
4    Illustration 3, would it be at the front just like
5    for Illustration 1?
6    A.    Yes, you definitely have Illustration 1 or 2
7    on the front prominently placed on the Page 2. And,
8    then, like I said, you either create a new section,
9    or maybe you put it under Features, or you put it
10   under the Care and Cleaning on Page 6. But, you've
11   got to include that information somewhere in the
12   body of the manual explaining what the process is,
13   and then that's the appropriate place for
14   Illustration No. 2.
15   Q.    On Illustration 1, you don't make any
16   reference to the 18-month cleaning.
17   A.    Right.
18   Q.    Is there any reason for that? Or, why
19   didn't you reference it?
20   A.    The 18-month cleaning is accounted for in
21   the cycle counter. So, we know, and by "we" I mean
22   myself, Mr. Stoddard, and Electrolux, know that 625
23   cycles is an average for 18 months. And that an
24   individual user may encounter 625 cycles in a few

167

1    months, or maybe three years.
2    So, Electrolux has pinned their cleaning
3    requirement based upon an approximate number of
4    cycles. So, we don't want the user cleaning the
5    dryer before they have to, and we don't want them to
6    clean the dryer after it needs to be done.
7    So if they're a heavy user, and they reach
8    18 months of average use within 12 months, you want
9    the cleaning at 12 months, not going another six
10   months, and another six months of lint buildup.
11   Q.    Okay. I believe we have thoroughly covered
12   your opinions in this matter, and your bases for
13   them.
14   Is there anything that you would like to
15   add?
16   A.    I can't think of anything at this time.
17   MS. YEMMA:  Okay. Ken, unless you
18   have anything, I'm done.
19   MR. LEVINE:  I have no questions of
20   this witness.
21   But just bear with me for one
22   second. I do want to consult with him for
23   just a minute on one issue, and then I'll be
24   right back in.

168

1    MS. YEMMA:  Okay. We'll organize
2    the exhibits while you're gone.
3    (Mr. Levine and Dr. Vigilante exit
4    the conference room.)
5    MR. LEVINE:  I wanted to make a
6    statement -- and it's really just so that
7    the record will reflect that I actually sat
8    here for the entire deposition -- and it's
9    that the expert report was issued in
10   January, and then the other case came along.
11   And through the additional consideration, or
12   study, the other warnings were issued. They
13   are not the warnings that were in the
14   January report. It would be our
15   intention -- when I say "our intention",
16   from a litigation standpoint, that we use
17   the more current warnings in this trial, or
18   litigation, as well.
19   And, I don't know if that was clear
20   from what communications that Patrick has
21   had with you, and the progress of this, and
22   wanted to make sure that you had had enough
23   time to ask Dr. Vigilante questions about
24   the more current ones so that at the time of

169

1    trial, no one will sit back, and say, well,
2    it wasn't in your original report, and so
3    you can't talk about it.
4    Are there any more questions that
5    you would like to ask in that regard?
6    MS. YEMMA:  And I didn't know until
7    today, that you were using the more updated
8    warnings. But, I understand that, and I
9    feel like I've asked enough questions.
10   And, in addition, in Vitale -- and
11   you'll correct me if I'm wrong -- that
12   report did contain updated warnings. Right?
13   THE WITNESS:  Yes. That's why
14   things got a little bit confused because of
15   the timing between everything.
16   MS. YEMMA:  I understand. Sure.
17   MR. LEVINE:  All right. And, I
18   have nothing else to add --
19   MS. YEMMA:  I appreciate you
20   mentioning that.
21   MR. LEVINE:  -- other than some
22   faxing breaks, and to get some candy from
23   the outside, and occasionally I made bad
24   jokes, that were edited out of the

43 (Pages 166 to 169)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

170

```
 1          transcript, and that's perfectly acceptable.
 2               Thanks.  I have nothing else to
 3     add.
 4               Do you have anything further?
 5               MS. YEMMA:  No, I have nothing
 6     further.  I think we're all set.
 7               MR. LEVINE:  All right.
 8               Well, thank you very much.
 9               THE WITNESS:  Thank you.
10               MS. YEMMA:  Thank you, Dr.
11     Vigilante.
12
13
14          (Witness excused.)
15          (Deposition concluded at 3:20
16     p.m.)
17
18
19
20
21
22
23
24
```

171

```
 1                    CERTIFICATE
 2
 3          I HEREBY CERTIFY that the proceedings,
 4     evidence and objections are contained fully and
 5     accurately in the stenographic notes taken by me
 6     upon the Deposition of WILLIAM J. VIGILANTE, JR.
 7     Ph.D., CPE, August 31, 2016, and that this is a true
 8     and correct transcript of same.
 9
10
11
12
13
             _____
14           DONNA HUNTER
             Registered Professional Reporter
15           and Notary Public
16
17
18          (The foregoing certification of
19     this transcript does not apply to any
20     reproduction of the same by any means,
21     unless under the direct control and/or
22     supervision of the certifying reporter.)
23
24
```

172

```
 1               INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over carefully
 4     and make any necessary corrections.  You should
 5     state the reason in the appropriate space on the
 6     errata sheet for any corrections that are made.
 7          After do so, please sign the errata sheet
 8     and date it.
 9          You are signing same subject to the changes
10     you have noted on the errata sheet, which will be
11     attached to your deposition.
12          It is imperative that you return the
13     original errata sheet to deposing attorney within
14     thirty (30) days of receipt of the deposition
15     transcript by you.  If you fail to do so, the
16     deposition transcript may be deemed to be accurate
17     and may be used in court.
18
19
20
21
22
23
24
```

173

```
 1                    E R R A T A
 2
 3     PAGE    LINE      CORRECTION
 4
 5     ----    ----    -------------------------------
 6     ----    ----    -------------------------------
 7     ----    ----    -------------------------------
 8     ----    ----    -------------------------------
 9     ----    ----    -------------------------------
10     ----    ----    -------------------------------
11     ----    ----    -------------------------------
12     ----    ----    -------------------------------
13     ----    ----    -------------------------------
14     ----    ----    -------------------------------
15     ----    ----    -------------------------------
16     ----    ----    -------------------------------
17     ----    ----    -------------------------------
18     ----    ----    -------------------------------
19     ----    ----    -------------------------------
20     ----    ----    -------------------------------
21     ----    ----    -------------------------------
22     ----    ----    -------------------------------
23     ----    ----    -------------------------------
24     ----    ----    -------------------------------
```

44 (Pages 170 to 173)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

174

1     ACKNOWLEDGEMENT OF DEPONENT
2
3     I _____, do hereby
4  certify that I have read the foregoing pages
5  _____ to _____ and that the same is a correct
6  transcription of the answers given by me to the
7  questions therein set forth, except for the
8  corrections or changes in form or substance, if any,
9  noted in the attached Errata sheet.
10
11  - - - - - - - - - - - - - - - - - - - - - -
12
13    Subscribed and sworn to before me this
14  _____day of _____, _____.
15
16  My commission expires:
17
18
19  _____
20  Notary Public
21
22
23
24

175

1          Vigilante-1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

176

1          Vigilante-2
2
3
4
5     Vigilante-2 is a CD retained by Ms.
6  Yemma, and not attached to the transcript.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

177

1          Vigilante-3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

45 (Pages 174 to 177)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

|  | 178 |
|---|---|
| 1 | Vigilante-4 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 180 |
|---|---|
| 1 | Vigilante-6 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 179 |
|---|---|
| 1 | Vigilante-5 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 181 |
|---|---|
| 1 | Vigilante-7 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

| | 182 |
|---|---|
| 1 | Vigilante-8 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 184 |
|---|---|
| 1 | Vigilante-10 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 183 |
|---|---|
| 1 | Vigilante-9 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 185 |
|---|---|
| 1 | Vigilante-11 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

47 (Pages 182 to 185)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

186

```
 1              Vigilante-12
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

187

```
 1              Vigilante-13
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

48 (Pages 186 to 187)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

## A

**ability (4)** 137:17,17
144:11,14
**able (11)** 33:21 41:15
41:15 65:20 84:8
85:23 108:15 136:4
137:23 139:8 155:5
**absolutely (2)** 82:24
141:18
**acceptable (5)** 53:8
111:22 150:11
161:9 170:1
**acceptance (1)** 112:8
**accepted (2)** 38:16
51:12
**access (1)** 75:11
**accessible (1)** 53:6
**Accident (1)** 111:16
**accompany (1)** 92:12
**accompanying (1)**
46:10
**accord (3)** 90:17
92:16 120:7
**accordion (3)** 43:17
43:22,24
**accordions (1)** 44:22
**accounted (1)** 166:20
**accurate (1)** 172:16
**accurately (1)** 171:5
**ACKNOWLEDG...**
174:1
**acquire (1)** 83:3
**acquisition (2)** 39:18
43:2
**actions (1)** 76:22
**activation (1)** 155:22
**active (5)** 117:23
118:1 127:7 137:7
156:1
**actual (5)** 40:17,21
40:23 44:9 67:23
**acuity (1)** 132:2
**add (3)** 167:15
169:18 170:3
**added (3)** 50:7 57:8
163:16
**addendum (1)** 38:15

**adding (3)** 140:20,21
162:20
**addition (6)** 13:22
58:18 71:8 141:5
165:4 169:10
**additional (2)** 19:1
168:11
**address (7)** 67:14,17
101:5,8,9 116:19
119:18
**adequacy (8)** 28:23
35:14,21 36:7 53:9
53:13 56:6 64:5
**adequate (22)** 70:12
71:14 72:14 73:5
108:8,10,12,14,18
108:20 109:6,7,13
109:23 111:18
120:4,14 125:13,16
125:20,22 132:24
**adequately (1)** 120:9
**adhered (1)** 44:21
**adhesives (1)** 43:16
**adjacent (3)** 25:16
73:18 127:24
**Administration (3)**
21:11,14,16
**adults (1)** 39:19
**advanced (1)** 161:16
**advantages (1)** 55:2
**advertisements (1)**
40:8
**Advil (1)** 42:13
**advisor (1)** 38:13
**advocating (2)** 62:7
123:8
**affect (5)** 28:22 31:15
35:18 130:18
135:19
**affirmative (2)** 77:7
77:9
**affixed (1)** 44:19
**afford (1)** 137:23
**age (1)** 132:2
**agencies (1)** 32:8
**agent (1)** 105:3
**ago (2)** 47:1 97:8

**agree (11)** 42:10
96:23 97:13 98:10
120:1,6,11 144:12
147:8,11 153:10
**air (2)** 72:3 125:10
**airflow (7)** 12:2 81:4
104:20,23 125:24
127:9 153:1
**airport (2)** 73:14,21
**al (3)** 69:12 70:3
72:10
**alarm (1)** 69:7
**alert (1)** 72:14
**alleged (1)** 11:3
**allegedly (2)** 49:14
62:11
**allow (2)** 91:13,21
**allowed (2)** 66:4
68:10
**allowing (1)** 67:6
**Allstate (2)** 4:17 17:1
**alternative (1)**
162:12
**Amended (2)** 5:8
11:7
**America (1)** 72:3
**amount (3)** 33:19,20
42:23
**amusement (1)** 47:7
**analysis (10)** 80:1,3
92:10 100:6,7
105:13 113:18
115:6 116:3 152:13
**and/or (4)** 54:7 79:24
105:15 171:21
**Annual (1)** 38:18
**ANSI (14)** 32:5 38:14
39:10 96:6,18
100:18 107:5
113:17,20 114:23
126:2 132:22 135:5
153:15
**answer (1)** 154:14
**answers (3)** 10:24
153:2 174:6
**anybody (1)** 52:19
**anymore (1)** 36:21

**anytime (2)** 41:19
90:6
**apart (4)** 15:8 68:6
92:15 100:22
**apologize (1)** 152:7
**appear (1)** 89:21
**appliance (2)** 81:15
154:9
**appliances (3)** 154:4
154:5 157:2
**applicable (5)** 28:24
39:6 54:19 114:4,21
**application (1)**
150:11
**applied (1)** 114:13
**applies (1)** 113:3
**apply (4)** 91:17
112:24 113:2
171:19
**Applying (1)** 38:6
**appreciate (3)** 29:12
99:16 169:19
**approaching (2)**
71:23 74:12
**appropriate (7)**
115:16 150:22,22
151:1,12 166:13
172:5
**appropriately (1)**
150:4
**approximate (3)** 16:4
16:11 167:3
**approximately (1)**
123:23
**April (7)** 22:8 58:23
64:12 74:23,24
75:19 81:17
**area (5)** 16:2 73:7
92:21 107:22
130:15
**areas (1)** 16:1
**argument (1)** 101:8
**arises (1)** 4:19
**article (7)** 29:14,14
29:14,15 31:3 39:21
155:2
**articles (19)** 11:20

28:16 29:11,17,22
30:3,7,12 31:10
32:21 37:7 39:24
40:9 45:12 154:20
158:13 160:11
163:8,9
**asked (16)** 18:5,7
23:17 38:13 46:17
48:15 50:14,18 51:3
61:8 77:16 85:15
115:4,7,10 169:9
**asking (1)** 87:3
**aspect (1)** 62:6
**assess (8)** 46:8 48:17
53:12 56:5 76:20
105:19 110:9 141:9
**assessed (2)** 47:7
54:23
**assessing (4)** 53:4
54:17 64:5,10
**assessment (3)**
129:17 130:5
157:12
**assessments (2)** 54:8
157:4
**associated (14)** 34:21
39:9 52:1 63:6
97:14,24 101:4
104:11 105:14
111:3 117:6 125:6
136:14 144:19
**assume (1)** 92:11
**assuming (1)** 92:9
**assumptions (1)**
142:16
**attach (1)** 57:17
**attached (15)** 3:5
36:19 43:4,7 44:12
47:5 86:8,9 91:5
143:7 158:20 159:6
172:11 174:9 176:6
**attention (4)** 35:23
74:14 108:13
160:14
**attentive (2)** 72:15
74:11
**attorney (1)** 172:13

**atypical (1)** 65:10
**audible (4)** 70:9,11
70:15 118:3
**audiences (1)** 161:10
**August (8)** 1:18
14:18 22:23 56:20
72:4 76:5,6 171:7
**authorized (4)** 94:24
95:1 123:15 138:20
**auto (1)** 104:19
**automatically (1)**
58:2
**available (4)** 29:18
53:12 117:14
151:18
**average (2)** 166:23
167:8
**avoid (8)** 74:12 93:21
96:20 97:5 101:11
108:16 130:24
136:9
**avoiding (1)** 108:17
**aware (25)** 27:3
64:20 68:3,19,20
89:7 90:14,15 95:11
99:4,6 113:21
119:17 138:22
139:21 148:4,21,23
149:2 152:1 153:3,7
153:24 154:6 156:5
**a.m (1)** 1:18

---

**B**

**b (4)** 3:4 126:22
142:4 149:19
**back (41)** 4:20 6:11
6:14,23 23:3 24:11
25:15,18 27:23 35:1
37:4 44:19,20,24
45:7 58:19 70:20,22
72:16,19 73:24
75:24 78:15 79:11
85:19 88:5 99:16
103:20 105:4
107:15 114:23
119:9 128:9,11
129:2 130:13 144:3

146:9 152:17
167:24 169:1
**background (4)**
27:15,18,19 53:18
**backgrounds (1)**
161:13
**bad (2)** 150:8 169:23
**bag (1)** 146:1
**balcony (2)** 49:17,24
**ballpark (1)** 74:17
**ball-hitch (3)** 82:19
82:23 152:2
**barrier (2)** 50:5
137:16
**base (1)** 128:17
**based (18)** 32:23
42:16 54:22,23,24
63:10 80:2 120:24
125:4,8 130:7 132:8
133:13,15 135:5,8
150:22 167:3
**bases (1)** 167:12
**basically (3)** 31:13
53:3 54:2
**basis (3)** 99:3,7 111:5
**Bates (7)** 11:1,17,18
12:2,3,6 92:2
**battery (1)** 45:21
**beacons (1)** 74:8
**bear (1)** 167:21
**bearing (2)** 49:19
50:1
**beeper (1)** 118:3
**beeping (2)** 104:19
104:24
**beginning (2)** 50:12
164:3
**begins (1)** 124:16
**behalf (5)** 46:7 71:11
71:13 98:4 110:8
**behavior (3)** 33:22
35:24 142:4
**belief (1)** 63:17
**believe (41)** 5:1,15,19
19:8 23:16 33:23
37:3 40:19 61:7
62:1,16 63:22 67:3

67:11 68:15 70:24
72:8 74:19 75:20,22
77:18 78:13 81:23
82:2 90:7 95:1
97:16 110:15 111:1
120:24 129:4
141:21 142:1 143:2
157:4 160:6,11
161:15,23 163:4
167:11
**Bell (2)** 1:17 2:5
**benchmark (1)** 54:12
**benefit (3)** 40:7 81:11
139:11
**benefits (2)** 108:22
154:24
**best (5)** 21:13 75:22
86:6 116:13 136:19
**better (6)** 11:4 42:9
44:2 125:1 128:18
152:22
**big (3)** 41:13,17
128:19
**bike (8)** 65:11 66:21
67:3,12,18 68:2,3,5
**Bill (1)** 12:3
**binder (3)** 13:24 14:1
14:3
**bit (5)** 43:10,18
156:24 158:6
169:14
**black (7)** 27:14,17,19
27:22 28:1,4 143:6
**black-and-white (1)**
27:10
**blame (1)** 112:18
**blockages (1)** 89:6
**Blue (2)** 1:17 2:5
**BMW (3)** 65:21 66:1
67:14
**board (2)** 59:12
119:9
**Bobcat (2)** 69:20,21
**body (3)** 32:14
112:11 166:12
**booklet (4)** 146:3,16
146:20,21

**booklets (1)** 146:19
**Boscov's (1)** 139:14
**bother (1)** 22:19
**bottle (8)** 40:14 42:7
43:5 44:10,11,12,14
45:4
**bottles (1)** 40:18
**bottom (3)** 21:20
66:22 89:15
**bought (1)** 50:4
**brakes (1)** 74:5
**branding (1)** 44:17
**Bravos (1)** 103:23
**break (8)** 5:3 7:2
56:15 83:13 89:24
141:17 159:13
160:5
**breaks (1)** 169:22
**Brian (3)** 8:23,23,24
**bridle (6)** 46:24 49:2
50:10 55:6,9 110:10
**Brief (2)** 141:19
159:9
**bring (6)** 85:10
126:24 133:24
137:23,24 158:23
**bringing (1)** 54:6
**broad (1)** 150:14
**brought (7)** 4:17 5:20
13:23 88:22 126:19
158:13,14
**Brown (2)** 8:2 9:1
**Brown's (1)** 8:3
**Brugger (1)** 59:12
**brush (3)** 85:22 86:5
86:7
**Buckley (1)** 11:7
**build (1)** 139:22
**buildup (6)** 89:4
97:11,24 105:15
125:5 167:10
**built (1)** 32:9
**bulkhead (7)** 82:15
82:16,19,23 152:4
152:11,14
**bullet (7)** 123:1,2,3
131:2 135:1 140:22

