IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

**JOSEPH AND URSY A. VITALE**
**Plaintiffs**

**v.**

**ELECTROLUX HOME PRODUCTS, INC.**
**Defendant**

Civil Action No.:
2:15-cv-01815 SD

**MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE TESTIMONY OF MICHAEL R. STODDARD, JR. AND WILLIAM J. VIGILANTE, JR., PH.D.**

Plaintiffs, Joseph and Ursy A. Vitale, by and through their attorneys, submit this Memorandum of Law in Support of their Response in Opposition to Defendant's Motion to Preclude Testimony of Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D. and aver as follows.

I.       **INTRODUCTION**

Electrolux has moved to preclude the testimony of Plaintiffs' expert witnesses, Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D., on the grounds that neither offer testimony that meets the requirements of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Plaintiffs' respectfully request oral argument / evidentiary hearing.

Over the years, Electrolux has unsuccessfully asserted these same arguments in other cases involving its ball hitch dryers. Noticeably absent from Electrolux's brief are citations to the numerous district court opinions concluding Electrolux's arguments are without merit.

II.      **STATEMENT OF FACTS**

This lawsuit stems from a dryer fire that occurred at the home of Joseph and Ursy Vitale

on September 4th, 2014. Plaintiffs' Complaint sounds in strict products liability and negligence against Electrolux Home Products, Inc. ("Electrolux"), and alleges that the Vitales' dryer, designed and manufactured by Electrolux, is defective in both design and warnings. The parties agree that the fire originated in the Vitales' dryer and was caused by the ignition of lint that accumulated inside the dryer. Electrolux, however, denies that a defect caused the fire.

Plaintiffs retained forensic dryer expert Michael R. Stoddard, Jr. to determine the cause of this fire. *See Exhibit A, Michael Stoddard CV; Exhibit B, Report of Michael Stoddard; Exhibit C, Michael Stoddard Dep. Tr.* Mr. Stoddard opines that, based on his inspection, the fire began within the subject dryer. *See Exhibit B, Report of Michael Stoddard, at p. 2.* Normal operation and use of the dryer caused lint particulate to separate from tumbling loads and infiltrate every part of the dryer, including an inaccessible space behind the dryer's drum. *See Exhibit B, Report of Michael Stoddard, at pp. 61-62.* On the day of the fire, lint particulate behind the dryer's drum was ignited by heat from the dryer's gas burner flame. *See Exhibit B, Report of Michael Stoddard, at p. 4.* Once ignited, the burning lint was propelled through the airstream and contacted the dryer's plastic components, which subsequently ignited. *See Exhibit B, Report of Michael Stoddard, at p. 4.* Once the plastics were involved, the fire compromised the gas valve on the burner, releasing unregulated natural gas and causing the fire to spread beyond the dryer's cabinet and severely damaging the Vitales' real and personal property. *See Exhibit B, Report of Michael Stoddard, at pp. 4-5.*

Mr. Stoddard also concludes the subject dryer was defective in design based on tests performed on identical and similar dryers and a review of voluminous discovery documents. First, the dryer was defective because it allowed for lint to accumulate behind the dryer drum, out of sight from the user, in close proximity to the heat source, allowing it to ignite. Second,

the dryer was defective because, once the fire was ignited, the use of combustible plastic component parts instead of steal or non-combustible component parts allowed the fire to breach the dryer cabinet and ignite nearby combustibles – instead of being contained within the dryer. *Exhibit B, Report of Michael Stoddard, at pp. 5-8.* Mr. Stoddard has designed and tested several alternative designs that would have prevented the accumulation of lint by the dryer's heat source, prevented the plastic component parts from igniting or spreading the fire, or warned the user that cleaning that area was necessary. *See Exhibit B, Report of Michael Stoddard, at pp. 87-110* (bulkhead design); *116-119* (alternative component materials); *121-125* (lint guard); *127-133* (exhaust monitoring device); *134-137* (periodic maintenance reminder).

Plaintiffs also retained Human Factors and Ergonomics expert, Dr. William J. Vigilante, Jr. *See Exhibit D, Dr. Vigilante CV, Exhibit E, Report of Dr. Vigilante; Exhibit F, Dr. Vigilante Dep. Tr.* Upon inspection of the dryer, its associated literature, and discovery documents, Dr. Vigilante opines that the subject dryer was defective because it failed to adequately warn the user that lint can accumulate behind the dryer drum and to have the interior of the dryer cabinet (including behind the dryer drum) cleaned by a professional every 12 months. *Exhibit E, Report of Dr. Vigilante, at pp. 38-39.* Dr. Vigilante concludes that the current warning system employed by Defendant was inadequate under industry standards and principles of Human Factors because it failed to feature an adequate warning prominently on the product, rather than in a manual or other literature associated with the product. *Exhibit E, Report of Dr. Vigilante, at p. 38.* Dr. Vigilante proffers several versions of adequate warnings based on industry standards and principles of his field that Defendant could have employed to cure the product's defective condition. *Exhibit E, Report of Dr. Vigilante, at pp. 31-33.*

Defendant files this instant motion to preclude both Mr. Stoddard and Dr. Vigilante.

III.   **LEGAL STANDARD**

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702.