141:1
**bulleted (1)** 41:18
**bulletin (1)** 138:8
**bullets (1)** 140:12
**bunch (2)** 36:18
37:11
**burn (1)** 123:19
**buys (1)** 146:6

---

**C**

**C (3)** 2:1 72:9 142:7
**cabinet (9)** 89:1,2,5,8
89:15 95:4,8,10
99:2
**cabinets (1)** 45:20
**cables (1)** 45:21
**call (15)** 12:14,20
13:16 25:13 26:11
79:18 86:6 88:13,14
88:16,18 93:16
137:9,10 159:20
**called (5)** 31:3 42:17
69:20,21 117:15
**calling (1)** 55:6
**calls (2)** 8:7 84:3
**cameras (1)** 36:20
**candy (1)** 169:22
**capturing (2)** 112:20
119:1
**car (4)** 45:20 73:12
73:24 74:13
**cards (2)** 36:15 45:24
**care (2)** 41:12 166:10
**career (1)** 126:7
**careful (1)** 91:11
**carefully (1)** 172:3
**Carl (19)** 8:2,15,16
8:17,18,19,19 9:3,3
10:23 19:4 97:18,19
97:23 98:8 145:9
148:8,15,22
**Carolina (2)** 133:8
135:9
**carriers (1)** 16:23
**carrying (1)** 34:8
**Carter (3)** 72:3,20
73:1

**case (73)** 7:15 8:14
9:2,6,7 15:20 22:5
24:15 27:3 46:15,16
46:20 48:6,10 50:3
58:24 59:15,23,23
60:1,4,15 61:2,3,9
61:11 64:22 65:1,3
65:16,23 66:15,22
67:11 68:1,14,16,19
69:11,14,24 70:8,14
71:9,19 72:20,23,24
73:1 74:15 75:16
77:1 78:10,12,16
79:16 86:21,24 87:3
101:23 103:2,14
105:9 109:12
130:14 131:24
134:23 137:5 162:6
162:12,19 163:10
168:10
**cases (47)** 12:21
15:22 16:4,5,9,16
16:18,21,24 25:1
59:3,7,9 60:2,7,10
60:12 61:12,14,16
61:24 62:2,4,8,10
62:14,18,21,23 63:1
63:20 64:1,2,16,19
69:4 71:8,17,18
72:2,2 79:22 82:18
86:16,18 103:3
105:11
**cash (1)** 137:16
**catch (1)** 97:12
**catching (1)** 68:5
**category (1)** 40:11
**cause (4)** 62:12 67:5
80:23,23
**caution (1)** 39:11
**caveat (1)** 150:13
**CD (29)** 3:7 5:24 6:3
6:5,9 7:3,6,8 10:6,7
10:8,12 11:9 13:22
14:4,10,23 15:1,5,9
15:14 17:4,18 19:12
21:10 75:3 77:1
103:12 176:5

**center (5)** 25:18
105:22 131:15
132:4,10
**certain (4)** 52:17
113:23 132:5
133:23
**certainly (3)** 117:21
163:21 164:20
**CERTIFICATE (1)**
171:1
**certification (2)** 4:2
171:18
**certify (2)** 171:3
174:4
**certifying (1)** 171:22
**cetera (4)** 24:2
123:16 132:17
133:21
**challenge (1)** 68:18
**challenged (1)** 68:13
**Chalrie (1)** 72:9
**chance (2)** 31:16,17
**change (5)** 19:21
35:23 110:14 137:7
163:20
**changed (6)** 9:15
123:6 124:17,23
140:11,14
**changes (8)** 21:5
51:10 53:5 120:19
155:20,21 172:9
174:8
**changing (1)** 124:24
**chapter (4)** 3:22 38:9
38:19 160:2
**characteristics (1)**
117:11
**characterize (1)** 19:3
**checklist (1)** 145:10
**chemical (2)** 64:8,9
**chemicals (2)** 42:21
43:15
**chipper (2)** 47:2
112:10
**chose (3)** 55:9 109:10
145:9
**chosen (2)** 55:19,21

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

191

chronologically (1) 45:18
circuit (1) 20:23
cite (3) 112:22 154:22 156:19
cited (2) 9:10 155:7
civilian (1) 70:24
claim (1) 11:3
claimed (1) 67:14
claims (2) 51:22 91:20
clarify (3) 99:11 106:3 109:24
Clausen (1) 8:15
clean (20) 83:23,24 84:2,5 85:12,18,21 86:3 88:10 94:22,24 95:9 137:11,12 139:3,19 142:12,15 143:23 167:6
cleaned (19) 81:22 83:24 86:11 87:13 89:1 94:8,12,15,20 95:4,7 99:3 105:15 123:15 124:2,6 139:1,17 146:22
cleaning (25) 8:7 9:12,13 81:16 83:16 83:16 84:11 87:19 89:3 94:10 98:21 105:19,20 107:2,8 123:22 131:16 140:2 149:5 166:10 166:16,20 167:2,4,9
cleanup (1) 70:23
clear (1) 168:19
clearance (2) 93:16 93:22
Clearly (1) 21:12
client (1) 48:5
close (1) 66:23
closed (6) 16:14 43:11,18 73:15,18 102:1
clothes (14) 16:19 28:17,18,19,24 29:1 59:4 60:5 61:3,11

104:21 112:24 113:2 144:10
Cloud (28) 1:5 8:2 9:15 10:24 14:8,8 23:13,17 74:15 75:20 79:15 81:14 81:16,19 94:8,12,15 95:3 103:2,6 121:2 145:2,18,20 146:15 161:14,18 162:6
Clouds (16) 4:18 25:8 28:13 90:5 91:17 92:5 94:23 102:2 141:22 142:11,17 143:17 143:24 144:4 145:16 161:12
Cloud's (1) 91:5
code (3) 107:5,6 113:12
codefendant (2) 60:20 64:2
codes (2) 152:23,24
coherently (1) 100:20
colleagues (1) 53:5
collected (2) 24:22,24
college (1) 161:15
collision (1) 73:6
color (9) 27:5,6,21,24 96:17 100:17,19 134:3,18
colored (1) 27:9
combustion (9) 60:14 61:11 62:14,15,17 63:5,19 97:7 100:3
come (17) 23:2 28:5 50:18 55:1,24 88:4 88:5,17 99:15 110:24 111:7 123:17 124:2,4 125:2 139:10 158:11
comes (6) 102:13,15 102:21 104:16 139:12 158:12
coming (4) 18:23 47:14 69:1 140:1

commencing (1) 1:18
commercial (1) 39:1
commission (2) 159:23 174:16
Commissioners (1) 59:13
committee (1) 38:12
communicate (3) 65:10 116:16 136:4
communicated (1) 107:9
communications (1) 168:20
companies (3) 46:11 81:16 87:23
company (16) 4:18 23:6 46:13,14,24 48:23 49:3 60:19 61:19 68:18 69:6 70:5,5 75:6 83:19 106:19
compare (3) 100:24 103:15 105:13
compared (2) 33:12 103:3
comparing (1) 132:21
comparison (4) 53:20 103:8 105:5 141:14
competition (1) 116:2
competitive (1) 54:9
competitors (1) 54:11
Complaint (2) 11:1,7
complete (1) 58:20
completeness (1) 122:19
compliance (14) 43:3 108:21,23 109:1,2 111:19,21 136:15 136:18,20,24 137:22 154:20 156:16
complicated (2) 139:7 151:10
complied (1) 113:19

complies (1) 96:6
comply (15) 31:18 96:10,15 108:19 113:5 120:2,13,15 135:20 136:13,14 137:18 142:10 153:11,15
complying (2) 108:22 113:21
components (2) 37:24 111:3
comprehending (1) 133:18
comprehension (2) 35:19 135:3
comprehensive (1) 163:24
computer (3) 10:5 36:14 155:9
computers (2) 36:18 36:19
concept (1) 118:4
concern (1) 144:16
concerned (1) 130:19
concerning (1) 157:15
concerns (1) 51:23
concluded (2) 125:9 170:15
conclusion (3) 52:3 125:19 130:8
conclusions (2) 34:13 80:2
condition (3) 59:24 137:1 156:4
conduct (2) 52:21 133:2
conducted (1) 35:13
conducting (2) 34:5 34:14
conference (2) 78:6 168:4
confirm (1) 122:19
confirmed (2) 82:20 135:10
confused (1) 169:14
confusion (1) 121:5

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

192

**conjunction (24)**
32:21 38:21 47:22
52:6,22 103:1
125:15,23 126:9,10
127:7 129:15,17
130:12 132:19,20
134:6,14 136:17,23
138:24 139:6
141:14 157:5
**connected (2)** 9:24
10:18
**connection (3)** 18:16
81:14 90:6
**consensus (1)** 113:14
**consequences (2)**
108:16 136:8
**consider (1)** 81:6
**consideration (1)**
168:11
**considered (1)** 161:6
**consistent (8)** 124:19
126:3,5 127:10
131:1 132:21
140:16 142:3
**console (8)** 128:9,10
128:12,14,16,17
130:18 132:13
**consoles (1)** 130:17
**conspicuous (3)**
127:17 143:6
163:22
**construction (3)**
73:15,19 74:6
**consult (1)** 167:22
**consultant (1)** 115:22
**consulted (1)** 112:6
**consumer (12)** 3:20
30:5 38:24 40:7
102:9 116:17 120:1
143:18 150:15
158:7 159:21,22
**consumers (3)** 120:6
120:12 156:17
**contact (1)** 111:2
**contacts (1)** 112:21
**contain (2)** 77:5
169:12

**contained (7)** 7:6 8:5
15:4,14 35:10 77:1
171:4
**container (8)** 40:21
40:22 42:13 44:19
44:20,22,23 50:21
**containers (2)** 42:12
42:20
**contains (1)** 7:12
**contemporaneous (...**
79:2
**context (3)** 12:18
138:17 164:17
**continuation (1)** 38:4
**continued (1)** 155:22
**continuing (1)**
104:24
**contrary (1)** 91:9
**control (2)** 165:9
171:21
**controls (1)** 134:16
**Convenience (1)**
55:23
**conversation (7)**
12:18,24 13:21
77:19,22 78:8 79:3
**conversations (2)**
28:9 79:15
**conveyed (1)** 106:10
**Conzola (3)** 30:23
38:3,17
**copied (2)** 7:22 21:22
**copies (6)** 8:3 19:15
103:11 121:3
122:16 159:14
**copy (33)** 5:5,12 7:3
7:22 8:8 9:16,20
10:10 11:7 14:11
17:3,5,7,11 18:2
20:2,3,5,16,17,18
20:21 21:6 22:15,18
29:9 57:17,20 58:8
58:20 76:13 91:2
120:23
**corner (2)** 43:11
66:22
**corporate (4)** 2:8

98:3 139:18 148:16
**Corporation (1)**
133:19
**correct (30)** 5:24
14:1 18:12 19:16
35:11 39:3 42:4
45:5 58:17,21 59:1
60:24 61:23 64:14
61:1 77:2,15 91:6
91:7,18 92:9 100:14
105:8 113:1 136:5
140:21 148:4
169:11 171:8 174:5
**CORRECTION (1)**
173:3
**corrections (3)** 172:4
172:6 174:8
**correctly (2)** 33:7
118:23
**corresponding (4)**
3:16,18 121:17
122:2
**corresponds (1)**
121:7
**cost (8)** 88:18,21
108:20,23,24 109:2
136:15 137:21
**costs (1)** 126:23
**Council (1)** 111:16
**counsel (3)** 2:6,10 4:2
**counter (5)** 81:4
125:10,24 127:9
166:21
**County (1)** 59:13
**couple (2)** 63:9 71:12
**course (5)** 15:21
32:17 101:6 139:11
164:2
**court (4)** 1:1,21 19:2
172:17
**Court's (1)** 68:11
**cover (4)** 7:20 14:14
14:17 143:19
**covered (3)** 115:2
126:10 167:11
**CPE (4)** 1:9 3:2 4:7
171:7

**Crabtree (3)** 7:8,9
11:14
**crank (1)** 66:22
**crash (2)** 59:18,23
**create (4)** 41:17
110:19 114:16
166:8
**created (3)** 78:24
79:2 142:9
**creating (3)** 54:1
129:15 138:6
**credence (1)** 139:9
**Creiger (1)** 8:20
**crews (1)** 73:15
**critical (8)** 31:15
65:10 118:12
149:16,20 150:22
151:2 161:8
**criticism (3)** 100:22
100:23 101:6
**cue (1)** 156:9
**current (13)** 20:18,21
21:2,9 29:6 56:19
56:22 57:2 83:1
84:23 85:1 168:17
168:24
**currently (6)** 85:3
151:18,22,23
152:17 165:1
**Curriculum (1)**
20:10
**CV (12)** 3:10,11 7:20
20:2,16 21:2,9,16
29:2,6,22 37:10
**cycle (9)** 80:20 81:4
123:22,24 125:10
125:23 127:9 165:8
166:21
**cycles (5)** 123:23
124:3 166:23,24
167:4
**C-3 (1)** 94:21
**C-4 (1)** 94:22

---

**D**

**D (1)** 3:1
**daily (2)** 99:3,7

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

193

**damage (1)** 97:6
**damper (2)** 93:13,13
**danger (1)** 39:10
**dangerous (1)** 137:1
**dashboard (1)**
 156:12
**data (5)** 28:21 115:9
 116:4,5,5
**date (3)** 21:20 22:11
 172:8
**dated (7)** 14:14 17:21
 20:11 29:6 56:20,23
 80:6
**David (2)** 8:1,16
**day (3)** 14:13 119:4
 174:14
**days (1)** 172:14
**day-to-day (2)** 98:12
 98:24
**deal (5)** 98:15,18
 100:7 104:7 117:16
**dealing (3)** 37:15
 115:11 165:10
**dealt (2)** 30:4 65:8
**decades (2)** 111:13
 156:21
**December (1)** 4:20
**decide (1)** 54:21
**decided (1)** 54:22
**decision (2)** 112:4
 115:13
**decorative (6)** 46:12
 47:17,21 48:23
 49:16 50:8
**deemed (1)** 172:16
**deep (1)** 126:24
**defect (1)** 66:20
**defendant (20)** 2:10
 4:16 59:10 60:19
 61:20 62:22,24 63:3
 63:20 64:1 65:9,11
 70:2 71:19,24 72:13
 72:16,22 73:10,13
**defendants (2)** 63:3
 69:24
**defense (6)** 7:8 18:20
 18:21 19:15 71:11

71:13
**define (3)** 53:2 108:8
 109:3
**defined (1)** 138:21
**definitely (1)** 166:6
**deflection (1)** 67:1
**degree (1)** 161:16
**dehumidifiers (1)**
 154:8
**deLUCA (3)** 1:15 2:2
 64:24
**demand (1)** 20:5
**DEMANDED (1)** 1:4
**department (2)** 12:10
 151:15
**depend (1)** 119:19
**dependent (2)** 136:21
 136:21
**depending (3)** 42:14
 101:17 133:20
**depends (14)** 54:19
 99:9 112:1,1,2
 114:18 116:18
 119:14,21,22,22,23
 151:9,17
**depicted (3)** 94:21,22
 102:24
**depo (4)** 9:2 10:15
 13:9 21:15
**DEPONENT (1)**
 174:1
**deposed (4)** 22:3
 58:23 81:21 129:13
**deposing (1)** 172:13
**deposition (44)** 1:6
 1:13 3:6 4:21,24 5:6
 5:6,8,23 6:16 7:16
 7:17,18 8:1,4,13
 10:11 14:19,21
 19:10 57:8 60:4
 64:12 68:22 81:14
 82:3 84:4 90:11,13
 91:5 110:7 112:7
 120:18 153:8 157:3
 158:3,14 168:8
 170:15 171:6 172:3
 172:11,14,16

**depositions (6)** 4:22
 7:23 8:14 12:8
 16:15 22:10
**Depot (3)** 42:22
 43:14 46:14
**describe (2)** 89:19
 165:7
**described (2)** 117:16
 152:5
**describes (2)** 105:14
 164:10
**description (3)** 3:5
 42:9 155:15
**descriptions (1)**
 155:23
**design (23)** 54:17
 66:20 81:2,7 109:8
 109:10,14,17 110:5
 110:14 111:8
 112:13 115:16
 116:9 117:24
 118:23 119:2,5,8
 137:7 149:13,13
 152:9
**designed (7)** 49:19
 50:1 111:7 116:12
 127:10 147:19
 148:13
**designee (2)** 98:3
 148:16
**designer (2)** 52:11
 110:2
**designers (1)** 117:19
**designing (7)** 38:23
 50:16 117:20 126:7
 132:6,19 133:23
**desirable (1)** 161:7
**desire (1)** 112:14
**destroyed (1)** 26:20
**determine (4)** 54:14
 71:13 106:5 150:21
**develop (2)** 132:1
 133:1
**developed (1)** 48:7
**developing (6)** 3:20
 50:17 117:20 126:8
 133:22 159:21

**development (3)**
 54:13,14 119:7
**device (2)** 47:4 81:5
**devices (2)** 36:19
 125:24
**diagram (1)** 12:2
**diameter (1)** 93:14
**differed (1)** 133:13
**difference (3)** 21:1
 109:6 140:10
**differences (1)**
 122:23
**different (16)** 14:10
 14:23 15:18 27:11
 38:24 54:16 79:4
 94:14 107:21
 132:15 133:20
 134:9 142:6 145:6
 145:12 155:24
**direct (2)** 40:7
 171:21
**direction (3)** 35:24
 43:21 142:13
**directly (6)** 34:4
 40:14 85:8 103:6
 105:13 128:16
**disadvantages (1)**
 55:2
**disassembling (1)**
 84:15
**disclosed (2)** 104:6,7
**Disclosure (1)** 11:17
**disclosures (2)** 11:17
 12:6
**discovery (11)** 7:13
 11:10,11,18 12:6
 19:1 28:9 92:1
 139:15 162:22
 163:5
**discussed (5)** 8:8
 80:21 84:21 90:11
 90:12
**discusses (1)** 156:1
**Discussion (2)** 6:22
 24:18
**disk (4)** 6:11 24:13
 24:13,14