This rule has been interpreted to require the proponent of an expert to show that the expert is: (1) qualified to give an expert opinion, (2) that the opinion given is based on a reliable method, and (3) that the opinion offered fits, *i.e.*, is relevant to the case at bar.  *See, e.g*., *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

First, to qualify as an expert witness, the witness must have specialized knowledge in the area of testimony resulting from knowledge, skill, experience, training, or education.  *See e.g. Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *2 (E.D. Pa. June 25, 2013).  The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *United States v. Fleet Mgmt., Ltd.*, 332 F. App'x 753, 757 (3d Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir.1994)).  At minimum, an expert's "skill or knowledge" must be "greater than the average layman with regard to the scientific matter at issue." *Elcock*, 233 F.3d at 742.  "[I]t is an abuse of discretion to exclude testimony simply because the trial court does

not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Curry, LLC*, 2013 WL 3196390, at *2 (quoting *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008)).

With regard to the second requirement, the focus of the *Daubert* inquiry is on the methodology of the expert, as opposed to their conclusions. *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998). "When the expert testifies to scientific knowledge, the expert's opinions must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (quoting *In re Paoli,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786))) (quotations omitted). "Although *Daubert* does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry . . . ." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

Finally, the proffered testimony must assist the trier of fact in resolving an issue relevant to the case to satisfy the "fit" requirement. *See, e.g., Oddi,* 234 F.3d at 145 (3d Cir.2000); *In re Paoli,* 35 F.3d at 743. For an opinion to "fit" the case, there must be a "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Oddi,* 234 F.3d at 145. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Yazdani v. BMW of N. Am., LLC*, No. CV 15-01427, 2016 WL 2755589, at *5 (E.D. Pa. May 12, 2016) (quoting *Daubert*, 509 U.S. at 591.)

## IV.   <u>LEGAL ARGUMENT</u>

Defendant's motion should be denied because both experts are qualified, employed a reliable method, and offer opinions that fit the facts of this case.

**A. Mr. Stoddard is qualified as an expert in fire origin and cause investigation, consumer clothes dryer design and safety, and the standard of care applicable to manufacturers who design and sell clothes dryers for consumer use.**

Before addressing Mr. Stoddard's qualifications and methodology, the Court should note that Mr. Stoddard has already withstood multiple challenges to the very opinions he offers in this case. Electrolux has subjected Mike Stoddard and his partner at Wright Group, Inc., Ronald Parsons, to at least six *Daubert* challenges. None of Electrolux's challenges have succeeded in barring their testimony.

For example, in *State Farm Fire & Casualty Company a/s/o Deitch v. Electrolux Home Products, Inc., et al.*, No. 2:10-cv-03901 (E.D.N.Y.). Mr. Stoddard was offered as an expert witness to testify to the same issues present in this case. Electrolux presented a nearly identical challenge to the qualifications of Mr. Stoddard, and the reliability and fit of his opinions. After a full evidentiary hearing, Electrolux's motion was denied. *See Exhibit G, State Farm Fire & Casualty Company a/s/o Deitch v. Electrolux Home Products, Inc., et al.*, No. 2:10-cv-03901 (E.D.N.Y.) (Transcript). Electrolux further challenged Mr. Stoddard on the issues present in this case in a California state court case, and Electrolux's challenge was defeated there as well. *See Exhibit H, State Farm General Ins. Co. v. Electrolux Home Products, Inc., et al.*, Superior Court, County of Los Angeles, Case No. EC053578 at 115-133.

Additionally, multiple federal courts have admitted, as both reliable and relevant, nearly identical testimony on the defective condition of dryer products from other expert witnesses having the same or similar qualifications to Mr. Stoddard. *See, e.g., State Farm Fire & Casualty a/s/o Slabach v. Electrolux Home Products, Inc.*, 2013 WL 3013531 (N.D. Ind., June 17, 2013); *Rager v. General Electric Co.*, 2010 WL 5393857 (M.D. Pa., Dec. 22, 2010); *Exhibit I, American Family Mutual Insurance Co. v. Electrolux Home Products, Inc.*, No. 11-cv-678 (W.D. Wis. June 26, 2014) (Order); *Exhibit J, New Jersey Mfrs. Ins. Group v. Electrolux Home*

*Products, Inc.*, No. 10-1597 (D.N.J.) (Transcript); *Exhibit K, The Standard Fire Ins. Co. a/s/o Newcomb v. Electrolux Home Products, Inc.*, No. 08-cv-540-SLC (W.D. Wis.) (Transcript); *Exhibit L, Philadelphia Contributionship Ins. Co. v. Electrolux Inc*., No. 2:10-cv-2045, Doc. # 68, at 29-31 (E.D. Pa. Sept. 28, 2011) (Transcript)

Therefore, Electrolux's present challenge to Mr. Stoddard is nothing more than an attempt to re-litigate what has already been decided by the United States Judiciary – that Mr. Stoddard is qualified to testify on the subject matter at issue in this case, and his testimony is both reliable and relevant. Electrolux has presented no authority to justify any deviation from the courts' determinations in any one of the numerous decisions addressing the reliability of the testimony Mr. Stoddard intends to offer.

### 1. Mr. Stoddard has ample practical experience that qualifies him as an expert in the cause and origin of the subject fires as well as dryer design and safety principles applicable to dryer products.

Electrolux offers four broad challenges to the qualifications of Mr. Stoddard, challenging first his qualifications to testify as an expert on dryer design. Federal Rule of Evidence 702 provides that a witness may testify in the form of an opinion if the witness possesses sufficient knowledge, skill, experience, training *or* education on the subject matter at issue. The "or" language in Rule 702 demonstrates that a witness may be qualified by any one of the five listed factors. *See Dychalo v. Cooperloy Corp.*, 78 F.R.D. 146, 149 (E.D. Pa. 1978). Thus, a witness may be qualified by experience alone. *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998).