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

dismiss **(1)** 32:19
dismissing **(1)** 32:2
display **(3)** 155:15,20
  155:20
distance **(2)** 131:19
  132:9
distances **(2)** 131:6
  131:22
DISTRICT **(2)** 1:1,2
Doctor **(8)** 83:21,22
  85:11 87:19,21 88:2
  88:20 139:12
document **(11)** 5:12
  5:16 17:16 20:15
  76:6 78:3,23,24
  121:19 122:6
  164:18
documents **(14)** 11:1
  11:18 12:6 13:24
  14:3 15:3,8,13 19:9
  76:4 146:1 159:10
  159:15,16
doing **(18)** 12:16 20:7
  32:13 37:5 64:11
  70:23 73:16,19
  75:15 80:1 86:15,17
  86:19 118:23
  130:13 133:1 137:3
  156:23
DONNA **(2)** 1:14
  171:14
dont **(1)** 122:8
door **(29)** 25:12,21
  26:3,4,5 27:7 95:14
  95:18,24 98:11
  101:17,18 102:1,4
  102:10,11,20,21,22
  107:19 108:4
  131:17 143:7,8,9,10
  144:18 153:10
  165:9
doors **(1)** 102:17
doubt **(4)** 85:23
  91:23 92:4 161:10
Dr **(28)** 3:9 4:13 7:3
  17:10,21 18:1 20:10
  20:14 21:18 22:3

23:5 28:15 56:17,22
58:15 77:21 78:3
90:5 95:22 103:1
122:6 141:21
145:15 157:5,10
168:3,23 170:10
draft **(1)** 131:1
draw **(2)** 34:13
  160:14
drawback **(1)** 137:19
drawing **(1)** 119:9
drawings **(1)** 54:3
dried **(1)** 63:12
drill **(2)** 86:5,9
drive **(7)** 6:7,8,11,12
  6:15 10:4 14:16
driver **(9)** 71:23 72:1
  72:15,22 73:5,13
  74:5,11,12
drives **(4)** 6:19 36:15
  46:1,2
driving **(1)** 73:11
dropouts **(1)** 161:20
drum **(7)** 84:8,10
  89:12 139:20,21,23
  165:9
dry **(1)** 104:22
dryer **(160)** 8:5 11:3
  11:3 19:5 23:13,15
  23:17,24 24:2 25:8
  25:16,17,18,19
  27:21,24 28:13
  42:18 60:5 61:11
  62:22 63:12,13,22
  63:24 64:10 81:2,22
  82:6,12,15,15,16,23
  83:3,5,7,15,16 84:5
  84:7,9,15,24 85:3,8
  85:23,24 88:3,10,17
  90:17 91:17,20 92:6
  92:12 94:5 95:4,8
  95:10,13 96:8 97:3
  97:14,24 98:1,2,9
  98:12 100:11 101:4
  101:12,17,18,24
  102:2 103:5,16,23
  103:24 104:5,10,11

104:14 105:7,15,23
106:6,14,20 107:10
107:13,14,17,18
108:1 113:16 114:5
114:10,11,12,15,19
114:21 117:6,12
125:7,14 127:16,23
128:9,10,11,16
129:9 137:12,14,23
139:20 140:1
142:12,15,17,20,22
143:12,13,16,19,23
144:1,6,10,17,18
145:4,10,17 146:2,8
146:16,17,20,22
147:2,5,8,12,19
148:2 152:11,14,17
152:21,23 153:11
153:23 164:6 167:5
167:6
dryers **(34)** 16:19
24:1,5,6,21 27:2
28:6,11,17,18,19,24
29:1,16 59:4 60:3
61:3 86:1 105:11,18
105:24 112:24
113:3 130:16 149:1
151:18,19,24 152:3
152:19 153:4,5,24
154:2
drying **(3)** 100:5
123:18 165:10
duct **(8)** 85:14,18
86:2 88:9 91:1,8
94:21,22
ducting **(2)** 8:12
91:22
ducts **(1)** 91:13
due **(2)** 80:4 152:8
duly **(1)** 4:7
dummy **(1)** 156:12
duplicate **(1)** 9:9
DVRs **(1)** 12:1

---
**E**
---
E **(7)** 1:16 2:1,1,4 3:1
3:4 173:1

earlier **(16)** 12:5
  37:12 45:23 75:2
  95:13 110:7 112:7
  120:18 132:14
  133:9,10 136:19
  153:8 156:24
  160:18 162:10
early **(2)** 73:9 162:15
easier **(2)** 35:4 155:9
easily **(1)** 36:22
EASTERN **(1)** 1:2
easy **(3)** 43:8 147:20
  148:14
eat **(1)** 90:1
economical **(1)**
  109:15
economically **(1)**
  110:6
edited **(1)** 169:24
editing **(1)** 21:4
edition **(2)** 111:15
  160:4
educated **(1)** 161:9
education **(1)** 15:17
educational **(1)**
  161:12
effect **(1)** 135:2
effective **(10)** 109:3,4
  109:7,12,18 125:17
  125:21 126:1 142:8
  156:23
efficiency **(1)** 82:11
EHP-Cloud **(4)** 11:2
  11:19 92:2,3
eighth **(1)** 157:20
either **(28)** 15:14
  19:11 41:24 45:14
  46:9 53:4 60:12
  61:18 63:12 64:19
  68:21 72:12 75:5
  77:1 78:17 79:24
  92:7,12 101:19,23
  111:2 123:18
  132:12 149:24
  155:17 161:15
  166:1,8
elbows **(1)** 85:9

elderly **(1)** 41:17
**electric (2)** 7:12
  123:19
**electrical (2)** 32:10
  90:20
**electrocution (1)**
  97:20
**Electrolux (77)** 1:9
  2:11 11:11,16,17
  12:1,3,4,5 15:22
  16:4,5,16,18 18:24
  22:12 24:6,20 26:22
  27:11 28:8 60:3
  61:2,12 76:21 86:15
  86:17,21 91:12,20
  92:1,8,23 93:20
  94:9 98:4 102:17,20
  103:2 105:11,11,13
  105:22 106:16
  113:5 114:9,22
  115:4,15,21 125:5
  125:14 129:22
  130:2 131:15 138:9
  138:9,19,21,22
  143:4 145:9,13
  148:4,17,21,23,24
  149:2,6,10 152:3,22
  153:23 163:5
  166:22 167:2
**Electrolux's (8)**
  10:24 90:18 94:6
  101:8 103:4 105:6
  162:22 163:7
**electronic (1)** 57:19
**elevated (3)** 49:17
  50:4 67:4
**elevation (1)** 49:21
**eliminate (4)** 109:18
  110:5 119:10
  144:11
**Emil (3)** 1:5 14:8
  145:18
**emphasize (1)** 135:1
**employee (3)** 73:10
  73:11 148:16
**employees (1)** 23:8
**enclosed (1)** 14:19

**encompass (1)** 44:14
**encompasses (1)**
  15:17
**encounter (1)** 166:24
**encountered (1)**
  131:6
**encountering (2)**
  112:3 116:23
**ends (1)** 32:13
**engagement (2)** 7:16
  14:12
**engineer (1)** 79:21
**Engineering (1)** 38:7
**engineers (2)** 82:17
  117:20
**English (1)** 44:4
**ensure (1)** 131:3
**entire (4)** 41:22
  84:13 85:12 168:8
**equipment (2)**
  151:11,16
**Ergonomics (3)** 3:23
  38:18 160:4
**errata (5)** 172:6,7,10
  172:13 174:9
**ERSA (1)** 1:21
**escape (1)** 67:7
**ESQUIRE (2)** 2:3,8
**essentially (4)** 53:15
  113:22 123:1
  124:14
**estate (4)** 42:8,24
  44:6 129:8
**et (7)** 24:2 69:12 70:3
  72:10 123:15
  132:17 133:21
**evaluates (1)** 157:10
**evaluating (4)** 42:2
  53:9 54:10 71:21
**evaluation (6)** 54:9
  54:12 129:14,21
  141:11,12
**evaluations (2)**
  132:15 133:3
**event (1)** 117:9
**eventually (2)** 123:9
  144:22

**evidence (2)** 92:12
  171:4
**exact (1)** 123:21
**exactly (4)** 35:7
  50:20,22 123:24
**examination (2)** 1:7
  38:11
**examine (1)** 23:13
**examined (1)** 4:8
**example (22)** 8:12
  34:24 35:3 36:4,5
  42:10 88:7 103:10
  112:5,9,9 114:19,22
  117:5 131:15 150:7
  151:10 156:1,8,11
  165:7,8
**examples (3)** 36:10
  155:16 156:6
**excerpt (2)** 3:22
  160:2
**excessive (1)** 67:1
**excluded (3)** 64:19
  68:8 81:8
**excluding (2)** 81:9,11
**excused (1)** 170:14
**Exemplar (7)** 8:10
  9:11 24:1,5,6,20
  28:6
**exhaust (6)** 66:23
  67:5,7 92:19,19
  125:10
**exhibit (19)** 5:9,17,18
  5:21 17:19,22 20:11
  29:7 56:23 57:18
  77:23 94:22 95:19
  121:18 122:3,24
  159:10 160:16
  164:15
**exhibits (2)** 124:13
  168:2
**exist (1)** 117:10
**existing (1)** 53:4
**exists (2)** 117:10
  137:3
**exit (1)** 168:3
**expand (3)** 42:23
  43:20 99:17

**expanded (1)** 38:19
**expect (3)** 112:19
  120:12 155:5
**expected (3)** 131:22
  132:9 134:15
**experience (8)** 15:17
  52:18 112:16
  127:12 133:5,6,16
  150:17
**experienced (2)**
  52:14 98:2
**experiences (1)**
  150:19
**experiment (5)** 32:24
  33:2,4 126:18 127:4
**experimentation (1)**
  54:4
**experiments (5)** 33:5
  33:15 42:5 132:17
  141:8
**expert (10)** 3:12 7:8
  11:14,16,16 18:20
  18:21 19:15 79:22
  168:9
**experts (1)** 16:7
**expert's (1)** 80:5
**expires (1)** 174:16
**explain (4)** 33:4
  66:17 140:9 164:17
**explaining (1)** 166:12
**explanation (2)** 91:12
  150:5
**explicit (2)** 101:10
  130:23
**explicitly (3)** 67:17
  117:15 158:14
**explicitness (1)** 136:6
**Exponent (1)** 11:24
**expose (2)** 32:11 35:5
**exposed (3)** 66:24
  116:24 117:7
**exposure (2)** 151:16
  151:16
**expressed (1)** 19:22
**extra (1)** 58:3
**eyes (1)** 131:8

**F**

face (1) 145:11
facilitate (4) 39:18
  41:16,20 43:2
facilitates (1) 41:19
facilitation (1) 41:23
facing (1) 108:1
fact (9) 65:21 66:1
  99:12 123:5 127:10
  127:15 136:16
  139:9 142:9
factor (2) 38:18
  117:3
factors (8) 3:23 28:22
  35:18 126:4 132:24
  135:7 158:12 160:3
factory (1) 102:22
facts (1) 66:17
fail (3) 50:3 67:6
  172:15
failed (2) 50:5 100:18
failing (1) 68:5
fails (1) 99:11
failure (2) 67:1,10
fair (2) 21:21 140:17
fairly (1) 117:8
fall (2) 16:2 32:4
falling (1) 49:20
falls (2) 83:21 130:4
familiar (6) 4:19 22:5
  69:22 83:10 87:2
  118:4
far (6) 51:13 90:13
  90:14,15 104:15
  158:18
Farm (3) 8:24 9:1
  17:1
fashion (1) 120:4
fault (1) 105:2
favorite (1) 54:18
faxing (1) 169:22
feasible (5) 80:20
  109:15,17 125:9,23
feasibly (1) 110:6
feature (1) 137:3
features (4) 127:8
  165:8,12 166:9

feel (1) 169:9
feet (4) 131:8,8,20
  132:2
felt (1) 65:19
few-minutes (1)
  56:15
field (1) 106:4
fifth (2) 29:15 160:8
figure (2) 119:9
  150:1
figuring (1) 116:15
file (9) 3:7 7:5,12
  9:16 17:4,18 24:11
  45:20 158:16
files (3) 6:18 24:11
  155:10
finalized (1) 80:12
finally (1) 142:11
find (9) 13:7 22:21
  24:19 31:14 42:21
  100:12 106:2
  131:19 151:19
findings (2) 79:23
  80:2
fine (3) 6:17 51:20
  122:10
finish (1) 83:12
finished (1) 15:6
finishing (1) 39:15
fire (27) 4:19 12:10
  23:24 26:20 37:1,3
  62:12 66:14 68:5
  80:23,24 96:23 97:4
  97:5,6,12,23 98:1,9
  100:8 101:4 105:14
  114:9 117:9 125:5
  142:14 152:8
fires (2) 19:5 61:24
first (18) 30:17 31:22
  34:17 37:13 50:17
  75:13 86:10,21
  87:21 106:23
  111:14 115:21
  116:18 123:1 127:2
  140:11 143:2
  144:14
firsthand (1) 133:15

Fisher (5) 103:22
  104:5,10 152:20
  153:22
five (1) 16:17
five-minute (1)
  141:17
fixed (1) 79:12
flashes (2) 104:20
  123:13
flashing (3) 74:7
  104:17 105:1
Flesch-Kincaid (1)
  157:11
Flex (1) 8:12
flexible (6) 91:1,8,13
  91:17,21 92:15
focus (1) 54:8
focused (2) 35:9 63:3
foil (7) 8:12 91:1,8,13
  91:17,21 92:15
folded (1) 63:13
folder (4) 10:15 13:9
  21:16 24:20
folder-wise (1) 10:13
folding (1) 43:9
folks (4) 52:17 54:6
  137:15 149:24
followed (3) 141:22
  142:3 143:3
following (1) 115:18
follows (1) 4:8
followup (1) 76:12
font (6) 131:10 132:3
  132:8 134:2,6,17
forces (2) 136:23,24
forcing (1) 136:17
foregoing (2) 171:18
  174:4
forensic (6) 23:6
  46:15,16 74:18 75:9
  75:10
foreseeability (1)
  76:22
forklift (2) 47:5
  69:17
form (4) 4:4 38:16
  163:10 174:8

formal (1) 54:4
format (3) 43:1 44:2
  114:2
formatting (9) 39:17
  40:5,12 58:6 131:2
  133:9 134:9 135:5
  135:12
forming (1) 15:10
forth (10) 15:24 53:7
  65:23 107:3 109:16
  110:6 130:24
  133:18 143:14
  174:7
found (4) 12:22
  21:13 105:24
  134:11
four (3) 58:16 93:14
  122:8
fourth (5) 29:14
  157:16 158:8,10
  160:8
four-ways (1) 74:6
four-year (1) 7:15
frame (16) 25:12,22
  25:24 26:3,4,5 27:7
  95:14,24 98:11
  101:17 107:19
  131:17 143:7,10
  153:10
Franklin (1) 83:9
freeway (1) 73:7
French (2) 27:16
  44:4
friend (1) 48:8
friend-client (1) 48:9
Frigidaire (2) 24:21
  91:14
front (23) 14:1 29:9
  33:18 44:17 45:6
  49:18 84:6,18,19
  102:23 107:14,17
  107:18 128:17
  130:17 132:12
  133:12 144:17,17
  164:3,8 166:4,7
full (1) 150:5
Fuller (2) 8:1,16

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

197

**fully (1)** 171:4
**function (2)** 156:1,3
**functional (1)** 155:21
**further (3)** 56:18
170:4,6

### G

**gallon (1)** 42:14
**gamut (1)** 45:24
**Gargiulo (2)** 8:21,23
**gas (9)** 25:16,18
82:15 96:8 114:10
114:12,24 123:18
153:11
**general (13)** 22:13
25:10 39:2 48:16
76:23 81:20 105:10
107:22 158:6,7,9
160:6 161:6
**generalize (1)** 62:3
**generally (19)** 6:3
15:13,16 19:2 21:4
25:9 26:21 28:19
29:15 32:8 48:17
51:20 52:5 70:8
73:2 74:17 97:1
157:8,9
**generated (5)** 75:6,8
75:10,14 80:8
**gentleman (1)** 85:11
**Gerry (1)** 11:15
**getting (3)** 80:10
87:12 146:15
**Gianferri (3)** 8:17,20
8:22
**give (12)** 6:10,14
10:11 13:4 48:18
81:10 112:5 113:24
127:21 128:4
131:14 139:6
**given (11)** 16:15 41:9
60:3 61:5 62:18,20
64:13 66:3 68:21
75:13 174:6
**gives (7)** 44:5 104:22
140:1 156:6,8,10,11
**giving (2)** 134:7

137:17
**glass (4)** 66:21 67:2,6
68:4
**Glen (1)** 83:21
**glue (2)** 43:11,18
**glued (2)** 43:18 44:21
**glues (1)** 43:15
**go (26)** 6:21 10:12
24:11 36:1 37:4
42:2 49:17 52:19
54:16 56:18 57:10
68:24 69:2 73:14
85:21,22 116:13,15
119:8 129:2 138:6
144:3,20 146:9
164:7,8
**goal (1)** 112:15
**goes (1)** 85:7
**going (59)** 5:5 7:9,19
10:22 16:6 17:3
21:3 34:19 35:1
41:21 48:22 51:2
52:7 56:18 58:12
61:15,18 62:5,20
75:16 80:9 89:10
94:13,14 95:16
99:15 100:9 101:19
101:19,21,24 105:4
116:20 120:12
121:4,14 122:10,14
122:16 127:19
130:11 131:7,20
132:4 135:16,17,20
137:12,20,22,23
138:17 139:8 144:7
144:10,21 159:15
162:11 167:9
**good (5)** 4:13,14 5:3
89:24 131:2
**Google (1)** 29:20
**Government (2)**
73:11,12
**grab (2)** 35:22
108:12
**grad (10)** 37:5 38:4
39:14,15,15 45:14
45:18,22 161:15,16

**grade (8)** 157:16,19
157:20 158:8,11
160:9,18 161:10
**graduate (5)** 34:10
35:17 37:15 38:5
133:4
**grammar (1)** 79:12
**graphic (3)** 9:12,13
138:7
**great (2)** 20:7 21:24
**greater (3)** 44:5
138:16 158:5
**greatest (8)** 97:15,16
97:21 98:1,6,8
117:5 125:6
**greatly (1)** 42:23
**Griddle (1)** 154:12
**ground (7)** 71:1,4
93:3,7,17,23 94:2
**group (2)** 2:7 54:8
**guard (5)** 49:20
109:10 112:13
116:9 137:7
**guarded (1)** 116:12
**guarding (3)** 109:8
109:14 119:3
**guess (7)** 31:5 44:15
75:17 86:6 106:11
107:4,6
**guidance (1)** 114:1
**guide (18)** 3:20,24
105:6 146:7,9,11,17
153:13 159:20,21
164:13,14 165:5,15
165:17,20,22,24
**guidelines (8)** 38:23
53:21 126:3 127:11
132:23 135:6,11
141:15
**guides (2)** 36:17
146:6
**guy (12)** 11:23 48:7
88:13,14,16 137:9
137:11,12,24,24
151:14,14
**guys (5)** 11:20 88:18
137:10 139:18