Here, Mr. Stoddard's opinions are supported by multiple factors listed in Rule 702 because Mr. Stoddard:

- possesses a Bachelor of Science in Arson Investigation from the University of New Haven;

- is a Certified Fire Investigator through the International Association of Arson Investigators;
- is a Certified Fire & Explosion Investigator through the National Association of Fire Investigators;
- has conducted more than 800 examinations of Electrolux gas and electric dryers;
- has conducted more than 1,000 hours of testing specifically related to Electrolux gas and electric dryers, and the failure modes associated with said products;
- has authored or co-authored more than eighty (80) reports specifically related to Electrolux gas and electric dryers, fires associated with those dryers, and the failure modes associated with those dryers;
- has attended more than twenty (20) training courses and seminars related to fire investigation;
- has attended more than sixty (60) hours of training courses and seminars specifically related to appliances and dryers;
- has taught four (4) training seminars relating to clothes dryer fires; and
- is a member of the Underwriters Laboratories (UL) 2157 Standards Technical Panel responsible for the Standard for Electric Clothes washers and Extractors (UL 2157) and Electric Clothes Dryers (UL 2158).

*Exhibit A, Michael Stoddard CV.*

Electrolux's primary basis to challenge Mr. Stoddard's qualifications is that he is not an engineer and has not designed products for Electrolux or a competitor of Electrolux. First, this argument ignores that Mr. Stoddard has designed and tested dryers, namely alternative designs to Defendant's defective ball-hitch dryers. *See Exhibit B, Report of Michael Stoddard, at pp. 156-177 and the appendixes to detailing the testing summarized in his report.* Further it ignores that he has inspected hundreds of Electrolux dryers, both burned and unburned, inside and out, as well as various dryer models from other manufacturers. *See, e.g., Exhibit B, Report of Michael Stoddard, at pp. 62* (discussing investigations); *87-110* (discussing the principles and virtues of the bulkhead design sold by other manufacturers); *159-175* (examples of testing performed by Mr. Stoddard on dryers across the market). It is evident from his detailed analysis of the subject dryer that he is familiar with each component and aspect of the subject dryer, both from his previous investigations, his review of documents obtained in discovery about the dryer's design, specifications, and failure modes, and his knowledge of other dryers sold on the

market.

Electrolux cites to no reported case (nor can it) which requires a proffered expert to have an engineering degree or employment experience with a product manufacturer in order for that expert to opine on a particular product.  In fact, the Federal Rules of Evidence Advisory Committee has stated:

> [n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training, or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

*Fed. R. Evid. 702 (2005) (Advisory Committee's Note, 2000 Amendment).* This approach to an expert's qualifications may have been best explained in the case of *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), in which the Sixth Circuit stated:

> [I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee . . . . On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry,* 25 F.3d at 1349-50.

Like the expert in *Berry,* Mr. Stoddard has an abundance of knowledge on dryer design, operation, and failure modes that jurors do not have, and is clearly qualified to testify in the present case based on any objective measurement. Given his wealth of knowledge and experience specifically related to dryers, Electrolux's argument that Mr. Stoddard does not have any training, education, or experience in the fields of engineering, product design, plastics, or product warnings and instructions is entirely misleading.

More so, Electrolux's reliance *Donegal Mutual Insurance Co. a/s/o Vanessa Schantz v. Electrolux North America, Inc.*, is misplaced. *See* ECF # 36-10 (attached as Exhibit B to Defendant's Motion). That case involved a very different issue with Electrolux's dryer, the failure of a bearing, and was over seven years ago. Since that time, Mr. Stoddard has devoted his time almost exclusively to investigating dryer fires and has since conducted hundreds of hours of tests, investigations, and research in the field of dryer design and dryer failures. *See, e.g., Exhibit B, Report of Michael Stoddard, at pp. 157-177* (listing the testing done since 2010). Further, the court's decision in *Donegal* ran directly contrary to its own decision in *Rager v. G.E.*, 2010 WL 5393857 (issued on the same day, by the same judge, in the same district, but reaching a contrary conclusion). That decision is neither relevant nor representative of Mr. Stoddard's qualifications or the case law surrounding the admissibility of his expert opinion.

### 2. Mr. Stoddard is qualified to offer an opinion on the burn characteristics of plastics.

Electrolux misrepresents Mr. Stoddard's opinions about the plastics used in the subject dryer. To be clear, Mr. Stoddard does not offer opinions regarding the makeup of the particular plastics, how the plastics themselves are manufactured, or how a particular plastic failed, such that the opinion would require expertise in the area of "plastics engineering." Rather, Mr. Stoddard's plastics-related opinion is limited to his opinion that the use of steel component parts and the elimination of combustible plastic component parts would have been more effective in containing the fire to the cabinet in most conditions, and particularly in the dryer fires at issue here. *See Exhibit B, Report of Michael Stoddard, at pp. 116-120.*

Mr. Stoddard has significant knowledge and experience with the burn characteristics of the plastics used by Electrolux and GE based upon his own observations in over 800 Electrolux dryer fire investigations and related testing. Mr. Stoddard is a certified fire investigator and has

significant training, education, and experience related to the flammability of materials, including plastics. *See Exhibit A, Michael Stoddard CV.* Mr. Stoddard also has training and coursework that specifically relates to hazard mitigation and the use of alternative materials relative to the opinions offered in this case. *See Exhibit A, Michael Stoddard CV.*