140:1
**G-A-R-G-I-U-L-O ...**
8:22

### H

**H (2)** 3:4 82:9
**half (7)** 16:13,13
67:13 86:13 88:12
137:9,11
**hallway (8)** 46:6
52:24 53:2,6,24
55:10,19 132:16
**hand (5)** 10:4 71:4
120:23 122:16
159:15
**Handbook (2)** 3:22
160:3
**handed (4)** 5:23
20:14 78:2 164:18
**handing (1)** 5:7
**handling (1)** 110:24
**hands (1)** 71:1
**happen (2)** 89:1
150:9
**happened (7)** 4:20
50:3 58:5 73:6,12
79:23 130:18
**happens (2)** 32:3,8
**happy (2)** 10:11 13:4
**hard (1)** 9:20
**hardcopy (1)** 9:18
**hazard (52)** 30:5
34:24 51:24 67:17
67:23 96:20,22 97:5
97:9,11,14,15,17,23
98:1,6,8,9 100:8
101:3,4,5,9,9,11,12
105:14 108:16
109:9,18 110:4
112:2,3,21 114:9
115:5,23 116:3,19
116:22 117:1,5,10
117:15 125:5,6
130:4,22,23 136:21
142:14 156:3
**hazardous (1)** 33:9
**hazards (18)** 32:15

32:20 34:17,19,21
97:21 98:7 115:5,7
115:11,14,24 116:6
119:2,10,15,22
156:4
**header (3)** 66:23 67:5
67:8
**headers (1)** 39:10
**hear (1)** 70:18
**hearing (1)** 116:11
**heat (4)** 67:4 97:11
140:22 141:3
**heating (2)** 123:18
124:3
**heavy (2)** 150:16
167:7
**heed (1)** 142:10
**held (2)** 6:22 24:18
**help (2)** 34:9 38:16
**helpful (1)** 156:7
**helps (1)** 136:15
**hesitant (1)** 88:9
**heuristic (8)** 46:5
53:14 129:14,21
132:16,18 133:3
141:12
**hidden (1)** 102:1
**hierarch (1)** 111:10
**hierarchy (5)** 111:8,9
116:20 118:22
119:11
**high (6)** 66:24 67:4
82:11 117:8 137:22
161:20
**higher (6)** 41:9
116:19 119:10
157:19 158:6 161:8
**highest (1)** 21:12
**highlighted (3)** 14:9
14:24 160:17
**highlighting (1)**
100:19
**highly (1)** 85:23
**hinge (8)** 101:19,22
102:4,6,9,14,16
108:2
**hinges (1)** 143:8

**hired (4)** 95:9 114:15
114:22 115:21
**hiring (1)** 115:22
**history (3)** 3:12
15:24 22:16
**hit (3)** 70:21 73:24
132:8
**hits (1)** 124:3
**Hold (1)** 24:10
**holding (2)** 121:20
122:6
**home (11)** 1:9 2:11
25:23 26:23 42:21
43:14 46:14 83:1
84:12,23 85:1
**homeowner (4)** 65:16
65:24 67:11,18
**homeowners (2)**
76:22 90:9
**homes (1)** 26:18
**hood (9)** 92:19,19
93:3,6,11,13,17,23
94:1
**hope (1)** 112:14
**horse (7)** 46:24 49:2
52:20 55:5,6,9
110:10
**horses (1)** 55:13
**host (1)** 136:22
**hotel (1)** 49:18
**hour (1)** 67:13
**house (5)** 83:6 85:6,6
87:16 94:22
**household (1)** 89:17
**Hughes (6)** 7:17,21
14:15,18 76:1,2
**Human (7)** 3:22
38:18 126:4 132:23
135:7 158:12 160:3
**HUNTER (2)** 1:14
171:14
**hurt (1)** 165:19
**H4 (3)** 82:8,10,11

---

**I**

**IBM (10)** 35:20 36:6
36:24 45:23 46:3,4

46:4 56:9 133:19
135:13
**idea (1)** 79:22
**ideal (1)** 119:12
**IdeaScan (1)** 36:3
**identification (12)**
5:10 17:19,23 20:12
29:7 56:24 77:24
95:20 121:18 122:4
159:11 164:15
**identified (8)** 75:3
115:5,8 116:7 125:6
162:22 163:4,7
**identify (11)** 6:3 14:6
21:1 78:4 92:1 97:9
108:15 115:14,24
122:22 160:1
**identifying (2)**
115:23 130:22
**idle (3)** 67:4,4,12
**idling (2)** 67:3 68:3
**ignite (1)** 67:7
**ignition (2)** 62:11
80:22
**ignore (1)** 41:24
**ignored (1)** 118:20
**II (1)** 2:8
**illustration (44)** 3:17
3:19 121:7,13,17,20
122:2,7,12,20,24
124:21 127:13
129:12 136:16
137:20 138:4,7,10
139:5 140:4,7,10,15
140:17 144:19
162:20 163:2,16,17
163:23 164:5,7,19
165:5,14,21 166:1,2
166:4,5,6,14,15
**Illustrations (3)**
129:10 132:7
162:14
**imagine (5)** 42:7
49:12 62:5 112:12
165:10
**immediately (1)**
144:15

**imperative (1)**
172:12
**implemented (2)**
109:15 117:23
**important (4)** 31:20
34:16 55:16 149:4
**impression (1)** 52:15
**improper (1)** 109:21
**improve (1)** 48:18
**inadvertent (1)**
112:21
**inappropriate (1)**
109:20
**inch (1)** 89:16
**inches (8)** 89:14 93:2
93:6,14,22 94:2
129:5,6
**incident (4)** 12:9
23:24 115:8 116:5
**include (4)** 80:20
151:2 165:15
166:11
**included (6)** 7:5
19:11 115:12
138:11 162:15
165:22
**includes (2)** 9:3
156:3
**including (5)** 8:14
11:10 85:13 97:6
131:2
**inclusion (1)** 163:15
**increase (5)** 41:21
134:11 135:16
149:7,10
**indicate (6)** 104:17
104:20 105:2 124:2
156:2,22
**indicated (2)** 19:14
120:18
**indicating (2)** 13:12
123:14
**indication (1)** 139:7
**indicator (46)** 8:10
43:20 80:20 81:3
103:18,19 104:8,14
104:16 118:2,3

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

123:7,13,20 124:19
124:21 126:11,13
127:8 128:1,2,7
130:14 144:20,21
144:23,24 152:21
152:23 153:3 154:1
154:6,20,24 155:3
155:16 156:14,16
156:18,21 164:6,11
164:24 165:2,4,11
**individual (2)** 33:7
166:24
**industrial (2)** 150:16
151:11
**inexperienced (1)**
52:16
**information (71)**
11:10 14:15 23:23
28:8 29:16 31:12,15
31:21 32:1 33:11,21
33:24 35:9,19 39:17
40:4,7 41:4,5,11,14
42:24 44:2,6,18
51:6 53:3 65:10
74:10 92:7 99:6,9
99:13 101:11,14
105:19,23 106:1,10
113:23 114:1,2
116:14 117:4,12,13
118:10,12,14,15,17
118:18,19 130:7,11
130:23 138:15
140:2 144:22
149:17,21 150:10
150:23 151:2
153:20 155:15,20
157:11 161:8
163:22 166:11
**informed (1)** 120:10
**initially (7)** 43:18
47:22 49:9 74:21
123:8 143:21
146:10
**injured (2)** 49:13,14
**injury (6)** 48:6 49:10
97:2,4,6,20
**input (1)** 36:19

**inside (19)** 25:12,21
25:24 26:3,4,5 27:6
88:10 89:2 95:5,6
95:14,18,24 98:11
101:17 143:7,9
153:10
**inspection (1)** 79:24
**install (2)** 91:14
147:23
**installation (21)**
26:18 91:2,9,10,16
91:19,24 92:5,15,16
92:24 93:15 102:19
105:7 146:12 147:7
147:24 153:13
162:18 165:16,18
**installed (4)** 85:1
90:17 101:18 146:8
**installer (1)** 146:1
**installers (1)** 148:23
**installing (1)** 146:2
**instance (1)** 109:20
**instruction (2)**
109:22 162:18
**instructions (30)**
3:21 44:9 50:23
51:4,8 76:21 90:18
91:3,9,10,16,19,24
92:5,17 93:1,16
94:6 102:20 105:7
120:3 146:13 147:7
147:24 153:14
158:4 159:21
165:16,18 172:1
**instructs (1)** 120:8
**insurance (3)** 4:18
16:23 61:19
**intend (1)** 77:7
**intended (7)** 49:16
52:8,9,13 101:5,9
126:12
**intention (3)** 18:8
168:15,15
**intentions (1)** 52:10
**interact (1)** 126:19
**interacting (1)**
134:15

**interchange (3)**
73:13,14,15
**interested (1)** 82:22
**interfere (1)** 144:13
**interior (6)** 84:5 95:7
95:10 139:1,3
142:15
**interrupt (1)** 9:17
**intuitive (2)** 147:19
148:10
**investigations (1)**
19:4
**invoice (2)** 75:14
76:9
**invoices (8)** 7:14,14
75:3,5,8,10,11,18
**involve (7)** 16:18
37:1 40:16 49:10
59:3,15 61:24
**involved (20)** 25:1
34:2,4 39:20 40:17
40:21,23 42:3,5
46:15 49:10 59:17
60:2,13 62:10,11
63:7 64:5 65:3
71:12
**involving (7)** 47:8
60:5 61:3,10,11
63:9 105:11
**irrational (1)** 142:5
**irrelevant (2)** 118:18
118:20
**issue (25)** 18:3,6 27:1
48:11 53:17,23 58:6
59:20,23 67:14
69:14 70:16 73:2
77:14 90:20 103:18
110:17 118:9
125:14 127:18
132:11 136:7 159:8
162:18 167:23
**issued (4)** 18:11
162:7 168:9,12
**issues (10)** 15:23,24
53:18 110:20,21
119:3 126:23
130:20 132:1 134:4

**issuing (1)** 18:14
**item (1)** 151:12
**items (2)** 51:7 115:2
**it'll (1)** 43:22
**i.e (1)** 137:5

---

## J

**J (4)** 1:9 3:2 4:6
171:6
**James (1)** 72:9
**January (12)** 11:6
18:4,15 72:9 78:6
78:14,18,19 79:19
80:8 168:10,14
**Japanese (1)** 106:19
**job (1)** 118:23
**Joeger (1)** 8:16
**John (1)** 11:15
**Johnson (4)** 12:9,9
14:9,20
**jokes (1)** 169:24
**Joyce (1)** 37:13
**JPEG (1)** 9:11
**JR (4)** 1:9 3:2 4:6
171:6
**judge (1)** 65:18
**jug (1)** 42:14
**July (3)** 14:14 21:19
76:4
**jumper (1)** 45:21
**June (5)** 8:24 28:14
82:4,5,6
**JURY (1)** 1:4

---

## K

**keep (5)** 10:22 43:11
49:20 58:12 137:4
**Ken (8)** 12:12 15:7
17:7 20:3 22:19
58:7 158:15 167:17
**Kenmore (5)** 24:21
82:8 88:15,15
106:15
**KENNETH (1)** 2:3
**kept (1)** 144:5
**keyboards (4)** 36:13
36:20 45:20 46:1

**killed (1)** 74:1
**kind (8)** 25:14,17
  27:8 50:18 58:8
  69:17 76:23 80:1
**King (17)** 8:2,17,17
  8:18,19,19 9:3
  10:23 19:4 97:18,19
  97:23 98:8 114:13
  145:9 147:18
  148:22
**King's (2)** 8:15 9:3
**kitty (1)** 47:3
**knew (5)** 41:12 65:11
  65:21 66:2 110:23
**know (103)** 4:22 5:3
  7:19 12:22 16:7,8,8
  17:1 25:13 26:21,24
  27:24 32:1 35:1
  41:8,9 47:21 51:13
  51:14 55:20,20 57:8
  57:9 58:5 59:16
  60:11 62:10 63:24
  75:9,24 80:9 82:12
  82:16,22 83:19 84:4
  85:10 86:4 87:24
  89:4 92:22 93:15,18
  94:1,15,23 95:3
  102:5,15 103:17
  104:10,15 105:22
  105:24 106:9,12,14
  106:15,18 107:2,8,9
  107:11,16 108:6
  116:7 122:8 127:18
  130:5,6 131:9 133:7
  133:15,22 134:19
  136:7,7,8 137:15
  139:15,16 142:19
  143:24 147:11,12
  147:14,15,16,22
  149:19 150:18
  151:15 152:20,21
  161:12,14,16
  163:14 165:13
  166:21,22 168:19
  169:6
**knowledge (4)** 39:18
  43:2 119:23 150:20

**known (2)** 31:21
  142:13
**knows (3)** 117:9
  139:13 149:1
**K&G (1)** 68:17

---

**L**

**lab (3)** 54:6,6 133:24
**label (76)** 3:15 25:12
  25:15,21 26:3,9,13
  26:13,15,23 27:6,12
  27:14,20,23 37:24
  39:17 41:20,21,22
  42:1,1,19,23 43:4
  43:20,22 44:8,11,13
  44:17,17,18,19 45:1
  45:3,8,9 50:7 95:14
  95:18,22,24 96:3,6
  96:21 98:11 100:17
  100:23 101:5 102:2
  102:4,8 107:20
  108:6 113:15,24
  115:17 124:15
  127:5 128:13,20
  131:1,16 132:4
  135:17,21 143:3,4,4
  143:6,15,20 145:3,5
  153:9
**labelling (1)** 46:10
**labels (33)** 11:2 25:7
  25:7 26:4,5,20 28:3
  35:11,14,21 39:23
  40:5,12,20 41:1,5
  41:14 42:17 44:1
  46:6 56:6 95:12
  106:7,10 107:10,12
  114:16 132:19
  141:23 142:17,19
  151:20 153:5
**label's (1)** 135:16
**laboratory (1)** 133:7
**lack (1)** 42:8
**lady (1)** 132:1
**laid (2)** 111:15 126:4
**laminating (1)** 43:10
**lane (3)** 73:17,17,18
**language (3)** 91:15

96:2 124:20
**languages (2)** 44:5,7
**large (2)** 42:18
  112:12
**larger (1)** 129:1
**latch (3)** 101:20,21
  102:12
**laundered (1)** 63:11
**Laundry (4)** 105:22
  131:15 132:4,10
**LAW (1)** 2:7
**lawsuit (3)** 4:17
  48:12 49:9
**layer (1)** 89:12
**leaf (1)** 70:23
**learn (1)** 133:2
**leasing (5)** 69:6,12
  70:3,5,5
**leaving (1)** 68:3
**left (8)** 45:4 63:12
  66:22 67:3,12
  107:23 116:11
  146:1
**legibility (3)** 131:4,21
  134:24
**legible (1)** 132:5
**length (2)** 67:9 85:12
**letter (5)** 7:21 14:12
  14:14,17 76:1
**letters (1)** 7:16
**let's (13)** 6:21 15:5
  37:4 49:5,18 57:18
  74:14 99:23 127:13
  129:24 138:4 140:4
  164:6
**level (15)** 52:17
  119:11 152:15
  157:4,16,19,24
  158:1,5,8,11 160:7
  161:6,7,11
**levels (1)** 161:8
**Levine (53)** 1:16 2:2
  2:3 4:10 6:6,10 9:21
  9:23 10:3,9,16
  12:15,23 13:3,6,11
  13:15,18 17:9,15
  20:4,7 21:8,12,17

21:21 22:21 23:1
  24:12,16 55:13,15
  56:11 57:5 58:9,12
  58:19 64:24 76:2,15
  83:14 154:13,16
  158:19,22 159:2,5
  167:19 168:3,5
  169:17,21 170:7
**lid (2)** 104:16,18
**lieu (1)** 109:9
**life (2)** 101:23,24
**light (34)** 103:18,19
  104:8,14,16,20
  118:2,3 123:7,8,10
  123:12,13,17,20
  124:1,4,19,22 128:7
  128:11 130:14
  143:1 144:23 145:1
  152:21 155:17
  156:5,11,12,18
  164:6 165:2,9
**lights (34)** 8:11 74:7
  80:20 81:4 105:1
  126:11,13 127:8
  128:1,2 130:14
  144:20,21 152:24
  153:3 154:1,6,21
  155:1,3,15,19,24
  156:2,4,7,8,14,16
  156:21 164:11,24
  165:4,11
**likelihood (8)** 31:16
  35:19 116:23 117:8
  133:17 134:12,19
  135:16
**limitation (1)** 137:20
**limited (3)** 64:18,21
  65:6
**line (5)** 1:17 2:4
  41:13 83:12 173:3
**lines (2)** 40:2 152:23
**linseed (4)** 63:10,16
  64:4,6
**lint (29)** 62:11 83:21
  83:22 84:7 85:11
  87:18,21 88:2,2,20
  89:2,4,8,12,20

97:11,24 98:1,9,21
100:7 101:4,12
105:14 114:9 125:5
139:12,22 167:10
**list (21)** 7:15 32:2,5,9
32:13,16,19 34:19
46:11 47:16 56:19
56:23 57:2 60:7
68:24 69:2 71:10
96:19,22 132:15
165:8
**listed (4)** 26:19 29:2
31:1 55:22
**listening (1)** 12:17
**listing (2)** 14:15 26:1
**lists (2)** 33:17 41:19
**literate (1)** 161:9
**literature (24)** 8:5
46:10,18 49:3 51:4
53:21 103:4,16
105:6,8 106:20,22
106:24 107:3
113:19 114:16
126:5 129:19
132:24 135:7
145:16 158:12
160:22 163:7
**litigation (7)** 27:1
47:23 48:2,3 50:6
168:16,18
**litter (1)** 47:3
**little (10)** 43:10,18
83:2 85:10 131:16
131:24 155:10
156:24 158:6
169:14
**live (12)** 33:2 42:6
54:5 55:11,11,13
89:17 126:17,19
127:4 132:17 141:9
**LLC (2)** 1:16 2:2
**load (2)** 49:19 50:1
**loader (7)** 69:8,15,16
70:10,21,22 71:3
**located (12)** 25:7
66:22 99:13 101:13
102:3,4,9 108:10

128:3 134:5,5,14
**location (1)** 99:19
**lock (1)** 104:16
**long (8)** 26:8 83:1
86:14 91:4 95:13,23
107:20 131:9
**longer (2)** 104:21
155:10
**look (23)** 46:8 50:18
51:3 76:15,21 87:5
93:18 94:13,17
106:2 110:9 116:6
116:13,21,22,24
122:9 131:18,21
140:4 144:3,7 147:4
**looked (19)** 33:6,19
35:20 41:4 42:15
45:19 49:23,23 51:7
93:8 103:9,18,20
105:17,24 115:1
130:10,15,21
**looking (15)** 38:22
41:7 42:20 51:2
52:10 65:19 82:18
82:20 102:22 132:6
132:11 134:4 143:9
145:21,22
**looks (6)** 8:3 39:24
58:24 76:3 93:20
155:17
**lost (1)** 118:17
**lot (15)** 15:18 32:3
39:24 40:9 42:19
89:8,10 129:8 133:8
135:8,10,11 137:15
139:15 146:3
**low (3)** 92:19 93:10
93:12
**lower (3)** 85:10
152:15 161:7
**Lowe's (2)** 42:22
43:14
**lunch (3)** 56:12 83:13
90:2