Finally, Mr. Stoddard's opinion is scientifically testable. In fact, Mr. Stoddard tested his opinion which resulted in the identical plastics contained in the subject dryer igniting, melting and spreading within the dryer cabinet. By contrast, Mr. Stoddard also tested the effects on steel components, which obviously did not burn. Video of this testing has been produced to Electrolux. *See Exhibit B, Report of Michal Stoddard, at pp. 172-175.*

### 3. Mr. Stoddard is qualified to opine to the absence of relevant warnings.

Electrolux misstates Mr. Stoddard's opinions regarding the adequacy of the warnings relative to the subject dryer. Mr. Stoddard has not offered, nor does he intend on offering, any opinions on warnings related to the field of "human factors," such as the propriety of the color, font, or style of a warning, or a consumer's ability or inclination to comprehend or react to any warning label or product literature.[1] Rather, Mr. Stoddard's opinion on "warnings" concerns the impropriety of Electrolux's use of product literature as a solution to a product design hazard. In other words, Mr. Stoddard will testify that Electrolux should not have needed any warnings at all. Under principles of hazard identification and mitigation, upon recognition that lint accumulation near the heat source presents a fire hazard, Electrolux should have first attempted to change its design to eliminate the hazard, and if that was not possible, place a guard protecting against the hazard. Only as a last result, under the safety hierarchy, should Electrolux have relied on a warning and placed the burden of hazard identification and mitigation on the average

---

[1] Plaintiffs retained William J. Vigilante, Jr., Ph.D to testify in this regard.

consumer.  *See Exhibit B, Report of Michael Stoddard, at pp. 85-87* (explaining the safety hierarchy).

He further points out that there are no consistent warnings advising the consumer to have the interior of the dryer, behind the drum, periodically cleaned and no label that specifically communicates the risk of fire from lint accumulation behind the dryer drum near the heat source. *See Exhibit B, Report of Michael Stoddard, at pp. 139-145.*  Mr. Stoddard does not need a background in Human Factors and/or Ergonomics to point out that Electrolux should not have relied on a warning, nor does he need such a background to point out the absence of a warning.

Moreover, the Third Circuit and other federal courts have deemed a product design expert competent to offer this exact type of "warnings" testimony.  In *Pineda v. Ford Motor Company,* the Third Circuit overturned the district court's preclusion of a product design expert witness who opined that a vehicle was defective because it lacked relevant warnings. 520 F.3d 237, 245 (3d Cir. 2008).  The expert offered an opinion on the vehicle's defective design, and also opined that it lacked adequate instruction and warnings related to the design defect in question.  *Id.*  The Third Circuit ruled a design expert could testify that providing warnings or instructions was a solution to a safety engineering problem. *Id.*  Specifically, because the testimony about "warnings" was not what the precise language, font, or color should be, but rather, that a proper instruction was a possible solution to an engineering safety problem, the expert was qualified to offer such testimony based on his qualifications as a design expert. *See Id.*

The *Pineda* court went on to hold that an expert does not have to substantively qualify in the drafting of service manuals or instructions in order to offer an opinion about a manufacturer's use of product warnings or instructions to address a design problem; all that is

required is a special knowledge of what may cause a defect in a product or machine.  *Id.; see also State Farm Fire & Casualty a/s/o Slabach v. Electrolux Home Products, Inc.*, 2013 WL 3013531 (N.D. Ind., June 17, 2013); *Exhibit G, State Farm Fire & Casualty Company a/s/o Deitch v. Electrolux Home Products, Inc., et al.*, No. 2:10-cv-03901 (E.D.N.Y.) (Transcript); *Exhibit K, The Standard Fire Ins. Co. a/s/o Newcomb v. Electrolux Home Products, Inc.*, No. 08-cv-540-SLC (W.D. Wis.) (Transcript).

This is exactly the type of testimony that will be offered in this case.  Such testimony is clearly admissible based on Mr. Stoddard's specialized knowledge of dryer design, operation and failure modes, and safety principles applicable to dryer manufacturers.

### 4.  Mr. Stoddard can testify to Electrolux's specific failures to cure the defect in its ball-hitch dryers.

Electrolux is also critical of Mr. Stoddard's qualifications to testify that Electrolux failed to take any action to cure the design defect.  Mr. Stoddard is qualified to render these opinions because, as established above, he is qualified to speak to general principles of product design, including the safety hierarchy.  *Exhibit A, Michael Stoddard CV; Exhibit B, Report of Michael Stoddard, at pp. 85-87; Exhibit C, Dep. Tr. Michael Stoddard, at pp. 63-65.*  In addition to his education and experience involving general principles of product design and safety engineering, Mr. Stoddard has spent a significant amount of time studying how such principles are applied within the dryer manufacturer industry.  Mr. Stoddard attended a renowned product safety training course offered by Whirlpool, the market leader in dryer sales, designed to educate those in the industry on proper application of safety principles to product design.  *Exhibit A, Michael Stoddard CV.*  In addition, he has interviewed other engineers within the dryer manufacture industry on their company's application of product safety design.  Finally, Mr. Stoddard is a

member of the UL 2157 Standards Technical Panel responsible for the Standard for Electric Clothes washers and Extractors (UL 2157) and Electric Clothes Dryers (UL 2158). *Exhibit A, Michael Stoddard CV.*

As with Mr. Stoddard's testimony regarding the absence of a warning, Mr. Stoddard's opinion on this matter comes from a design perspective following the safety hierarchy. Mr. Stoddard has reviewed thousands of documents related to Electrolux's dryer fires and it is apparent that Electrolux knew that lint could accumulate behind the dryer drum and cause a fire. *See Exhibit B, Report of Michael Stoddard, at pp. 44-61.* With knowledge of this defect, under the safety hierarchy, Electrolux should have designed out the hazard, provided a guard against the hazard, or adequately warned against the hazard. *Exhibit B, Report of Michael Stoddard, at pp. 85-87.* Instead, Electrolux ignored the hazard and instead blames consumers for improper installation and maintenance, relying on warning labels that do not identify the hazard posed to consumers.