_____

**M**

**machine (5)** 47:2

123:14 137:4 139:2
139:4
**machinery (2)**
112:13 150:16
**Mae (1)** 72:9
**main (3)** 25:5 40:2
164:1
**maintain (2)** 93:22
120:7
**maintained (1)** 94:5
**maintenance (12)**
98:13,15,16,17,18
98:19,22 114:6,7
151:12,14,15
**majority (1)** 27:14
**maker (1)** 154:10
**making (5)** 51:22,22
115:13 142:16
152:2
**malfunction (3)**
156:8,9,11
**Malone (1)** 68:17
**mandatory (1)** 113:5
**mangled (1)** 112:12
**manifestations (1)**
160:24
**manipulated (3)**
33:17 133:11,14
**manipulating (1)**
133:16
**manner (3)** 31:14
32:14 127:15
**manual (73)** 33:22
35:10 65:9,13,15,17
65:18,22,23,24 66:2
66:3,3,12 67:16,19
67:20,21 68:2 91:14
92:11 93:21 99:7
102:24 103:23,23
104:5,12 111:17
113:24 130:9 138:7
138:12,16 139:5
146:24 147:2,4,9,13
147:14,21 148:3,9
148:18,22 149:2,3,8
149:11,15,19,20,22
150:9,12,21 151:2,5

151:7,8,13,17
157:11 163:14,20
164:3,4,7,9 165:1,2
166:12
**manuals (24)** 8:10
24:2 30:20,22 31:5
31:7,13 33:8,16,18
33:20 34:15 40:3,4
41:7 91:12 103:11
103:21 118:11
139:24 148:24
149:23 150:4
163:16
**manufactured (8)**
28:11,13 102:16
104:11 105:18
106:14,15 152:18
**manufacturer (31)**
32:12 46:17,19
47:19 50:15 51:12
52:23 60:17,23
61:22 62:22 63:4,15
63:23 64:1 69:7
70:2,6 71:11,15
102:14 103:5 110:2
110:9,22 114:15,20
120:8,12 126:24
151:1
**manufacturers (9)**
33:14 43:12 46:8
48:15 103:16
105:18 113:10
117:19 152:2
**manufacturer's (5)**
3:20 68:23 105:8
120:3 159:20
**manufacturing (2)**
110:1 118:24
**mark (15)** 5:5 15:5,5
17:3 29:4 56:18
77:20 95:16 121:3,4
121:6,15,23 122:10
122:14
**marked (27)** 3:5 5:9
17:18,22 18:1,10
19:23 20:11,15 29:6
56:23 58:16 77:23

78:23 95:19,23
100:12 113:15
121:17 122:2,16,23
124:11 159:10,14
164:14,20
**market (6)** 51:2
52:18 151:18,22,23
152:1
**marketed (1)** 52:14
**marketing (7)** 44:17
51:1,5,9,21 52:4,12
**marking (3)** 20:1
22:19 164:12
**Marquette (8)** 8:18
8:23 86:24 87:1,2,8
87:10 162:16
**Martin (2)** 69:12
70:3
**Maryland (1)** 68:17
**material (12)** 7:13
24:1 48:24 50:19
51:1,9 53:15 54:22
76:24 103:9 162:23
163:5
**materials (14)** 3:7
5:20 12:4 17:5,18
18:16,19 19:3,6,9
24:24 51:10 52:4
103:12
**Matt (1)** 86:23
**matter (42)** 4:18 8:8
8:11,16,17,18,18,19
8:20,20,21 9:1,1
10:24,24 15:10 18:2
18:6,12,17 19:1,15
22:4 23:12 53:16
74:17 75:7,21 76:19
77:6 79:21 80:5,15
81:14,16,19 90:6
92:10 103:6 120:17
129:13 167:12
**matters (3)** 22:12
103:7 162:16
**Maytag (6)** 60:12
61:10 103:10,23
104:1 106:18
**Ma'am (1)** 29:10

**McDonald/Ogle (1)**
11:24
**McHenry (1)** 11:16
**mean (10)** 10:10
14:24 42:3 58:1
77:9 84:12 98:20
131:12 162:13
166:21
**means (3)** 98:3 139:2
171:20
**meant (4)** 52:17
73:13 75:2 92:23
**measures (1)** 119:24
**Media (1)** 2:9
**medication (6)** 39:23
40:13 42:8,11 43:13
45:14
**medications (4)** 40:1
40:6 41:2 42:21
**meet (4)** 32:6 99:12
100:18 113:11
**Meeting (1)** 38:18
**meets (1)** 126:1
**Melissa (2)** 2:8 4:16
**members (1)** 38:12
**memory (7)** 75:14,22
84:20,21 92:21
157:21 162:11
**mention (3)** 94:7
138:18 145:8
**mentioned (6)** 12:5
14:21 24:4 47:21
153:23 156:24
**mentioning (1)**
169:20
**menu (1)** 56:12
**Men's (1)** 68:17
**merely (1)** 140:16
**message (4)** 108:14
134:7 135:2 136:5
**messages (1)** 136:11
**met (4)** 4:15 54:15
92:20 114:9
**metal (1)** 93:12
**method (2)** 53:9 55:3
**methods (1)** 55:22
**mice (2)** 36:19 46:1

**Michael (5)** 8:21,22
12:9 14:9,20
**Michigan (1)** 59:19
**microwaves (1)**
154:8
**middle (2)** 25:17,18
**Mike (23)** 3:14 11:6
11:12 12:14,18,21
13:9,13,15 25:2
28:10 77:19,22 78:6
79:6,18 80:7 92:20
123:5 124:17 125:9
128:6 144:7
**military (1)** 73:11
**million (1)** 112:16
**Mills (1)** 83:9
**mind (1)** 18:23
36:23 45:22 47:14
69:1 113:6,7 119:12
122:9 128:23 159:1
**minimum (6)** 93:20
93:22 113:9,14
129:11 132:8
**minute (3)** 24:10
73:22 167:23
**minutes (1)** 67:11
**misperceiving (1)**
51:24
**missing (3)** 45:10
57:13,14
**misspell (1)** 79:13
**mistaken (1)** 129:6
**misunderstood (1)**
44:13
**mitigate (2)** 109:9
119:10
**mitigating (1)** 119:2
**mix (1)** 134:23
**mobile (3)** 25:23
26:18,23
**mockup (3)** 40:20,20
54:1
**mockups (1)** 54:2
**model (5)** 25:20 26:2
26:10,14 82:21
**modified (1)** 124:18
**moment (4)** 30:7

36:21 47:15 97:8
**monitor (4)** 81:4
125:11,24 127:9
**monitors (3)** 36:14
36:20 46:1
**months (8)** 105:16
166:23 167:1,8,8,9
167:10,10
**morning (4)** 4:13,14
13:22 73:9
**Morrison (3)** 11:20
11:21,22
**motivate (1)** 108:18
**motivated (1)** 118:14
**motivation (2)**
136:12,14
**motorcycle (7)** 59:18
59:21 65:3,12,14
66:5,8
**motorized (1)** 86:7
**move (1)** 154:17
**moved (2)** 84:23
128:22
**movers (1)** 85:2
**multifactor (1)** 112:3
**multilane (1)** 73:7
**multiple (11)** 7:15
33:5 41:3 44:4,7
54:16,24 65:7,12
96:17 116:18

---

**N**

**N (2)** 2:1 3:1
**name (3)** 4:16 46:13
69:11
**named (1)** 154:9
**names (2)** 11:22 60:9
**National (1)** 111:16
**nature (2)** 32:12
111:2
**near (6)** 71:6 97:11
128:11 140:21
141:2 143:7
**nearly (1)** 88:19
**necessarily (1)** 104:8
**necessary (10)** 23:21
23:22 67:9 117:16

126:22 127:3,3,6
156:20 172:4
**need (21)** 4:23 5:2
17:7 20:3,4 23:23
31:20 34:16 57:16
91:2 99:3,6 105:15
137:3 139:10
142:14 149:14,18
149:21 152:7
154:24
**needed (7)** 84:4
90:10 99:14 101:14
130:8 139:1,21
**needs (9)** 124:2 139:9
139:16 140:2 151:3
151:4 165:17,20
167:6
**Nemire (1)** 37:18
**Neucum (1)** 8:15
**never (14)** 32:19
34:20 94:20 106:4
109:7,19 110:2,4
111:6 138:21 145:3
145:19 146:8 147:3
**new (1)** 166:8
**nice (1)** 84:6
**NICOLSON (1)** 2:7
**night (1)** 59:18
**non (6)** 32:20 34:16
34:21 35:4,7 49:16
**nonrigid (1)** 50:23
**Norfolk (2)** 73:7,8
**normal (1)** 142:6
**normally (1)** 86:1
**North (3)** 2:9 133:8
135:9
**Nos (1)** 159:11
**Notary (3)** 1:15
171:15 174:20
**note (2)** 114:8 144:5
**notebook (10)** 8:6
13:23 14:22 15:1,4
15:9,15 17:12 19:11
77:2
**noted (10)** 26:13
27:13 80:24 91:9
93:4 129:4 144:8

160:18 172:10
174:9
**notes (15)** 3:13 11:5
12:13 77:18,18,21
78:5 79:5,5,7,16
102:20 144:8
145:18 171:5
**notice (6)** 3:6 5:6,8
7:18 41:15 108:11
**noticed (2)** 134:12
135:17
**notices (1)** 7:16
**November (4)** 75:15
75:21 76:7 104:13
**number (22)** 3:5 12:2
12:3 15:21 16:3
25:21 26:11,15
27:18 28:20 41:21
47:1 58:2 82:21
92:2 107:1 116:23
119:12 122:8 149:7
149:10 167:3
**numbers (4)** 11:18
11:18 12:6 123:21
**Nunez (2)** 69:12 71:8
**nutshell (2)** 31:9
155:6

---

**O**

**objections (2)** 4:3
171:4
**obstructions (1)**
93:24
**obvious (10)** 31:22
31:24 32:18,20
34:17,18,21,24 35:4
35:7
**obviousness (1)** 33:9
**occasion (1)** 147:2
**occasionally (1)**
169:23
**occasions (1)** 78:17
**occupational (1)**
111:12
**occur (2)** 117:9
156:10
**occurred (1)** 156:9

**occurring (1)** 156:3
**October (4)** 69:5
74:19,21 159:22
**offer (1)** 77:7
**offered (1)** 162:5
**offering (1)** 92:8
**offhand (7)** 35:2
63:21 88:1 93:18
94:3 123:21,24
**office (4)** 7:18,21
14:18 53:6
**Offices (1)** 1:15
**oh (9)** 6:4 10:9 20:6
24:16 57:7 87:15
109:23 141:1
158:19
**oil (13)** 63:10,10,16
64:4,5,6,7 66:21
67:5,6,6,7 68:4
**oily (1)** 63:11
**okay (207)** 5:3,4,15
5:23 6:2,20,23 7:11
9:17,21,23 10:9,16
10:22 12:12,16 13:5
14:6 15:3,7,12
17:14 20:1,6,9,20
21:6,17,21,24 22:7
22:15 23:2,10,12
24:4,9,16 25:10
26:14 27:5,23 28:15
29:2,4,22,24 30:8
30:16,18 33:4 34:10
35:13,16 36:5,10
37:4,10,19 39:4,20
40:24 42:7 45:11,17
46:23 48:14 49:5
50:10,14 51:14,17
55:5,9 56:1,10
57:16 58:7,11,13,23
59:3,15 60:20,22
61:1 63:18 64:12
66:9 69:3,11,13,19
69:22 70:7,18 72:2
72:7 75:23 76:11,17
77:13,17 78:20
79:10 81:10,12,24
82:6,11,14 83:7,13

83:19,22 84:14,17
85:5 87:2,5,7,11,18
90:12,15 91:16
93:10,19 94:4,19
95:12 96:2,12,15
97:8,16,19 99:2,5
99:10,15 100:4,16
103:7,11,15 104:3
105:4,17 106:9,20
108:6,8 109:2
112:22 115:20
118:7 120:17 121:3
121:11,14 122:14
122:15 124:11,20
124:24 126:16
127:13 128:13,19
129:3 130:1 133:2
135:23 136:2 138:4
140:9,20,24 141:7
145:23 148:20
153:2,8,19,22 154:5
154:9,11,19 155:8
156:15 157:10,14
157:19 158:9 159:8
159:13,18,24 161:2
161:21 163:3
164:22 167:11,17
168:1
**old (1)** 82:13
**older (3)** 22:20 39:19
41:17
**once (3)** 15:6 94:8
124:3
**oncoming (1)** 73:5
**ones (14)** 35:7 36:22
43:8 45:21 56:4
63:2 71:10 116:7
129:22,23 136:3
142:9 153:6 168:24
**on-product (34)** 25:7
35:10,14,21 36:7
37:6,14,16 39:7,11
39:12 41:1 45:13,19
46:6,9 48:21 49:4,7
50:7,11 56:6 62:8
106:7 107:12
114:16 115:17

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

204

119:13 126:6,8
151:20 153:5
160:22,24
**open (16)** 14:1 16:8
16:10,11 31:21,24
32:18,20 34:17,18
34:21,24 35:4,7
143:9 155:10
**opened (2)** 16:13
88:17
**opening (1)** 93:13
**open-ended (1)** 153:4
**operating (1)** 143:13
**operation (5)** 98:12
98:24 114:5,7 117:6
**operations (1)** 164:9
**operator (2)** 134:15
156:5
**opined (1)** 125:9
**opinion (20)** 70:7,11
77:11 81:1 90:16
94:4 96:5 99:20
100:1,7 111:5 113:9
124:8 125:12 149:6
149:9 151:3 153:14
157:6,14
**opinions (21)** 15:10
19:22 65:5,7 66:1
68:6,7 70:14 72:11
77:6,7 80:15,17
100:6 123:6 124:17
124:18 161:21
162:5 163:10
167:12
**opportunity (5)** 5:17
19:18 23:13 80:11
106:21
**opposed (9)** 35:10
69:18 77:10 98:12
99:7 124:13 130:9
143:6 151:13
**opposing (1)** 11:14
**ORAL (2)** 1:7,13
**order (4)** 7:19 19:2
37:23 129:5
**ordering (2)** 30:21
40:4

**organize (1)** 168:1
**original (5)** 38:20
66:10 105:4 169:2
172:13
**origination (1)** 80:23
**outlet (3)** 83:9 84:24
93:22
**outside (5)** 48:2 85:9
85:22,24 169:23
**outweigh (1)** 108:21
**outweighed (1)**
108:22
**ovens (1)** 154:7
**overall (1)** 112:19
**overlap (1)** 136:3
**overlapping (1)**
135:24
**overload (1)** 118:13
**over-the-counter (7)**
37:23 39:22 40:1,5
40:12 41:2 45:14
**owned (1)** 68:2
**owner (8)** 60:18
61:18 66:5,7,10
67:18 147:8 150:9
**owners (1)** 83:4
**owner's (23)** 3:24
34:15 65:9 105:6
146:6,7,9,11,17
147:9 148:3 150:11
153:13 163:14,19
164:13,14 165:5,15
165:17,20,22,24

————————————
**P**
————————————

**P (2)** 2:1,1
**PA (5)** 1:17,23 2:5,9
83:21
**package (1)** 50:24
**packaging (3)** 40:14
47:3 50:22
**packet (1)** 145:19
**page (56)** 3:3,5,5
5:16 29:13,23 30:2
30:3,9,24 31:1,3
37:13,14,14,21 38:7
39:7,9 44:21 45:7

57:10,10,13,14,17
58:1,8,18,20 59:11
69:5,5,9 72:5,6,6,8
72:21 80:21,24
102:19 145:24
146:3,16 147:3
150:9 155:12
160:17 161:4
164:20,20 165:7
166:7,10 173:3
**pages (5)** 57:20 67:20
67:21 163:23 174:4
**paid (2)** 137:14
146:13
**paints (1)** 43:15
**Pakel (5)** 103:22
104:5,10 152:20
153:22
**panel (3)** 84:6,18
100:19
**paper (5)** 43:9 53:24
54:2 111:15 155:9
**papers (3)** 133:9,10
146:4
**paper/pencil (1)**
40:20
**paragraph (1)**
134:22
**paraphrasing (1)**
148:12
**parenthesis (1)** 141:2
**part (10)** 49:22 81:7
84:16 98:21 100:6
101:7 116:16 123:5
149:15 163:1
**participate (1)** 45:12
**particular (5)** 26:2
91:14 150:6 156:2
161:23
**particularly (4)**
32:10 41:16 130:19
157:1
**Partly (1)** 84:12
**parts (3)** 31:5 65:18
135:2
**Pat (1)** 76:12
**Patrick (3)** 14:15

76:2 168:20
**paused (1)** 56:11
**pay (1)** 137:13
**paying (1)** 147:22
**PC (1)** 45:24
**PCM (1)** 36:15
**PDF (5)** 9:11,14,22
13:10 58:4
**peer-reviewed (3)**
161:22,24 162:8
**pencil (1)** 54:1
**PENNSYLVANIA...**
1:2
**people (29)** 33:2,19
41:7,15,22,24 42:3
49:20 51:24 52:16
66:2 89:17 116:24
118:13 127:1 130:5
130:6 132:2 133:12
133:24 134:22
137:13 142:9
148:21 149:1,11,14
149:19 152:24
**people's (4)** 35:23
119:22 133:17
149:18
**percent (4)** 101:23,24
111:19 112:15
**percentage (3)**
111:21,23 112:8
**perceptions (1)** 30:5
**perfectly (3)** 6:17
150:10 170:1
**perform (2)** 41:1
141:8
**performance (1)**
133:13
**performed (3)** 19:4
35:8,16
**periodic (1)** 107:2
**peripherals (1)** 36:18
**permitted (1)** 91:18
**person (6)** 23:18,19
24:8 49:13 53:15
55:12
**personal (3)** 48:6
97:5,20

personally (1) 126:6
perspective (1) 110:1
Pharmaceutical (1) 37:24
pharmaceuticals (1) 40:8
Philadelphia (1) 1:23
phone (1) 79:12
photographs (9) 11:13,14 23:15,23 24:1,5,7,9 93:5
physical (2) 10:10 40:22
Ph.D (4) 1:9 3:2 4:7 171:7
pick (3) 52:19 132:16 132:18
pickup (1) 71:2
pictures (1) 25:3
piece (3) 112:12 150:16 151:10
pinch (1) 112:10
pinned (1) 167:2
Piombino (1) 11:15
pipe (1) 93:13
place (3) 107:21 151:12 166:13
placed (4) 67:15 127:23,24 166:7
placement (2) 130:20 166:3
places (2) 42:22 112:11
plaintiff (6) 70:18,20 71:14,23 73:23 74:11
plaintiffs (2) 2:6 59:6
plaintiff's (1) 7:4
planning (2) 18:5 50:19
plans (1) 77:14
plate (2) 26:11,12
play (2) 55:1,24
Plaza (1) 1:22
please (5) 17:13 55:15 140:20 172:3 172:7

pockets (1) 126:24
point (18) 18:7 29:11 37:10 48:19 67:1,2 67:10 77:16 89:24 99:21 106:11 114:6 123:2 127:14 144:9 148:15 149:22 158:3
points (5) 112:11 123:2,4 131:3 135:1
pop (1) 10:5
popping (2) 36:22 45:22
population (8) 117:2 131:18,23 132:5 137:8,21 142:6 150:19
porch (1) 49:24
portion (2) 85:13 137:8
position (2) 7:4 50:5
possible (1) 78:22
possibly (1) 76:9
post (1) 23:24
potential (3) 35:3 112:20 142:14
potentially (3) 97:12 117:7 144:13
power (7) 9:2,7 34:3 34:23 42:9 87:6,9
Powers (1) 162:16
practice (2) 85:18,20
practices (2) 129:18 131:2
preferred (4) 33:10 33:13 37:23 41:5
prefire (1) 25:8
preliminary (1) 38:11
preparation (1) 19:10
prepared (1) 12:24
prescription (3) 40:8 43:13,13
presence (2) 71:24 72:15
present (15) 28:22