In summary, Electrolux argues Mr. Stoddard is unqualified to testify here despite the thousands of hours of testing, examination, and analysis performed on Electrolux and other manufacturers' dryers, and it has failed to acknowledge the scope of his knowledge and education related to the issues in this case. Electrolux has offered the present challenge despite multiple courts deeming him qualified on these same issues. Because Mr. Stoddard's qualifications grossly exceed what is required, Electrolux's challenge to Mr. Stoddard on qualifications grounds must be denied. Viewing the entirety of Mr. Stoddard's credentials, analysis, and opinions in this case, it is abundantly clear that he is qualified to testify as an expert witness, and that his opinions satisfy the minimal standards for admissibility.

**B.  Mr. Stoddard employed a reliable method and his opinions fit the facts of this case.**

Mr. Stoddard has spent the vast majority of the last ten years analyzing and testing Electrolux dryers, dryer design, dryer operation, dryer failure modes, and assessing accepted principles and standards related to the field.  It would be virtually impossible to list the "facts or data" Mr. Stoddard has collected in furtherance of his opinions, as that information is so voluminous that it can only be produced on a portable hard-drive.   Incredibly, Electrolux suggests that Mr. Stoddard lacks sufficient knowledge to testify regarding Electrolux dryers and that this vast amount of testing and other information provided to Electrolux does not amount to sufficient work by Mr. Stoddard to make his testimony reliable.

Mr. Stoddard employed a reliable methodology.[2]  His attached report details no less than a dozen separate categories of tests performed by Mr. Stoddard, with those categories covering more than 200 separate tests performed during the course of his analysis.  *See Exhibit B, Report of Michael Stoddard, at pp. 156-177* (summarizing tests performed).   In addition, while Electrolux criticizes some of the tests performed by Mr. Stoddard, and that Mr. Stoddard chose not to perform other tests which it believes he should have performed, the fact remains that Mr. Stoddard's theory has been exhaustively tested, which clearly satisfies *Daubert*'s "testability" factor.   In any event, an attack on a conclusion drawn from data is inappropriate for a *Daubert*

---

[2] In his report, Mr. Stoddard states that his investigation into the origin and cause of the fires was guided by *NFPA 921: Guide for Fire and Explosion Investigations.   Exhibit B, Report of Michael Stoddard, at pp. 3-4.  NFPA 921* is a consensus document addressing all aspects of fire science, and has been recognized by numerous federal courts as providing a reliable methodology for fire investigation. *See e.g. State Farm Fire & Cas. Co. v. Steffen*, 948 F. Supp. 2d 434, 442 (E.D. Pa. 2013) (collecting cases). Consistent with *NFPA 921's* requirement, Mr. Stoddard's report identifies the appliance involved in the ignition, identifies lint and other combustible material collected in the area as the material first ignited and identifies the circumstances and factors that allowed the fire to occur. Mr. Stoddard has also considered and eliminated all other possible sources of ignition, including misuse of the dryer, improper installation, improper cleaning, and improper materials. Finally, in compliance with *NFPA 921*, Mr. Stoddard has identified a design defect and identified that design defect as a cause of the fire.  In addition, as established in many of the exhibits attached to this Motion, federal courts across the county have determined Mr. Stoddard's methodology and the grounds for his opinions regarding the dryer's defective design and the feasibility of design alternatives are reliable.

motion and more appropriate for cross-examination.  *See e.g. Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.").

Electrolux offers two criticisms of Mr. Stoddard's method and the fit of some of his opinions.  First, it argues that Mr. Stoddard's opinions regarding the use of combustible plastics is unreliable and does not fit the facts of this case.   It also argues that Mr. Stoddard's opinion that the subject dryer inefficiently manages lint accumulation in unreliable and does not fit the facts of the case.   For the reasons herein, Electrolux's motion must be denied.

   1.  **Mr. Stoddard's opinion regarding the combustible plastics used in the subject dryer is reliable and satisfies the fire requirement under *Daubert*.**

Electrolux argues that Mr. Stoddard's opinion that the subject dryer is defectively designed because it contained combustible plastics in lieu of more fire resistant materials, namely steel, is unreliable.  However, Electrolux is only challenging the results of the test Mr. Stoddard performed on the plastics used in the subject dryer because, according to Electrolux, it does not represent "real world dryer fires."  *See Electrolux's Brief at p. 13.*  This is not a basis for preclusion, but fodder for cross examination.

In October 2013, Mr. Stoddard tested three different air/trap ducts – one comprised of HB plastic, one comprised of vertical burn plastic ("5V") (more fire resistant than HB), and one made of metal (steel).  *See Exhibit B, Report of Michael Stoddard, at pp. 172-176.*  The purpose of the tests was to highlight differences in the burn characteristics of the materials and to see whether Electrolux's dryer could contain a fire within the cabinet, ignited for any reason behind

the dryer drum.  The tests showed that 5V plastics performed better when exposed to open flames than HB, but not when compared to steel, and that Defendant's dryer could not contain a fire within the cabinet.  The testing is relevant to "real world" fires because the ignition and burn characteristics of the plastics that are used in Defendant's dryer are the same whether in the lab or in the "real world."