31:14 34:16,17 41:14 42:24 43:1 44:6 84:11,14 105:19 114:1 117:3 154:1 156:4
presentation (5) 31:22 40:6 41:4,5 134:10
presentations (1) 31:1
presented (7) 31:24 32:14 33:10,18 38:17 41:10 127:16
presenting (5) 29:16 31:12 44:1 54:7 104:9
pressure (1) 50:2
prevalence (1) 117:10
prevalent (1) 111:11
preventing (1) 143:18
Prevention (1) 111:17
Principles (1) 38:7
print (3) 128:21 131:22,23
printed (4) 12:13 27:14,17 57:5
printout (1) 120:22
prints (1) 41:17
prior (8) 8:14 31:1 75:15 78:17 80:10 83:3 84:3 127:12
prioritization (4) 30:19 31:4 34:15 133:10
priority (1) 41:9
probably (8) 54:23 85:2 87:7 106:23 128:18 146:4,6 149:4
problem (5) 26:19 49:22 131:10,11 144:18
problems (3) 41:18 137:6 147:5

proceedings (1) 171:3
process (4) 27:1 50:16 119:5 166:12
processing (1) 119:8
produce (2) 24:10 26:23
produced (7) 8:6 19:1,7 27:3 28:9 91:24 138:9
produces (1) 26:22
product (93) 3:21 28:23 30:20,22 31:4 31:7,13,16 33:8 34:1,18,22 39:2 40:3,4,22,23 41:4,7 41:10,20,20 42:12 47:3,19 50:11,15,17 51:5 52:1,2,7,8,10 52:12,13,15,16,23 53:22 54:7,10,17 59:20 60:22 61:22 63:4,10 64:8,9 69:13 79:24 99:8 103:4 105:20 110:8 110:23 111:4,7,12 113:3,19 114:18,21 119:15,19,20,21 120:7 130:5,8 137:4 138:12,15 139:8 145:16 148:10 149:12,14,17,21,24 150:1,3,8,15 151:4 151:4,13,17 152:9 159:21,23
products (29) 1:9 2:11 30:5 32:3,6,10 33:16 34:1 36:6,24 38:22,24 39:20 40:17,17 43:14 48:18,20 51:14 56:2 59:22 63:7 100:5 112:6 133:11 135:14,14 154:3 157:1
profession (1) 53:8
professional (6) 1:14

126:7 139:10,12
146:13 171:14
**profile (3)** 92:19
93:11,13
**progress (2)** 105:1
168:21
**prohibits (1)** 91:21
**project (2)** 112:1
133:21
**prominent (1)** 163:23
**prominently (1)**
166:7
**propensity (1)**
139:22
**proper (1)** 150:7
**properties (1)** 63:6
**property (2)** 60:18
61:18
**proposal (1)** 145:12
**propose (4)** 127:22
128:19 143:15
165:22
**proposed (9)** 53:4
99:24 120:16 128:3
141:9,22 142:3
143:3 166:3
**proposing (5)** 138:11
151:21 153:6
162:11 163:15
**pros (1)** 134:22
**protect (1)** 119:24
**provide (15)** 41:23
46:8 75:16 101:3,10
108:14 109:12
118:9 120:14
136:22 139:24
142:8 144:21 150:5
162:19
**provided (24)** 19:14
24:2 27:19 33:7
51:5 54:11 65:14
72:13 73:4 76:21,24
99:22 103:9 113:23
120:4 129:22,23,24
130:12,16 138:10
148:24 155:14
156:6

**Providence (1)** 2:9
**provides (6)** 138:16
155:16,23,23
157:21,24
**providing (5)** 35:22
44:3 50:19 116:14
130:23
**pubically (1)** 29:18
**public (4)** 1:15 161:7
171:15 174:20
**publication (1)** 38:14
**publications (1)**
30:24
**publish (1)** 38:13
**published (9)** 28:16
28:21 37:7 38:17,20
45:12 104:13
159:22 160:4
**pull (5)** 25:4 43:20,21
43:22 44:20
**pulled (2)** 158:15
159:4
**pullout (8)** 42:17,23
43:4 44:5,8,15,21
45:1
**purchase (3)** 65:12
83:7 149:1
**purchased (2)** 83:5
84:24
**purpose (2)** 79:18
112:17
**pursuant (1)** 19:2
**Purswell (3)** 6:5
157:10 158:18
**Purswell's (2)** 7:3
157:5
**put (27)** 6:13,18 9:16
27:2 31:20 38:12
44:24 49:24 50:2
58:2 76:23 99:5
101:16 114:3 128:7
128:18 131:16
143:4 144:16
145:10 150:7
158:10 164:19
165:11,19 166:9,9
**putting (6)** 32:13,15

43:10 143:15,19
144:15
**P-I-O-M-B-I-N-O ...**
11:15
**p.m (2)** 90:3 170:16

_____

**Q**
**qualifications (1)**
68:13
**qualified (4)** 123:15
138:20,23 139:3
**quantify (1)** 89:20
**question (15)** 4:4
16:2 27:8 74:2,9
92:18,23 94:15
105:5 110:16
149:24 151:6
152:16 153:2
156:15
**questioning (2)** 20:24
83:12
**questions (6)** 38:11
167:19 168:23
169:4,9 174:7
**QuickStart (1)** 36:17
**quite (1)** 26:20

_____

**R**
**R (3)** 2:1 173:1,1
**rack (1)** 165:10
**Rae (1)** 8:20
**rags (1)** 63:11
**railing (15)** 46:12,12
47:17,22 48:23,24
49:5,14,15,18,22,23
49:23,24 50:8
**ramp (1)** 73:18
**ran (1)** 45:24
**range (2)** 137:5
160:19
**rank (3)** 33:8,9,10
**ranking (1)** 33:13
**rate (3)** 31:17 136:20
154:20
**reach (4)** 52:3 67:9
125:19 167:7
**reacted (1)** 133:13

**read (43)** 33:24 41:22
42:1 65:18 67:19,20
67:21,21,22 118:14
120:2,13 125:1
134:13,23 142:9,17
142:19 145:3,16,18
145:19 146:4,9,12
146:23 147:9,13,14
147:15,16,21,23
148:3,9,17,24 149:3
149:11,19,20 172:3
174:4
**readability (6)** 35:18
39:18 131:5,13
134:24 135:3
**Readable (1)** 161:5
**readers (1)** 31:23
**readily (9)** 99:14
101:14,22 117:2,14
117:14 127:17,19
143:5
**reading (26)** 4:10
31:24 33:20 34:20
35:18 41:16,19,20
42:1 43:2 65:22
68:1 133:17 134:20
147:1 148:22 149:8
157:4,12,16,24
158:1 160:7 161:5,8
161:11
**readout (1)** 129:19
**real (4)** 42:8,24 44:5
129:8
**realistic (1)** 51:23
**realize (3)** 7:3 81:6
159:6
**really (7)** 42:18 59:22
72:23 119:8,19
156:20 168:6
**rear (2)** 128:10,11
**reason (17)** 23:20
55:23 90:8 91:11,23
92:4 124:7,10,24
126:21 128:22
145:13 146:9 147:4
147:23 166:18
172:5

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**reasonability (1)**
65:8
**reasonable (10)**
80:19 99:5 108:24
109:2 111:23 112:8
120:9,11,15 151:1
**reasonably (2)** 72:15
74:11
**reasons (3)** 96:17
104:22 118:11
**reattach (1)** 44:24
**rebuttal (2)** 77:10,15
**recall (46)** 33:21 35:6
36:21 48:3,4 49:8
49:11,12 50:9 52:5
60:16,18 62:4,7,9
63:1,2,19 64:3,11
67:19 69:6,14,19
70:4,6,7 72:11
74:16 78:21 86:23
88:1 106:5,13 107:7
108:7 142:22 145:4
146:10,18,21,23
147:6 155:6 161:17
161:19
**recalled (1)** 146:19
**recalls (2)** 146:15
147:1
**receipt (1)** 172:14
**receive (2)** 65:17,24
**received (7)** 18:16,19
66:12 145:19 146:3
146:4,19
**receiving (2)** 65:22
66:2
**recess (4)** 56:16 90:2
141:19 159:9
**recognize (4)** 33:21
95:22 146:17
159:16
**recognized (4)** 116:2
116:3,4 117:2
**recommend (2)** 50:7
110:14
**recommendation (5)**
51:9 117:18 158:6,9
160:7

**recommendations ...**
31:19 46:9,17 48:18
51:17 126:3 127:11
129:18 132:23
135:6,12 141:15
**recommended (2)**
42:16 160:19
**record (17)** 4:15 6:2
6:21,22,24 13:22
14:7 24:17,18 58:15
78:4 122:18,22
127:22 159:18
160:1 168:7
**red (5)** 123:9,12,17
124:4 126:13
**redoing (1)** 46:17
**reduce (3)** 136:12
149:14,18
**reduces (2)** 134:24
136:11
**redundant (1)** 165:18
**refer (2)** 22:4 27:5
**reference (7)** 15:20
149:15,23 156:14
159:20 166:16,19
**referenced (2)** 144:2
163:8
**references (2)** 9:10
155:7
**referencing (1)** 29:12
**referral (1)** 48:5
**referred (1)** 48:9
**referring (1)** 97:10
**reflect (1)** 168:7
**refrigerator (1)**
104:4
**refrigerators (1)**
154:7
**regard (55)** 7:2 19:5
23:12 28:3 34:14,23
36:7,24 37:6 39:7
40:11 41:1 48:1
49:14 50:15 51:7,10
52:4 55:5 56:1
63:19 81:1 90:22
93:16 95:12 97:3
100:2,10,23 109:4

113:16,18 114:9
115:14 123:7
124:11,18 125:10
127:2,4 129:21
140:4,24 141:7
153:3 155:2 156:14
160:21,23 163:1,14
165:14,21 166:3
169:5
**regarding (11)** 7:22
26:18 28:10,16
78:10,12 79:15
105:20 130:23
138:20 154:24
**regards (1)** 108:9
**Registered (2)** 1:14
171:14
**regular (5)** 98:17,18
98:19,22 139:8
**regulatory (1)** 113:12
**related (17)** 19:3
29:15 30:6 31:11
38:1,9 39:16,17
40:10 41:8 53:18,21
59:24 66:1 101:12
151:11 164:23
**relation (1)** 102:4
**relative (1)** 89:10
**relegate (3)** 110:3,4
111:6
**relegated (1)** 116:8
**relegating (1)** 115:12
**relevant (3)** 41:11
42:18 162:19
**reliance (1)** 149:18
**relied (3)** 15:9,19,22
**rely (3)** 65:9 103:13
118:11
**relying (6)** 15:13
80:14,18 115:24
116:21 163:10
**remember (38)** 7:24
11:23 30:4,6 33:7
35:1 36:11 46:13
49:13 50:20,22
51:18 59:16 60:9
63:8,13 69:4 70:12

70:13,13,15 71:5,7
72:18 81:13 86:22
88:3 97:21 107:5,23
110:11,21 123:21
123:23 127:20
143:16 157:7,17
**remind (1)** 5:2
**removal (1)** 47:4
**remove (1)** 7:10
**removed (2)** 84:18
124:20
**removing (1)** 47:5
**repair (1)** 105:2
**repeated (2)** 151:5
164:9
**report (63)** 3:9 6:4
7:4,6,7 9:10,13,15
11:6,8,12 12:10,22
13:1 17:3,6,8,21
18:2,3,9,10,11,14
18:15 19:22 26:1,13
27:13 77:3,5,15
80:6,7,10,12,21,24
94:7 112:23 114:8
120:20,21 121:1,2,7
122:13 124:13,15
128:24 138:5,19
144:3 157:20 159:4
161:22,23 162:20
163:9 168:9,14
169:2,12
**reporter (4)** 1:15 4:9
171:14,22
**Reporters (1)** 1:21
**reporting (1)** 115:8
**reports (15)** 11:15
18:6,20,21 19:15,19
19:21 31:2 120:22
161:24 162:2,7,10
162:15,21
**report's (1)** 80:4
**represent (2)** 4:16
18:24
**reproduction (1)**
171:20
**require (1)** 96:18
**required (7)** 32:6

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

94:6 107:4 113:13
139:13 147:15
152:14
**requirement (8)**
92:24 105:21 107:3
107:9 114:5 147:21
149:5 167:3
**requirements (9)**
54:13,15 92:21
94:10 100:18
120:15 126:2
131:21 135:5
**requires (1)** 105:2
**reroute (1)** 73:20
**rerouted (1)** 73:21
**research (11)** 28:20
37:8 40:2 41:13
119:16 135:6,8,8,10
135:11 142:7
**reserved (1)** 4:4
**residential (1)** 70:22
**residue (1)** 110:24
**resources (2)** 54:24
133:21
**respect (5)** 28:21
80:22 81:3 100:1
118:22
**respiratory-wise (1)**
111:3
**respond (1)** 156:18
**responded (1)** 12:10
**responding (1)** 73:24
**response (1)** 157:14
**responses (1)** 11:11
**responsibility (3)**
120:2,7 147:9
**responsible (1)** 40:3
**responsive (1)** 5:21
**rest (3)** 32:2,19
118:19
**restricted (2)** 104:23
152:24
**restricting (1)** 93:21
**restriction (1)** 104:21
**result (3)** 37:8 38:10
68:4
**results (3)** 41:6

133:23 155:22
**retain (1)** 118:16
**retained (28)** 3:8
16:24 17:20 46:7,19
47:19 48:14 59:6,9
60:15 61:2,9,16,21
64:24 69:6,23 71:13
71:18 74:16,19,22
75:19 76:19,20
103:3 110:8 176:5
**retention (2)** 50:12
52:22
**return (1)** 172:12
**reusable (7)** 47:11,12
47:17 48:7,11
110:11,16
**reverse (2)** 102:11
108:4
**reversed (1)** 71:3
**reverses (1)** 102:10
**reversible (2)** 102:18
165:9
**reversing (1)** 102:21
**review (8)** 4:23 5:17
19:18 53:15 76:7
80:11 96:2 106:21
**reviewed (3)** 19:10
153:13 154:19
**reviewing (1)** 19:21
**rewrite (1)** 123:3
**rewrote (2)** 123:1
125:1
**Ricklefs (2)** 8:21,22
**ride (2)** 47:7 65:14
**right (51)** 10:3,20
13:3,11,18 23:1
29:9 33:2 46:21
55:6,10 58:19 73:17
74:14 85:7 89:23
97:3 98:24 99:3,23
102:22 106:17
107:23 108:1
114:11 118:5
120:20 121:23
122:20 124:15
126:12,12,14
128:14 132:12,12

135:17 140:7 141:1
147:10 148:3 151:8
152:10 160:9
163:17 165:23
166:17 167:24
169:12,17 170:7
**rigid (3)** 50:23 85:6
85:13
**Ripley (6)** 8:23,23,24
114:13 147:18
148:13
**risk (14)** 31:23 37:1,2
37:3 40:6 96:23
97:2,3 112:2 118:24
130:4 152:8,12,15
**road (6)** 1:17 2:4,9
59:13,18,24
**roadway (2)** 59:22
60:1
**Rob (1)** 11:7
**Robson (8)** 53:1
74:22 75:6,9,17
76:10 162:3,7
**role (1)** 62:2
**room (1)** 168:4
**Rose (1)** 2:8
**rough (1)** 59:18
**Rual (1)** 69:12
**rubber-like (1)** 100:5
**rule (1)** 78:22
**rules (1)** 4:23
**ruling (1)** 68:11
**run (2)** 31:23 85:8
**running (4)** 32:23
33:1 53:5 151:14

————————————
**S**
**S (2)** 2:1 3:4
**safe (2)** 127:8 137:4
**safeguard (2)** 125:16
136:23
**safeguarding (2)**
110:4 125:23
**safeguards (3)** 127:8
130:11 136:17
**safety (29)** 30:19,22
31:4,7,12,15,22

39:12 65:10 110:3
111:9,10,12,12,16
112:15,19 116:20
118:12,22 119:11
119:23 137:2,7
149:17,21 150:23
151:2 159:23
**sake (1)** 122:19
**sat (1)** 168:7
**satisfactory (1)** 158:2
**saw (2)** 72:8 89:20
**saying (3)** 24:12
80:10 141:1
**says (11)** 5:16 13:9
43:20 57:22 70:3
113:22 124:21
135:21 150:8
155:19 157:20
**scanned (1)** 106:23
**scanners (2)** 36:13
45:24
**scenarios (2)** 63:14
63:18
**scene (1)** 11:13
**scheduled (2)** 98:15
98:16
**scheduling (3)** 7:18
7:23 121:1
**school (14)** 34:11
35:17 37:5,15 38:4
38:5 39:14,15,15
45:14,19,22 133:4
161:20
**scope (1)** 75:13
**screen (1)** 98:21
**sealed (1)** 67:2
**sealing (1)** 4:2
**search (1)** 29:20
**Sears (7)** 83:8,9
84:24 88:16,16
139:13,18
**seats (1)** 45:20
**second (7)** 29:13
40:11 56:12 128:4
145:2 160:4 167:22
**secondhand (2)**
65:13 66:6