Further, the basis for Mr. Stoddard's opinion on fire containment is not limited to the testing he has performed, but also the hundreds of "real world" dryer fires he has investigated where Electrolux's combustible plastic component parts have ignited and allowed the fire to breach the cabinet and ignite nearby combustibles.  In addition, his opinion is based on the analysis of dryer fires and exemplar units manufactured by Electrolux's competitors. Mr. Stoddard has investigated over a hundred clothes dryer fires involving other manufacturers' dryers and analyzed the materials used in those dryers as they relate to fire growth and spread and how those materials compare to the plastics used in the subject dryer.

Next, Electrolux argues that Mr. Stoddard's fire containment opinion does not 'fit' the facts of the case simply because Mrs. Vitale testified that she opened the dryer door during the percipient stages of the fire.   Again, Electrolux has failed to provide the Court with the whole story and has ignored the physical evidence in this case. Regardless of whether the door was open or not, even Defendant's expert admits that the gas valve became compromised during the fire.  Mr. Stoddard opines that this led to the spread of fire outside the cabinet.  *Exhibit B, Report of Michael Stoddard, at pp. 4-5, 43-44.*   That Defendant disagrees with a conclusion Mr. Stoddard has reliably drawn from physical evidence is appropriate for cross-examination and does not affect Mr. Stoddard's admissibility.  Mr. Stoddard's opinion that the subject dryer is defectively designed because the use of plastic components adds a significant quantity to

secondary fuels and allows fire to more easily spread out of the cabinet is relevant and would unquestionably assist the jury in determining that the subject dryer is defective.

Additionally, Electrolux's reliance on *American Family Mutual Insurance co. v. Electrolux Home Products, Inc.,* is misplaced. *See Exhibit I, American Family Mutual Insurance Co. v. Electrolux Home Products, Inc.,* No. 11-cv-678 (W.D. Wis. June 26, 2014) (Order). Electrolux's own memorandum quotes the court: "Without knowing the specific facts of each fire at issue in this case, the court cannot determine if the testimony would assist the jury in determining any fact at issue in this case." *Id. at p. 8.* The court then deferred on ruling on the matter until the record was more clearly developed. *Id.* Here, the record is developed, and the record reflects that the dryer's combustible plastic component parts ignited and contributed to the spread of the fire. *Exhibit B, Report of Michael Stoddard, at pp. 4-5.* This case is therefore not instructive on the issue.

### 2. Mr. Stoddard's opinion that Electrolux's ball hitch dryer design causes excessive lint accumulation is reliable and satisfies the fit requirement under *Daubert*.

Electrolux has not accurately portrayed the testing conducted by Mr. Stoddard and it ignores the overwhelming body of evidence that supports Mr. Stoddard's lint ignition theory. His opinion is reliable because it is based on overwhelming scientific evidence. Extensive testing and field analysis conducted by Mr. Stoddard, and many others, confirms that when lint is ignited by the dryer's heat source (i.e., gas burner or electric heater coils), the natural airflow within the dryer draws the burning embers towards additional accumulated lint and the dryer's plastic component parts which ignite. *Exhibit B, Report of Michael Stoddard, at pp. 61-70, 179-180.*

Mr. Stoddard has examined hundreds of Electrolux dryers and has documented this lint collection with photographs produced in this litigation. *Exhibit B, Report of Michael Stoddard,*

*at pp. 61-70, 159-172.* Significantly, Mr. Stoddard's alternative design eliminates the potential for lint to accumulate and ignite behind the drum. *Exhibit B, Report of Michael Stoddard, at pp. 87-116, 121-125.*

In addition to the testing and field analysis he has performed, Mr. Stoddard's opinion is supported by a 2003 study by scientists from the Consumer Product Safety Commission, which conducted tests to evaluate the accumulation of lint within a dryer. *Exhibit B, Report of Michael Stoddard, at pp. 149-155.* The Commission reached the same conclusion as Mr. Stoddard that: lint begins to accumulate inside a dryer chassis upon first use; lint accumulates on the dryer's components, including the heater and the dryer floor; accumulation occurs even when the dryer's lint screen has been cleaned after each usage, and the dryer is properly exhausted.

Electrolux argues there is no fit between Mr. Stoddard's analysis of the exemplar dryers and the facts at issue in these cases because Mr. Stoddard relies on a "biased" sample that is not representative of the relevant population of Electrolux dryers. *See Electrolux's Brief at p. 16.* However, this argument fails because the scientific principles that underlie Mr. Stoddard's opinion regarding the location and propensity of lint accumulation discerned through his studies have universal application. To Mr. Stoddard, it does not matter *how* the lint accumulates, but where it accumulates. In other words, the fact that Mr. Stoddard may not know a given dryer's installation history or other factors that may contribute to an increased amount of lint accumulation is entirely irrelevant. To Mr. Stoddard, Electrolux should not have allowed *any* lint to accumulate in close proximity to the heat source. His investigations show that all of Electrolux's dryers were accumulating lint in dangerous proximity to the heat source. *Exhibit B, Report of Michael Stoddard, at pp. 63-70.*

Moreover, the *Daubert*-articulated "fit" standard is much different from Electrolux's.