**Secondly (1)** 130:10
**section (9)** 44:15
  161:4 164:10,23
  165:1,3,10,12 166:8
**see (31)** 23:17 26:19
  31:7,17 68:24 71:10
  74:12 82:18 89:1
  91:1,15 94:17
  108:11 116:13
  121:9 124:22 125:3
  127:19 128:6
  133:12,13 142:4,9
  143:22 144:11,14
  150:9 160:16,18
  165:3,4
**seed (1)** 63:10
**seeing (6)** 28:5 32:18
  35:19 106:5 133:17
  134:19
**seen (18)** 5:12 19:6
  23:15 24:5,7,7,9
  27:5,9,9 43:12
  84:19 90:10 93:5
  106:24 111:14
  135:17 143:2
**segment (2)** 132:5
  137:21
**self-heating (1)** 63:5
**self-reported (1)**
  33:22
**seller (1)** 52:11
**sells (1)** 105:22
**semirigid (2)** 85:4,13
**send (3)** 75:17 76:4
  139:19
**sends (1)** 25:3
**sensing (1)** 104:19
**sent (7)** 7:17,22 11:10
  14:12,15 76:6 88:16
**separate (3)** 135:23
  136:1,3
**Sergeant (1)** 12:8
**serial (3)** 25:20 26:10
  26:15
**series (1)** 35:12
**serious (1)** 98:7
**service (15)** 105:2

115:9 116:4 123:13
  123:15,17 124:21
  137:9,10 138:8
  139:13,14 164:11
  164:24 165:2
**serviced (1)** 137:5
**servicer (3)** 94:24
  95:2 138:21
**set (8)** 33:16 38:1
  54:12,13 107:3
  133:12 170:6 174:7
**setting (1)** 51:24
**settled (2)** 16:10,12
**seventh (1)** 158:1
**severity (1)** 116:22
**Shannon (1)** 8:18
**Sharon (2)** 1:5 14:8
**sheet (7)** 43:9 54:2
  172:6,7,10,13 174:9
**Shelley (1)** 8:15
**shipped (1)** 91:20
**shooting (2)** 47:8
  48:4
**short (5)** 7:2 20:23
  56:16 159:13 160:5
**shortcomings (1)**
  48:19
**shortly (1)** 21:23
**show (1)** 56:21
**shown (2)** 142:7
  156:22
**shuffle (1)** 118:17
**shut (3)** 123:19 124:4
  144:24
**shuts (1)** 144:22
**Sic (1)** 83:21
**side (20)** 85:7,7
  101:19,20,21,22
  102:7,9,12,12,14,15
  102:16,22 107:23
  107:24 108:2,2
  118:21 143:10
**sight (3)** 66:21 67:6
  68:4
**sign (2)** 39:13 172:7
**signal (4)** 27:15
  100:19 134:18

165:9
**signed (1)** 14:11
**signify (1)** 155:21
**signing (2)** 4:11
  172:9
**similar (10)** 31:6
  41:6 84:2 106:1
  151:20 153:6
  161:24 162:6,9,17
**simplicity (1)** 52:1
**single (2)** 59:17 123:8
**sir (3)** 22:22 24:12
  154:13
**sit (3)** 63:1 77:13
  169:1
**site (2)** 11:13 79:24
**sitting (1)** 76:16
**situation (4)** 54:20
  119:14 150:24
  151:9
**situations (2)** 47:18
  110:13
**six (9)** 19:7 58:24
  61:15 83:2 86:20
  87:12,16 167:9,10
**sixth (3)** 157:16
  158:8,10
**sixth-grade (1)** 158:5
**size (14)** 42:12,13
  128:22,23,24 129:4
  129:7,11 131:4,22
  132:3,8 134:6,17
**skid (7)** 69:8,15,16
  70:10,21,22 71:3
**skimmed (2)** 146:7
  146:10
**skimming (1)** 146:20
**skims (1)** 146:5
**skin (1)** 111:2
**skinny (7)** 3:15 25:14
  26:8 95:14,18,24
  107:20
**small (3)** 42:13
  131:23 132:3
**smaller (2)** 41:17
  42:20
**snake (2)** 86:6,8

**snow (2)** 47:4,5
**sold (4)** 43:14 46:14
  50:21,21
**solely (3)** 35:9 39:12
  130:9
**solid (1)** 104:17
**solution (4)** 109:8,10
  109:14,17
**somebody (1)** 50:4
**sorry (22)** 28:7 30:13
  30:17 44:13 57:7
  58:10 61:5 62:19
  69:9 70:21 78:11
  96:7 103:21,24
  106:3 109:23,24
  115:18 121:9
  145:22 155:10
  162:24
**sound (1)** 5:3
**sounds (1)** 69:22
**source (5)** 97:12
  123:18 124:3
  140:22 141:3
**South (1)** 1:22
**space (4)** 42:19 58:3
  134:21 172:5
**spacing (3)** 41:18
  131:3 134:8
**Spanish (3)** 27:16
  44:3,4
**spark (1)** 35:3
**speak (2)** 90:5,9
**speaking (1)** 98:4
**special (1)** 156:3
**specific (15)** 9:6
  28:24 38:22 39:2,11
  55:15 73:3 78:12
  96:20 101:3 108:15
  128:23 130:22
  136:10,11
**specifically (34)**
  15:11,12,20 21:3
  28:18 51:18 52:5
  66:18 67:17 80:19
  81:18 90:19,22 93:9
  94:17 96:19 97:10
  100:7 103:13 105:9

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

105:16 106:12
111:14 112:24
113:2,3 114:2,20
117:15 146:23
154:23 156:19
163:11,12
**specificity (1)** 136:6
**specifics (1)** 65:16
**spent (1)** 33:19
**spoke (3)** 8:11 79:6,9
**spontaneous (9)**
60:13 61:10 62:14
62:15,17 63:5,19
97:6 100:3
**spot (1)** 107:20
**spring (1)** 82:4
**springtime (1)** 82:2
**Square (2)** 1:16 2:3
**stacked (1)** 63:13
**stains (1)** 43:15
**standard (24)** 32:4,4
32:5,7 38:15 96:8
96:12,16 99:12
100:24 112:22,23
113:6,10,14,16,22
114:14,17,24,24
115:1 132:22,22
**standards (11)** 32:14
53:20 114:8,20
116:1 126:2 127:11
129:18 135:12
141:15 153:11
**standing (1)** 84:13
**standpoint (11)**
74:18 112:19
113:12,13 118:24
131:5,5,13,14
149:13 168:16
**standstill (1)** 68:4
**start (4)** 32:18 54:13
86:17 130:3
**started (5)** 47:22
86:15 124:10
144:15 162:20
**starting (3)** 29:13
30:1 47:16
**starts (1)** 32:10

**state (9)** 8:24 9:1
17:1 59:19 71:24
104:17 133:8 135:9
172:5
**stated (3)** 92:24
145:13 158:14
**statement (4)** 26:18
108:19 109:24
168:6
**statements (4)** 33:8
67:15,22,23
**states (5)** 1:1 72:3
73:10 93:21 161:5
**stating (1)** 14:18
**status (3)** 155:20,21
156:22
**stenographic (1)**
171:5
**step (1)** 142:13
**steps (1)** 142:12
**step-by-step (1)**
129:20
**Steve (1)** 8:16
**Steven (2)** 8:3 9:1
**stick (1)** 99:23
**stipulated (1)** 4:1
**stipulations (1)** 4:9
**stock (1)** 25:2
**Stoddard (29)** 3:14
7:23 11:6,12 12:14
12:19 13:10,14,15
25:2 28:10 77:19,22
78:6,9,16 79:3,6,15
79:19,20 92:20 93:2
123:6,24 125:9
128:6 130:13
166:22
**Stoddard's (6)** 80:7
80:12,14,17 124:8
144:7
**stop (2)** 34:20 41:24
**stopped (8)** 70:24
71:1,2,3 73:16,20
73:22 74:12
**stopping (1)** 89:24
**storage (2)** 36:16
46:2

**stored (1)** 143:24
**stores (2)** 81:15
144:9
**stoves (1)** 154:7
**strapped (1)** 137:15
**street (2)** 1:22 70:22
**string (1)** 31:11
**striving (1)** 113:10
**struck (2)** 70:20 71:4
**structure (1)** 49:16
**stuck (1)** 45:7
**studies (25)** 28:21
31:11,13 33:15 34:2
34:5,8,14 35:8,12
35:13,16,17 37:5
38:2 40:16,17,19,24
45:11 46:5 52:21
119:17 154:19
156:17
**study (4)** 39:22 42:3
42:16 168:12
**stuff (7)** 32:18 41:7,8
41:11 51:21 100:2
144:15
**style (3)** 43:17 82:15
82:16
**sub (1)** 123:2
**subject (9)** 52:22
53:16 68:11 79:21
80:5 90:17 91:10
92:24 172:9
**subjects (10)** 32:23
33:1,6 42:6 54:5
126:17,19 127:4
132:17 141:9
**submitted (1)** 38:14
**subrogation (3)**
16:21 60:19 61:19
**Subscribed (1)**
174:13
**substance (1)** 174:8
**substances (1)**
110:18
**substantially (3)**
151:20 153:6 162:6
**sued (1)** 63:16
**sufficient (3)** 24:3

72:14 131:4
**suggest (2)** 142:5
156:17
**suggested (2)** 115:15
127:16
**suitability (1)** 65:8
**suitable (1)** 161:6
**Suite (4)** 1:17,22 2:4
2:8
**sum (1)** 31:9
**summaries (3)** 8:13
9:2,5
**summary (1)** 9:8
**sunup (1)** 73:9
**supervision (1)**
171:22
**supplement (1)** 137:2
**supplemental (3)**
18:6,8 77:14
**support (4)** 49:15
68:22 154:20
160:12
**supposed (2)** 128:2
146:22
**sure (37)** 4:19 7:19
12:15 17:2 29:13
35:22 37:11 41:15
45:2 53:11 55:4,20
56:7,14 58:9 62:21
66:20 80:16 81:10
83:14 99:1,18
110:17,18,22 115:2
115:18 117:12,13
118:6 121:11
130:21 136:4 146:5
149:16 168:22
169:16
**survey (3)** 106:4
151:24 152:19
**surveys (1)** 81:15
**swing (1)** 102:21
**sworn (2)** 4:7 174:13
**system (3)** 48:8 81:22
156:22
**systems (2)** 36:16
46:2

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

211

**T**

**T (3)** 2:3 3:4 173:1
**tab (1)** 8:6
**tacky (1)** 43:11
**take (29)** 4:21 5:2
  6:11,14 56:14 72:16
  72:18 75:24 78:15
  79:7,16 83:13 84:6
  84:10,19 85:14,19
  86:1 88:8 89:24
  103:20 104:21
  122:9 128:5 129:3
  129:20 139:20,21
  141:16
**taken (4)** 1:13 84:9
  119:24 171:5
**takes (2)** 136:9
  155:10
**talk (12)** 49:5 65:20
  66:4 71:2 79:21
  96:23 129:24 130:2
  138:4 143:17
  153:17 169:3
**talked (21)** 36:2,12
  37:5 47:10 56:2
  78:16 79:20 95:13
  110:7,10,22 112:6
  113:15 133:9,10
  135:15 136:19
  152:6 153:9,12
  157:3
**talking (11)** 33:2
  40:13 90:19,22
  98:14,17 134:1,2
  150:15,15 160:21
**talks (2)** 97:2 164:10
**tall (2)** 25:14 129:6
**tape (4)** 36:14 46:1,2
  145:10
**target (11)** 47:9,11
  47:11,12,18 48:5,8
  48:11 110:11,16,19
**tear (2)** 45:1,9
**Technical (1)** 31:2
**technician (3)** 123:16
  139:14,14
**technicians (1)**

139:16
**techniques (3)** 39:5
  41:24 133:20
**teleconference (2)**
  3:13 11:5
**telephone (4)** 13:16
  77:22 78:6,8
**tell (7)** 51:18 85:17
  93:2 124:5 136:2
  144:23 145:1
**telling (1)** 138:24
**temperatures (1)**
  66:24
**terms (4)** 24:4 99:19
  100:16 105:10
**tested (3)** 126:6,16
  135:13
**testified (27)** 4:8
  65:17 67:12,18 68:6
  94:8,18,20,21 97:18
  97:19,23 129:14
  139:19 142:24
  143:17 145:4,9
  146:15,18 147:18
  148:7,8,9,13,23
  160:6
**testify (3)** 68:10
  144:4 145:3
**testifying (1)** 144:5
**testimony (30)** 3:12
  7:15 8:15 9:3,4
  22:16,22 56:19,22
  57:2 58:17 59:1
  60:3,7 61:4,6 62:21
  64:13,18 68:16,18
  68:21 97:22 127:21
  132:14 142:2,21
  143:1 148:1 157:7
**testing (18)** 32:22
  46:5,6 53:1,2,14,24
  54:1,5 55:10,11,12
  55:20 56:3,5,8
  132:17 135:14
**text (8)** 27:14,17,19
  57:21 131:3 157:15
  160:17 161:5
**textbook (7)** 38:19

154:23 155:4,6,13
  155:14 160:3
**textbooks (1)** 15:19
**thank (6)** 13:5,19
  21:24 170:8,9,10
**thanks (2)** 76:17
  170:2
**thing (12)** 99:11
  109:5,5 117:22
  124:5 127:14
  129:12 133:22
  145:2,8 146:23
  156:13
**things (20)** 32:12
  36:20 42:15 45:20
  55:1 88:5 103:17
  116:18 133:23
  136:15,22 138:18
  143:19 144:9 145:6
  150:9 152:5 158:19
  164:1 169:14
**think (78)** 16:1 21:4
  25:4 30:2 35:2
  36:11 47:10,13 50:3
  57:12,15,20 58:3,6
  60:12,13 61:8 62:13
  62:24 67:15 72:17
  72:17,22 73:7,21
  75:12,17 80:7 81:18
  82:20 83:9 84:3,20
  84:21 86:23 87:4
  88:12 92:18,20,21
  93:8 94:7 98:14
  100:16 102:21
  104:5 105:12
  110:17 111:15
  112:9 122:18 123:5
  124:9,9 129:10
  131:24 138:3,22
  139:2,18 142:21
  147:18 148:8,15
  152:6 156:13,15,20
  157:19 161:14,19
  162:20 163:24
  164:8 165:17,19
  167:16 170:6
**third (7)** 5:8 26:6,7

26:16,17 29:14 66:7
**thirdhand (1)** 65:13
**third-party (1)** 61:19
**thirty (1)** 172:14
**thoroughly (1)**
  167:11
**thought (4)** 6:6 81:9
  111:11 125:1
**thoughts (1)** 54:3
**three (11)** 1:16 2:3
  7:14 25:5 40:2 44:6
  75:3 89:14,18 131:8
  167:1
**three-bound (1)**
  13:24
**three-inch (1)** 89:12
**thumb (8)** 6:7,8,11
  6:12,15,19 10:4
  14:16
**time (25)** 4:5 8:6
  33:19 61:1 67:9
  68:1 74:6 79:4 80:5
  84:13 86:10 87:21
  111:14 121:10
  126:23 128:5 129:3
  133:21 135:9
  143:12,22 144:10
  167:16 168:23,24
**timeframe (4)** 28:10
  34:11 54:23 152:22
**timers (1)** 80:21
**times (6)** 26:17 58:24
  88:24 110:8 112:17
  127:17
**timing (1)** 169:15
**Timothy (1)** 59:12
**title (1)** 31:6
**toasters (1)** 154:8
**today (7)** 4:15,21
  5:13 77:13 152:6
  158:15 169:7
**today's (2)** 5:6 19:10
**told (3)** 85:16 92:20
  114:23
**tool (2)** 42:9 53:11
**tools (4)** 34:3,23 39:5
  53:12

**top (25)** 31:1 37:19 39:9 47:6 63:13 72:6 84:9,18,20,22 128:8,10,15 129:8 130:18 131:17 132:13,13 143:15 143:19,23 144:1,6 144:20 145:10
**topic (1)** 29:16
**topics (1)** 40:10
**tops (1)** 131:9
**tore (1)** 45:3
**Townley (3)** 72:10,17 72:18
**Township (2)** 1:16 2:4
**toxic (2)** 110:18 111:2
**tracks (1)** 69:18
**tractor-trailers (1)** 47:6
**traditionally (1)** 132:1
**trailer-based (1)** 47:2
**train (2)** 52:19 53:18
**trained (1)** 53:16
**trainers (1)** 52:14
**training (9)** 15:17,19 46:24 49:2 50:10 52:18 55:6,9 133:4
**transcript (11)** 1:13 10:23 14:19 90:11 90:13 170:1 171:8 171:19 172:15,16 176:6
**transcription (1)** 174:6
**transcripts (3)** 8:1 14:8,22
**transition (11)** 85:4 85:14,18 86:1 88:8 90:24 91:8,13,22 94:16,20
**transitioned (1)** 152:4
**trap (1)** 84:7
**travel (4)** 42:13

73:17,17,18
**treatises (1)** 15:18
**tree (3)** 2:8 47:2 112:10
**Trey (2)** 11:21,22
**trial (11)** 1:4 4:5 9:4 60:4 64:13 68:8,10 68:22 77:8 168:17 169:1
**trick (1)** 27:8
**trigger (1)** 123:21
**truck (8)** 70:24,24 71:2,2,6,6 73:19 74:6
**true (2)** 129:16 171:7
**trying (2)** 150:2 154:16
**turn (5)** 5:15 74:14 120:16 127:13 143:12
**twice (1)** 88:3
**two (31)** 8:3 9:5 11:17,19 16:1 26:4 26:5 30:2,3,12 31:5 41:13 63:14 64:16 67:15,20,21 68:2 71:16 85:9 88:18 89:11,14 129:7 131:8 137:10 140:11 141:1 145:5 158:13 159:15
**two-page (1)** 78:2
**type (15)** 34:1 39:20 40:24 63:7 69:13 79:8,13 82:6 86:5 98:2 106:9 119:19 134:1,6,7
**types (6)** 38:24 132:15 133:20 134:9 154:5 155:24
**typically (19)** 12:20 25:17,20 42:11 43:24 44:16 63:11 69:17 79:20,21 80:4 85:15 88:4,6,8,11 90:9 102:17 158:4
**typing (1)** 79:9

**typo (1)** 78:18
**Tyrell (1)** 9:4
**T-C (1)** 13:10

---

**U**

**ubiquitous (2)** 156:11 157:1
**UL (5)** 32:4 107:6 114:4,13,24
**unaware (1)** 149:4
**unburned (1)** 28:5
**underlying (1)** 66:17
**underneath (2)** 144:24 156:10
**understand (14)** 73:1 81:7 93:10 98:5 100:9,10 114:10 118:7 137:2 142:23 145:7 157:23 169:8 169:16
**understanding (30)** 15:23 25:6,11 27:20 28:1,4,12 52:6 65:5 66:14,19 84:17 93:6 93:12 94:11 96:1,9 96:11 101:7,16 102:6,8 123:11 124:16 125:4,8 130:3 136:12 145:15 159:3
**understands (2)** 108:15 148:2
**understood (1)** 67:23
**unfair (1)** 65:20
**unfamiliar (1)** 150:2
**unimportant (1)** 118:19
**unique (3)** 32:15,20 34:21
**United (4)** 1:1,22 72:3 73:10
**University (2)** 133:8 135:10
**unknown (1)** 32:15
**unreasonable (1)** 147:16
**update (6)** 121:20