Under *Daubert*, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, nonhelpful." *Daubert*, 509 U.S. at 591 (emphasis added).  Thus, in order for Mr. Stoddard's testimony to be deemed "not relevant," it must not relate to any issue in this case. Mr. Stoddard's opinion regarding the propensity of Electrolux's ball-hitch dryers to accumulate lint in a dangerous location clearly relates to whether the subject dryer is defectively designed. Accordingly, Mr. Stoddard's testimony is relevant and admissible.

### C.    Dr. Vigilante employed the scientific method and his opinion fits the facts of this case.

Defendant also seeks to preclude Plaintiffs' Human Factors and Ergonomics expert, William J. Vigilante, Jr., Ph.D., CPE.   Defendant seeks to preclude Dr. Vigilante entirely, despite only expressly taking issue with two of his opinions.   Defendant argues that Dr. Vigilante employed no method to create his own warnings, criticizing it as a "thought experiment."  In reality, Dr. Vigilante's method was nearly identical to, and in many ways more complete and reliable than the method employed by Defendant's own Human Factors expert, Dr. J.P. Purswell.  As explained herein, Dr. Vigilante's opinions are based on sound scientific principles and research, not conjecture.

Additionally, Defendant challenges the reliability and fit of an opinion Dr. Vigilante gave during his deposition.  When asked by Defendant's counsel, Dr. Vigilante testified that he believes his proposed on product warnings would have changed the Vitale's behavior and prevented the fire.  The opinion is based on facts on the record and is therefore reliable and fits the facts of this case.  Defendant's attack is on Dr. Vigilante's conclusion, not his method.  That is the province of the jury, not the trial court.

1. **Dr. Vigilante's analysis is derived from the scientific method, which is a generally accepted methodology recognized in all courts.**

Defendant does not take issue with the method employed by Dr. Vigilante to opine on the inadequacy of the dryer's existing warning system. It therefore concedes that Dr. Vigilante's method to determine this was reliable. Defendant focuses its argument solely on Dr. Vigilante's proposed warnings. However, it is clear from his report and from his deposition that Dr. Vigilante employed the exact same method to reach his conclusions about both the inadequacy of the existing warning system and the adequacy of his proposed warning system. To reach his opinions, Dr. Vigilante employed the scientific method. To employ the scientific method, the expert must: (1) come to a hypothesis, (2) collect relevant data, (3) test and/or analyze the data, and (4) reach a conclusion based on that analysis.

Dr. Vigilante first hypothesized that the dryer's warnings may be inadequate and that the warnings he proposed may be adequate. He then gathered the relevant data and tested that data against his hypothesis. He tested both the existing warning system and his proposed warnings against core principles found in the field of Human Factors and the industry standard, ANSI Z535.4. *See generally Exhibit F, Dep. Tr. Dr. Vigilante, at pp. 150-154* (explaining his method for reviewing the existing warnings); *155-160* (explaining his method for creating the adequate labels and warnings). This involves looking at the content, language, font, color, size, etc. of the warnings. *See, e.g., Exhibit E, Report of Dr. Vigilante, at pp.* 18-20. The warning itself must also clearly identify the hazard, the steps necessary to avoid the hazard, and the consequence of failing to avoid the hazard. *See, e.g., Exhibit E, Report of Dr. Vigilante, at pp.* *21-25.* He also tested the adequacy of the placement of the existing warnings and his own warnings: according to industry standards, including ANSI Z535.4, and research in the field of Human Factors, a warning should be placed conspicuously on a consumer product when it

concerns a hazard where the consequences of failing to heed the warning are severe, the frequency of potential accidents as a result of failing to heed the warning is high, and the general public is unaware of the hazard associated with the product. *See Exhibit E, Report of Dr. Vigilante, at pp. 8* (citing testimony from Electrolux that fires from lint accumulation is the most common and severe hazard faced by users of its dryers); *9-13* (providing a review of the literature in the field that supports his position that reliance on warnings in the manual was inadequate); *13-16* (detailing the public perception of the hazard).

As a result of this testing, Dr. Vigilante concluded, *inter alia*, that Defendant's warnings were inadequate according to the ANSI Z535.4 standard and the literature in the field; that an adequate warning label needed to be affixed directly on the product visible to the user; and that his proposed warnings were adequate. *See Exhibit E, Report of Dr. Vigilante, at pp. 38-39.*

This method is recognized by Defendant's expert as reliable and generally accepted in the field. *Exhibit M, Dep. Tr. Dr. J.P. Purswell, at pp. 118-120* (explaining his methods).

Dr. Vigilante, employing this method, has been found competent to testify in a number of federal district courts across the country. *See e.g. Yazdani v. BMW of N. Am., LLC*, No. CV 15-01427, 2016 WL 2755589, at *5 (E.D. Pa. May 12, 2016); *Jenks v. New Hampshire Motor Speedway*, No. 09-CV-205-JD, 2012 WL 405479, at *3 (D.N.H. Feb. 8, 2012); *Exhibit N, Omnibus Order on Parties' Motions to Exclude Expert Testimony, Nexter v. Textron, Inc., No. 1:13-CV-920-DAE at * 54-57 (W.D. Tx. November 17, 2015).*

In *Jenks*, the defendant made the exact same challenge as Defendant attempts to do here. However, the court found the method Dr. Vigilante used to draft his proposed warnings was reliable because "Vigilante drafted the proposed warning in accordance with ANSI standards in conjunction with his review of warnings literature and guidelines." *Jenks*, 2012 WL 405479, at

*3.