122:7,12,20 124:7 140:17
**updated (17)** 3:11,16 3:18 9:14 22:15 120:22 121:8,9,12 121:16 122:1,8 123:6 124:18 140:6 169:7,12
**updating (1)** 124:10
**usability (6)** 38:6 54:5,6 56:3,5,8
**usage (1)** 41:8
**use (49)** 21:13 24:15 26:14 35:5 41:18 42:16,22 49:17,19 51:15 52:7,13 55:23 56:2 66:21 91:8 92:15 96:17 97:3,14 100:17 109:11 114:17 117:6 131:2 131:3 134:17,18,21 134:23 135:1 141:11 144:14 147:12,19,20 148:2 148:14 149:1 150:1 150:2,11 154:24 155:19 157:1 158:7 165:7 167:8 168:16
**user (32)** 31:16,16 32:17 43:19 66:6 99:6 101:18 102:10 108:11,15,18 112:17 116:14,17 117:2 119:24 123:14 127:19 135:14,20 138:16 139:6,8 144:9,22 148:1,17 150:17,18 166:24 167:4,7
**users (13)** 31:24 34:18 41:17 65:12 65:21 131:18 137:8 138:22 139:2 148:8 148:24 149:3,7
**user's (2)** 108:13 131:8
**usual (3)** 4:9 85:17

85:20
**usually (2)** 43:19
  160:19
**utilized (1)** 135:13
**UTV's (1)** 47:8
**U.S (2)** 73:12 159:22

———————
**V**
**vacuum (1)** 84:6
**vacuums (1)** 154:8
**Valley (2)** 1:16 2:3
**vapor (1)** 67:7
**variables (9)** 133:11
  133:14,16 134:1,10
  134:11,19 135:15
  135:19
**varied (1)** 67:10
**Various (1)** 25:1
**vary (1)** 42:12
**vegetable (4)** 63:10
  63:15 64:4,6
**vehicle (9)** 59:17
  71:16,17,18,22
  72:13,16 73:4
  156:12
**vent (15)** 81:16,22
  83:15 85:4,6,7
  88:14,18 89:5 93:11
  93:17,23 94:1
  137:11,24
**vented (1)** 85:3
**venting (21)** 83:23,24
  84:2 85:12 86:3,11
  87:12 88:24 89:2,9
  89:19 90:20,23,24
  94:5,8,10,12,16,24
  99:2
**version (13)** 3:16,18
  14:10,23 15:1 21:18
  22:20 27:6 121:8,12
  121:16 122:1 140:6
**versions (3)** 27:9,10
  27:12
**versus (5)** 59:12
  68:17 69:12 72:3,9
**vicinity (1)** 66:23
**view (1)** 157:5

**viewer's (1)** 131:20
**viewing (1)** 132:9
**Vigilante (47)** 1:9 3:2
  4:6,13 5:9 17:10,19
  17:22 18:1 20:11,14
  21:18 22:3 23:5,6
  28:15 29:7 30:1,1
  30:23 37:18 38:3,3
  56:17,23 58:15
  74:18 75:9 77:23
  78:3 90:5 95:19,22
  103:1 121:18 122:3
  122:6,17 141:21
  145:15 159:10,14
  164:14 168:3,23
  170:11 171:6
**Vigilante's (4)** 3:9
  17:21 20:10 56:22
**Vigilante-1 (3)** 3:6
  5:5 175:1
**Vigilante-10 (5)** 3:18
  140:5,10 141:8
  184:1
**Vigilante-11 (4)** 3:20
  159:19 161:3 185:1
**Vigilante-12 (4)** 3:22
  160:1,2 186:1
**Vigilante-13 (3)** 3:24
  164:13 187:1
**Vigilante-2 (5)** 3:7
  15:6 17:4 176:1,5
**Vigilante-3 (5)** 3:9
  18:2,11 19:23 177:1
**Vigilante-4 (5)** 3:10
  20:2,15 21:2 178:1
**Vigilante-5 (3)** 3:11
  29:5 179:1
**Vigilante-6 (4)** 3:12
  56:19 58:16 180:1
**Vigilante-7 (4)** 3:13
  77:20 78:24 181:1
**Vigilante-8 (8)** 3:15
  95:17,23 100:12
  102:3 107:21
  113:16 182:1
**Vigilante-9 (12)** 3:16
  121:15 122:19

124:12 125:3,13,20
  126:17 127:23
  128:21 141:13
  183:1
**Vigilante/Wogalte...**
  30:9,10,10,11,21
  37:21,22,22 38:1
**Vigilant's (1)** 77:21
**Vigilante-3 (1)** 17:5
**violation (1)** 100:13
**Virginia (1)** 73:8
**visibility (3)** 72:23
  74:3 131:13
**visible (11)** 99:14
  101:15,22 114:6
  117:14 127:17,19
  143:5,8,11,13
**visitor (1)** 10:18
**visual (1)** 132:1
**Vitae (1)** 20:10
**Vitale (22)** 8:8,11,19
  9:9 22:4 36:2,12
  47:10 58:24 81:13
  81:21 82:3 84:3
  120:24 121:1
  127:21 129:13
  152:6 157:3 158:3
  158:13 169:10
**vivid (1)** 112:9
**voluntary (1)** 113:13
**vs (1)** 1:8

———————
**W**
**Wade (1)** 72:9
**waffle (1)** 154:10
**waived (1)** 4:3
**walked (1)** 82:18
**wall (3)** 85:7,7,9
**want (33)** 6:10 10:4
  10:10 17:11 20:8
  25:3,13 78:22 84:4
  88:11 100:10 106:3
  116:7,21,22,24
  117:12,13 121:11
  136:6,7,8 145:8
  149:13,16,18
  150:14 158:22

165:13 167:4,5,8,22
**wanted (11)** 35:24
  80:9 81:10 91:1
  124:19 128:6 132:8
  147:20 152:16
  168:5,22
**warn (2)** 115:17
  152:24
**warned (1)** 120:10
**warning (105)** 3:15
  3:16,18 25:24 26:9
  27:16 33:17 35:21
  35:22 39:10 40:5
  41:21 44:18 50:11
  53:9,10,13,22 54:10
  62:8 69:8 70:15,19
  71:14,23 72:14 73:5
  74:10 96:12,20
  99:21 100:11
  108:12,18,19,20
  109:4,4,8,11,13,18
  109:19,22 110:3,5
  111:18 112:14,18
  112:23 117:20,23
  118:1,5,21 119:1,6
  120:23 121:6,16
  122:1 123:2 124:5,8
  125:2,12,13,16,17
  125:20,21 126:12
  126:16,20 127:23
  130:12,16 131:9,16
  131:19 132:3 133:1
  134:12 136:20,22
  137:1,18 138:20
  139:6 141:7,9,12,23
  142:3 143:11
  144:11,14,24 150:6
  150:8,8 151:11
  152:14 156:5 160:8
**warnings (116)** 9:11
  9:14,14,15 10:15
  28:16,22,23 30:19
  30:22 31:4,7,12,23
  32:5 33:20,23 34:15
  34:19 36:8,13,14,14
  36:15 37:6,14,16
  38:23 39:6,8 44:9

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

214

45:4,13,19 47:1,3,4
47:7,8 48:17,21
49:1,4,7 51:4,8
53:17,17,19,22 54:7
54:17 59:24 62:5
64:6,10 68:23 70:9
70:12 71:21 72:23
74:4 76:20 81:6
98:10 99:24 104:9
105:20 108:9 110:9
110:10 111:6 113:4
115:12,22 116:8,10
116:11,21 118:10
119:6,13,18 120:3
120:13,14,17,19,21
126:4,6,8 127:7
129:11,15,21 132:7
132:24 135:7 142:8
142:8,22 146:11
149:16 158:4
160:22,23 161:1
162:12 163:21
164:2 168:12,13,17
169:8,12
**warning's (1)** 131:7
**warranty (3)** 115:9
116:5 152:8
**washer (3)** 103:24
155:17,18
**Washers (1)** 154:7
**wasn't (19)** 12:17
27:3 39:11 40:21
48:11 50:1 59:22
60:17,22 66:4,9
68:3 84:12 99:13
106:16 126:22
127:18 129:7 169:2
**water (2)** 32:11 35:6
**way (25)** 17:16 20:8
33:10,13,17 43:1,4
44:16 52:11,14
64:19 76:23 85:21
85:22 86:6,7 92:7
92:13 102:23 116:9
128:18 138:19
140:18 149:14
150:4

**ways (3)** 25:5 54:16
133:23
**web (1)** 25:4
**websites (1)** 40:7
**Wednesday (1)** 1:17
**weeks (1)** 19:7
**well-known (1)** 34:18
**went (10)** 13:21
37:11 38:16 45:23
50:24 56:4 71:1
79:11 123:9 143:12
**weren't (4)** 51:22
64:9 65:22 139:21
**Wet (1)** 32:11
**we'll (5)** 15:5 23:2
26:11 124:12 168:1
**we're (10)** 4:21 7:9
33:2 35:1 42:19
100:9 121:14
150:14,15 170:6
**we've (2)** 4:15 100:11
**wheels (1)** 69:18
**Whirlpool (4)** 60:13
61:10 103:10 104:4
**white (11)** 13:23
27:15,17,19,22 28:2
28:4 131:3 134:7,21
143:6
**wide (2)** 41:18 129:6
**WiFi (2)** 9:24 10:18
**WILLIAM (4)** 1:9
3:2 4:6 171:6
**wireless (2)** 36:15
45:24
**withdrawing (1)**
124:14
**witness (41)** 3:2 6:4,8
6:12,18 9:22 10:1,7
10:14,17 12:20 13:2
13:8,13,17 17:13
21:10,15,19 22:24
24:14,19 55:14 57:7
57:15,19,24 58:10
76:3,14 83:15
121:22 141:16
154:15 158:21,24
167:20 169:13

170:9,14 172:1
**Wogalter (1)** 30:22
**Woodson (1)** 155:14
**Woodson's (1)**
154:23
**word (4)** 11:4 26:14
65:19 134:18
**worded (1)** 138:19
**wording (2)** 140:11
140:14
**words (5)** 27:15,17
61:21 66:9 102:13
**work (23)** 17:11
28:16 36:13,17 38:5
38:20,21 41:6 48:6
50:6 70:23,23 73:6
73:16,19 75:13,15
75:20 103:1 105:10
117:19 123:12
124:12
**worked (3)** 36:7
82:17 130:17
**working (6)** 23:10,11
34:7,8 60:17 124:6
**workplace (1)** 111:12
**world (2)** 113:7,8
**worried (2)** 119:6
129:7
**wouldn't (8)** 88:15
88:17 101:6 112:18
115:23 128:13
144:12,18
**write (4)** 18:8 158:7
158:10 161:10
**writing (2)** 18:14
79:5
**written (5)** 15:18
28:15 79:7 104:9
158:4
**wrong (3)** 119:7
140:21 169:11
**wrote (2)** 55:7 100:17

**X**

**X (2)** 3:1,4
**XL (1)** 103:23
**XYZ (1)** 150:8

**Y**

**Yazdani (1)** 64:22
**year (15)** 37:16 74:20
75:15 82:21 86:12
86:12 88:12,20 94:9
104:11 137:9,10,14
138:1 163:6
**years (16)** 24:22
27:11 32:9 41:3
47:1 58:16 68:2
82:12 83:2 86:20
87:12,17 107:1
152:3 163:5 167:1
**yellow (6)** 123:9,12
123:13,20 124:1
126:14
**Yemma (79)** 2:8 3:3
3:8 4:12,16 5:11
6:17,20,23 7:1 10:6
10:8,19 12:12 13:5
13:19,20 17:7,10,14
17:17,20,24 20:1,6
20:9,13 21:24 22:2
22:18 23:2,4 24:23
29:4,8 55:16,18
56:14,17 57:1,12,16
57:22 58:7,11,13,14
76:11,17,18 77:17
78:1 83:11,18 89:23
90:4 95:16,21
121:14,19,23 122:5
141:18,20 154:18
159:1,3,8,12 164:12
164:16 167:17
168:1 169:6,16,19
170:5,10 176:6
**yesterday (1)** 14:12
**younger (1)** 39:19

**Z**

**zone (1)** 73:6
**Z21.5.1 (5)** 96:6,8
113:17,20 153:15
**Z535 (2)** 38:14 96:7
**Z535.4 (9)** 38:15
96:13,18 99:12
100:13 112:23

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

126:2 132:22 135:5

**$**

**$100 (1)** 88:23
**$300 (1)** 88:19

**0**

**00019 (1)** 92:3
**0011 (1)** 92:2

**1**

**1 (25)** 3:17 5:9 121:7
  121:13,17 122:20
  122:24 124:21
  129:10 132:7
  136:16 140:15,17
  144:19 162:14,17
  163:17 164:5,7,19
  165:5 166:1,5,6,15
**1st (3)** 8:24 74:19,21
**1/20/16 (1)** 17:22
**1:00 (1)** 90:2
**10 (7)** 67:10 82:12
  121:24 122:3,17
  128:21 131:9
**10-foot (1)** 85:8
**10:00 (1)** 1:18
**100 (2)** 111:19
  112:15
**11 (2)** 159:11,14
**11/1/15 (2)** 3:10
  20:11
**11:35 (1)** 56:12
**1187 (1)** 160:17
**12 (9)** 16:6 93:22
  94:2 150:9 159:11
  159:15 160:16
  167:8,9
**12:30 (1)** 90:2
**121 (2)** 3:17 12:1
**122 (1)** 3:19
**13 (2)** 87:4 164:15
**13th (1)** 14:18
**14th (6)** 11:6 78:7,14
  78:17,19 79:19
**1400 (1)** 2:9
**1520 (1)** 1:22

**159 (2)** 3:20,23
**164 (1)** 3:24
**17 (2)** 3:7,9
**17th (3)** 1:22 22:23
  56:20
**175 (1)** 3:6
**176 (1)** 3:7
**177 (1)** 3:9
**178 (1)** 3:10
**179 (1)** 3:11
**18 (3)** 105:16 166:23
  167:8
**18-month (4)** 123:22
  149:4 166:16,20
**180 (1)** 3:12
**181 (1)** 3:14
**182 (1)** 3:15
**183 (1)** 3:17
**184 (1)** 3:19
**185 (1)** 3:20
**186 (1)** 3:23
**187 (1)** 3:24
**19th (1)** 4:20
**19063 (1)** 2:9
**19103 (1)** 1:23
**19422 (1)** 2:5
**1950's (1)** 111:15
**1996 (1)** 31:6
**1997 (3)** 30:2,12
  160:4
**1998 (1)** 30:1
**1999 (4)** 30:23 37:13
  38:3,6

**2**

**2 (18)** 17:19 29:17
  72:8 134:17 138:4
  139:5 162:14,17,21
  163:2,17 164:21
  165:14 166:1,2,6,7
  166:14
**2nd (1)** 76:7
**2:15-cv-00571-GJ...**
  1:4
**20 (2)** 3:10 18:4
**20th (2)** 18:15 80:8
**2001 (2)** 39:15,16

**2003 (8)** 28:14 39:14
  39:16 114:23
  152:18,19 153:24
  159:22
**2004 (1)** 72:9
**2005 (4)** 11:6 14:18
  104:13 152:20
**2005-2006 (1)** 152:22
**2006 (6)** 30:23 38:4,5
  38:9,19 39:14
**2012 (2)** 8:24 87:4
**2013 (1)** 4:20
**2014 (2)** 69:5 72:4
**2015 (13)** 14:14
  37:20 74:21,23
  75:19,21 76:5,6,8
  78:7,14,18 86:18
**2016 (11)** 1:18 18:4
  18:15 22:8 56:20
  58:23 64:13 78:19
  79:19 81:17 171:7
**215 (1)** 1:23
**2158 (2)** 114:13,24
**22nd (2)** 74:23,24
**220 (2)** 1:17 2:4
**24 (1)** 80:21
**25 (1)** 11:2
**26 (1)** 11:2
**26th (1)** 22:8
**29 (1)** 3:11

**3**

**3 (19)** 3:19 17:22
  69:5,5,9 72:6,6
  121:21 122:2
  129:10 132:7
  137:20 140:4,7,10
  162:14 165:21
  166:2,4
**3:20 (1)** 170:15
**30 (3)** 1:22 161:4
  172:14
**31 (2)** 1:18 171:7
**357 (1)** 155:12
**36 (2)** 3:22 160:2
**38 (2)** 38:9 145:24
**39 (1)** 145:24

**4**

**4 (9)** 3:3 8:6 20:11
  72:21 122:7,12
  129:6,12 162:14
**4-6 (1)** 160:18
**40 (3)** 12:4 145:24
  146:3
**42 (1)** 146:16
**43 (2)** 146:18 147:1
**44 (3)** 147:1,3,6
**45 (2)** 12:4 147:6

**5**

**5 (7)** 3:6 29:7,13,17
  37:13 129:5 165:7
**5.1 (1)** 96:7
**512 (2)** 1:16 2:4
**557 (1)** 12:2
**558 (1)** 11:19
**56 (1)** 3:12
**5613 (1)** 12:7
**564-1233 (1)** 1:23
**575 (1)** 124:1
**592 (1)** 11:19
**593 (1)** 12:6

**6**

**6 (15)** 29:23 30:2,3
  37:14,14 56:24
  57:13,20,22 58:4
  59:11 80:24 102:19
  129:5 166:10
**6th (2)** 161:5,10
**6.8 (1)** 158:1
**600 (1)** 124:1
**6035 (1)** 2:8
**625 (4)** 123:23 124:3
  166:22,24

**7**

**7 (11)** 30:9 31:3
  37:21 57:10,11,13
  57:23 58:4,18,20
  77:23
**7th (1)** 14:14
**7/18/16 (2)** 3:11 29:6
**75 (1)** 12:3

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**76 (1)** 12:2
**77 (1)** 3:14

---
**8**
---

**8 (5)** 30:24 31:1 39:7
  39:9 95:19
**8th (1)** 161:5
**8/17/16 (1)** 56:23
**800 (1)** 27:18
**82-page (1)** 67:16
**85-page (1)** 67:16

---
**9**
---

**9 (3)** 121:18 122:17
  122:24
**90 (1)** 101:23
**95 (3)** 3:15 101:23,23
**96 (3)** 30:11,21 38:1
**97 (2)** 30:10 37:22
**98 (2)** 30:10 37:22
**99 (4)** 30:9 37:21
  38:10,20