The method employed by Dr. Vigilante, involving testing a warning against industry standards and the literature and principles of Human Factor, has been found time and time again to be reliable in federal courts in the Third Circuit and other circuits.  *See e.g. Dolfman v. Edwards*, No. CIV.A. 13-2831, 2015 WL 3477736, at *1 (E.D. Pa. June 2, 2015); *Durkin v. Wabash Nat.*, No. CIV.A. 10-2013, 2013 WL 1314744, at *11 (D.N.J. Mar. 28, 2013); *Surace v. Caterpillar, Inc*., No. CIV. A. 94-1422, 1995 WL 303895, at *4 (E.D. Pa. May 16, 1995), *aff'd in part*, 111 F.3d 1039 (3d Cir. 1997); *Michaels v. Mr. Heater, Inc.*  411 F. Supp. 2d 992, 999-1000 (W.D. Wis. 2006).

Defendant appears to fault Dr. Vigilante for not conducting "live" tests or surveys using human subjects for these warnings.  This argument was expressly rejected in *Jenks*, where the court further found "[t]he lack of scientific testing on his proposed warning does not render his opinion inadmissible."  2012 WL 405479, at *3.

 Further the Human Factors literature and the ANSI Z535.4 standard upon which Dr. Vigilante relies on is based on conclusions drawn from peer reviewed studies of "real life" testing.  Therefore, if something is adequate or inadequate based on Human Factors literature and ANSI Z535.4, it is based on "real life" field testing.  *Exhibit F, Dep. Tr. Dr. Vigilante, at pp. 160-161; see also* ECF 36-15, at 135-135 (Dr. Vigilante's Deposition Testimony in the Cloud case attached as Exhibit H to Defendant's Motion).  The entire point of having an industry standard and publishing works in the field is to give researchers and industry experts a way to test the adequacy of warnings without having to undergo the expense and effort of conducting live field testing for each warning.  Because Dr. Vigilante does not propose anything that is a radical, or even a minimal shift from generally accepted principles in his field and industry, it

is entirely reliable to rely on those well-worn principles established by the literature in the field and the ANSI Z535.4 standard.

Defendant also relies on two inapposite cases. Defendant's analogy of Dr. Vigilante to the expert in *Curry v. Royal Oak Enterprises* is not convincing. No. CIV.A. 11-5527, 2013 WL 3196390 (E.D. Pa. June 25, 2013). The expert in *Curry* was a trained chemist, not qualified to give an opinion on warnings. *Id.* at *4-5. Because he was not an expert in Human Factors, his opinion on the warnings of the product were not based on any literature in the field or industry standards. *Id.* As such the Court should not be persuaded.

The analogy to the expert in *Mause v. Glob. Household Brands, Inc.*, is equally tortured. No. CIV.A. 01-4313, 2003 WL 22416000 (E.D. Pa. Oct. 20, 2003). Similar to *Curry*, the expert in *Mause* did not base his opinion on the warnings on any industry standard or literature in the field of Human Factors. *Id.* at *4-6. This is of course, opposite of Dr. Vigilante's method. Unlike the experts in *Curry* and *Mause*, Dr. Vigilante's opinion is not based on subjective speculation, but rather objective data commonly relied on by experts in the field, including Defendant's own expert. If Defendant truthfully objects to Dr. Vigilante's method, it would not have paid its own expert to employ the same method.

2. **Dr. Vigilante's opinion that the proposed warnings would have provided necessary information to avoid the fire hazard is based on facts of record.**

Defendant also takes issue with Dr. Vigilante's opinion that the Vitales would have read and heeded his proposed warning, avoiding the fire. Despite evidence in the record, Defendant contends there is no factual basis for this opinion. Defendant's argument is meritless.

Dr. Vigilante testified at length the exact factual underpinnings for this opinion. *Exhibit F, Dep. Tr. Dr. Vigilante, at pp. 194-199.* It is not baseless speculation to conclude that the Vitales would have read and heeded Dr. Vigilante's warning. The placement of Dr. Vigilante's

large, bright warning on top of the dryer – as opposed to the existing, small, black and white text label inside the dryer door – would have given the Vitales the opportunity to see the warning. *Exhibit E, Report of Dr. Vigilante, at pp. 28-33.* The warning is based on industry standards and literature that has shown warnings formatted and located in a manner consistent with Dr. Vigilante's proposed warning will be seen, read, and heeded. In addition, it is based on the Vitales' testimony that showed they endeavored to take care of and maintain their dryer properly. It is also based on the Vitales' testimony that if they had known the information contained on Dr. Vigilante's warning label, they would have followed the directive. *Exhibit F, Dep. Tr. Dr. Vigilante, at pp. 194-199; Exhibit E, Report of Dr. Vigilante, at pp. 33-38.* In other words; there is sufficient factual basis to conclude that this warning would have been visible to the Vitales, and the Vitales would have been motivated to comply.

## V.      CONCLUSION

For the reasons stated above, Defendant Electrolux Home Products, Inc.'s Motion to Preclude Testimony of Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D. should be denied.

Respectfully submitted,

de LUCA LEVINE, LLC

BY:   Patrick A. Hughes

RAYMOND E. MACK, ESQUIRE
P.A. ID No. 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
P.A. ID No. 91415
phughes@delucalevine.com
Three Valley Square, Suite 220
Blue Bell, PA  19422
215-383-0081 (Main) / 215-3383-0082 (fax)
ATTORNEYS FOR PLAINTIFFS

Date:  April 3, 2017