1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:15-cv-01815-SD

JURY TRIAL DEMANDED

JOSEPH and URSY        )
A. VITALE              )
                       ) DEPOSITION UPON
                       )
                       ) ORAL EXAMINATION
                       )
        vs.            )        OF
                       )
ELECTROLUX HOME        )  WILLIAM J. VIGILANTE, JR.,
PRODUCTS, INC.         )  Ph.D., CPE

- - -

TRANSCRIPT OF ORAL DEPOSITION, taken by
and before DONNA HUNTER, Registered Professional
Reporter and Notary Public, at the Offices of deLUCA
LEVINE, LLC, Three Valley Square, 512 E. Township
Line Road, Suite 220, Blue Bell, PA, on Tuesday,
April 26, 2016, commencing at 9:56 a.m.

ERSA Court Reporters
30 South 17th Street
United Plaza, Suite 1520
Philadelphia, PA  19103
(215) 564-1233

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**2**

1  A P P E A R A N C E S:
2
3  deLUCA, LEVINE, LLC
   By:  PATRICK A. HUGHES, ESQUIRE
   Three Valley Square
4  Suite 220
   512 E. Township Line Road
5  Blue Bell, PA  19422
6  Counsel for Plaintiffs
7
   NICOLSON LAW GROUP
8  BY:  MELISSA YEMMA, ESQUIRE
   Rose Tree Corporate II - Suite 6035
9  1400 North Providence Road
   Media, PA  19063
10
11 Counsel for Defendant,
   Electrolux Home Products, Inc.
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1
            I N D E X
2
3  WITNESS:
4  WILLIAM J. VIGILANTE, JR., Ph.D., CPE
5
      By Ms. Yemma.................Page 4
6
7
8       E X H I B I T S
           PAGE        PAGE
9  NUMBER   DESCRIPTION   MARKED  ATTACHED
10
   Vigilante-1  Notice of Deposition   5      207
11
   Vigilante-2  Curriculum Vitae      18      208
12
   Vigilante-3  History of Expert
13           Testimony              50      209
14 Vigilante-4  Updated Four-Year
            Testimony History      51      210
15
   Vigilante-5  2/29/16 Report        66      211
16
17
18
19
20
21
22
23
24

**4**

1
2          (It was stipulated by and between
3  counsel that sealing, and certification be
4  waived; and that all objections, except as
5  to the form of the question, are reserved
6  until the time of trial.)
7
8          . . .WILLIAM J. VIGILANTE, JR.,
9  Ph.D., CPE, having been duly sworn, was
10 examined and testified as follows:
11         THE REPORTER:  Usual stipulations?
12         MR. HUGHES:  Except for reading and
13 signing.
14 BY MS. YEMMA:
15 Q.    Good morning, Dr. Vigilante.
16 A.    Good morning.
17 Q.    We introduced ourselves before we got
18 started, but for the record, my name is Melissa
19 Yemma, and I'm with the Nicolson Law Group.  And, I
20 represent the defendant, Electrolux Home Products,
21 in this lawsuit that's been brought by Allstate
22 Insurance Company, and Joseph and Ursy Vitale.
23         So, we're here today to take your
24 deposition.  And, I understand you have given

**5**

1  depositions before today.  Is that correct?
2  A.    Yes, ma'am.
3  Q.    Okay.  And, I'm sure you've heard the
4  various rules that govern depositions.  Do you need
5  me to repeat those for you today?
6  A.    I don't believe so.
7  Q.    Okay.  I don't want you to be uncomfortable.
8  If you need to take a break, please let me know.  We
9  can talk about a lunch break as we get further into
10 the deposition, but if you need water, coffee, tea,
11 let me know.  Sound good?
12 A.    Sure.
13         MS. YEMMA:  All right.  I'm going
14 to mark as Exhibit 1 the Notice of
15 Deposition.
16         (Document marked Exhibit Vigilante
17 No. 1 for identification.)
18 BY MS. YEMMA:
19 Q.    Dr. Vigilante, I am going to hand that to
20 you.  Dr. Vigilante, have you seen the document
21 that's been marked as Exhibit 1?
22 A.    Yes, I have.
23         MR. HUGHES:  Melissa, this is the
24 deposition notice that was sent to us

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

6

1    yesterday?
2           MS. YEMMA:  Right.  And, I was
3    going to say that.
4    BY MS. YEMMA:
5    Q.    So, there were some changes in the
6    scheduling, and we served this deposition notice
7    yesterday.  But, you have seen this before today?
8    A.    Yes.  I looked at it on my phone last night.
9    Q.    Okay.  And, it's my understanding you did
10   bring file material with you today?
11   A.    Yes.  I brought all of my case material.
12   Q.    Okay.  And, you have in front of you a black
13   three-ring binder.  Is that correct?
14   A.    That's correct.
15   Q.    Okay.  And if you could identify for the
16   record, generally, what's in that binder?
17   A.    There's nine tabs.  I can go through the
18   tabs real quick.  Would that help?
19   Q.    That's great if you could do that.
20   A.    The first tab is two copies of my C.V., and
21   two copies of my four-year testimony history.
22         Tab two is a copy of my report in this
23   matter.
24         Tab three are my deposition summaries for

7

1    Joseph Vitale, Ursy Vitale, and Mr. Carl King in
2    this matter.
3           Tab four are deposition summaries of other
4    Electrolux employees from prior or different
5    matters, including David Fuller from the Cloud
6    matter, Steven Brown, I believe is from the Cloud
7    matter, Carl King from the Cloud matter, Carl King
8    from -- a couple different Carl King's.  One's dated
9    July 2nd, 2014.  One's dated July 18th, 2013.
10   Deposition of Brian Ripley in the Gargiulo matter;
11   Brian Ripley from July 18th, 2013; Brian Ripley in
12   the State Farm consolidated matter, I believe,
13   July 1st, 2012.  Mike Ricklefs from April 23rd,
14   2014; Mike Ricklefs from the Gargiulo case; Stephen
15   Joerger from February 11th, 2014.  And, that's the
16   State Farm versus Electrolux Home Products.  Shelley
17   Claussen from State Farm versus Electrolux Home
18   Products.
19         And then summaries the from Carl King's
20   deposition in the Power matter.  And, King's
21   testimony, trial testimony in the Tirrell case.
22         Tab five is a compilation of things.
23   There's a couple different dividers.  The first set
24   are just different examples of flexible foil venting

8

1    that's sold both by Electrolux, and by
2    do-it-yourself hardware stores.  I believe they're
3    from Lowe's, but it might be Home Depot.  I don't
4    remember which one, offhand.
5           Another web description of flexible foil
6    venting from Lowe's.  And, then one from Amazon --
7    I'm sorry, Sears, a Lambro dryer vent flexible foil
8    transition duct from Sears.
9           The next set of documents are from
10   Electrolux.  The first one is from their Electrolux
11   store regarding -- I can go through why I picked
12   them out, if you want, or I can just identify,
13   however you want to do it.
14   Q.    You can identify why you picked them out.
15   A.    All right.  The reason I picked this one out
16   is Electrolux states on the website, and I printed
17   in August 2013, that "Most people don't know that
18   lint can build up around the heating element and
19   cause a fire."  They state, "If you're using a
20   flexible dryer vent made of foil, or plastic, your
21   dryer, family, and home may not be as safe as you
22   think."
23         The next one is from Electrolux website,
24   again their Electrolux store, that I downloaded in

9

1    July, 2012.  And it states, "Clean the inside of the
2    dryer and around its heating element.  Most people
3    don't know that lint can build up around the heating
4    element, and cause a fire."
5           The next document is Electrolux Service
6    Bulletin from November, 2000.  On Page 19 it states,
7    "Fortunately most people use the flexible tubing
8    shown in diagrams D, E and F."
9           So the reason I pulled those three as a
10   handy, and put them in my notebook, was they deal
11   with consumers' knowledge and practice with regard
12   to dryers, and dryer vent systems.
13         The next stack are, again, they're from
14   different associations, and they deal with
15   consumers' practices, and knowledge, with respect to
16   dryers, dryer fires, dryer lint fires, and use of
17   venting material.
18   Q.    Are we still on the tab five?
19   A.    Yes.
20   Q.    Okay.
21   A.    So the first one is from the National Fire
22   Protection Association, and it has an updated
23   publication date of July, 2013.
24         The next one is an Underwriter Laboratories

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

10

1  Product Safety Tips.  And, I don't have a date on
2  that one.
3       The next one is a Consumer Product Safety
4  Commission Safety Alert, that is dated June, 2003.
5       The next one is from an Ontario Fire
6  Marshal's office dated October 1st, 1996.
7       The next one is in a newsletter titled
8  Topeak (ph) KM News dated August, 2003.
9       The next is from, I believe, the University
10  of Florida dated -- I downloaded it on 12/21/2004.
11       And then the vent -- we move to the next
12  batch of, again, documents from different
13  organizations related to consumers' knowledge, and
14  use of dryers, and cleaning, and venting, and so
15  forth.
16       The first one is from NFPA.  The second one
17  is a CPSC Safety Alert, and that's got a publication
18  date of June, 2003.
19       The next one is from the Grand Valley Fire
20  Department.  And, this one looks like I downloaded
21  it July, 2015.
22       The next document is from the Wright
23  Patterson Air Force Base, dated September, 2001.
24       The next two are from the website

11

1  laundryalternative.com, and they're dated -- I
2  downloaded them December 21st, 2004 -- I take that
3  back.  I didn't download them in 2004.  They're
4  dated December 21st, 2004.
5       The next one is from a company called
6  Allen's Chimney Sweep, and that has a date of 12/21,
7  2004.  I don't think I downloaded it.  I think
8  that's the publication date that seems to be on it.
9       The next one is from a website called
10  Fixitnow, and that's dated October, 2003.
11       Tab six is notes that I took several years
12  ago when calling appliance service professionals,
13  and dryer cleaning vent services in New Jersey, in
14  the Greater Philadelphia area, and up in New
15  Hampshire.
16       Tab seven is the Dryer Owners Manual and
17  Installation Instructions that was produced in this
18  matter.
19       Tab eight is the report of J.P. Purswell
20  with my notes on it.
21       And then I provided two references after it,
22  one from the Handbook of Human Factors and
23  Ergonomics.  Published in 1997, Chapter 36, Warnings
24  and Risk Perception.

12

1       And then the second one is from the CPSC
2  titled Manufacturers Guide to Developing Consumer
3  Product Instructions dated October, 2003.
4       And then the last tab are my two invoices
5  that I had sent to Mr. Hughes' office for my work in
6  this case.
7            MS. YEMMA:  Pat, can I get a copy
8       of tabs 3 through 8?
9            MR. HUGHES:  Sure.
10            MS. YEMMA:  Off the record.
11            (Discussion held off the record.)
12            MS. YEMMA:  Back on the record.
13  BY MS. YEMMA:
14  Q.    Dr. Vigilante, we just went through what was
15  contained in the three-ring binder that you brought
16  with you today.
17  A.    Yes, ma'am.
18  Q.    And you also brought with you a flash drive;
19  is that correct?
20  A.    Two flash drives.
21  Q.    Two flash drives, okay.  And, one is white
22  and one is black, for lack of a better way to
23  identify them.
24       If you could just generally explain what's

13

1  on the white flash drive, that you brought with you.
2  A.    Sure.  There are nine folders, and then
3  several other documents.  So, the first folder is
4  the deposition summaries, I think all of which were
5  printed in tabs 3 and 4.
6       The second folder on the flash drive is
7  documents that were provided to me by Mr. Hughes'
8  office that were all discovery documents in this
9  matter.
10       The next folder is called Dryer Literature,
11  and that's everything that was in tabs -- I think
12  it's tab 5, 6 -- tabs 5 and 6.  Plus, there's
13  another sub folder in there called Exemplar --
14  example indicator lights.  And, these are manuals
15  from different appliances that have indicator lights
16  for service on the machine.
17       The next folder is called Photos, and in
18  there are the photos from John Fry's inspections,
19  Mike Stoddard's photos, and the photos from the
20  Upper Dublin Fire Marshal's office.
21       The next folder is entitled Randall Bills'
22  Photos, and that's all of Mr. Bills' photos that
23  were provided to me.
24       The next folder is entitled References, and

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

14

1    in there are all the references I sited in the last
2    section of my report -- or the references section of
3    my report. I think the last section of my report is
4    the appendices.
5          The next folder called Reports, and it's got
6    my report, Mike Stoddard's report, John Fry's
7    report -- two John Fry's reports, I should say. And
8    then another folder called Defense Experts, and
9    that's got Mr. Purswell's report, Randy Bills'
10   report, and it has the Electrolux Rule 26 (a)(2)
11   Disclosure, and then it has the two book chapters
12   that I mentioned that are in tab eight.
13         The next folder is called Vitale underscore
14   WGI60294, and that has another copy of Mike
15   Stoddard's report.
16   Q.    Is that from the Vitale matter?
17   A.    Yes.
18   Q.    Okay.
19   A.    The next folder is called Warning, and it
20   has three JPEGs, that are essentially the warnings
21   that were in my report, Section E of my report.
22         And then the documents are my four-year
23   testimony list, CV, the initial case inquiry form
24   and engagement letter sent out from Robson Forensic

15

1    when I was with Robson Forensic.
2    Q.    And, again, I am going to ask you this
3    question later: What was the date of that letter?
4    Would that have been the initial -- when you were
5    initially retained?
6    A.    Give me one second. The case inquiry form
7    has a date of July 8, 2015. The engagement letter
8    has a date of July 8th, 2015, but that's when
9    Robson's sent it. It's not signed. So, I'm not
10   sure when Mr. Hughes, or his office, returned it,
11   and officially engaged my services.
12   Q.    But, you would have been contacted about
13   this matter before July 8th, 2015?
14   A.    About this specific matter?
15   Q.    Correct.
16   A.    All I can say to you is the earliest that I
17   am sure of is July 8th, 2015. It's possible that
18   Mr. Hughes discussed the matter with me prior to
19   that date, but I don't have a memory of it.
20   Q.    Okay. I didn't mean to interrupt.
21   A.    That's okay. The next document is my
22   retention agreement, that I sent to Mr. Hughes, on
23   October 1st, 2015.
24         The next document is essentially the signed

16

1    version of that letter from Mr. Hughes, and that's
2    got a date of October 1st, 2015.
3    Q.    So that letter, was that sent under your new
4    company of Vigilante Forensic?
5    A.    Yes, ma'am.
6    Q.    Okay.
7    A.    And then the last document is the executed
8    deposition letter, that you had signed, with the
9    correction to the date, and the name of the case,
10   because it was originally for Cloud.
11   Q.    Okay. Up-to-date because I sent it on
12   Friday, so...
13   A.    Yes, yes. Thank you very much.
14   Q.    Sure.
15   A.    And, you're welcome to look. So, that's why
16   I brought the laptop.
17   Q.    Thank you. And, I have my laptop in my car,
18   too.
19         So, I just have one question about the copy
20   of Dr. Purswell's report, we were discussing off the
21   record that the copy that's in your binder has some
22   notes on it.
23   A.    Yes.
24   Q.    And, Pat is looking into whether his

17

1    position is that I can have it, or not. So I just
2    wanted to know the copy that's on flash drive, does
3    that similarly have notes?
4    A.    Yes.
5    Q.    Okay. So, I just wanted to point that out.
6    Okay.
7          So then the black flash drive, what does
8    that contain?
9    A.    This has the State Farm discovery documents.
10   So, there's hundreds of thousands of documents on
11   there -- hundreds of thousands of pages of
12   documents.
13   Q.    And is that, as far as you know, a complete
14   set of the documents from the State Farm
15   consolidated matter, that you were provided by
16   counsel?
17   A.    I can check real quick because I don't know
18   if it's complete. There are 22 folders labelled
19   Folder 1 through 22, and then a folder labelled
20   Supplemental Document Production.
21         Folder one has a bunch of documents, but the
22   first document in the list is entitled EHE
23   underscore SF0012699. So if I had to guess, there
24   are other documents that I don't have.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

**18**

1  Q.    Okay.
2  A.    And I can give you if you want the last
3  Bates number on the last document.
4  Q.    That's okay.
5        So, Dr. Vigilante, your entire file, you
6  have the two flash drives, and then the three-ring
7  binder, that we talked about earlier.  Does that
8  compromise your entire file for the Vitale matter?
9  A.    Yes.
10 Q.    And, does that include all the documents you
11 are relying on in this matter to render your
12 opinion?
13 A.    All those specific documents I'm relying
14 upon, yes.
15 Q.    Okay.  And, you made that clarification,
16 "specific documents".  Are there documents you are
17 relying on generally, that aren't included?
18 A.    Well, truly, I've spent 20 years gaining
19 knowledge from other documents that are part of my
20 general background, education, and training, that I
21 am relying on.  But the specific documents for this
22 case, I have produced them on the flash drive.
23 Q.    Thank you.
24       (Document marked Vigilante Exhibit

**19**

1        No. 2 for identification.)
2  BY MS. YEMMA:
3  Q.    I'm going to hand you what's been marked as
4  Vigilante-2.  And for the record, it is a 10-page
5  document.
6        Is this a document you have seen before
7  today?
8  A.    It appears to be a copy of my C.V.
9  Q.    And, there's a date at the bottom of the
10 document on the left-hand side, do you see that,
11 November 1st, 2015?
12 A.    Yes.
13 Q.    What does that date represent?
14 A.    It's the date the document was created.
15 Q.    And --
16 A.    Well --
17 Q.    I'm sorry, go ahead.  I didn't mean to cut
18 you off.
19 A.    That's okay.  That's the date the document
20 was last updated.
21 Q.    Are there any updates, that should be added
22 to this document, from July 1st, 2015?
23 A.    From November?
24 Q.    I'm sorry, November 1st, 2015.

**20**

1  A.    Yes.  I haven't updated it since November
2  1st, 2015.  I don't think that there's anything that
3  should be added.
4  Q.    And, you're currently employed; is that
5  correct?
6  A.    Sure, yes.
7  Q.    And, where do you work?
8  A.    I work for Vigilante Forensic.
9  Q.    And, is that a company you started?
10 A.    Yes.
11 Q.    And, you started that in 2015?
12 A.    Yes.
13 Q.    What month did you start?
14 A.    The official -- the LLC was formed -- the
15 LLC is Vigilante Consulting.  That was formed in,
16 maybe, August/September timeframe of 2015.  The
17 official start date for Vigilante Forensic was
18 October 1st, 2015.
19 Q.    And prior to that, you were employed by --
20 is it Robson Forensic?
21 A.    Robson Forensic.
22 Q.    Okay, thank you.  And, you were employed
23 there from 2003 to 2015.  Is that correct?
24 A.    Yes, ma'am.

**21**

1  Q.    In what month in 2015 did you cease
2  employment with Robson?
3  A.    My last date would have been the last
4  calendar day of September of 2015.
5  Q.    And, why did you leave Robson Forensic?
6  A.    To start my own company.
7  Q.    And, what does your company do?
8  A.    Vigilante Forensic provides both forensic
9  consulting and traditional consulting work.
10 Vigilante Forensic is the arm of Vigilante
11 Consulting that handles strictly forensic matters.
12 Q.    And, do you currently have any employees?
13 A.    No.
14 Q.    So you were -- I think we established
15 earlier that you were retained in July of 2015 for
16 the Vitale matter.  Is that correct?
17 A.    I don't know that that's correct.
18 Q.    Do you think it was prior to that?
19 A.    No.  The easiest way to explain it is that
20 the first known contact I had with Mr. Hughes
21 regarding this matter was in July of 2015.  At that
22 time, I was employed by Robson Forensic.  Robson
23 Forensic sent Mr. Hughes an engagement letter.  I do
24 not have a copy of a signed engagement letter, so I

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**22**

1  don't know if he ever retained me while I was
2  employed by Robson Forensic.
3       I do know that I was retained on October
4  1st, 2015 by Mr. Hughes under Vigilante Forensic.
5  Q.    Okay. So apart from the signed engagement
6  letter, to the extent that it exists with Robson
7  Forensic, were there any other documents, that
8  you're aware of, that were generated while you were
9  at Robson related to this matter, that you do not
10 have?
11 A.    Not that I'm aware of.
12 Q.    And when you were with Robson, can you tell
13 me what type of work that you did over your time
14 there?
15 A.    Sure. I had several positions, or
16 responsibilities, at Robson Forensic. From, I
17 guess, like, 2010 until the end of 2014, I was the
18 Area Manager for the Philadelphia area for Robson
19 Forensic.
20      From beginning of my employment with the
21 company, until I left the company, I was the
22 Practice Group Leader Manager for the Human Factors
23 Practice Group.
24      I also did my own casework at Robson the

**23**

1  entire time I was employed there.
2       As part of my employment responsibilities, I
3  was also responsible for doing work for Robson
4  Forensic's sister company, or subsidiary, Fournier,
5  F-O-U-R-N-I-E-R, I believe, and that work was
6  traditional consulting work. So, nonforensic, or
7  non litigation-related.
8  Q.    So any litigation-related work would have
9  been done under Robson Forensic?
10 A.    Yes, ma'am.
11 Q.    And, you had traditional casework from the
12 time you started in 2013 until you left in 2015?
13 A.    I started in 2003, and I left in 2015. I
14 didn't have work that spanned the entire time.
15 There were projects that came in, and went. And, I
16 don't remember when the last consulting --
17 nonforensic consulting job was. I believe it was in
18 the spring of 2015.
19 Q.    So while you were at Robson Forensic -- and
20 this question also includes the sister company, the
21 subsidiary -- on average, how many hours were you
22 billing per year for litigation work?
23 A.    For a number of years, I would say it was
24 around 1,000 hours a year.

**24**

1  Q.    And, did that change, or fluctuate?
2  A.    Well, when I first started, it would have
3  been significantly lower.
4  Q.    How about in 2014, the year before you left?
5  A.    It was about 1,000.
6  Q.    And before you left Robson, what was your
7  hourly billing rate that they charged for your work?
8  A.    It was either -- well, I can tell you
9  specifically because it would have been in the
10 letter. Give me one second.
11 Q.    Okay.
12 A.    It looks like they were charging my time at
13 $415 per hour.
14 Q.    At now with Vigilante Forensic, what is your
15 hourly rate?
16 A.    It is 335 an hour for all non
17 testimony-related work.
18      For deposition and trial testimony, it's 385
19 an hour.
20      And then for videotaped testimony, it's
21 another $50, so I think it's 435.
22 Q.    So while you were at Robson, if you could
23 give me a breakdown of how you spent your time in
24 terms of casework versus the consulting work. Are

**25**

1  you able to do that?
2  A.    Yes, the majority of my time -- I should say
3  the majority of my billable time, I think, is the
4  question you're asking me, the majority of it was
5  spent on forensic-related matters.
6       The nonforensic-related matters varied, you
7  know, from -- let's say a month's perspective --
8  from zero percent to maybe 20 percent.
9  Q.    Let's break it down between the forensic and
10 nonforensic.
11      So, the forensic work that you did, would
12 that all be litigation-related, or your being
13 retained by a plaintiff, or a defendant?
14 A.    Or insurance company, or a federal or state
15 government, and then I think that's -- it would
16 either be criminal, civil, or insurance related.
17 Q.    And, for the forensic work, can you break it
18 down between plaintiff and defendant, how much time
19 was spent doing work for a plaintiff versus
20 defendant?
21 A.    Typically, it's been about 60/40 throughout
22 my years of doing this type of work, and it can
23 swing maybe five percent either way on a given
24 half-year basis.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

26

1  Q.     So, the forensic work, that would include
2  writing expert reports, and testifying like you are
3  doing in connection with this matter?
4  A.     Sure.
5  Q.     Okay.  So the other part of your work, the
6  nonforensic, can you tell me what type of work
7  you did that would be considered nonforensic?
8  A.     From a billable hour standpoint?
9  Q.     Well, let's take it from the billable hour,
10  and then the nonbillable hour?
11  A.     Okay.  The billable hour nonforensic work
12  would be traditional consulting, and that was mostly
13  related to manufacturers, property owners, and so
14  forth, hiring me.  Or, I'd be working through them
15  hiring the firm consulting on warnings-related, or
16  product safety-related issues.
17  Q.     Anything else?
18  A.     I may have done work with sound ordinance
19  issues, neighbors putting in a racetrack, and are
20  concerned about the sound.  And you go out, and
21  measure the sound, and then you may have to go and
22  provide a report, or something, for a zoning
23  hearing.
24  Q.     Okay.  How about the nonbillable work, the

27

1  nonforensic, nonbillable work?
2  A.     So, that was about half my week, typical
3  week, for the last, maybe, four, five years of my
4  employment with Robson.  So, I opened the
5  Philadelphia office for the company, which would
6  have required dealing with finding space, leasing
7  space, fitting out space, hiring, interviewing,
8  hiring employees, firing employees.  So, personnel
9  issues.  Marketing, business development-related
10  activities, mentoring activities.  And, I have to
11  decorate the office for the holidays.
12  Q.     Oh, okay.
13  A.     So, that was part of the area manager
14  responsibilities.
15          The practice group, I had responsibilities
16  with the practice group.  And that, again, involved
17  interviewing and hiring human factors experts,
18  mentoring, peer reviewing those experts, and then
19  letting some of those experts go throughout the
20  years.
21          And then part of Practice Group Leader
22  responsibilities is also marketing in business
23  development.
24  Q.     When you started with Robson Forensic in

28

1  2003, did they have a Philadelphia office?
2  A.     They did not.
3  Q.     So, you helped start that?
4  A.     Yes.  They had -- the reason I hesitated was
5  they had a -- the company has different areas, and
6  they had a Philadelphia area, but they had no office
7  in the area.  So when I opened the office in the
8  area, that was the first office in Philadelphia.
9  They have an office in New Jersey, South Jersey,
10  that for a while, I guess, I supervised the
11  Philadelphia area, and then that responsibility got
12  transferred to the manager in Lancaster.
13          And then when I opened the office in
14  Philadelphia, that became my responsibility.  It's a
15  little convoluted.
16  Q.     So before Robson, you were at ARCCA -- at
17  least that's how I pronounce it?
18  A.     Yes.  I worked for ARCCA prior to Robson
19  Forensic.
20  Q.     What did you do at ARCCA?
21  A.     Essentially, forensic investigations for
22  ARCCA, exclusively.
23  Q.     Is that when you first started working in
24  litigation in cases?

29

1  A.     No.
2  Q.     Okay.  That would be before that?
3  A.     Yes.
4  Q.     Okay, we will get to that.
5          So, before ARCCA, you were at --
6  A.     It's not on my CV.
7  Q.     It's not on your CV, okay.
8          Then, can you tell me about that, when you
9  first started in litigation?
10  A.     Yes.  I can't say that I was in litigation,
11  but my first doing forensic investigation started as
12  a grad student working for my advisor, who was hired
13  by attorneys to do forensic investigations.  And, he
14  would have the students do literature reviews,
15  document reviews, analysis, and studies, and so
16  forth.  And, he would pay us $20 an hour, which at
17  that time I thought was a lot of money, and then I
18  realized that he was billing, and he was
19  shortchanging us.
20  Q.     So, was that when you were at North Carolina
21  State University?
22  A.     Yes.
23  Q.     Okay.  During when you were pursuing your
24  doctorate, or before that?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**30**

1 A. I would think most of that work was done
2 after the Master's was earned, and while I was
3 working towards the Ph.D., but I could be mistaken.
4 Q. So during that time -- so, say, between 1997
5 and 2001, did you give any depositions in connection
6 with a lawsuit?
7 A. No. I don't think that he disclosed that he
8 was having us do the work.
9 Q. Understood. Okay.
10 A. Maybe he did. I can't say that. We were
11 hired more as a technical staff, if you will.
12 Q. So then after you left North Carolina State
13 University, when was the next time that you were
14 providing consulting services in litigation?
15 A. I started with ARCCA as an independent
16 consultant in, I think, 2001, and then I worked for
17 them -- I worked for ARCCA on a part-time
18 independent consultant basis.
19 At the same time I worked for ARCCA, I was
20 also working for IBM as a full-time employee for
21 IBM, and basically ARCCA was moonlighting.
22 And then when I joined Robson Forensic in
23 the summer of 2003, I had to leave ARCCA due to case
24 conflicts, and so forth.

**31**

1 Q. Dr. Vigilante, at any point in your career,
2 have you ever been hired by a product manufacturer
3 to draft a warning?
4 A. Yes.
5 Q. Okay. Can you give me an example of that
6 situation?
7 A. Sure. I worked for the IBM Corporation
8 doing design and development of consumer and
9 commercial-related products. And while at IBM, I
10 was responsible for designing the product warnings,
11 both manual warnings and on-product warnings.
12 Q. What specific type of products were you
13 designing warnings for when you were working at IBM?
14 A. They varied. I've done large commercial
15 storage base systems. These are a type of storage
16 base systems that, like, a Google would use, or a
17 large company like IBM, where they were
18 refrigerator-sized units that were hundreds in a
19 room, all the way down to little cards that -- the
20 warnings that went on little cards that went inside
21 your laptop to provide wireless connection prior to
22 them integrating it into the Intel chips that are
23 commonly used with laptops today. So, it varied.
24 I have done warnings for keyboards,

**32**

1 monitors, scanners, tape drives. Like I said,
2 storage systems, tape libraries. I've done warnings
3 for software apps, web aps.
4 So, it kind of ranged amongst all different
5 types of products.
6 Q. So the products that you just described,
7 those were all while you were with IBM. Is that
8 correct?
9 A. Yes.
10 Q. Okay. And, were you working in a group when
11 you were developing the warnings, or were you
12 working on your own?
13 A. Typically, I was part of a Product
14 Development Team, and I was the User Experience Rep,
15 or the User Experience Design Team Lead.
16 Q. Did you say team leader?
17 A. Team leader/team lead, same thing.
18 Q. Okay. I just didn't hear you. I'm sorry.
19 So as the team lead, what would your role
20 be?
21 A. Well, typically, I was responsible for all
22 of the usability aspects related to the product
23 design. So, it can start from identifying the
24 requirements when we were launching new products, or

**33**

1 launching a significant redesign of an existing
2 product, to creating formal requirements to start
3 with the designers to create requirements for the
4 actual design of the product, the interface design.
5 Creating mockups and prototypes, testing them with
6 various different usability techniques, working with
7 the information developers to craft the warnings in
8 the manuals, and reflections in the manuals, testing
9 that information through various usability testing
10 techniques, doing validation testing near the end of
11 the product development cycle, working with the
12 service group to identify where we're having issues
13 with products that were out in the field to identify
14 things that need to be addressed, and updates to
15 refresh it to the products.
16 I think that's probably a good general
17 description of my activities, and responsibilities.
18 Q. You referenced usability testing it. Can
19 you explain to me what that is, specifically? I
20 think I have an idea, but...
21 A. Yes. I bought a -- it's essentially to do
22 assessment testing of an interface warning
23 literature. There's different ways that you can do
24 it, depending upon your time, where you're at in the

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

34

1  development cycle, the money that's been set aside
2  for it, and whatever other constraints you may have.
3  So, they run from doing heuristic evaluations where
4  you're applying human factors principles, theories,
5  guidelines, and recommendations to the design to
6  looking at what's standards are applicable, and
7  applying those standards to the design to make sure
8  you meet minimum standards.
9       There's also, what we call, hallway testing,
10  which is essentially bringing in your coworkers, or
11  even, maybe, the maintenance staff, or folks from
12  the service call center, you know, who are readily
13  available, and typically somehow associated with the
14  company because you can grab them the hallway to
15  come in, and I've developed this warning, look at
16  it, tell me what it says.  Or, I've developed this
17  interface, try to use it, and tell me what you
18  think.  So, you can get feedback from other people
19  besides yourself.
20       There's focus groups where, typically, you
21  pay people to come in from the outside.  Usually
22  they're representative of users, or the user
23  community.  You sit around a table, a conference
24  table.  There's typically a moderator.  People are

35

1  shown different things.  They may be ideas for
2  design.  They may be the actual prototypes for the
3  design.  They may be other products out there.  And,
4  you gather requirements from the people, what do
5  they need, what problems are they experiencing in
6  whatever system they may be currently using, what
7  would they like to see in new designs, new products,
8  or new iterations of an existing design.  So, you
9  gather input from the group as a whole.
10       Usability testing is typically done
11  one-on-one.  So you have a user sitting in front of
12  whatever product, or warning, or literature, that
13  you are testing, or assessing, and it's one-to-one
14  interaction between the user, and the product.
15       Competitive benchmark is where you would
16  have users use your product, and then use a
17  competitor's product, and see how the two products
18  compare with respect to performance, ease of use,
19  understanding, et cetera.
20       Those are generally the accepted ways of
21  doing different types of human factors, or usability
22  assessment.
23       There's also, from more of a human factors
24  hardcore doing task analysis, which would not --

36

1  either require, or not require, a user, and that's
2  going through the steps that are necessary to
3  complete a task -- well, first, you want to identify
4  the important tasks that are of question; then,
5  identify the steps that are needed to complete those
6  tasks, identify the information, tools, and
7  knowledge that the user may need to complete each
8  step in the task, identify errors, mistakes, hazards
9  that can occur, or exist, during each step of the
10  task.
11       For bigger systems with employees, you can
12  look at job safety analysis, which are similar to
13  task analysis but you're doing it from the job
14  standpoint.  So, there are different human factors
15  techniques that may, or may not, be relevant to a
16  product development site.
17  Q.    So when you're developing a warning, how do
18  you decide which techniques you are going to use
19  because you're not doing all of these techniques
20  every time you're designing a warning: is that
21  right?
22  A.    Sometimes.
23  Q.    Sometimes?
24  A.    Sure, sometimes, yes.  Sometimes, again,

37

1  it's going to be a question of the warning, the
2  constraints, what we know from field data, or
3  service data, service call data, prior incidences.
4       So I'll give you an example.  One of the
5  products I worked on, and developed a warning for,
6  was the IBM IdeaScan.  And we had put it out into
7  the market -- the team did before I got on the team.
8  So it was a product development team focused on the
9  IdeaScan scanner, you know, maybe seven, eight
10  people sat on the product development team
11  representing engineering, electrical mechanical
12  engineering testing, marketing, business
13  development, quality service, and so forth.
14       They put the scanner out with a warning, and
15  an instruction manual, and the instruction manual
16  also had a warning.  And, basically, the warning
17  dealt with unlocking the scanner head before using
18  it.
19       Based upon the way the scanner was designed,
20  the scanner, if it moved during shipment, whether
21  being placed on the pallet, being placed on the
22  truck, moved from the truck to the store, the store
23  to the car, the car to home, you know, all the
24  movement of it, if it jiggled or jerked the scanner

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

**38**

1  head around, you'd break it. So, they would lock it
2  to the frame rails of the scanner. So you needed to
3  unlock it before you used it because if you tried to
4  use it without unlocking it, you would break the
5  scanner head. And then it would be no good, and
6  you'd get calls; people would return it, and so
7  forth.
8        So service identified after -- you know,
9  they put the product into the marketplace -- a large
10  increase of people breaking the scanner head doing
11  exactly what the warning they had put out told them
12  not to do.
13       So I got brought into the team to figure out
14  what's going on, how to fix the issue. And,
15  certainly, I looked at the warning, the on-product
16  warning, and the -- warning and instruction manual,
17  and identified that it was -- it didn't meet the
18  standards; it didn't meet the guidelines. It was a
19  bad warning. It was an inadequate warning. It
20  wasn't prepared the right way. It wasn't
21  attention-getting. It wasn't explicit and specific.
22  It wasn't placed in a place where it would be
23  readily seen by the user before they did whatever
24  they do.

---

**39**

1        So it was quite clear from the service data
2  that the warning didn't have its intended effect.
3  It was clear looking at it, and doing heuristic
4  evaluation, that this is why we are getting service
5  calls, this is a bad warning.
6        So I developed a new warning, and went
7  through the standards, and the guidelines, to
8  develop that warning. And, then integrated that
9  into the existing products that were being shipped
10  out. And we saw our return rates, and incident
11  rate, decline significantly. So, we knew that it
12  worked, and we verified that it worked based upon my
13  redesign of the warning.
14  Q.    So the IdeaScan scanner, before you got
15  involved in the project, did have it -- and I just
16  want make sure I understood your testimony
17  correctly -- it had an on-product warning, and then
18  there was the same warning in the owner's guide. Is
19  that fair?
20  A.    I don't know if it was the same warning, but
21  the same topic was addressed in the owner's manual.
22  Q.    Okay. So the IdeaScan scanner, how big of a
23  product are we talking about? Is it something that
24  would stand alone on the ground, or is it something

---

**40**

1  that goes on a desktop, just like a general sense?
2  A.    It was a desktop scanner.
3  Q.    Okay. And, do you know where the warning
4  was located on the scanner?
5  A.    It was on the bottom.
6  Q.    The bottom? So you would have to lift it up
7  to see it?
8  A.    Yes. That was part of the problem.
9  Q.    Okay. So then if you could explain to me --
10  I know you said once you became part of the team,
11  you made changes, and those were implemented.
12        Could you just, specifically, if you
13  remember, tell me what changes you made?
14  A.    Sure. The first thing I did was I took a --
15  I don't know what the best word to describe it is --
16  but I took a warning, and I made it so that it
17  prevented you from opening the top of the scanner
18  lid until you removed the warning. So, it was a
19  piece of paper that kind of cuffed the scanner.
20  And, I made the label itself safety orange, and then
21  I put a warning on it -- meaning the ANSI Z535.4
22  requirements.
23        So, it had the signal word "warning" in
24  color with the text. I don't remember exactly what

---

**41**

1  the text said, but it had something to do with
2  warning, remove -- or unlock scanner, turn scanner
3  over, unlock it before starting. If you attempt to
4  start it, blah, blah, blah. So that was the
5  interactive warning I put on there.
6        On the bottom, I took the warning that was
7  there, and again formatted it to the ANSI standard.
8  It was a white and black label, or something like
9  that -- so inconspicuous. Redundantly put it on the
10  bottom, and then in the manual did the same thing,
11  highlighted it in the manual. When they initially
12  had it in there, it wasn't highlighted. There was
13  nothing conspicuous about it. It didn't stand out
14  from the other information in the manual.
15  Q.    So, before your changes, do you know how
16  many pages the manual was?
17  A.    I don't remember offhand, and I don't
18  remember -- IBM had at the time -- IBM liked to --
19  before I got on the teams I was involved with --
20  liked to produce multilingual manuals. So the
21  manual for English may have been anywhere from a
22  half dozen to a dozen pages. But the manual,
23  itself, may have been longer because they threw in
24  Spanish, French, Japanese, Chinese, you know,

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

42

1    wherever they're planning on selling it.  So the
2    manual, itself, may have been bigger, or thicker.
3    Q.     But in different languages?
4    A.     Different languages, yes.
5    Q.     So the warning, that you were involved with
6    changing, do you know what page it was on in, at
7    least, the English portion of the manual?
8    A.     I don't recall that well where it was
9    initially.
10   Q.     Did you change the location in the manual?
11   A.     I don't recall if I had to change the
12   location, or not, but I would have to assume one
13   way, or the other, and I don't know if you want me
14   to assume.
15   Q.     I don't want you to assume.
16          When you said "highlight", what I thought of
17   when you said that was, you know, highlights with
18   color.  But, maybe you meant something different.
19   A.     Well, again, using the signal word in the
20   ANSI colors, make it larger, have a border around
21   it, make at stand out from the other information on
22   the page.
23   Q.     So after the changes had been implemented
24   both to the label, that you had to interface before

43

1    using the scanner, and also to the manual, were
2    those changes kept in effect?
3    A.     For that.  Then, we changed that to the
4    IdeaScan 2000, and we found a way to fix the problem
5    so that the warnings weren't needed after that.
6           So, again, from a product design standpoint,
7    you want to eliminate problems, safeguard them, and
8    then provide warnings.  So, the focus was on getting
9    rid of the problem.
10   Q.     So while you were at Robson Forensic, and
11   also at the sister company, were you ever hired by a
12   product manufacturer to draft a warning --
13   A.     Yes.
14   Q.     -- for consumer products?
15   A.     Consumer and commercial.
16   Q.     Okay.  So, let's just stick with the
17   consumer products.
18          Can you give me an example of a product that
19   you were hired by a manufacturer to create?
20   A.     The last one I did was a warning for a
21   target, a reusable target for target shooting.  I
22   don't recall the name of it offhand.
23   Q.     The name of the product, or the name of the
24   manufacturer?

44

1    A.     Both.
2    Q.     Both, okay.  So, a target for bow and arrow
3    shooting?
4    A.     Firearm shooting.
5    Q.     Oh, firearms.  Got it, okay.
6           So tell me about that project, and what did
7    that involve?  What was your initial assignment in
8    that company?
9    A.     The company designed, and developed, a
10   new-fangled target, if you will, that there were
11   essentially disks, and when you hit it with a
12   projectile, a bullet, it would puff out with what
13   would look like smoke, and would give some feedback
14   to the shooter that they were hitting the target,
15   and it would be a little bit more exciting than
16   shooting a static paper target.
17          The disks went in paper targets, so they
18   were, like, cutouts, and the paper target, you put
19   the disk in there.  I got contacted by the
20   manufacturer -- I don't recall exactly how, but they
21   were looking at what warnings they needed to put on
22   the product, and then they wanted advice and
23   guidance on how to format and present the warning on
24   the product.

45

1    Q.     And, what did you do for them in response to
2    that assignment?
3    A.     Two things.  Generally, one is I worked with
4    them to identify the hazards associated with it.
5    And that entailed working with their designer, and
6    then working with their toxicologist because there
7    was a -- because, again -- I don't know how to
8    describe it.  It's like a solid powdered substance
9    that would, when struck, or touched, give off
10   whatever any properties of the products were.  So I
11   wasn't sure if there was an inhalation, or a toxic
12   issue with it.  So, my first suggestion was to have
13   a toxicologist look at the ingredients of the
14   product, and make sure there was nothing toxic about
15   it.  And if there was, of course, we'd have to
16   address it in a warning.
17          And then we looked at the other -- like I
18   said, from the design standpoint, what other hazards
19   could be potentially associated with it.
20          After we identified the hazards, I gave them
21   advice on how to present the information on the
22   product packaging, how to format it based upon the
23   ANSI standard, where to place it on the product, and
24   so forth.

12 (Pages 42 to 45)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

46

1 Q.     Okay.  As far as you know, is that product
2 still in use today with the warning that you
3 designed?
4 A.     As far as I know.  I don't think I ever saw
5 the finished product, and I never saw the finished
6 warning.
7 Q.     Have you ever been retained by a dryer
8 manufacturer to develop a warning?
9 A.     Not that I'm aware of.
10 Q.     Okay.  Have you been retained by a dryer
11 manufacturer to review warnings?
12 A.     Not that I'm aware of.
13 Q.     Dr. Vigilante, when you are developing a
14 warning, how do you decide, generally, what goes on
15 the product versus what goes in the product
16 literature?
17 A.     Yes.  So, there's general guidelines how to
18 make a determination.  So you want to look at: (1)
19 the severity of the hazard; (2) likelihood; (3)
20 exposure.  And, that will give you the ability to
21 assess hazards by risk.  So, certainly the higher
22 risks ones you want to make sure you're dealing
23 with.
24        And, then, the other variables you want to

47

1 look at are:  (a) what are people's knowledge?  Is
2 the information that you are providing consistent,
3 or not consistent, with people's expected knowledge?
4 And then you're looking at is the hazard something
5 that is, again, consistent, or unique, to your
6 particular design.
7        So the risk assessment, the expected
8 knowledge, and consistency, and other products are
9 your three big ones that you want to consider.
10 Q.     Going back to the reusable target -- to use
11 that as an example -- what was the most severe
12 hazard associated with the target?
13 A.     The most severe was the potential for the
14 user to set the target up in front of something that
15 could be damaged, or hurt, or killed.  So, if they
16 improperly placed the target, and you shot at it,
17 and shot through it, and there was a playground in
18 the background, that would be considered the most
19 severe hazard.
20 Q.     So, the placement of the target?
21 A.     That was a big one.
22 Q.     So, was there a warning associated with
23 where the target should be placed?
24 A.     In the instructions, I think what they

48

1 decided to do was put the NRA Safe Gun Handling
2 Requirements.  So that was provided with the target.
3 So, number one, is to -- I don't know if I can
4 remember them in order.  But one of the top three is
5 know what you're shooting at, and what's beyond it.
6 So, target placement.
7 Q.     Okay.  When you said "in instructions",
8 just to clarify, so with the reusable target, did it
9 have warnings on the product?
10 A.     Well, it didn't have it on the product.  It
11 came in a -- like a -- for lack of a better term --
12 a plastic bag with a label, like, stapled to the top
13 of it.  And, I think the -- there was -- I suggested
14 the warning for the toxicology issues be on the
15 label, and I think they agreed to put the top three
16 of the NRA Safe Gun Handling on the label.  And the
17 rest of them were repeated, and expanded upon, in
18 the instruction manual insert that came with the
19 product.
20 Q.     So the label that was on the plastic bag --
21 just so I am understanding -- and, let's go back to
22 the plastic bag.  Was that a covering that's meant
23 to be discarded once you start using the target?
24 A.     Yes.

49

1 Q.     Okay.  So, was the warning affixed by a
2 sticker, or how was it attached to the plastic?
3 A.     My understanding was that they were going to
4 have, like, a plastic vessel, and then you would
5 have a cardboard strip at the top, double-sided,
6 that you would staple over the plastic.  So if
7 you -- I don't know how to explain it -- maybe if
8 you went and bought a kid's Halloween costume where
9 it's in a plastic bag, and they put the marketing
10 piece on the top of it, and staple on it.  And, it's
11 got a little description that's a continuation of
12 the top stapled part that goes in front of it, that
13 you have to remove that cardboard to open the bag to
14 get the costume out.  It's essentially the same
15 principles.  It's a common way to package durable
16 one-time use goods.
17 Q.     So once --
18 A.     Or, nondurable -- nondurable, yes.
19 Q.     Nondurable, okay.
20        So, once the initial purchaser, they buy
21 this target, and then if they wanted to start using
22 it, they would have to remove the plastic vessel
23 that had the warning attached.  Is that correct?
24 A.     They would have to remove the target from

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

50

1  the package.
2  Q.    Okay. And, essentially, they could throw
3  away the packaging. Correct?
4  A.    Yes. It was a one-time use product.
5  Q.    Okay. So, it's a one-time use. So, you use
6  it one time, and then you're discarding the product?
7  A.    That's what it was meant to be. I mean,
8  theoretically, you can shoot it once and then, you
9  know, if it starts raining, and you decide you're
10 done for the day, but then you would have to put it
11 somewhere. Because, like I said, it's like a
12 powdery substance. So if you handle it, it gets
13 everywhere. So you wouldn't want to put it in your
14 car because you would have whatever color it was
15 staining everything.
16 Q.    Okay. Just to go back to my last question.
17 So once the plastic vessel, we'll call it, was
18 removed, though, there were no warnings on the
19 actual product. Is that right?
20 A.    That's correct, you couldn't attach a label
21 to it.
22 Q.    Okay.
23        (Document marked Vigilante Exhibit
24 No. 3 for identification.)

51

1  BY MS. YEMMA:
2  Q.    I am going to hand you what's just been
3  marked as Vigilant-3. And that, I believe, is a
4  copy of your testimony back in March of 2012. Is
5  that right?
6  A.    That is, yes.
7  Q.    And as far as you know, is this a current
8  copy of your testimony, both deposition and trial,
9  from March, 2012 to the present?
10 A.    It is not.
11 Q.    It is not. Okay. So, what needs to be
12 added to the document to make it current.
13 A.    Here you go. (Witness handing document to
14 Ms. Yemma.)
15 Q.    Okay, thank you.
16        MR. HUGHES: Do you want me to make
17 copy of that?
18        MS. YEMMA: Okay. And, let's just
19 take a five-minute break, too.
20        MR. HUGHES: Sure.
21        (Brief recess.)
22        (Document marked Vigilante Exhibit
23 No. 4 for identification.)
24 BY MS. YEMMA:

52

1  Q.    Dr. Vigilante, we have marked as Vigilante-4
2  a document that you kindly provided to us this
3  morning. And, could you identify for the record
4  what that document is?
5  A.    That's my updated four-year testimony
6  history.
7  Q.    Okay. And, in your career, how many
8  depositions can you estimate that you've given?
9  A.    Over 100.
10 Q.    And, how many times have you testified in
11 court over the course of your career?
12 A.    Like, 33 times.
13 Q.    When you testified in court, had you been
14 qualified as an expert each of those 33 times, as
15 far as you know?
16 A.    I would have been, yes.
17 Q.    Okay. And, in what discipline were you
18 offered as an expert at trial, if you can recall?
19 A.    So, typically, I'm offered as a human
20 factors expert, and then in this product warning
21 case, I'll be offered as an expert in warnings,
22 product warnings, product safety. I think it
23 depends on the jurisdiction, and what the court
24 requires.

53

1  Q.    Okay. Have you been qualified in any case
2  as an expert in product warnings?
3  A.    Yes.
4  Q.    Same question with regard to product safety,
5  to the extent there's a difference?
6  A.    Oh, I'm sorry. Yes, I don't know -- I can't
7  tell you what the exact words were.
8  Q.    Okay.
9  A.    You know, if my client offers me as a human
10 factors expert in product safety, product warnings,
11 I don't know the exact terminology he's using.
12 Q.    Have you ever been excluded by a court from
13 testimony?
14 A.    Yes.
15 Q.    How many times?
16 A.    In two federal courts, two federal cases,
17 and then a state court in Virginia.
18 Q.    Okay. The two federal cases, they wouldn't
19 appear on your testimony history, correct, if you
20 didn't testify in those cases?
21 A.    One was in 2004, so that's been a number of
22 years ago. And, I don't recall if the second one,
23 if that was more than four years ago. It might have
24 been more than four years ago, as well.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

54

1  Q.    Okay.  So, let's start with the first one in
2  2004.  Where was that case venued, if you know?
3  A.    It was either New York, or Connecticut.
4  Q.    And, who were you retained by in that case?
5  A.    I don't recall the firm's name.
6  Q.    Was it by plaintiff?
7  A.    On behalf of plaintiff, yes.
8  Q.    On behalf of the plaintiff.  And, it was a
9  products case?
10 A.    Yes.
11 Q.    What type of product was at issue?
12 A.    It was a bicycle helmet sold by Costco.
13 Q.    And, do you recall what the challenge was to
14 your testimony, as you sit here?
15 A.    I don't recall the challenge.  I recall the
16 Judge's ruling that the field of psychology was
17 nothing more than commonsense; therefore my opinion
18 wasn't beyond the province of the jury.  And, as you
19 can imagine, I strongly disagree with that opinion.
20 Q.    All right.  And the other case, do you
21 remember what year that was, or --
22 A.    I'm thinking that that was more than four
23 years ago, but it was probably in the later 2000's,
24 early -- maybe 2010, 2011.  It wasn't as old as

---

55

1  2004.
2  Q.    And, where was that case venued?
3  A.    That was in Virginia.
4  Q.    Federal Court?
5  A.    Yes.
6  Q.    And, were you retained on behalf of the
7  plaintiff?
8  A.    Yes.
9  Q.    And, was it a products case?
10 A.    Yes.
11 Q.    What type of product was at issue?
12 A.    It was a pole vault mat.
13 Q.    Okay.  And, the court excluded your
14 testimony at trial?
15 A.    It was a government motion, I believe, or I
16 don't know if it was a Motion in Limine, or what the
17 exact motion was.
18 Q.    And as you sit here, do you recall what the
19 Judge's ruling was on that motion?
20 A.    He ruled the hazard was an act of God, and
21 therefore unforeseeable to the defendants;
22 therefore, no warning was necessary.
23 Q.    Was that it?  Was there anything more?
24 A.    I think that was the gist of it.

---

56

1  Q.    So, can you tell me just a little bit about
2  that case?
3  A.    Yes.  It was a pole vault mat used in high
4  schools, or colleges, or what have you, and they're
5  typically large sections of mat that are strapped
6  together, and then a thinner mat is placed over the
7  top of them to prevent people from going in cracks
8  when they fall into them when they pole vault.
9  Because they're used outside, the manufacturers
10 recommend that they lift them up onto a base, kind
11 of like a bed frame for your bed.  And what happens
12 is, is that when there's a strong windstorm, wind
13 can get under it, and it acts like a sail.  It'll
14 pick it up, and toss it.
15    And what we found in our investigation was
16 that this is happening all across the country, and
17 it's typically associated with big windstorms,
18 whether it's tornadoes, or other thunderstorm
19 events, strong thunderstorm events.
20    The particular incident, there was some kind
21 of athletic event at a high school where a crowd had
22 gathered to watch the event.  They were in the
23 stands.  And, the pole vault mat was left out on its
24 crates, and a windstorm came in suddenly.  They

---

57

1  called the match, and they suggested that people go
2  to their cars for safety.
3    As the spectators were walking through the
4  infield, I guess the wind came down, picked up the
5  pole vault mat, and knocked it into three people,
6  injuring them, one of them significantly.
7    So the question was, at least from my
8  standpoint was, was it necessary for the
9  manufacturer to provide a warning to either stake it
10 down, or make sure it's brought inside when not in
11 use, or when heavy winds are expected.
12 Q.    In the bicycle helmet case, do you recall
13 what your opinion was, or what you looked at in that
14 case?
15 A.    That one was a little different.  It
16 involved -- essentially, the product packaging for
17 the helmet made a bunch of untrue claims regarding
18 the protection offered by the helmet.  They claimed
19 it was the greatest thing since sliced bread for
20 safety, that it was used by NASCAR drivers, used by
21 Tour de France riders.  And, what turns out, it was
22 a piece of garbage.  I think the biomechanical
23 expert opined in the case you were better off
24 putting a Styrofoam cooler on your head, and riding

---

**15 (Pages 54 to 57)**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

58

1    down the street.
2         So, obviously, the marketing was not in sync
3    with the quality of the product.  And, I opined on
4    the effect the marketing would have on a purchaser's
5    belief as to the safety offered by the product.
6    Q.    And, you mentioned -- and, this is in the
7    two federal court cases.  Was there one state court
8    case where your testimony was precluded?
9    A.    Yes.
10   Q.    And, what year was that state court case,
11   that you were involved in?
12   A.    I don't recall the years.  I'm really giving
13   the best estimate as to the late 2000s.
14   Q.    And, where was that case venued, what state,
15   if you recall?
16   A.    Virginia.
17   Q.    And, you were retained on behalf of the
18   plaintiff in that case?
19   A.    Yes.
20   Q.    And, it was a products case?
21   A.    No.
22   Q.    What kind of case was it?
23   A.    It was a premises case.  It was a
24   trip-and-fall on the extended bed of a shopping cart

---

59

1    at a Best Buy.
2    Q.    Okay.  And, so the plaintiff was injured?
3    A.    They tripped on the -- he walked around the
4    cart, didn't realize there was an extended base, and
5    tripped on the base.
6    Q.    And, do you recall what the court's opinion
7    was in that case with regard to the motion the
8    exclude your testimony?
9    A.    Yes.
10   Q.    Can you tell me what that was?
11   A.    Sure.
12   Q.    Okay.
13   A.    The judge ruled that the State of Virginia
14   didn't recognize the field of human factors.  They
15   wouldn't let me testify as an expert in human
16   factors.
17   Q.    How do you define human factors?
18   A.    Human factors is a science that studies how
19   people interact with, or use, all different types of
20   product, machines, and systems.  From a basic
21   science perspective, we study people's perceptual
22   abilities.  That's how we see, hear, feel.  How we
23   gather information from our senses from the
24   environment.  We study decision-making, and things

---

60

1    that affect decision-making.  We study physical
2    abilities and limitations.
3         From an applied standpoint, we work with
4    engineers, architects, product designers, to design
5    products to take into consideration these human
6    factors associated with perception, cognition, and
7    physical abilities and limitations.
8         Our goals are to design products that are
9    easy to use.  They're comfortable to use for the
10   user.  And, most importantly, they're safe to use by
11   the user.
12             MR. HUGHES:  Off the record for one
13   second.
14             (Discussion held off the record.)
15             MS. YEMMA:  Back on the record.
16   BY MS. YEMMA:
17   Q.    Okay.  If you could turn your attention to
18   Vigilante-4.
19   A.    Okay.
20   Q.    And I didn't have a chance to review this
21   updated list, but it's my understanding you have
22   given testimony in three other Electrolux cases.  Is
23   that right?
24   A.    I believe so.

---

61

1    Q.    The Members Select, the Loiotile case, that
2    was in March of 2015.  I'm on Page 4.
3    A.    Yes.
4    Q.    And, then in August, 2015 in the Swanson
5    case?
6    A.    Yes.
7    Q.    And, there was an earlier one --
8    A.    It's on Exhibit 3.
9    Q.    Okay.  So that was one in April of 2012 in
10   the American Family Mutual case?
11   A.    The Power case, yes.
12   Q.    Right, the Power case.  Okay.
13        And, that's left off Vigilante-4 because you
14   just gave the last four years of your testimony?
15   A.    Yes.
16   Q.    Got it.
17        Dr. Vigilante, approximately how many dryer
18   cases have you been retained in where Electrolux is
19   a defendant, if you know?
20   A.    I have been retained in, altogether, I'm
21   going to say over a dozen.
22   Q.    Of those dozen cases, how many are current,
23   would you say?
24   A.    I don't know all of them that are current.

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

62

1   I just -- I know I've got, I think, four current
2   with -- I would say five, I know, are current; two
3   may be ongoing.  I don't know if it's settled, or
4   not.  So, I think that's probably about it.  Maybe,
5   let's say, five current, and maybe two that may be
6   current.
7   Q.    With the rest being closed, as far as you
8   know?
9   A.    As far as I know -- oh, I take that back.
10  Maybe three may be current.  I haven't spoken to one
11  of my clients -- the Loiotile matter, I don't know
12  if that's current, or not.  I don't know if that
13  settled.
14  Q.    So of the five current, and then the two or
15  three that you're unsure of, are those cases all
16  with Mr. Hughes' office, or are they with other
17  attorneys?
18  A.    Other attorneys.
19  Q.    And, are they in cases involving insurance
20  companies other than Allstate?
21  A.    I would imagine so.
22  Q.    Dr. Vigilante, have you ever sat on any
23  committees that create standards for household
24  appliances?

63

1   A.    No.
2   Q.    Have you ever been invited to sit on a
3   committee that creates standards for household
4   appliances?
5   A.    No.
6   Q.    Have you ever applied to be a member of a
7   committee that creates standards for household
8   appliances?
9   A.    No.
10  Q.    Sorry to jump around a little bit.
11       So just going back to your testimony
12  history, other than the cases involving Electrolux,
13  are any of the cases on your testimony list related
14  to cases involving clothes dryers?
15  A.    I don't think there's anything else on the
16  testimony list that are related to clothes dryers.
17  Q.    Okay.  So, how about thinking about your
18  entire career.  Have you provided consulting
19  services in litigation in a case involving a clothes
20  dryer not manufactured by Electrolux?
21  A.    I believe so.
22  Q.    Okay.  How many times?
23  A.    Maybe, two or three.
24  Q.    Okay.  And in those two to three cases, were

64

1   you retained on behalf of the plaintiff?
2   A.    Yes.
3   Q.    And, was the defendant the same in those two
4   to three cases?
5   A.    I don't know that.
6   Q.    Do you know the name of any of the
7   defendants -- or the name of the dryer manufacturer?
8   A.    In know one was either Whirlpool or Maytag.
9   And at that time, I don't recall if Whirlpool had
10  bought Maytag at that time.  So, I don't know if
11  they were the same company, or not.
12  Q.    Was that while you were with Robson?
13  A.    Yes.
14  Q.    Do you remember the year?
15  A.    I'm going to say that one was closer to,
16  like, 2005, 2006.
17  Q.    Do you recall what led to the lawsuit?  Was
18  there an injury, or a fire?
19  A.    I believe it was a fire.
20  Q.    What was your role in that case involving
21  either Whirlpool, or Maytag?  Do you recall?
22  A.    It, most likely, related to warnings,
23  adequacy in warnings.
24  Q.    Do you have a recollection, as you sit here,

65

1   what your role was?
2   A.    I'm making that assumption because I don't
3   have a -- I don't have -- I don't have a memory of
4   being retained to deal with a particular design
5   issue other than product warnings.
6   Q.    Okay.  And, is that a case you gave
7   testimony in?
8   A.    That did not go to trial.
9   Q.    How about a deposition?
10  A.    I'm thinking there was a deposition.
11  Q.    And, do you recall where the case was
12  venued?
13  A.    I do not.
14  Q.    Do you remember if it was federal, or state,
15  court?
16  A.    I do not.
17  Q.    Do you recall any of the opinions you gave
18  in the case?
19  A.    I do not.
20  Q.    Do you recall if you were critical of the
21  product manufacturer's warning?
22  A.    I don't recall what my opinions were in that
23  case, but I imagine if I was deposed, I probably had
24  opinions that were favorable to my client, which

17 (Pages 62 to 65)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

66

1  would be adverse to the defendant.
2          There may have been -- I don't know, but
3  there may have been two, or more, defendants because
4  there may have been a retailer installer.  So the
5  opinions may have been directed at them.  I just
6  don't recall.
7  Q.     Do you recall if whether the product, the
8  dryer in the case, does it have on-product warnings
9  in addition to warnings that were contained in paper
10  form?
11  A.     I don't recall, but I would imagine so.
12  Q.     So in the other -- I know you said two to
13  three cases where a dryer was involved -- you don't
14  recall the names of the dryer manufacturers in those
15  cases?
16  A.     No.
17          (Document marked Vigilante Exhibit
18          No. 5 for identification.)
19  BY MS. YEMMA:
20  Q.     I am going to hand you what's just been
21  marked as Vigilate-5.
22          Dr. Vigilante, I just handed you what's been
23  marked as Exhibit 5.  Do you recognize that
24  document?

67

1  A.     It appears to be a copy of my report for
2  this matter dated February 29th, 2016.
3  Q.     Okay.  We established earlier in your
4  deposition that you had a document that was dated
5  back in July of 2015 from Robson with regard to this
6  matter, and that was the earliest date that you have
7  for this case.  Is that correct?
8  A.     Yes.
9  Q.     While you were at Robson, did anyone assist
10  you with this file, that you are aware of?
11  A.     Not that I'm aware of.
12  Q.     And while you have been at your own company,
13  Vigilante Forensic, has anyone, other than yourself,
14  worked on the file?
15  A.     On my behalf?
16  Q.     On your behalf.  Like, have you hired
17  anyone --
18  A.     Not that I'm aware of.
19  Q.     -- to assist you?
20  A.     No, I have not.
21  Q.     Okay.  What were you retained to do in this
22  case?
23  A.     The purpose of my investigation was to
24  determine if the warnings provided with the dryer

68

1  were defective in a manner which caused the fire; if
2  Electrolux actions were unreasonable, and the cause
3  of the fire; and if the Vitales actions were
4  foreseeable to Electrolux.
5  Q.     And, were you just reading from, is that
6  Page 2 of your report?
7  A.     Yes, ma'am.
8  Q.     Okay.  Dr. Vigilante, does your report
9  contain all of the opinions that you intend to offer
10  in this case?
11  A.     As of the date I wrote my report, it did.
12  Q.     Okay.  And as you sit here today, realizing
13  this report was authored, and was issued, on
14  February 29th, 2016, do you have additional opinions
15  that you anticipate offering at trial?
16  A.     Yes.
17  Q.     Okay.  Could you tell me what those are?
18  A.     They are in response to the defense expert
19  reports.
20  Q.     Which defense expert, specifically?
21  A.     I don't know who I'll be asked to provide
22  rebuttal report to but, certainly, Mr. Purswell.
23  And then I had some comments on Mr. Bills' report,
24  as well.  But, I don't know if I will be asked to

69

1  provide that testimony, or not.
2  Q.     Okay.  So since we don't know what Counsel
3  will ask you at trial, I would like to explore at
4  least what your reactions, or rebuttal opinions, are
5  in regard to those reports.
6  A.     Sure.
7  Q.     So, let's start with Dr. Purswell.  You've
8  had an opportunity to review his report in
9  connection with this matter?
10  A.     Yes.
11  Q.     And, what opinions do you have in response
12  to what he's offered?
13          And if you need to look for something on
14  your computer, you can.
15  A.     Yes.  After reading Mr. Purswell's report,
16  my opinion is that he's wrong, that his opinions are
17  contrary to the state of the art of the science of
18  warning recommendations, guidelines, and standards,
19  and of human factors guidelines and recommendations.
20          My opinions are that the references he cited
21  related to warnings actually contradict his
22  opinions, and it's my opinion that many of the
23  things he stated in his report are factually
24  incorrect and/or misleading.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

70

1    Q.    Anything else?
2    A.    I think that's generally it.  I mean I have
3    specific comments.  I think he's got a list of 23 --
4    a list of 21 different items.
5    Q.    Are you talking about the number of
6    paragraphs in his --
7    A.    He's got 21 opinions.
8    Q.    Do you have a response to each one of those
9    opinions?
10   A.    Most of them, yes.
11   Q.    Okay.  I didn't bring a copy of Dr.
12   Purswell's report.  Do you have a copy accessible to
13   you?
14   A.    Yes.  I'm looking at it now.
15   Q.    Okay.  And if you need to refer -- you know
16   the rule, if you need to refer to anything, that's
17   fine, during course of the deposition.  Just let me
18   know that you are referring to it, if you don't
19   mind.
20   A.    Okay.
21   Q.    So let's go in reverse order.  You said with
22   regard to Dr. Purswell's opinions, you said that
23   they are factually incorrect, and/or misleading.
24   And, I'm paraphrasing.  Those were from my notes.

71

1    A.    Yes.
2    Q.    Okay.  Can you be more specific what you're
3    talking about, or what your opinions are?
4    A.    Sure.  I think it's probably easier just to
5    go through each of his opinions that I have comments
6    on.
7    Q.    Okay.  I was going to do that, too.  So,
8    let's start there.
9    A.    Okay.
10   Q.    If you would just tell me what number you
11   are referring to.
12   A.    Well, for example, on the first opinion, he
13   states that, and I'll quote, "However, he does not
14   explain why he believes his judgments -- his
15   judgment should be substituted for that of the ANSI
16   Committee which dressed the issues of which warnings
17   for gas dryers should appear first in the manual."
18         And what I found misleading about that is
19   that Electrolux designees testified that they used
20   both the UL standard, and ANSI standard, to
21   determine what information to provide, and that they
22   actually provide information that's not required by
23   either standard.
24         So it's really not my judgment; it's

72

1    Electrolux's judgment as to what they're putting on
2    the product, and how.
3    Q.    Anything else with regard to Opinion No. 1?
4    A.    No.
5    Q.    Okay.  Opinion 2?
6    A.    Opinion 2, Mr. Purswell, basically says I
7    ignore the fact that the homeowners could not recall
8    any on-product labels, and neither attempted to
9    acquire an owner's manual, or installation
10   instructions.
11         And I take issue with that because he never
12   explains why the Vitales should have, or would have,
13   attempted to acquire a manual.  And, he never
14   explains what the process would be for them to have
15   done so.  So, he made that opinion without providing
16   any analysis.
17         He also ignores the fact that the warning
18   that Electrolux provided on the product was not
19   conspicuous.  And, that gets into Opinion No. 3,
20   where he believes the warnings on the dryer are
21   quite -- quote/unquote "quite conspicuous".
22         And, of course, the warnings on the dryer
23   are black text on a white label on a white
24   appliance.  The door labels on the inside door

73

1    frame, that can't be seen unless the door is open.
2    And it's my understanding Electrolux puts it on the
3    right side of the door frame, which is the hinge
4    side of the door frame.  And, certainly, that would
5    make it even more difficult for a user to notice it.
6         The warning on the back was also printed in
7    white on black, or black on white, and would not be
8    seen unless the dryer is pulled out from the wall
9    because, of course, most of the time the user uses
10   it, it's going to be not pulled out from the wall.
11   And, I think Mrs. Vitale said she never pulled the
12   dryer from the wall; therefore, she would never have
13   the opportunity to see said warning.
14   Q.    Anything else with regard to 2 or 3?
15   A.    I think that covers it.
16   Q.    Okay.  How about Opinion 4?
17   A.    In Opinion 4, he makes the statement that
18   somehow or another -- he states that the
19   requirements of ANSI Z535.4 conflict with those
20   contained in ANSI Z21.5.1; therefore, the
21   requirements of ANSI Z535.4 would not apply.
22   However, there is absolutely no evidence, or
23   support, to suggest that ANSI Z535.4 conflicts with
24   ANSI Z521.5.1.  He's provided no evidence to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

**74**

1  substantiate that claim and, in fact, there is none.
2  Q.    Anything else with regard to 4?
3  A.    No.
4  Q.    Okay.
5  A.    Also -- yes, there is.  I'm sorry.
6       I believe Brian Ripley, who was responsible
7  for the design of the warning that went on the
8  dryer, testified that he could have provided any
9  format he wanted for it.
10      Number 5, he states that I attempt to impose
11 an obligation on Electrolux to ensure its consumers
12 comply with Electrolux's warnings for the gas dryer.
13 This attempt to impose the duty did not only provide
14 appropriate hazard warnings for its products, but to
15 also ensure that purchasers of its products
16 adequately comply that the warning is unrealistic
17 and impractical.
18      He made that entire assertion up.  Nowhere
19 in my report, or my testimony in this case, or other
20 cases, do I say that Electrolux has to ensure its
21 consumers comply with the warnings for the dryer.
22 Q.    Anything else with regard to 5?
23 A.    Well, my opinions are that they have to
24 provide adequate warning to motivate people to

---

**75**

1  comply.  And if they don't get people complying with
2  the warning, they need to figure out what's wrong,
3  and do something different so that people do comply.
4  Q.    Okay.  Number 6?
5  A.    Number 6, he says the warnings on the dryer,
6  and in the manual, comply with applicable standards.
7  He does not list what standards it complied with,
8  but it failed Z535.4, and it failed UL2158.  And
9  according to Mr. Ripley, they utilized UL2158 in a
10 design of both their electric and gas dryers.
11      And, maybe Mr. Purswell is not aware of that
12 testimony.
13 Q.    Anything else with regard to 6?
14 A.    He says at the end of the paragraph, the
15 maintenance interval to control the hazard
16 approximately 12 months is also stated in the
17 owner's manual, and the installation instructions.
18      And my point is, is that it doesn't do the
19 Vitales a lot of good because they were never given
20 the manual.
21      And, Carl King, as corporate designee,
22 testified that Electrolux was aware that many users
23 buy the product secondhand, and many of those users
24 do not get a manual with it.  And he was aware, and

---

**76**

1  the company was aware, that if a secondhand user
2  didn't get a manual, they would not be aware of the
3  necessity to clean the dryer.
4       And then unrelated to Electrolux's failure
5  to provide the warning on the product is J.P.
6  Purswell's use of the approximate sign in a sense.
7       And, we're going to discuss this a little
8  bit later, but approximately 12 months is not a very
9  good warning, particularly in light of the testimony
10 that a fire could occur, even if you planned on
11 cleaning it every 12 months, before the 12-month
12 period.
13 Q.    Okay.  So, anything more with regard to 6?
14 A.    No.
15 Q.    Okay.  So, Opinion No.  7.
16 A.    No. 7, he says that the information in the
17 manuals were each concise, and clearly written, and
18 that the Flesch Kinkaid reading level of 8.9 of the
19 owner's manual and installation instructions, and
20 the statements, and the on-product labels, had a
21 reading level of 10.  He stated the language and
22 grammar used in instructions and warnings were
23 written to be understood by persons without a high
24 school diploma.

---

**77**

1       Here, again, Purswell is misstating facts,
2  and he's inconsistent with the guidelines for the
3  design of warnings for product safety information,
4  which states that is you're going to use a reading
5  level assessment, like Flesch Kinkaid, that you want
6  to make sure the text is at a fourth to sixth grade
7  reading level, not a ninth or tenth grade reading
8  level.
9       And it should also be noted that the
10 military uses a sixth grade reading level for the
11 instruction of their manuals.
12 Q.    Dr. Vigilante, what is the basis for your
13 opinion that it should be between a fourth and a
14 sixth grade level?
15 A.    They're the two references that I provided
16 in tab number 8.
17 Q.    That's the Handbook of Human Factors and
18 Ergonomics?
19 A.    That's one.
20 Q.    And, then Manufacturer's Guide Developing
21 Consumer Products Instructions?
22 A.    That's two.  They're others.  They were the
23 two I brought specifically.
24 Q.    Okay.  Any other comments with regard to

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

78

1  Opinion 7?
2  A.     The other the comment is that the gentleman
3  who wrote the first article -- you have to turn to
4  page 3, that's the book chapter.
5  Q.     Page 3 of the book chapter?
6  A.     Title page is Chapter. Laugherty and
7  Wogalter are two of the editors of one of the books
8  he sites as his reference. Handbook of Warnings was
9  edited by Michael Wogalter. So the guy who edited
10 the book he's referencing states in his book chapter
11 that the appropriate reading level is on the fourth
12 to sixth-grade level. I just wanted to point that
13 out.
14 Q.     Did you work with Mr. Wogalter at North
15 Carolina State?
16 A.     Yes.
17 Q.     How did you work together? Were you in same
18 group, or --
19 A.     He was my major advisor.
20 Q.     Was that during when you got your Master's
21 or Ph.D., or both?
22 A.     Both.
23 Q.     Anything else with regard to Opinion 7 that
24 we haven't already discussed?

79

1  A.     I think that's generally it.
2  Q.     Okay. How about Opinion 8?
3  A.     In 8, he states that the warnings safety
4  related precautions were placed near -- and I stress
5  the word near -- beginning of the documents, and
6  were adequate to instruct persons installing and
7  maintaining the dryer.
8         And, I have a couple comments about that.
9  The first is, is that according to Carl King, the
10 lint fire hazards associated with lint buildup, lack
11 of maintenance, and blockage of the vent, is the
12 greatest, most likely hazard associated with the
13 product. But, yet, the information related to it
14 are not placed at the beginning of the document.
15 They're placed "near" the beginning.
16        And as I explain in my report, the
17 information is buried in the manual.
18        The second comment I want to make is he
19 provides no analysis for his opinion.
20        And then, third, he fails to recognize that
21 Electrolux's own employees did not understand the
22 warning.
23        So, we have Shelley Claussen, David Fuller,
24 and Steve Joerger, not understanding and recognizing

80

1  the hazard, or the need to have a dryer taken apart,
2  and cleaned, to avoid the hazard.
3         Third, he fails to note that Electrolux
4  allows the subject install, that is the dryer to be
5  installed with flexible foil venting.
6         Fourth, he fails to recognize the irony, I
7  guess, that the incident GE dryer was installed with
8  GE branded, and UL approved, venting.
9         So, he does not address that in his report,
10 or his opinions. And, I find it inconceivable that
11 he doesn't even bother to address that fact.
12 Q.     Anything else with regard to 8?
13 A.     I think that generally covers it.
14 Q.     Opinion 9?
15 A.     No. 9, he says that he has reviewed a video
16 depicting the partial disassembly and cleaning of
17 the dryer prepared by Carl King. He says the
18 process is pretty forward, and can be performed by a
19 competent appliance repair person, and that there's
20 no special procedure required for cleaning lint in
21 the dryer cabinet.
22        And it should also be noted the lint
23 cleaning process does not require the complete
24 disassembly of the dryer.

81

1  So, a couple points: Number one is that I
2  don't believe that the disassembly process would be
3  difficult for a trained appliance repair person who
4  knows what they're doing. The problem, of course,
5  is he fails to recognize that Electrolux doesn't
6  tell the trained authorized servicer what to do in
7  the cleaning, or that the drum needs to be removed
8  during the cleaning. It's not an issue of them
9  being able to do it; it's a question that they don't
10 know it because Electrolux didn't bother to tell
11 them.
12        The second point is that yes, there is
13 special procedure required for cleaning lint from
14 the dryer cabinet. And, it includes removing the
15 drum.
16        As I note in my call to many different lint
17 service providers, the lint cleaning providers, they
18 think that running a vacuum down the lint trap is
19 sufficient to clean it. So, obviously, there is a
20 specific special procedure for cleaning the dryer
21 cabinet.
22        Third, they said it does not require
23 disassembly of the dryer. And, again, this is
24 misleading in the fact that I'm not sure what he

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

82

1  would consider complete disassembly of the dryer if
2  he doesn't consider removing the drum from the dryer
3  as complete disassembly of the dryer.  So, I would
4  consider having -- or the need to remove the drum as
5  being a complete disassembly of the dryer.
6  Q.     Have you reviewed the video of Carl's
7  disassembly of the dryer, the one that he's
8  referring to?
9  A.     I have not.  I don't know that I have ever
10 been provided with that.
11              MS. YEMMA:  Off the record.
12              (Discussion held off the record.)
13              MS. YEMMA:  Back on.
14 BY MS. YEMMA:
15 Q.     Okay.  Anything else with regard to 9?
16 A.     No, but I do have a comment on No. 8 I
17 forgot.
18 Q.     That's okay.
19 A.     On conclusion 8, he cites footnotes 2, 3, 4
20 and 5, which are books related to warnings.
21     The first two are selections from Human
22 Factors and Ergonomics Society Meetings.  So those
23 two volumes consist of many different and separate
24 papers.  But, he doesn't say which of the particular

83

1  papers, and/or chapters applies.  So he's just kind
2  of giving a general book, and not telling us what in
3  it is applicable.
4      The fourth and fifth footnote, I note are
5  published in 2005 and 2006 after the manufacture
6  date of the dryer, and therefore didn't apply to the
7  design and manufacture of the incident dryer.  So
8  I'm not sure why he is using them.
9      And then I note that two papers that I cited
10 in my report, that conflict directly with his
11 opinions, are in the first two -- one of the first
12 two footnotes, footnotes 2 or 3.  I just wanted to
13 point that out.
14 Q.     Okay.  So, can you say that again.  I'm
15 sorry.  So, footnote 2 and 3 --
16 A.     Footnotes 2 and 3 are a compilation of
17 warnings proceedings papers, proceedings papers that
18 deal with warnings and safety.  And, two of the
19 papers that I cite in my report that conflict those
20 opinions are in those two volumes.
21 Q.     In what reference are you referring to?
22     And, you can refer to it by number, if
23 that's easier.
24 A.     No problem.  No. 18, and I believe that's in

84

1  Volume 1.
2  Q.     Okay.
3  A.     And then 22, and I believe that's in Volume
4  2.
5  Q.     And just so we're clear, for the record, you
6  are referring to the references on Page 40 of your
7  report?
8  A.     Section G, pages 40 and 41 of my report.
9  Q.     All right.  Did you have anything additional
10 with regard to 8?
11 A.     Well, no.
12     The other thing I wanted to point out is
13 that from the Handbook of Warnings, which is
14 footnote number 5, Chapters 1, 7, 8, 9 and 10
15 provide information that's contrary to his opinions.
16 Q.     How so?
17 A.     Well, if we go into Chapter 1, which is
18 Scope by Michael Wogalter, he talks about the
19 Requirements of Warnings, The Guidelines for Product
20 Warning Design, and they include important critical
21 safety information on the product.  It needs to be
22 explicit and specific, and the person must be able
23 to avoid the hazard when they comply with the
24 warning.

85

1      And, these things are all not met by the
2  warnings Electrolux provides.
3      Chapter 7 is the book chapter I wrote with
4  Mike Wogalter, and in there I provide information
5  and research related to what makes a warning
6  conspicuous.
7      And I can assure you that had the product
8  been manufactured 2006 or '07, I would have cited my
9  own chapter as to why this manual's warning
10 information on the product in the manual is not
11 conspicuous.
12     Chapter 8 deals with comprehension, and I
13 don't recall who the author of that is offhand.  But
14 that chapter, again, gives information on the
15 necessity to providing explicit and specific
16 information, and it also provides information that
17 states that the text should be at the sixth grade
18 level, not the eighth, ninth, or tenth grade level.
19 So, again, inconsistent with his opinions.
20     Chapter 9, I believe is Attitudes and
21 Beliefs.  And this gets into, again, the effect of
22 familiarity and experience on people's likelihood to
23 look for and read product warnings, and circles back
24 to the importance of ensuring that adequate,

**22 (Pages 82 to 85)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

86

1  conspicuous, and properly located warnings are
2  provided to overcome those hurdles.
3      Chapter 10, I believe, is Motivation. And
4  amongst the different topics of Motivation is Cost
5  of Compliance, which Purswell does not address, and
6  Electrolux does not address. And that one of the
7  things I wanted to show by calling different
8  appliance shops, and dryer vent services, is to get
9  a cost. So, these dryers cost anywhere from 400
10  bucks to $800 depending upon -- and, that's the
11  majority of them -- there are some higher and lower.
12  But these things, to get them cleaned every 12
13  months, is going to cost the user up to $300 a year.
14  That's a huge bar to cost of compliance, and it's a
15  reason why you want to fix it from a design
16  standpoint rather than, you know, using warnings.
17      So, again, it's obviously information that
18  Purswell is not taking into account that's directly
19  applicable to our warnings, and our case.
20  Q.    Okay.
21  A.    And, that's just what I remember offhand.
22  Q.    Okay. So, you were responding to both
23  Opinions 8 and 9?
24  A.    Well, Opinion No. 8 provides the footnotes

87

1  to those four references.
2  Q.    Anything else with regard to the footnotes
3  associated with Opinion 8?
4  A.    I think that's generally it.
5  Q.    Okay. How about Opinion 10?
6  A.    Sure. Opinion 10, I note that I question
7  whether or not the testimony of the homeowners mean
8  anything to him. So he said I don't cite any peer
9  review literature that my proposed adequate warning
10  system would eventually cause them to take actions
11  which would have prevented the fire.
12      Ursy Vitale testified that had a warning,
13  consistent with what I offer, and on the dryer, she
14  would have heeded it.
15      Second, the literature in the standards of
16  sight are based upon research that shows these are
17  the factors that ensure, or make, a product
18  effective in getting people to comply with the
19  warning.
20      And, then he takes exception to the way I
21  had my finding worded. And my opinion is that had
22  Electrolux provided adequate information, they would
23  have (a), provided Joseph and Ursy Vitale with
24  informed content, which is an important concept in

88

1  the world of warnings, that he seems to ignore.
2      And, three, my opinion is that they would
3  have avoided the fire. I don't know what else he
4  wants me to say. So, I just kind of question what
5  he is trying to get to, and what he's trying to --
6  why he is not understanding the opinion.
7      So, I think that's generally it.
8          MR. HUGHES: Do you want to take a
9      break right there, and we can look at the
10      menu and order lunch?
11          MS. YEMMA: Sure.
12          (Brief recess.)
13          MS. YEMMA: Okay. We're back on
14      the record.
15  BY MS. YEMMA:
16  Q.    Before we took a short break, we were just
17  about to turn to Opinion 11 from Dr. Purswell.
18      So, do you have any rebuttal to his Opinion
19  No. 11?
20  A.    Yes. I have to make a clarification on when
21  we were talking about the footnotes 2, 3, 4, 5, I
22  was referencing Chapters 1, 7, 8, 9 and 10. I was
23  actually thinking about the textbook Warnings and
24  Risk Communication published in 1999, which was the

89

1  precursor to the Handbook of Warnings published in
2  2006. So, the same topics are covered in those
3  chapters. I had the wrong book.
4      So I just wanted to make that clear.
5  Q.    Okay. So it wasn't the Handbook of
6  Warnings?
7  A.    The Handbook of Warnings would have been a
8  different chapter. So, Chapter 1 was Scope. And
9  Handbook of Warnings, Chapter 1, in Warnings and
10  Risk Communication Handbook is called Introduction.
11      Chapter 7 in the Warnings and Risk
12  Communication with Attention Switch and Maintenance
13  by Wogalter and Leonard, Chapter 18 in Handbook of
14  Warnings is my Attention Switch and Maintenance.
15      And then Chapter 8 is Comprehension and
16  Understanding in the Warnings and Risk Communication
17  book, not the Handbook of Warnings. That is, I
18  think, Chapter 19, but I'm not sure, offhand.
19      The other two chapters are also covered in
20  the Handbook of Warnings, but they're different
21  chapter numbers. They would be later, later
22  chapters. It was after Chapter 11.
23  Q.    Okay. Thanks for clarifying.
24  A.    Sorry about that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

90

1  Q.    No, that's okay.  If you need to go back,
2  and clarify any earlier testimony, please do so.
3  Okay?
4  A.    Okay.
5  Q.    All right.  So turning to Opinion 11, any
6  rebuttal to that opinion?
7  A.    Yes.  He's criticizing Mr. Stoddard for the
8  use of the cycle counter because he said that dryer
9  lint accumulation may vary by types of clothing
10  dried, as well as by venting between dryer drum and
11  the place where the dryer is exhausted outside.
12  And, he says Mr. Stoddard does not clarify how he
13  would handle these variations.
14       So his assertion is that if you use the
15  cycle counter, it may not be effective, and it may
16  be unreliable because a fire could occur before the
17  cycle counter gets to the end where it stops, and
18  shuts the dryer off.
19       And, probably, Mr. Purswell does not
20  understand that Mr. Stoddard's proposed cycle
21  counter was based upon Electrolux's determination of
22  when the cleaning should be done on average.  And
23  that that is a problem, again, with a design of the
24  dryer in that had a person read, understood, and

91

1  intended to comply with the 12-month cleaning
2  recommendation Electrolux provides, they may still
3  have a fire because of things that Mr. Purswell
4  cites in his report, amongst other things.
5       That's the problem, or a problem, with the
6  warnings, is that the 12 months in this case, 18
7  months in the other Electrolux manuals, you can
8  intend to follow it, and still have a fire.  That's
9  why it's not adequate.
10       So I think it's just kind of -- I don't know
11  what the right word is.  It's just crazy that he
12  would fault Mr. Stoddard for the same problem that
13  Electrolux has with their warning.
14  Opinion 12, Mr. Purswell cites the consumer
15  reports evaluation of airflow monitors and dryers,
16  and uses this to suggest that Mr. Stoddard's design
17  change would not be effective.
18       And, I just don't know where -- (a) I didn't
19  realize that Mr. Purswell was an expert in airflow
20  monitors, or even in product engineering, or
21  electrical engineering, mechanical engineering, to
22  have an opinion on this topic.
23       Two, Mr. Purswell fails to recognize that
24  other manufacturers have used, and implemented

92

1  airflow monitors, and that Electrolux uses an
2  airflow monitor on some of their higher-end dryers.
3       So, I don't know if this is self-imposed
4  ignorance, or it's just ignorance totally on his
5  part.
6       No. 13, my general comment is that he's
7  moving the onus to providing adequate warning to the
8  user, the dryer users, on Allstate, and blaming
9  Allstate for failing to provide adequate information
10  to their insureds.
11       This is absurd.  Electrolux had no right,
12  whatsoever, to rely upon Allstate, or any insurance
13  company, to ensure adequate warning is provided to
14  the users of their product.
15       No. 14, he states that there is no study to
16  differentiate amongst dryer buyers, and nothing
17  support my statement, or citation, that the CPSC
18  staff claims they believe the survey respondents are
19  more safety conscious than the population as a
20  whole, and therefore the claim is unverifiable, and
21  unverifiable -- I'm not sure why he puts that twice.
22  But that's, again, ridiculous.
23       It's the CPSC's statements that I cited.
24  So, he's taking umbrage, I guess, or taking offense

93

1  the CPSC, the folks that did the studies on claim.
2       Number two, if he looked at it honestly, the
3  way they got their data was by people going to the
4  Consumer Product Safety Commission website, which is
5  a website dedicated to consumer product safety,
6  which would mean that these people are interested in
7  consumer product safety, and therefore more likely
8  be more safety conscious than the general
9  population.
10       But what really kills me is that it doesn't
11  make a difference because the people in the study,
12  their behavior was contrary to the recommendations
13  of Electrolux anyway, and were consistent with the
14  Vitales' behavior, and with the behavior of most of
15  the fire investigations that Carl King has
16  investigated, that is, they're not cleaning the
17  interior of their dryers, and they're using flexible
18  foil venting.  So, what difference does it make
19  whether they're more safety conscious, or not.  The
20  fact of the matter is that the majority of users are
21  doing the same thing the Vitales did, and they're
22  doing it because Electrolux is failing to provide
23  adequate warning.
24  Q.    Anything else on 14?

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

94

1  A.      That covers it.
2  Q.      Okay.  Opinion 15, any rebuttal to that?
3  A.      Yes.  It's a misstatement of my opinion.
4  He's inferring that somehow or another, I'm stating
5  that all maintenance instructions require safe
6  operation of the product be directly on the product.
7         And I never stated that, and never opined.
8  So I don't know why he's giving a misstatement
9  opinion.
10        But, certainly, it is my opinion, that they
11  should have had a warning on the product that says
12  it needed to be cleaned every 12 months.
13        No. 16 says that the UL215 standard
14  applicable to gas dryers specified in the
15  information about the need for periodic cleaning of
16  the appliance by a qualified technician be contained
17  in the instruction manual.  It does not indicate it
18  be included in the on-product label.
19        And, my only rebuttal to that is to see
20  section 7.1.113, which is contrary to his statement
21  and opinion.
22  Q.      Anything else with regard to 16?
23  A.      I think that covers it.
24  Q.      17, any rebuttal?

95

1  A.      He's stating that the warning literature is
2  clear, that the recall of any particular on-product
3  warning decreases but the number of warnings
4  increases, as well as the length of each individual
5  warning.  Thus, Electrolux's decision to refer users
6  of its dryer to the owner's manual and installation
7  instructions rather than include the information and
8  on-product label for some of its maintenance
9  procedures was reasonable and appropriate.
10        At this point, I am really banging my head
11  at the table reading his report.  Number one, the
12  safety literature, the human factors literature, and
13  the warnings literature, says that you want to
14  design out the hazard, and provide safeguards, and
15  not rely upon warnings.
16        So if you have an excessive number of
17  warnings that need to be on the product, it's a sign
18  of a defective design.  So if they had fixed their
19  design, provided adequate safeguarding, there
20  wouldn't be a need for the warning.
21        Number two, he's right.  The more
22  information you provide, the less likelihood someone
23  is going to be able to remember it all.  People are
24  stuck with memory limitations.  It's a consequence

96

1  of being human.  Human memory is limited.  That's
2  why the warning needs to be on the product in and of
3  itself, conspicuous on the top, or in front, of the
4  product.  Because if a user reads the manual for the
5  dryer, there's no chance in the world they're going
6  to memorize 10 pages of instructions and warnings.
7  I don't understand how he doesn't recognize what
8  he's saying.  He recognizes the inability of people
9  to remember lots of information, but then is saying
10  that the greatest number one hazard associated with
11  the protect is okay putting in the manual that
12  people can't read and remember, as opposed to being
13  on the product by itself, or is conspicuous,
14  explicit, and specific.
15        In his own opinion, he's conflicting
16  himself.
17  Q.      Anything else on 17?
18  A.      The other thing I note is that, again, the
19  warnings in the manual for the greatest most likely
20  hazard should have been conspicuous, therefore it
21  attracts people's attention.  And, the way
22  Electrolux buried this information is not
23  conspicuous.
24        So, again, if you're worried about people's

97

1  ability to remember and recall all of the
2  information they're reading in this multipage
3  manual, you'd think they would want to make sure
4  that the most important critical information for the
5  greatest number one hazard is conspicuously
6  presented, is the most prominently presented
7  information in the manual, which it is not.
8         I think that covers it for 17.
9  Q.      Any rebuttal to 18?
10  A.      Yes.  He's trying to state that the warning
11  meets the ANSI Z535.4 standard, and it doesn't, both
12  on the product, and the manual.  ANSI Z535.4
13  requires color safety orange to make the warning
14  information conspicuous, to highlight it from the
15  other information to draw attention to it.
16        The warning on the product is white.  It's a
17  white label with black text on a white appliance.
18  That's not conspicuous.
19        ANSI Z535.4 says the information should be
20  placed -- should be visible where and when the
21  information is needed.
22        Again, that means on the product.  For the
23  install of the vent, it means on the back of the
24  product near the vent.  For the maintenance, it

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

98

1  means on the top, or in front of the product, not in
2  the manual.  In the manual, it's not visible where
3  and when the information is needed.  So, it's
4  contrary to the standard.
5       And number 3, the standard says you need to
6  specify the hazard.  And, there's nothing on the
7  product that specifies the hazard.  There's nothing
8  in the manual.
9       Related to the cleaning, that specifies if
10  you don't clean it, lint will build up behind and
11  near the heat source, and cause a fire.  Nor does
12  the manual tell you that the greatest, most likely
13  cause of a fire is related to lint buildup, and not
14  cleaning.
15       So, example on Page 8 of the manual, it
16  states to have a qualified technician vacuum the
17  lint from the dryer once a year.
18       And then two, the exhaust duct, inspect and
19  clean the exhaust ducting at least once a year to
20  prevent clogging.  If partially clogged, exhaust can
21  lengthen the drying time.  The hazard of fire is not
22  identified anywhere in that section.
23       Number two, it's not true that a qualified
24  technician vacuums the lint from the dryer once a

99

1  year.  It should say that the qualified technician
2  to take the dryer apart, remove the drum, and remove
3  lint from behind the drum near the heat source where
4  it can build up, and cause a fire once a year.  That
5  would be explicit and specific consistent with ANSI
6  Z535.4.
7       On Page 4 -- I think this is the only other
8  location they provide with respect to cleaning the
9  interior of the dryer.  Again, it is not specific to
10  the hazard that lint's going to build up near the
11  heat source, cause a fire.  It's not explicit in
12  what needs to be done, the fact that the dryer needs
13  to be open, and the drum removed, and the lint
14  removed from around the heat source, and behind the
15  dryer.  Again, inconsistent with ANSI Z535.4.
16       And, I go through how and why it doesn't
17  meet the standard in my report.
18  Q.   We'll get to that later in the deposition.
19  A.   Sure.
20  Q.   Okay.  Any other rebuttal to Opinion 18?
21  A.   I think that does it, for the most part.
22  Q.   Okay.  And Opinion No. 19, any rebuttal?
23  A.   Contrary -- he says contrary to the
24  suggestion of myself, there's no evidence to

100

1  precautions stated that GE's owner's manual and
2  installation instructions to have the interior of
3  the dryer cleaned by a qualified service personnel
4  every 12 months is not adequate to prevent
5  accumulation of lint in sufficient quantity within
6  the dryer cabinet to cause a fire.
7       Brian Ripley testified that following the
8  warning may not prevent a fire.  So, apparently,
9  Mr. Purswell is not aware of Mr. Ripley's testimony.
10  And in my report, I rely directly on Mr. Ripley's
11  testimony.
12  Q.   Anything else on 19?
13  A.   That covers it.
14  Q.   Okay.  And how about Opinion No. 20, any
15  rebuttal to that?
16  A.   Yes.  So he says that he disagrees that
17  Electrolux should define a qualified service
18  personnel on the label, or in the user's guide.
19       Again, Mr. Purswell, who is ignoring the
20  testimony of Electrolux's own people, who feel that
21  they were qualified to clean their own dryers, even
22  though they didn't possess the knowledge, skills,
23  and questionable abilities to do it.
24  Q.   Anything else on 20?

101

1  A.   I think that's it.
2  Q.   Okay.  And I think 21, that's last opinion?
3  A.   21 is the last opinion.  In this, he
4  questions Mr. Stoddard's engineering, and I just
5  question his expertise and ability to discuss dryer
6  design, and the reliability of cycle counters and
7  airflow monitors.
8       And I also question his competency in human
9  factors in warnings because his opinions are
10  contrary to the science.  They're contrary to the
11  citations he cited.  They're contrary to the basic
12  safety hierarchy.  They're contrary to basic human
13  factors principles with regard to indicator lights.
14  And, he disregards the basic research regarding
15  on-product warnings, manual explicitness,
16  motivation, familiarity, and all the other topics
17  that are related.
18  Q.   Okay.  Earlier you stated that you also had
19  rebuttal opinions to --
20  A.   I wasn't done.
21  Q.   Oh, I'm sorry.  I thought you paused.
22  A.   Those are opinions.  He gives -- in the
23  second half of his report, he gives a description of
24  the owner's manual, and I make a couple notes in

26 (Pages 98 to 101)

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

102

1  that.
2       In the first paragraph, it says the first
3  page of the manual -- or, excuse me, the second page
4  of the manual contains the warnings mandated by ANSI
5  Z21.5, and that's a half truth.  The top part of it
6  has the gas warning, but the second part of it has
7  the California Safe Drinking Water Act Requirement.
8  That's not required by ANSI Z21.5.  So his statement
9  is simply not true.
10      And the third thing I want to point out is
11  that the information from the ANSI warning, and the
12  California warning, only take up about half a page.
13  There's a whole half the page that's blank that
14  could have been utilized to put the warning
15  regarding the greatest, most likely, fire hazard
16  associated with their product.
17  Q.     Anything else in rebuttal to Dr. Purswell's
18  report, that we haven't discussed?
19  A.     Yes.  The last half of that paragraph --
20  Q.     Can you tell me what page you're on?
21  A.     I'm sorry, it's page 7 of his report.
22  Q.     Okay, thanks.
23  A.     The first paragraph under Owner's Manual and
24  Installation Instructions, he notes that on Page 3,

103

1  that Electrolux says don't use plastic or the
2  combustible ductwork.  But, they don't address the
3  flexible foil on page 3.  It's not until later in
4  the manual that they even mention flexible foil
5  venting, even though it's commonly used.  It's used
6  by most -- over 50 percent of the dryer users,
7  according to Electrolux literature, I think.  And,
8  Carl King testified that it's very common in the
9  fires he investigates.  It's not even listed on page
10  three under the warning regarding proper
11  installations.
12      And, he ignores the fact that Electrolux
13  sold flexible foil venting at the time this dryer
14  was manufactured, and sold.  And, he completely
15  ignores the fact that the flexible foil venting,
16  that was on this dryer, was GE branded, and UL
17  approved.
18      So, two more the paragraphs down he finally
19  references page 8.  So now we get into page 8 of the
20  manual for the critical safety information that
21  people don't know about, or is the most likely
22  hazard, and greatest hazard.
23      And as I noted above in his opinions that
24  information on page 8 of the manual related to

104

1  cleaning, it's not formatted like a warning.
2  There's no indication that fire is a consequence of
3  not doing it.  There's no signal word to alert
4  people that it's safety related.  There's no
5  bolding.  There's not even any underlining on the
6  information related to having the lint vacuumed from
7  the dryer once a year.
8       On the next page, he points out the
9  information later in the manual.  Now, we've got to
10  go farther into the manual to get information on the
11  prohibition of using flexible foil, page 12 in the
12  manual, for the greatest safety hazard associated
13  with this dryer.
14      And, he points out that a bunch of the
15  information on the page says to use rigid, or
16  flexible, metal duct.  But he fails to note that
17  under exhaust system requirements, Electrolux
18  doesn't define what a flexible metal duct is.  So,
19  I'm pretty sure the last time I checked, aluminum is
20  considered a metal, and it's flexible foil because
21  it is flexible.  So, do people confuse flexible
22  metal to mean flexible foil.
23      And then, of course, at the bottom of that
24  page, Electrolux says it's okay to use flexible foil

105

1  as long as it's UL certified, and it's cut to
2  length, and it's not crushed, or collapsed, and not
3  to be used in the wall.
4       So when we look at the flexible foil used in
5  the Vitale install, it was cut.  It may not have
6  been the shortest possible length, but it was cut
7  from an overall length.
8       It was stretched out.  It was not crushed or
9  collapsed prior to the fire, that anyone is aware
10  of.  It was used as transition duct.  There was a
11  rigid piece of tubing in the wall.  There's no
12  evidence that there was resting on any sharp
13  objects.  It was UL certified, or UL approved.  It
14  was, in fact, GE branded.  And, there's no
15  information to indicate that it did not conform to
16  local building codes.  It ran up, and directly out
17  of the building.  So, it wasn't a convoluted run.
18      So according to the manual, and what we find
19  in the installation of the flexible foil duct, it
20  met the manual requirements.
21      And the other thing I note is that Purswell
22  doesn't recognize anywhere in his report that
23  Mr. Vitale took the vent off once a year, and
24  cleaned it, consistent with the manual.  Yet, there

**27 (Pages 102 to 105)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

106

1    was still a fire.
2         So, it's installed consistent with the
3    manual.  Its vent was cleaned consistent with the
4    manual.  And, yet, there's still a fire because
5    they're not aware that lint could build up near the
6    heat source behind the dryer drum, or under the
7    dryer drum, and cause a fire.
8    Q.    Can I ask you question about what you had
9    just testified to?
10   A.    Sure.
11   Q.    So, with regard to you made a comment that
12   the vent is consistent with the manual?
13   A.    Yes.
14   Q.    Okay.  So, what forms your basis for that
15   opinion?  Have you examined the venting for the
16   Vitale dryer?
17   A.    I have not examined it other than the
18   photographs, and the descriptions provided by the
19   other experts.
20   Q.    Okay.  So anything else, as part of your
21   review in this that supports the basis for that
22   opinion?
23   A.    Well, my understanding is that Mr. Vitale
24   unhooked it, and checked it each year.  There's no

107

1    testimony that it was bent, or crinkled, or stepped
2    on, prior.  There was no evidence that it was
3    sitting on a sharp object.  According to the
4    measurements, it's not the original length when you
5    buy these.  They're sold in eight-foot lengths, and
6    it's listed as slightly greater than four feet, I
7    think.
8         It was used as transition duct.  It wasn't
9    used in the wall.  There was a rigid metal piece in
10   the wall.  There's no testimony that it violated any
11   of the local building codes.
12   Q.    Anything else?
13   A.    I think that's all.
14   Q.    Okay.  Do you want to stop now and eat, or
15   do you want to finish going through Purswell's
16   report?
17   A.    Yes.  There's just a few more.
18   Q.    Okay.  Let's keep going, and then that will
19   be a good place to stop.
20   A.    The next section is on the on-product label
21   and instructions.  They're saying there are three
22   on-product labels.
23   Q.    Can you just give me a page number for
24   Purswell's report?

108

1    A.    Bottom of page 10, and going to page 11.
2    Q.    Got it.  Thanks.
3    A.    And, I just note that not all the
4    information on the label is required by UL or ANSI.
5    Brian Ripley testified to that.  I go through the
6    label that's on there.  In the first part, it says
7    to avoid fire hazard, personal injury, fire damage,
8    including spontaneous combustion.  And, then there's
9    a list of steps:  One is clean lint screen before
10   and after each load.  And, I note that Mrs. Vitale
11   said she did that.  Dry only fabrics which have been
12   washed with water.  I haven't seen any testimony
13   that that was violated.  He says next, the label
14   says a clothes dryer produces combustible lint, and
15   should be exhausted outdoors, which this dryer was.
16   And then he quotes care should be taken to prevent
17   the accumulation of lint around the exhaust opening,
18   and surrounding area.
19        And, I note the Vitales' testimony is
20   consistent with this, too.  They pulled the dryer
21   out once a year, remove the duct, cleaned the duct,
22   cleaned and replaced the outside hood.  Mrs. Vitale
23   said she dusted, and used the Dustbuster for lint to
24   dust around on the dryer.  So, apparently, it's

109

1    consistent with the label.
2         At the bottom of the label, Purswell notes
3    that if you have a question about your appliance,
4    you can contact GE Appliances.
5         And, I note that the Vitales didn't have a
6    question regarding the dryer.  They testified they
7    weren't having any problems with the dryer.  So, why
8    would they call GE if they didn't have questions.
9         He notes that Microsoft Word reports a
10   readability grade of 7-1/2 for these statements.
11   And, I note again that the guideline for Product
12   Safety Information and Warning is the sixth-grade
13   level for the general public.
14        Next, he talks about the temporary
15   checklist, and I just want to note that the
16   temporary checklist -- and temporary being the
17   important part -- did absolutely no good for the
18   Vitales because they moved into the house several
19   years after it was installed, and that checklist was
20   long gone.
21        I also note that Purswell ignores the
22   testimony of Carl King as to why they put the
23   checklist on the top front of the dryer, and that is
24   to be, in quote, "in your face" to make sure the

**28 (Pages 106 to 109)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

110

1   user sees it as opposed to putting a warning on the
2   back of the dryer, or the dryer door frame on the
3   hinge side of the dryer.
4        He talks more about the dryer checklist.  It
5   says three factors cause dryers to take too long:
6   Long duct run, too many elbows, clogged duct pipe,
7   or vent hood.  And, I note that all three of these
8   were not applicable to the Vitale dryer.
9        He also notes that the checklist says the
10  manufacturer recommends using rigid, or flexible
11  metal vent systems.  And, I note that key word is
12  "recommends".  As Shelley Claussen testified,
13  "recommends" is not a requirement.  It is a
14  recommendation.  You can do it; you may not have to
15  do it, but it's certainly not a requirement.
16       And, again, I note that he fails to
17  acknowledge that both GE and Electrolux marketed,
18  and sold, flexible foil venting at and around the
19  time this dryer was manufactured, and sold.
20       And, finally, I note that I have not seen
21  any method, or analysis, other than his personal
22  opinion, unsupported by any specific scientific
23  literature, and the general literature that he did
24  cite, do not support his opinions.

111

1        And, that's my last comment.
2   Q.    Anything else with regard to Dr. Purswell's
3   report, that you haven't already testified to in
4   rebuttal?
5   A.    I think that pretty much covers it.
6        MS. YEMMA:  Off the record.
7        (Discussion held off the record.)
8        (Lunch brake)
9   BY MS. YEMMA:
10  Q.    Dr. Vigilante, we took a break for lunch,
11  and now we are back on the record.  And I think
12  where we stopped is we had just gone through Dr.
13  Purswell's opinions; you gave me your rebuttal to
14  that.  And, we were finished with that.  Right?
15  A.    Yes, I believe so.
16  Q.    All right.  So turning to Randy Bills, who
17  is our engineering expert in this case.  Did you
18  have an opportunity to review his report, and
19  opinions?
20  A.    Yes.
21  Q.    Do you, at trial, anticipate offering any
22  rebuttal to anything he offered in his report?
23  A.    That's a good question.  I don't really
24  anticipate it but, of course, that's for Mr. Hughes

112

1   to decide.
2   Q.    Of course.
3   A.    I would think that his report is more --
4   questions regarding his report are probably better
5   directed to Mike Stoddard, or John Fry.  I just
6   denoted some issues going through it myself that
7   were incorrect in his statements, so I just marked
8   them on the report.
9   Q.    Okay.  If you would, can you go through
10  those with me so in the event you are asked
11  questions about Mr. Bills' report at trial, I would
12  like to know what you say?
13  A.    Sure.  Well, the first has to do with the
14  fact that he is saying that the install -- let me --
15  Q.    And, if you're looking at a particular page,
16  if you could just tell me what page.
17  A.    Will do.  On page 6 under Review of File
18  Materials, it says the use of foil venting as the
19  transition duct was in direct violation of the
20  installation instructions.
21       And, he notes this a few times in the
22  report.  And, I note that that's not true.  The
23  installation instructions allow the use of flexible
24  foil venting.

113

1        And much like Mr. Purswell, he doesn't
2   address the fact that Electrolux, and GE, both
3   marketed and sold flexible foil venting at about the
4   same time this dryer was manufactured, and sold.
5        The other thing I noted -- again, this is
6   something I think is strictly Mike Stoddard's
7   area -- but he notes on page 27 that the that high
8   thermal limit switch was cycling, and he notes that
9   the limit switch cycles due to excess of high
10  temperatures in the dryer.  And he says that
11  excessive high temperatures in the dryer result of
12  reduced airflow to the unit.
13       So, from a fire safety standpoint, and a
14  applied desire standpoint, you have a safety device
15  in the dryer that's going off because of excessive
16  heat in the dryer due to reduced airflow.  Why
17  didn't they tie that in so to shut the dryer down, or
18  provide an indicator light to the user to alert them
19  of the fact that there hot air in the dryer, or
20  excessive temperatures in the dryer due to reduced
21  airflow.
22       So, it's another system that Electrolux had
23  the potential opportunity to build on, and why they
24  didn't build off it is, you know, like I said is

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

114

1    questionable to me, and the ability to do so is
2    something I defer to Mike Stoddard.
3         And on page 31, he notes that the flexible
4    foil ducting was too long, and had not trimmed to
5    the minimum length necessary.  But, he gives the
6    length is over 4 feet.  And most of the dryer ducts
7    that I have seen is at least 6 feet, 8 feet, long.
8    So it had to be trimmed somewhat; it just wasn't
9    trimmed enough.
10   Q.    You mentioned that you have seen.  Have you,
11   in either connection with this case, or other cases,
12   examined flexible foil venting?
13   A.    Well, yes.  The fact of the matter is before
14   I got involved in these cases, I used flexible foil
15   venting, that I purchased from Home Depot, Lowe's,
16   or what have you.  I have known family members to
17   use flexible foil venting.  As I got involved in
18   these cases, you know, like I said I've taken
19   photographs of flexible foil venting that's sold at
20   Lowe's, and so forth, and I did print out some of
21   the pictures I took from -- it was either Lowe's, or
22   Home Depot -- I don't remember which -- of the
23   different types of flexible foil ducting they sell.
24   And, I downloaded a picture from the -- from Sears

115

1    regarding the flexible foil duct they sold, which
2    was five feet in length.
3    Q.    And, I note you are looking at your
4    notebook.  Can you just tell me what tab you're
5    looking at?
6    A.    Tab 5.
7    Q.    Okay.  Sorry.
8    A.    That's okay.
9    Q.    Do you have anything else to add to that?
10   A.    No.
11   Q.    All right.  Just going back to Mr. Bills'
12   opinion in his report, any other rebuttal?  We were
13   on page 31, and you were talking about his comments
14   with regard to the venting, the length of it.
15   A.    The other thing I noted was on page 34.
16   And, again, this is a Mike Stoddard area.  I just
17   noted the discrepancy at the bottom of page 34, he
18   states that SEA disagrees that the first fuel
19   ignited had to be lint collected within the heater
20   pan mounted to the rear wall of the dryer cabinet.
21   And, he says no physical evidence exits that would
22   allow anyone to opine as to from where the lint that
23   was ignited originated.  SEA believes that lint on
24   the gas burner on the combustion chamber could have

116

1    been pulled into the open flame, and ignited.
2         So, he just gets done telling us in that
3    sentence that there's no evidence that allows anyone
4    to form an opinion, and in the next sentence later,
5    he gives an opinion.
6         So, that's just a -- you know, it's an
7    inconsistency that I noted in his report.
8    Q.    Okay.  Anything else, any other criticisms?
9    A.    Well, on the next page on 35 on the first
10   full paragraph about almost to the end, he says the
11   results of their testing did not reveal any abnormal
12   accumulations of lint in the Electrolux dryer.
13        And, I didn't go back and look it up, but
14   I'm fairly certain that Ripley and/or King testified
15   that in the life cycle testing, they found burnt
16   lint in their dryer, and they had a lint dryer fire
17   in one of their testing units.
18        So, obviously, he's not addressing those
19   facts in his opinions.
20   Q.    Anything else?
21   A.    On his cause analysis, page 37, he says an
22   improperly-installed vent system will reduce the
23   airflow through the dryer resulting in lint
24   accumulation in the dryer.  Proper airflow through a

117

1    dryer is important -- emphasis on the word
2    important -- for the dryer to be able to function
3    correctly.
4         And I note even though that's correct,
5    Electrolux did nothing to actively monitor or alert
6    users of inadequate airflow.
7    Q.    Anything else?
8    A.    I don't know why he didn't address that
9    fact.  I mean, they should have have done something
10   to monitor and alert users because it's so
11   important.  But, I think that's all I have for
12   Mr. Bills' report.
13   Q.    Okay.  If we can return back to your report
14   in this case, Vigilante-5.
15   A.    Yes.
16   Q.    And, on page 2 --
17   A.    Oh, can I make a note on my report before
18   you ask a question?
19   Q.    Sure.
20   A.    There was a typo, and it changed
21   the sentence from a negative to a positive.  So,
22   it's on page 36, bottom of page 36.
23   Q.    Okay.
24   A.    The bottom paragraph that starts with David

**30 (Pages 114 to 117)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

118

1  Fuller, it says in the second sentence, "Fuller
2  testified that although he cleaned his dryer once a
3  year, he did disassemble the dryer."  It should be
4  he did not disassemble the dryer.
5  Q.     Okay.
6  A.     I noticed, like, two other typos, but that
7  one was a substantive one.
8  Q.     Okay.  And as you sit here today, Dr.
9  Vigilante, are there any other substantive changes,
10  other than the change you just made on page 36, that
11  you would like to make in your report?
12  A.     No, not that I noticed.
13  Q.     And as we proceed through the rest of your
14  deposition, if anything comes up, you'll let me
15  know.
16  A.     Yes.
17  Q.     Okay.  So if you would turn your attention
18  to page 2 of your report, and I think you have a
19  copy in your binder, if you want to use that copy.
20  A.     Yes.
21  Q.     So, in the -- I'll call it the fourth
22  paragraph, it starts out, "I may use the
23  following"...
24  A.     Yes.

119

1  Q.     Do you see that?
2  A.     Yes.
3  Q.     Okay.  So, I'll just read the sentence for
4  context.  "I may use the following materials as
5  exhibits to illustrate my testimony:  Photographs
6  taken of the incident dryer; instructional material
7  and manuals provided by GE and/or Electrolux;
8  examples of on-product warnings and indicator lights
9  used on other types of products; example on-product
10  warnings and indicator lights for the dryer as
11  described in Section E-3 of this report, and the
12  references and standards cited within this report."
13         Did I read that correctly?
14  A.     Yes, ma'am.
15  Q.     So I have a question with regard to that
16  examples of on-product warnings and indicator lights
17  used on other types of products.  Is that
18  information contained either on the hard drive, that
19  you brought with you, or in your notebook?
20  A.     It's in the hard drive, and it's referenced
21  in my report.
22  Q.     Okay.  Can you just point me to where that
23  is referenced?
24  A.     Sure.  That's on page 29.

120

1  Q.     Can you tell me what paragraph you are
2  referring to?
3  A.     The big paragraph starting with "Stoddard
4  concluded".
5  Q.     Okay.
6  A.     So about halfway down, I give examples of
7  different indicator lights on different types of
8  products.
9  Q.     Okay.  How about with regard to the
10  warnings?  You said on-product warnings and
11  indicator lights in that sentence on the page 2.
12  A.     Yes.  I don't know that -- I don't know that
13  I figured out exactly which other example on-product
14  warnings to provide.
15  Q.     Okay.  Is that something you plan to
16  investigate further, and identify examples?
17  A.     Depending upon what Mr. Hughes' trial
18  strategy is.
19  Q.     Okay.  And, I don't want to get into that
20  right now.
21         But as you sit here today, your testimony is
22  that you don't have any examples of other on-product
23  warnings?
24  A.     I don't think I've come up with specific

121

1  examples of on-product warnings that I would use in
2  the case.
3  Q.     And with regard to the indicator lights, is
4  there anything other than what you've mentioned on
5  page 29?
6  A.     I've mentioned them on page 29, and then I
7  produced a bunch of manuals for products with
8  indicator lights.
9  Q.     And, that's on the white hard drive?
10  A.     Yes, under dryer literature example,
11  indicator lights.
12  Q.     And are any of those indicator lights on
13  clothes dryers?
14  A.     Yes.  There's one on the Fisher Paykel DEGX1
15  dryer.
16  Q.     And, do you happen to know the Fisher Paykel
17  dryer, that you're referring to, do you know when it
18  was manufactured?
19  A.     There's two.  There's a Whirlpool dryer,
20  too.
21  Q.     Okay.
22  A.     But, the Fisher Paykel manual was published
23  in November, 2005.
24  Q.     When you say "published", you are talking

31 (Pages 118 to 121)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

122

1  about the product literature?
2  A.     Yes.
3  Q.     Okay.  And, then, what about the Whirlpool
4  dryer?
5  A.     The Whirlpool dryer, I don't have a date on
6  it.  I've got the model number, so I can go back and
7  look that up.  But, I don't have a date on it.  It's
8  a Whirlpool Duet vent indicator, Model WED, as in
9  David, 70HEBW0.
10  Q.     Okay.  So just those two dryers, the Fisher
11  Paykel, and the Whirlpool; is that right?
12  A.     If that's what I provided on the hard drive.
13  Q.     Okay.  Do you have an understanding of when
14  the Vitales' dryer was manufactured?
15  A.     2004.
16  Q.     And, are you aware of any dryers that were
17  manufactured, and sold, in 2004, that had indicator
18  lights?
19  A.     I have to go back, and see whether or not
20  Electrolux, in their best models, have indicator
21  lights.  You mean for airflow?
22  Q.     For airflow.
23  A.     Yes.  I have to go back, and look to see if
24  they have that in 2004.  I know in later models,

123

1  they put it in their best models.
2  Q.     How about with regard to any other dryer
3  manufacturers?
4  A.     Not offhand.
5  Q.     Okay.  Is that something you've looked into
6  as part of either this case, or the other dryer
7  cases you have against Electrolux?
8  A.     I haven't tried to go back, and identify
9  them all.  I think I relied upon Mike Stoddard to do
10  that in research.
11         The Fisher Paykel, and the Whirlpool, I just
12  happened upon.
13  Q.     How did you happen upon them?
14  A.     I don't recall at this time.  It's been a
15  while.
16  Q.     Is that something you were able to access
17  online?
18  A.     The Whirlpool dryer is a photograph, so I
19  don't know where I got it from.
20         The Fisher Paykel was a manual that I, most
21  likely, downloaded from the web.
22  Q.     Dr. Vigilante, on page 3 of your report, you
23  reference teleconferences with Mike Stoddard on
24  January 27th, 2016.  Do you see that?

124

1  A.     Yes, ma'am.
2  Q.     Okay.  Did you have more than one phone call
3  with Mr. Stoddard on that date?  I only ask because
4  it says teleconferences?
5  A.     By my guess, that's a typo.
6  Q.     Okay.  And, was that the only conversation
7  you had with Mike Stoddard regarding this specific
8  matter, the one on --
9  A.     Yes.
10  Q.     -- January 27th --
11  A.     Most likely.
12  Q.     Okay.  Have you had interaction with
13  Mr. Stoddard in connection with other Electrolux
14  cases that you have?
15  A.     Yes.
16  Q.     Have you ever been to the Wright Group?
17  A.     Their office?
18  Q.     To their office, yes.
19  A.     No, I have not.
20  Q.     Have you ever met Mike Stoddard in person?
21  A.     I don't think so.
22  Q.     So, how do you communicate with him?
23  A.     Phone, and e-mail.
24  Q.     Did you have any e-mail communications with

125

1  Mr. Stoddard in connection with the Vitale case?
2  A.     I don't believe so.
3  Q.     Have you ever spoken with Ron Parsons from
4  the Wright Group?
5  A.     Yes.
6  Q.     Did you have any conversations with him in
7  connection with this case?
8  A.     I haven't talked to Ron in a couple years.
9  Q.     Okay, that makes it easier.
10         So, can you tell me, to the extent you
11  recall, about your conversation with Mr. Stoddard on
12  January 27th?
13  A.     I don't recall what my conversation was with
14  Mr. Stoddard on the 27th.  I don't recall.
15  Q.     Did you take any notes during that
16  conversation?
17  A.     I don't think so.
18  Q.     Have you spoken with -- well, do you know
19  who John Fry is?  And, I think you mentioned him
20  earlier.
21  A.     Yes.  I may have had my report up, my draft
22  report up when talking to Mike, and may have made
23  notes directly in there.  But I don't recall seeing
24  it in my report.  But, typically, if I have a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

126

1    teleconference with Mike, and I don't have his
2    report, I'll take notes on the conversation.  But
3    since I don't have the notes, I don't think it was a
4    very -- and I have -- his report is dated so much
5    earlier than mine, that I don't think that -- I
6    don't think that I took very many notes.  Well, it's
7    only three days earlier.  Is that right?  Yeah,
8    okay.  Yeah, I don't know why I don't have notes.
9    Q.      Do you typically take notes?
10   A.      That's what I said, typically if I am
11   working on a report, and Mike is involved in the
12   case, and I don't have his report, I'll call him,
13   and I'll ask him what his opinions are, and what his
14   findings are, if he had talked to the homeowners,
15   what the scene looked like, what they found with the
16   investigation of the scene, and/or product.  And I,
17   typically, will take notes.
18       So why I didn't take notes this time around,
19   I don't know.
20   Q.      Did you have any conversations with John Fry
21   in connection with this matter?
22   A.      No, I don't believe so.
23   Q.      Did you speak with either Ursy, or Joseph
24   Vitale in connection with this matter?

---

127

1    A.      I don't believe so.
2    Q.      Is that something you typically do in
3    connection with your evaluation in speaking with
4    homeowners?
5    A.      It depends on what is covered in the
6    deposition because a lot of times in the deposition,
7    some of the topics I am interested in are not
8    covered, and then I will request a telephone
9    conversation with the homeowners.
10   Q.      In this specific case, did you feel like the
11   information that you were looking for was adequately
12   covered in the deposition, that you didn't have to
13   speak with them separately?
14   A.      That's correct.
15   Q.      Dr. Vigilante, you have listed on page 3 a
16   number of deposition transcripts from -- well from
17   former Electrolux employees, we'll classify them as.
18       Are these deposition transcripts that you
19   reviewed specifically in connection with this case,
20   or had you reviewed them previously for other
21   Electrolux cases?
22   A.      Yes.  The only one that I reviewed of an
23   ex-Electrolux employee -- or, I don't know if that's
24   the way you describe Carl King, Carl King is still

---

128

1    on the payroll in one form, or another.  Carl King
2    is the only deposition transcript I read
3    specifically for this case.  All the other
4    transcripts I had read for other cases either in the
5    past or, for example, Dave Fuller's, I read while I
6    was drafting this report.  But, his deposition was
7    taken in the Cloud.  And, the same thing with, I
8    think, Carl King's, I was reading that about the
9    same time I was putting together my analysis for
10   this case.
11   Q.      And, you have a number of the documents from
12   the State Farm --
13   A.      Yes.
14   Q.      -- consolidated action listed.  It's, like,
15   the third bullet on page 3.  So -- I'm not going to
16   add up the numbers -- but, have you reviewed all of
17   the documents within the bates ranges, that you've
18   provided?
19   A.      No.
20   Q.      Okay.  Have you reviewed some of the
21   documents in the ranges?
22   A.      Some of them.
23   Q.      Okay.  And, did you take any notes while you
24   were reviewing the documents?

---

129

1    A.      Well, some of them are in the list of --
2    some of these deposition are in that range of bates
3    numbers.  So, I did take notes on some of them.  But
4    if I had notes, I would have put them in my file,
5    and I don't have any in my file.  So other than the
6    deposition summaries for some of the depositions, I
7    didn't write any notes.
8    Q.      And the summaries that you created, those
9    are all contained in what was copied from your
10   notebook, and are on the hard drive.  Right?
11   A.      All the summaries I have are on the hard
12   drive.
13   Q.      Did you conduct any surveys specifically for
14   this case?
15   A.      What kind of surveys?
16   Q.      Surveys -- well, really any kind of surveys.
17   I realize it's a broad question.  It was intended to
18   be broad.
19   A.      Okay.  I surveyed different appliance
20   stores -- I'm sorry -- dryer vent cleaning services
21   yesterday.  One, in part for preparation for today
22   and two, it's time to do my dryer vent at home so I
23   kind of combined both.
24   Q.      Apart from the survey of the dryer vent

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

130

1   cleaning companies, any other surveys, that you
2   conducted?
3   A.      I did survey the literature for things that
4   were relevant to my opinions, and analysis.
5   Q.      Okay.  Anything else?
6   A.      The only other survey type activity would
7   have been looking at different dryer manufacturers.
8   But, I don't know that I did that specific for this
9   case.
10  Q.      Let's talk about the survey of the dryer
11  vent cleaning company.  Can you tell me specifically
12  what you did?
13  A.      I went to the YellowPages.com, and looked up
14  folks that did dryer vent cleaning, that were in a
15  reasonable proximity to my ZIP Code.  And then I
16  went to Google Maps, and put in my ZIP Code, and
17  then did a search nearby for dryer vent cleaning.
18  And, I went through and called the different
19  services, and asked them what they charged, what
20  they did, if they -- two things became clear again:
21  One, I didn't notice during my first survey a couple
22  years ago, but this survey, a bunch of the services
23  weren't taking the transition duct off the dryer.
24  They were going to run a cleaning tool from the

---

131

1   outside into the dryer without removing the
2   transition duct.  And I questioned, kind of softly
3   questioned them why they wouldn't take the
4   transition duct off.  And people that reported was
5   that it wasn't necessary.  They could know when they
6   get into the dryer.  One guy told me only if the
7   homeowner asked will they take the transition duct
8   off.
9       So I found that certainly disturbing,
10  particularly by the fact I think the recommendation
11  from Electrolux is to take it apart, and clean it,
12  as opposed to just running a brush from the outside
13  all the way into the dryer.
14      And then, two, they weren't taking apart the
15  dryer.  They weren't going to take the drum out.
16  The most common reason was -- or the only reason
17  they gave was -- I shouldn't say the most common --
18  all of them that gave a reason was because they were
19  afraid they would break the dryer, and they didn't
20  want to have to pay for the dryer -- replace the
21  dryer.  They weren't appliance service repairmen, so
22  they weren't going to open the dryer.
23      A few of them had told me that they cleaned
24  the interior of the dryer, when I initially asked

---

132

1   them if they cleaned the interior of the dryer.
2   They said, yeah, we clean the interior of the dryer.
3   And I asked them how, and they all pretty much said
4   they stick a vacuum down the lint trap.  And, that
5   would get the lint from under the drum, and so
6   forth.
7       And then when I followed up with a question,
8   what about the lint behind the drum, they all kind
9   of scratched their head -- figuratively, not
10  literally.
11      And then one guy I asked, he told me that it
12  wasn't necessary to clean the interior of the dryer;
13  you only had to clean the exhaust, which I found
14  disturbing, as well, considering that Electrolux is
15  recommending you clean both.
16      So, there's still a lot of misinformation in
17  the folks that are handling these services for the
18  general public, for the consumer.
19      And, then I noted that the prices range
20  anywhere from 99 bucks to $150.  And, that's just to
21  get the vent cleaned.  So, like I said, if you throw
22  another $100 to $150 on it, you're paying almost the
23  price of the dryer every year to get it cleaned.
24  Q.      How many companies did you call?

---

133

1   A.      I do have those in my summary, too.
2   Q.      Is that something that's printed out here?
3   A.      No, only e-mail.  Sorry, I didn't think
4   about it.
5   Q.      That's okay.  No need to apologize.
6   A.      I called -- I got ahold of six of the ads on
7   the Yellow Pages, but one of the ads was the same
8   company as one of the other ones.  So, I wouldn't
9   count that as two.
10  Q.      So, it would be five?
11  A.      Five separate companies.
12  Q.      And, you were searching using your home
13  address, or --
14  A.      ZIP Code.
15  Q.      Right, your ZIP Code.
16  A.      Well, actually, for the Yellow Pages, I used
17  Phoenixville, PA.
18  Q.      Okay.
19  A.      For the Google Maps, which was -- the five
20  was only Yellow Pages.  And, then I called five from
21  Google Maps.  And, I think I got ahold of -- I'm
22  sorry.  I called four from Google Maps.
23  Q.      Did you use a ZIP Code to do the Google Map
24  search?

---

**34 (Pages 130 to 133)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

134

1   A.    Yes, 19460.
2   Q.    Okay.  So when you did the Google Map
3   search, and you found four companies, and then the
4   Yellow Pages search was really five companies?
5   A.    No.  I mean, there were -- when I did the
6   searches, there were more companies.  For the Yellow
7   Pages, I started at the top, and went down, and I
8   stopped after the -- actually, the seventh or eighth
9   one.  One of them I called, and nobody answered.
10  So, I didn't get any information from them.  One of
11  them was in New Jersey.  I don't know why that
12  showed up.  But, I started at the top and went
13  through number one, two, three, four.  Number five,
14  I couldn't reach.  Number six was in New Jersey.
15  Number seven was the same as number one.  And then
16  number eight was in Delaware.  And, number nine was
17  in Quakertown.  So, I contacted nine.  I spoke to
18  nine, seven, four, three, two, one.
19  Q.    And, Dr. Vigilante, in your notes, did you
20  identify the names of the companies that you called?
21  A.    Yes.
22  Q.    Okay.  And, did you take notes from those
23  conversations?
24  A.    Yes.

135

1   Q.    Did you ask each of them what they would
2   charge?
3   A.    Yes, and I noted that, too.  This is the
4   Yellow Pages: these are my notes.  (Indicating)
5   Q.    Okay.
6   A.    And, then, also in that same file was the
7   individual ones from Google Maps.  This is one from
8   Google Maps.  (Indicating)
9   Q.    Okay.
10  A.    So I went to their web page, and then put
11  some notes.  And, like I said, there was four of
12  them I got ahold of.  I actually got hold of a fifth
13  one, but he didn't call me until 7 o'clock last
14  night, and at that time, I had closed the file.
15  But, he was consistent with the rest of them.
16  Q.    Okay.  And, can you just tell me what folder
17  those documents are in on the flash drive?
18  A.    Sure.  It's on our dryer lit, l-i-t, and
19  then under cleaning calls.
20  Q.    Dryer lint?
21  A.    No, no, lit, l-i-t, literature, dryer lit.
22  Q.    Okay.  You also testified earlier that you
23  had done a literature survey.  Can you be a little
24  more specific about what you did in connection with

136

1   that?
2   A.    Well, two, you know, of the references I
3   cited include both general human factors principles,
4   theories, guidelines; warnings, theories,
5   guidelines; standards for warnings.  And, then
6   they've got a bunch of stuff specific to clothes
7   dryers from the UL2158 standard to the CPSC stuff,
8   the NFPA stuff, the U.S. Fire Administrative stuff.
9   And, then I went through, again, the literature that
10  I have in -- that we talked about in tab number
11  five.
12  Q.    Anything else?
13  A.    I think that's about it.
14  Q.    Okay.  And then the third thing you said was
15  that you looked at different dryer manual -- well, I
16  wrote manual.  Is that what you said?
17  A.    Manufacturers.
18  Q.    Manufacturers.  Thank you.
19  A.    Dryer manufacturers, yes.
20  Q.    Okay.  So, tell me what you did in regards
21  to looking at different dryer manufacturers?
22  A.    Well, I think I corrected myself.  I wasn't
23  sure I would consider that specific to this case.
24  It's stuff I had done in the past, that's applicable

137

1   to this case.
2   Q.    And, you're relying on that information in
3   forming your opinion?
4   A.    Somewhat, yes.
5   Q.    Okay.
6   A.    So, for example, I understand that there are
7   different types of dryer designs.  I understand
8   that -- I'm not aware of any other dryer
9   manufacturer that has a -- I don't know how to put
10  this -- the same type of a problem that Electrolux
11  has with dryer vent buildup behind the -- near the
12  heat source, and propensities for fires.  So,
13  certainly that's a factor in my analysis.
14  Q.    Well, what do you understand with regard to
15  the different types of dryer designs?
16  A.    Well, my understanding is that two main
17  things are of concern:  One is the bulkhead versus
18  the ball-hitch.  And, then it's my understanding
19  that some dryer manufacturers will design for fire
20  containment, drum fire containment.  And, Electrolux
21  generally has not been concerned about that in the
22  timeframe of the Alliance series platform.  I think
23  it's not until the new UL standard came up, that it
24  required the testing that they started designing

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

138

1  for.
2  Q.    So, you understand the dryer in this case
3  was a GE branded dryer.  Correct?
4  A.    Yes.
5  Q.    Do you know whether GE imposed any fire
6  containment requirements on Electrolux in connection
7  with the manufacture of this dryer?
8  A.    I do know that in the late '90s, they have
9  the SEE test, they were requiring Electrolux to
10  pass.  But, I didn't see anything, or anyone talk
11  about whether or not, it applied to the incident
12  dryer.  So, I don't know if it was a requirement, or
13  not, at this point.
14      I think that my understanding, too, was that
15  Mrs. Vitale left the door open.  So, I'm not sure
16  how relevant it is to the causation.
17  Q.    I just had a followup of something you said.
18      Did you read anything to suggest to you
19  that, perhaps, the Vitale's dryer would not have
20  been subject to the SEE test?
21  A.    I'm sorry, I didn't see anything either way.
22  Q.    Okay.  It's just a question in your mind
23  whether -- because you haven't seen anything either
24  way whether it would have been subject to the test,

---

139

1  or not?
2  A.    Well, no.  I'm not questioning it.  It's not
3  relevant to what I'm doing in this case.  I didn't
4  see whether they did, or not.  Like I said, I don't
5  think it's related to causation, but these are
6  questions for Fry and Stoddard.
7      The only thing I noted was that, generally,
8  when I surveyed -- the question was with regards to
9  surveying dryer manufacturers.  The two issues that
10  I saw were some manufacturers required a fire
11  containment; Electrolux didn't.  And, the bulkhead
12  versus Ball-Hitch.
13  Q.    What manufacturers did you note required the
14  containment?
15  A.    I know GE did.
16  Q.    And, are you referring to the SEE test when
17  you say that?
18  A.    Yes.
19  Q.    Okay.  Any other manufacturers?
20  A.    I don't know -- yes, I don't know
21  specifically.
22  Q.    Okay.  Earlier in your deposition today, you
23  mentioned that you worked on a case involving a
24  Whirlpool dryer?

---

140

1  A.    Whirlpool or Maytag.
2  Q.    Whirlpool or Maytag, okay.
3      So, Whirlpool or Maytag dryer, and that
4  involved a fire?
5  A.    I believe so.
6  Q.    Do you know whether it was alleged that it
7  was a lint fire?
8  A.    My memory is it was alleged it was a
9  spontaneous combustion due to oily rags, or
10  something.
11  Q.    During your entire career, have you ever
12  worked on a case involving a lint fire in a bulkhead
13  design dryer?
14  A.    No.
15  Q.    Dr. Vigilante, do you have an opinion -- and
16  you may have addressed this earlier, but I just
17  wanted to make sure for the record.  Do you have an
18  opinion whether the Vitales' dryer was installed in
19  accord with the instructions, that were provided by
20  Electrolux?
21  A.    It looks like it was.
22  Q.    You state "it looks like it was".  Is there
23  some reservation you have in saying yes?
24  A.    Well, number one, I wasn't asked to look at

---

141

1  it.  And, number two, I haven't had the opportunity
2  to see the scene, or the evidence.  So, to me, it
3  appeared like it met the requirements, and the
4  exceptions that Electrolux, itself, provided in the
5  manual.
6      So, we went through in Purswell's report,
7  and it was -- according to Mr. Bills, it was over 4
8  feet.  Like I said, this stuff comes in 8-foot
9  length.  So it may have been cut to length.  No
10  one's testified -- or no one's stated whether it's
11  been cut from 5 feet, from 8 feet, 10 feet, or
12  whatever.  So, it looks likes it was cut.  There was
13  no report of kinking, or damage to it, prior to the
14  fire.  Mr. Vitale cleaned it every year.  It went
15  straight up, and out, so there was no unnecessary
16  bends, or what have you.  It was GE branded, and UL
17  approved.  It was only used as a transition duct.
18      So it met all the exemptions, and
19  requirements, in the manual, that I can see.
20  Q.    Do you have any opinion with regard to
21  whether the subject dryer was maintained in
22  accordance with Electrolux's instructions?
23  A.    I do have an opinion.
24  Q.    Okay.  And, what is that opinion?

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

142

1    A.    Yes, and no.
2    Q.    Okay.  Could you explain for me?
3    A.    Yes, because there are instructions at some
4    point tell you to clean the lint -- the interior of
5    the dryer.  And at other points, it says to clean
6    the vent system.  So, obviously, they're cleaning
7    the vent system every year.  So, yes.  But they
8    didn't clean the interior of the dryer, so it would
9    be no.
10   Q.    Okay.
11   A.    I do have one other opinion related to that.
12   Q.    Okay.
13   A.    And it's in the report, is that given the
14   Vitales lay knowledge in what they did do, they did
15   clean around the dryer; they did clean the cabinet
16   of the dryer; and they did clean, I think, the lint
17   screen.  They may, given the lack of specificity and
18   explicitness of the instructions, they did clean the
19   interior of the dryer; they just didn't clean the
20   interior of the dryer that Electrolux meant to
21   clean.
22   Q.    And, we'll get to that part in --
23   A.    So, you know, technically, they did clean
24   the dryer in accordance with Electrolux's

143

1    instructions; they just didn't clean it in the way
2    Electrolux intended.  And part of the reason -- or
3    the reason for that is because Electrolux didn't
4    provide specific, explicit information on what needs
5    to be cleaned.
6    Q.    Okay.  If you would turn to page 9 of your
7    report.
8    A.    Sure.
9    Q.    So on page 9, the first paragraph -- I guess
10   it's all one sentence.  Could you read for the
11   records.
12   A.    It starts with "even though"?
13   Q.    Yes.
14   A.    "Even though they were aware that lint was
15   accumulating in their dryers and was the number one
16   cause of dryer fires, Carl King testified that since
17   1988, Electrolux has failed to make any design
18   changes to their Ball-Hitch dryers to reduce the
19   amount of lint that accumulates in their dryers or
20   the rate (frequency) of fires occurring with their
21   dryers."
22   Q.    Dr. Vigilante, do you have any opinion as to
23   what design changes Electrolux should have made?
24   A.    I'm leaving the design changes to Mr.

144

1    Stoddard.
2    Q.    All right.  And, you would agree with me
3    there's no way to eliminate lint from a dryer.
4    Correct?
5    A.    That's my understanding.
6    Q.    You don't have any reason to disagree with
7    that statement.  Right?
8    A.    I don't have anything to disagree with that
9    statement.
10   Q.    Okay.  Sticking on page 9, the last
11   paragraph, the first sentence says, "If they chose
12   to rely upon warnings to mitigate the fire hazard
13   associated with the use of their dryer (i.e., if
14   design and guarding alternatives are not available
15   or feasible), Electrolux must ensure that their
16   warnings are effective in motivating the user to act
17   and behave in a safe fashion."
18         What is your basis for that statement?
19   A.    Which part of it?
20   Q.    The part that starts after the comma,
21   "Electrolux must ensure that their warnings are
22   effective in motivating the users to act and behave
23   in a safe fashion."
24   A.    Yes, general chronic safety principles are

145

1    if a hazard is recognized, you have to eliminate
2    your design, you have to guard it if the design
3    change is not feasible.  And if the design change
4    and guarding is not feasible, you have to rely upon
5    warnings.  But, you have to ensure you're providing
6    adequate warnings.
7          If you can't provide adequate warnings, you
8    have to consider whether or not you should be
9    allowing the product to exist in the marketplace.
10   Q.    When you use the phrase "adequate warning",
11   how would you define that?
12   A.    Well, again, it has to be located when and
13   where the information is needed.  It has to be
14   conspicuous to grab the user's attention.  The user
15   has to understand what the warning is intended to
16   communicate.  The warning has to be consistent with
17   their knowledge base, or at least provide them with
18   new knowledge that they do have.  It has to be
19   following the warning, or heeding the warning.  The
20   user must be able to avoid the negative
21   consequences.
22         Part of the understanding, comprehension,
23   conspicuousness, and so forth, is getting them to be
24   motivated to comply.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

146

1    So, again, we've got issues with cost of
2  compliance. We've got issues with familiarity.
3  We've got issues with prior experience, and so
4  forth. So if you have cases where prior experience,
5  or familiarity, is going to reduce the likelihood of
6  somebody looking for warnings, that means you've got
7  to make the warning more interactive, and more
8  conspicuous.
9    If people have a different idea of the
10  hazards that are associated, your warning has to be
11  specific and explicit to make sure that they
12  understand what the hazard is, and that the hazard
13  isn't what they preconceived it as, or what they had
14  thought in the past.
15    So, these are things that motivate people to
16  comply.
17  Q.    We talked about earlier ANSI Z535.4.
18  A.    Yes.
19  Q.    So, I'd like to talk a little bit about ANSI
20  Z21.5.1.
21  A.    Okay.
22  Q.    In conjunction with your analysis, did you
23  compare -- and we'll break it apart. We'll start
24  with on-product labels. Did you analyze whether the

147

1  on-product labels on the Vitales' dryer complied
2  with Z21.5.1?
3  A.    As far as I know they did.
4  Q.    Okay.
5  A.    You mean, as to what information needed to
6  be on the product?
7  Q.    That's right.
8  A.    Yes.
9  Q.    Okay. So, you have not criticism -- you're
10  not going to say at trial that the warnings on the
11  dryer didn't comply with ANSI Z21.5.1?
12  A.    Yes. I believe that there's no open
13  question as to whether or not the warnings required
14  by that standard were on the dryer, or not.
15  Q.    Okay. Now, same line of questioning with
16  regard to the information that was contained in the
17  product literature.
18    Did you perform an analysis of whether the
19  product literature was in accord with ANSI Z21.5.1?
20  A.    I did not do an analysis because I did not
21  see anything to suggest that the information
22  required by that ANSI standard wasn't addressed in
23  the manual.
24  Q.    Okay. So just to recap, all the information

148

1  that's required by that ANSI standard was contained
2  in the manual for the Vitales' dryer. Is that your
3  testimony here?
4  A.    I don't know that that's true, but I don't
5  know that -- I haven't seen any evidence to suggest
6  that it wasn't true.
7  Q.    Do you believe that ANSI Z21.5.1 is in any
8  way relevant to your analysis of this matter?
9  A.    It doesn't address the lint fire hazard, and
10  it doesn't -- well, it is relevant in the fact that
11  it doesn't preclude the manufacturer from adding
12  additional warnings to the product, or manual. And,
13  it doesn't preclude the manufacturer from how they
14  format, or present, those warnings.
15    So one of the things that Mr. Purswell
16  stated was that ANSI Z535.4 was in conflict, and
17  therefore not relevant. That's simply not the case.
18  There's nothing in the other ANSI standard to
19  preclude the use of Z535.4 from formatting or
20  presenting warnings on the product, or in the
21  manual.
22  Q.    If you were hired by a dryer manufacturer to
23  create a warning for their dryer, what standard
24  would you use?

149

1  A.    Well, I would ask them which standards are
2  relevant to their industry. So, the UL --
3  Q.    Let's say it's a gas dryer. I should have
4  said that.
5  A.    For example, if Electrolux called, I would
6  ask them what industry standards are relevant to
7  your dryer. That's where I would start from.
8    So the ANSI standard that you mentioned,
9  the UL2158, if Electrolux testified that that was
10  relevant, or they utilized that. So, you would
11  start there. You would go through, and ask them
12  based upon their hazard analysis, what other hazards
13  are associated with their dryer.
14    So the standards are minimum standards.
15  They may not have to capture all the hazards
16  associated with it. So, the manufacturer's on the
17  hook responsible for doing the hazard analysis. The
18  hazard analysis is the overriding theme. Looking to
19  see what's required in the standard is a subset of
20  that.
21    So, those two things I would ask them: What
22  hazards have you identified; what standards are
23  applicable; what warnings and standards are
24  required, and then are there any hazards that are

38 (Pages 146 to 149)

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

150

1    not addressed in the standards, that are applicable,
2    or relevant, to your product.
3    Q.    Dr. Vigilante, what methodology did you use
4    in conjunction with your analysis?
5    A.    I used the scientific method.
6    Q.    Okay.  And, specifically, how did you use
7    the scientific method in conjunction with the case?
8    A.    Well, I started with a general question
9    regarding the warnings provided with the dryer.  I
10   did some -- well, I didn't have to do a lot of
11   background research because you know I've been
12   involved in these cases, and had that background
13   research already done for my hypothesis, and then I
14   did my analysis.  I looked at the discovery material
15   that was available from the other cases, the State
16   Farm cases, the specific discovery information in
17   this case.  I referenced the literature human
18   factors, warnings literature, product safety
19   literature, relevant.  I compared with what
20   Electrolux did, and provided, what the standards,
21   guidelines, and recommendations from industry, from
22   humans factors literature, from warnings literature,
23   the ANSI standards, say should have been done, and
24   then I compared them and I found that Electrolux

---

151

1    fell short of those requirements, and came to my
2    opinions.
3    Q.    So the general question that you started
4    with, what was that question?
5    A.    The general question is whether or not
6    Electrolux provides adequate warning with their
7    dryers.
8    Q.    Okay.  If you could turn to page 10 of your
9    report.
10   A.    Sure.
11   Q.    Under the Section E.1.1.
12   A.    Okay.
13   Q.    So the fourth paragraph that starts out
14   "Contrary to contemporary industry standards and
15   recommendations."  So my question simply is what you
16   were referring to "contemporary industry standards
17   and recommendations", what are you referring to?
18   A.    Well, they're in the analysis right under
19   that.  So, for example, the first one I cite is ANSI
20   Z535.4.  The second one I cite is the book chapter
21   from Wogalter and Leonard in the textbook Warnings
22   and Risk Perception.  The next one I cite is the
23   Human Factors Design Handbook.  The next one I cite
24   is a peer-reviewed article in the journal,

---

152

1    Occupational Health and Safety.  The next one I cite
2    is the Product Safety Signs and Label System Manual
3    from the FMC Corporation.  And then later on, I cite
4    the UL215 standard.
5    Q.    So with regard to UL2158, did you conduct
6    analysis whether the warnings either on the product
7    or in the literature were either consistent, or
8    inconsistent with UL2158?
9         MR. HUGHES:  For this particular
10        case?
11        MS. YEMMA:  Yes.  And, I am only
12        asking -- I realize that's the electric
13        dryer standard, but he is referring to it in
14        his report.  So, I think it's a fair
15        question.
16        MR. HUGHES:  With the caveat that
17        this case involves a gas dryer.
18        MS. YEMMA:  Right.  No question.  I
19        am only referencing it because he did.
20        THE WITNESS:  To clarify, Brian
21        Ripley, and Carl King, testified --
22   BY MS. YEMMA:
23   Q.    I understand.
24   A.    -- that they used the UL2158 standard for

---

153

1    the design of both their electric and gas dryer
2    warnings.  So, Ripley and King testified to that.  I
3    didn't testify to that.  I'm just repeating what
4    they said, and relying upon what they said.
5         So, number two, I did not go through UL2158,
6    and see if all the warnings they required were on
7    the dryer.
8         What I did note is that UL2158, Section
9    7.1.13 requires "A cautionary marking intended to
10   instruct the operator shall be legible and visible
11   to the operator during normal operation of the
12   appliance.  A marking giving service instructions
13   shall be legible and visible when servicing is
14   performed."
15        So these are under the section regarding
16   on-product markings, labeling, and warnings in
17   UL2158.
18        So my opinion is, is that they failed --
19   Electrolux failed to meet that requirement because
20   the servicing, the 18-month servicing, or 12-month
21   servicing, information is not on the dryer of the
22   cautionary marking intended to instruct the operator
23   of the number one hazard associated with the
24   operation of the dryer was not on the dryer.

---

**39 (Pages 150 to 153)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

154

1     Therefore, they were -- Electrolux didn't
2  provide the information on the dryer as the human
3  factors literature, the warnings literature, product
4  safety literature, and the product safety standards,
5  or the product warning standards, stated should be
6  on the product.  I'm saying that that's consistent
7  went the UL requirement that cautionary markings be
8  on the product where it's visible and legible during
9  normal operation and/or servicing.
10  Q.     Okay.  Moving ahead to page 15 of your
11  report, and I'll wait till you get there.
12  A.     Okay.
13  Q.     So, on that first paragraph -- it's not a
14  full paragraph -- but the last sentence where it
15  starts out "Given their experience", do you see
16  that?
17  A.     I got it.  Okay.
18  Q.     "Given their experience and familiarity with
19  dryers, it was foreseeable to Electrolux that many
20  professional installers would not have a need or
21  desire to consult the manual while installing the
22  dryer."  And, then you have three cites, too.
23      And, I have not read the articles that you
24  cited, but I'm curious as to what you'll testify at

155

1  trial is your support for that statement?
2  A.     Well, I think a couple things.  (1) are the
3  citations that I cited; (2) is King's testimony that
4  they are aware that the installers were not using
5  the manuals to install the dryers.
6  Q.     I want to talk next about your criticism of
7  the language "interior of the machine" on page 21.
8  A.     Okay.
9  Q.     So that first sentence says -- and I'm on
10  the last paragraph of page 21, "Within their manual,
11  Electrolux intends the phrases 'interior of the
12  machine' and 'from the dryer' to mean all areas
13  inside the cabinet of the dryer:  under, above,
14  behind, around the drum; top of motor; heater
15  housing; and baffle."  And, you're citing Carl
16  King's testimony.
17      In your opinion, what language would be more
18  explicit, or appropriate, per the standard?
19  A.     It's in my report in Section E3.
20  Q.     And, you're looking on Page 31?
21  A.     Yes, ma'am.
22  Q.     Okay.  So on Page 31, there are two
23  illustrations.  Can you tell us about those, and
24  we'll start with the first one?

156

1  A.     Sure.  Illustration 1 assumes that
2  Electrolux provides the indicator light, and either
3  cycle counter and/or airflow monitor, that Mike
4  Stoddard opined about.
5  Q.     So one, or the other?
6  A.     Yes.
7  Q.     Okay.  Go ahead.
8  A.     So that would be presented on the top, or
9  near the top console near the light, near the
10  service indicator light -- the indicator light.
11      And Illustration 1 would be repeated in the
12  manual.  In the -- well, this one is only an
13  operator -- sorry -- the Owner's Manual and
14  Installation Instructions Manual.
15      And then in conjunction with Illustration 1
16  in the manual is my opinion that they should have
17  provided Illustration 2, along with text to describe
18  what and where the dryer needed to be, this symbol
19  on cleaning.
20      So Illustration 2, I think, is -- I took
21  that from an Electrolux Service Manual, and it is my
22  opinion that it should be copied and placed in the
23  manual with Illustration 1, with accompanied text to
24  explain what and where it needed to be cleaned, and

157

1  inspected.
2      And, that's the bottom paragraph on page 30
3  is what I'm suggesting should be in there.
4  Q.     So with regard to Illustration 1, do you
5  have an opinion as to what size the label should be?
6  A.     I do, and it's going to depend upon where on
7  the console it's placed.
8  Q.     Okay.  That makes sense.
9  A.     Yes.  So, it depends on how they place it on
10  the console.  So you can either put it on the
11  console, or you can put it on the top of the dryer
12  underneath the console not directly underneath the
13  light because the console on this dryer is a
14  vertical surface that's perpendicular to the top of
15  the dryer.
16      So, depending upon the real estate on the
17  console, they can put it next to the light, or they
18  can put it on the top of the dryer adjacent to the
19  console under the light.
20  Q.     So the second option you just described,
21  that would be for -- the console can either be at
22  the, I would describe it, at the rear, or on the
23  front of the dryer?
24  A.     They can, but the issue is that Electrolux

**40 (Pages 154 to 157)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

---

158

1    uses different console designs.  So some of them are
2    more cluttered than others.  So it just depends on
3    where they put the light, and how cluttered with
4    other indicator lights, and dials, and whatnot, are
5    displayed there are on the console.
6    Q.    Okay.  So the size of the label would be
7    dependent on the type of console, and the available
8    real estate on the console?
9    A.    Yes.  But, the minimum is an 8 point font
10   for the text message.  And, this is bigger than 8
11   point font.
12   Q.    Okay.  That was my next question.
13         So, 8 point font for everything below the
14   red banner?
15   A.    Yes.
16   Q.    And then how about -- sorry.  The 8 point
17   font, is that dictated by ANSI, by the 535.4, or --
18   A.    Generally, 8 point font is the smallest
19   unless there's a space constraint, and that's
20   assuming a two -- I think a two or a three foot
21   viewing range.  So standing in front of the dryer,
22   but when you're using the console, you're going to
23   be closer so you would be within that two-foot
24   range.

---

159

1         If there were significant space constraints,
2    ANSI allows you to go down to 6 point font.  But, my
3    research has shown that, particularly with elderly
4    people, which are not excluded from using this
5    dryer, you don't want to go below 8 point font.
6    Q.    Okay.  With regard to the Illustration 2,
7    this would be contained in the owner's guide, or the
8    installation instructions?
9    A.    Well, see, in this case, there's only one
10   manual.  In other cases, there's an install, and an
11   owner's guide, and user and care guide.  So this
12   would be in this manual, one manual.
13   Q.    How many times would it appear?
14   A.    Well, certainly it needs to appear in the
15   front of the manual, in the beginning.  It can be
16   incorporated into the care and cleaning section so
17   it's redundant.
18   Q.    When you say in the front, do you mean on
19   the first page, like the cover?
20   A.    Not necessarily the cover, but either the
21   cover of page 2 where the gas warning is.
22   Q.    And, what support do you have that the label
23   you're proposing both in Illustrations 1 and 2 would
24   be followed?

---

160

1    A.    The warning that I created is based upon the
2    ANSI Z535.4 standard, and the warnings in human
3    factors literature, all of which have been provided
4    based upon testing that shows that these things make
5    warnings noticeable, understandable, and motivate
6    people to respond.
7         Illustration 2 is the pictograph that
8    Electrolux uses, so I would assume that it would be
9    effective.  If it's not effective then, of course,
10   it needs to change.  And, what Electrolux is
11   currently providing is not effective.
12   Q.    Okay.  Earlier in your testimony, we talked
13   about when you were at IBM, and you did the
14   usability studies, and the focus groups.
15        Have you done anything like that to support
16   that the warning in Illustration 1 is something a
17   consumer would follow if it was on their dryer in
18   the manner in which you proposed?
19   A.    Yes.  What I testified earlier was that
20   there are multiple tools in the bag for the human
21   factors expert to do usability testing, and
22   assessment.  And, one of them was a heuristic
23   evaluation.  And, I did conduct that on this
24   warning, and I conducted it on the warning and

---

161

1    instructions and materials that Electrolux provided.
2    Q.    How did you conduct the heuristic
3    evaluation?
4    A.    It's based upon taking my skills in the
5    field of human factors, or ergonomics and warnings,
6    and looking up the relevant literature, the relevant
7    standards, to see whether or not Electrolux met
8    those standards, those guidelines, and those
9    recommendations and principles.  And, of course,
10   based upon that analysis, I show that they didn't.
11        And then second, I design my warning based
12   upon the relevant standards, literature, guidelines
13   and principles.  And those standards, guidelines,
14   literature, and principles show that when you design
15   warnings like this, they are, in fact, effective.
16   Q.    So apart from what you just said in terms of
17   establishing that this warning would be effective in
18   moving the behavior of consumers to do what the
19   warning actually says, have you done anything, like
20   by holding a focus group, or anything of that
21   nature, to support that the warning would be
22   followed and would motivate the user?
23   A.    Right.  I did the heuristic testing.  And
24   the same standards, literature, principles that I

---

**41 (Pages 158 to 161)**

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

---

**162**

1  used to design this warning, I used in the design of
2  other warnings when I was with the IBM Corporation,
3  and did that validation testing, and showed that
4  people are more likely than not going to comply with
5  the warning.
6       So, there's nothing to indicate that this
7  warning would be inconsistent with all those other
8  warnings that I had the opportunity to do individual
9  testing on.
10  Q.    Okay.  If we can turn to page 32 --
11  A.    And, I want to say, too, that the
12  Illustration 1 is associated with the service
13  indicator light.
14       If the service indicator light is not
15  followed, the dryer shuts down forcing the call.
16  So, it's a much more effective warning.  It's a
17  warning in conjunction with an active safeguard so
18  you're not depending upon the warning solely.  So
19  we're going to get to the next illustration that
20  depends upon the warning solely.
21       So, certainly Illustration 1 is a much
22  stronger warning to get people to comply.
23  Essentially, the warning in Illustration 1 is giving
24  folks a heads-up that this light is going to come

---

**163**

1  on.  When it comes on, you need to get it cleaned;
2  otherwise, it's going to shut down.  And then when
3  it shuts down, the warning tells you why it shut
4  down.
5  Q.    Okay.  So then turning to Illustration 3,
6  that you have captioned "Alternative Front Console
7  Warning."
8  A.    Yes.
9  Q.    Tell me about what do you propose for this
10  warning, where on the console?
11  A.    This one needs to be on the top of the
12  dryer, and/or the front of the drum.
13  Q.    So, you're proposing this warning without
14  the indicator light.  Is that right?
15  A.    Yes.  Illustration 3 is if Electrolux
16  chooses not to provide the available safeguard, the
17  very least they could have done was provided a
18  conspicuous, explicit and specific on-product
19  warning that was readily visible at all times,
20  either on the front of the drum -- drum door, I
21  should say -- the front of the drum door, or the top
22  of the dryer cabinet.
23  Q.    Okay.  So the front of the drum door, I
24  think I know what you're talking about, but

---

**164**

1  could you -- the door is square -- can we agree on
2  that?
3  A.    Yes.
4  Q.    Okay.  So where on the door would you
5  propose that the label be placed?
6  A.    Well, certainly, if you're not going to
7  center it, which you can, I would put it -- if
8  you're not going to center it, I would set it on the
9  handle side of the door.
10  Q.    Okay.  So, near the handle?
11  A.    Yes.  The only problem, of course, is if
12  it's a reversible door.
13  Q.    Right.
14  A.    So, then you put it on top of the dryer
15  cabinet.
16  Q.    Okay.  So when you say on top of the dryer
17  cabinet, if we refer to the top of the dryer, again,
18  as a square --
19  A.    Mm-hmm.
20  Q.    -- where on that square would you put the
21  label?
22  A.    I think that you would center it.  If you
23  weren't going to center it, you would either bring
24  it closer to the front edge, or closer to the

---

**165**

1  console, but I wouldn't move it off to the left, or
2  to the right.  And, I think --
3  Q.    And, the reason being that?
4  A.    Well, I think that's just a better spot, but
5  I don't think it's going to make that big of a
6  difference if it's a little bit more to the left
7  than to the right.
8  Q.    And, then in terms of the size of the label?
9  A.    At least what's in my report.
10  Q.    Okay.  And, what font did you use for
11  Illustration 3 for the text?
12  A.    I think the text is 14-inch -- or 14 point.
13  Q.    And, then where it says "warning" in red,
14  that seems to be a little bigger font?
15  A.    It's orange.
16  Q.    I'm sorry.
17  A.    That's okay.  I think it's the printer.
18       With respect to that, ANSI Z535.4 calls out
19  the specific color for that signal word panel.  So,
20  it's called safety orange.
21  Q.    All right.  So safety orange where the
22  warning appears, what size is that?
23  A.    That's at least -- I tend to like it at
24  least double the size of the message text.  But, the

---

**42 (Pages 162 to 165)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

166

1  standard allows it to be 50 percent bigger than the
2  message text.
3  Q.     So in your Illustration 3, is it 28 point
4  font.
5  A.     About that, yes.
6  Q.     Okay.  Dr. Vigilante, I know we talked about
7  this with regard to Illustrations 1 and 2, but with
8  regard to number 3, did you conduct any analysis, or
9  do you have any data to support that a consumer
10 would comply with the warning in Illustration 3 as
11 it's proposed?
12 A.     Yes.  We did an heuristic evaluation to
13 ensure that it met the minimum standards related to
14 product safety signs and labels, human factors
15 literature, and the warnings literature.
16 Q.     With regard to Illustration 4, this is a
17 warning you are proposing to be on the rear of the
18 cabinet.  Is that correct?
19 A.     Yes.
20 Q.     Okay.  And, are you proposing that
21 Illustration 3 and 4 would be used together?
22 A.     On the rear of the cabinet?
23 Q.     No.  I meant used on the same dryer?
24 A.     Yeah.  They're two different issues.

167

1  They're related, but they're two different issues.
2  Right?
3  Q.     Right, I understand.  I just to make sure I
4  understood correctly.
5  A.     But, just to clarify, number 4 is going to
6  be used with either number 1 or number 3.  So,
7  number 1 and number 3 are the alternative based upon
8  whether or not there's a cycle counter, airflow
9  monitor, or indicator light.
10       2 and 4 are always going to be used because
11 2 goes in the manual --
12 Q.     Right.
13 A.     -- to describe where it needs to be cleaned
14 after you tell them it needs to be cleaned.
15       And, 4 is going to be in the manual, and
16 it's going to be on the back of the dryer.  So that
17 when the installer, who doesn't read the manual,
18 will get the warning.
19 Q.     And, where on the rear of the dryer do you
20 propose that Illustration 4 be?
21 A.     Adjacent to the exhaust opening.
22 Q.     So, above, on the side?
23 A.     It doesn't matter to me.
24 Q.     Okay.  And, the size of the warning would be

168

1  as it's represented in your report?
2  A.     As long as it's 8 point font.  This looks
3  like it's 10 point font.  So it could be 10; it
4  could be 8.
5  Q.     Okay.  With regard to that heading Warning
6  in the safety orange at 28 point font, or --
7  A.     Well, it would be at least double.  I prefer
8  double.  Standard allows 50 percent more.
9  Q.     Okay.
10       MR. HUGHES:  Let's take a
11 five-minute break.
12       (Brief recess.)
13 BY MS. YEMMA:
14 Q.     I wanted to ask you in conjunction with your
15 analysis in this matter, and I don't think I asked
16 this before, but did you look at on-product labels,
17 or product literature, from other dryer
18 manufacturers other than Electrolux?
19 A.     We talked about that.  I don't think I did
20 anything specific for this case except for the
21 Fisher Paykel, and the Whirlpool indicator light.
22 Q.     Okay.  So, are you aware if any dryer
23 manufacturer, not including Electrolux, puts on an
24 on-product warning, those cleaning requirements?

169

1  A.     I don't recall any offhand other than the
2  Laundry Center.
3  Q.     Well, the Laundry Center that Electrolux
4  makes?
5  A.     Yes.  I'm sorry.
6  Q.     Okay.  But for other dryer manufacturers,
7  are you aware of any dryer manufacturer that puts a
8  label on the product that instructs the user to have
9  the dryer cleaned?
10 A.     Yes, I don't recall another label -- another
11 manufacturer that has to do that.  While I don't
12 recall another example of a manufacturer that does
13 that, but I don't know that the other manufacturers
14 have to do that.
15 Q.     Why is that?
16 A.     They have different designs.  They have
17 different hazards associated with them.
18       Again, the issue with this dryer, as Carl
19 King testified, is that the lint fire is the
20 greatest hazard and most likely fire scenario
21 associated with this dryer.  It's not like it's the
22 least likely thing they're going to see with this
23 dryer.  It's the most critical hazard associated
24 with this dryer, according to Mr. King.

43 (Pages 166 to 169)

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

170

1      So another manufacturer that's manufacturing
2  a bulkhead, where it's not that significant of an
3  issue, you know, they may not have to put it on the
4  dryer.
5  Q.     Okay.  If you could turn to page 26 of your
6  report.
7  A.     Okay.
8  Q.     So on page 26, the third paragraph, in the
9  middle of the paragraph where it starts at "it is
10  common," do you see that?
11  A.     Okay.
12  Q.     Okay, and I'll read it.  "It is common for
13  products and appliance manufacturers, such as
14  Whirlpool, to assess the usability of their
15  products, including dryers, and the efficacy of
16  their product warnings and instructions."
17      Did I read that correctly?
18  A.     Yes.
19  Q.     Okay.  So, what is your basis for that
20  statement?
21  A.     Well, (a), it's talked about in the products
22  safety management textbooks.  It's talked about in
23  the -- it's taught in the human factors and product
24  safety classes.  It's been my experience at IBM that

171

1  these are the types of activities that we did with
2  regard to warnings, instructions, and usability.
3  There's a whole industry of human factors
4  professionals, such as myself, that get hired by
5  companies to do this exact thing.
6      And then specifically with respect to
7  Whirlpool, I know that Whirlpool, several years ago,
8  submitted their new washer/dryer combo in the
9  usability -- the user center design process they put
10  in place to design it into the competition at the
11  Human Factors and Ergonomics Society Annual
12  Conference.  We do a -- under the Product Technical
13  Group, we do a User Center Design Award each year
14  where manufactures submit their product, and they
15  detail the usability in human factors related
16  activities they did during the design process for
17  that product to ensure ease of use, safety and
18  comfort.
19      So, I've been sitting on that award team
20  maybe half the last 10 years, or so.  So, I've seen
21  each year there's about a dozen submissions of
22  manufacturers that submit their products.
23  Q.     So it's knowledge you learned -- with regard
24  to sitting on that award team -- concerning

172

1  Whirlpool?
2  A.     For Whirlpool, specifically?
3  Q.     For Whirlpool, specifically?
4  A.     Yes.
5  Q.     Okay.  Are you aware of what any other dryer
6  manufacturers do with regard to developing warnings?
7  A.     I know what Electrolux does.
8  Q.     Okay.  Apart from Electrolux.  So, apart
9  from Electrolux, do you know what other dryer
10  manufacturers -- and I'm going to be more
11  specific -- back in the timeframe of 2003-2004?
12  A.     Yes, I wasn't researching -- well, that's
13  not true.  I think I had a Whirlpool case back in
14  2004-2005, maybe 2006, timeframe.  But, I didn't do
15  a project back in that timeframe to determine what
16  other manufacturers were doing, other dryer
17  manufacturers were doing.
18  Q.     So in the Whirlpool case -- and we've talked
19  about it a couple of times -- but to your
20  understanding, the fire, or the alleged fire,
21  started from spontaneous combustion?
22  A.     Yes.
23  Q.     Okay.  And, do you know what specifically --
24  were they drying materials soaked in flammable

173

1  liquids?  Do you know what the underlying facts were
2  that brought about the spontaneous combustion?
3  A.     I'm not 100 percent sure, but I would think
4  it was more cooking oils and, say, for example,
5  jeans soaked in gasoline, or something like that.
6  Q.     So, cooking oil, and towels from the
7  kitchen, or --
8  A.     It's probably more likely than, like I said,
9  move coveralls covered in oil and grease.
10  Q.     Okay.  And, you don't recall specifically
11  whether you were looking at an on-product warning,
12  or what was in the literature; is that right?
13  A.     I don't recall.
14  Q.     Was that a subrogation case, if you know?
15  A.     I believe so.
16  Q.     And, it was in Virginia?
17  A.     That one, I don't think so.
18  Q.     Okay.  I may be misremembering.
19      Do you remember where it was pending?
20  A.     I'm pretty sure the client was one of the
21  several attorneys for Cozen, O'Connor down in
22  Atlanta.  But I think the defense attorney, for
23  whatever reason, was out, like, the Chicago area.  I
24  don't know why that's coming to mind, but...

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

174

1  Q.    All right.
2  A.    And I remember the defense expert, the
3  defense human factors expert, was out of California.
4  Q.    Okay.  If you could turn to page 29, please.
5  A.    Okay.
6  Q.    You referenced Mike Stoddard, and his
7  conclusion with regard to the indicator light.  And,
8  I'm curious as to whether you have any information
9  regarding compliance rates by consumers with
10 products that have indicator lights?
11 A.    How so?
12 Q.    In terms of if an indicator light comes on,
13 whether consumers do something in response to that?
14 A.    I believe they do.
15 Q.    Okay.  And, have you conducted any studies
16 to support that they do, or can you reference any
17 studies that would support --
18 A.    I used to design products that had indicator
19 lights, and I used them to alert and inform users of
20 different states, and when the state occurred, they
21 would have to do different things.
22 Q.    What products were those?
23 A.    Anything from scanners, tape libraries,
24 monitors, keyboards, laptops, storage base systems,

175

1  wireless cards.
2        I mean, indicator lights are fairly commonly
3  used.  It's kind of like how do we know people
4  breathe oxygen.  It's just -- it's that common.
5        The reason they're used is they have certain
6  benefits.  They are more of an active warning.  So,
7  they're more likely to capture your attention.  So a
8  light flashing on your dryer is going to capture
9  your attention more so than a static warning that
10 doesn't grab your attention as much.
11       So, they're precariously used in product
12 design, and an appliance design.
13 Q.    So in a scanner, for example, what would the
14 indicator light be used for?
15 A.    Well, typically, it would be for indicating
16 power on so that you don't try to turn it off when
17 it's on, and turn it on when it's off, to let you
18 know that the scanner is actually running so you
19 don't hit the scan button again.
20       So it could be an error, that you want to
21 flash rapidly, to let the user know there's
22 something wrong with scanner.
23 Q.    In any of the products that you just
24 identified, that had the indicator light, would the

176

1  light signify that the user had to do something
2  affirmatively with regard to the product?
3  A.    Most of them do because it tells you what
4  state the system's in, and if you want to change the
5  state, you would have to do something affirmatively
6  with the product.  So --
7  Q.    Okay.  But what about something -- I'm
8  sorry, go ahead.
9  A.    For example, my laptop, the screen is
10 asleep, I believe.  If the unit was sleeping, you
11 would have an indicator light that slowly bleeps to
12 let you know that it's sleeping.  So, you wake it
13 up.  If you don't know that it's sleeping, you may
14 assume it's off, and then hit the button to turn it
15 on, which means you're going to reboot the system,
16 which you didn't have to do.
17       So indicator lights give a state to the
18 system, and then if you want that state to change,
19 whether it's good, bad or indifferent, you have to
20 actively do something to get it changed.
21 Q.    Okay.  If you could turn to page 36, please.
22 A.    Okay.
23 Q.    In the -- I guess the second paragraph where
24 it starts out "based upon".  Do you see that?

177

1  A.    Okay.
2  Q.    In that sentence, you refer to Emil and
3  Sharon Cloud, and I just wanted to confirm that's
4  just a typo.
5  A.    That's a typo.  I apologize.
6  Q.    No, no, that's okay.  I just wanted to point
7  that out because the other correction you made was
8  actually at the bottom of that page.
9  A.    Yes.
10 Q.    And, I just noticed that, too.  I assume
11 that should say Ursy and Joseph Vitale?
12 A.    Yes, ma'am.
13 Q.    Okay.  So if you turn to page 38 under the
14 section after "Findings".
15 A.    Okay.
16 Q.    I know we talked a lot about your opinions
17 throughout the deposition, but I'd just like to run
18 through and make sure I understand what your bases
19 are.
20 A.    Sure.
21 Q.    Okay.  So --
22 A.    If I can make a statement that the basis for
23 them is everything in the analysis.  So, they
24 usually follow a section of analysis to make an

45 (Pages 174 to 177)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

178

1    opinion.  So if I missed anything, I don't want to
2    be precluded from pointing back to the analysis to
3    say everything I meant to say is in the analysis
4    section.
5    Q.    Okay.  So with that explanation -- okay, and
6    I think that's absolutely fair.
7          Okay.  So, Finding No. 1:  "Electrolux's
8    yearly cleaning and exhaust duct recommendations
9    failed to comply with the standard of care for the
10   design and development of product safety warnings
11   used to communicate critical safety information to
12   product users and installers."
13         What is your basis for that opinion?
14   A.    I'm sure it's multifaceted.  So, number one,
15   it wasn't on the product.  Number two, the manner in
16   which it was presented in the manuals is inadequate
17   and inappropriate.  So, that's kind of a general
18   reasons why.
19   Q.    Okay.  And how about No. 2, and I'll just
20   read it:  "Electrolux was aware that installers and
21   users of their dryers were not reading the written
22   material they provided with the dryer, were only
23   reading parts of the accompanying material, and/or
24   did not have the material available when

179

1    installation and/or using the dryer."
2          What's your basis for Opinion No. 2?
3    A.    I believe most of it comes from Carl King's
4    testimony.  I go through that on pages 13 and 14 of
5    the report, and I reference Carl King, Carl King's
6    multiple depositions, as the designee for
7    Electrolux.
8    Q.    Turning to Opinion 3:  "It was not
9    reasonable for Electrolux to rely solely upon the
10   use of manuals and a checklist to warn installers
11   and users that the incident dryer needed to be
12   cleaned at least once a year, that flexible foil
13   venting should not be used, and lint buildup near
14   the heat source and a fire can result if these
15   instructions are not followed."
16         What's your basis for that opinion?
17   A.    Well, if you look at Findings 1 and 2, it's
18   cumulative.  Right?  So, they failed to comply with
19   the standard of care from the design, development
20   and product safety warning.  Electrolux was aware
21   that their installers and users were not reading the
22   material, were only reading parts of it, and/or did
23   not have it available in installing and using the
24   dryer.

180

1          So if you put those two in conjunction with
2    the fact that it's the greatest hazard associated
3    with the product, then that's how I come to my
4    opinion.
5    Q.    Anything else?
6    A.    Whatever is in the analysis.
7    Q.    Okay.  So Opinion 4:  "Electrolux should
8    have conspicuously and permanently placed the
9    warnings directly on the dryer and the dryer was
10   defective and reasonably dangerous without them."
11   A.    Yes.
12   Q.    What's your basis for that opinion?
13   A.    The standard of care for the industry, the
14   standards related to product safety, signs, and
15   labels, the human factors literature, the warnings
16   literature, the fact that it's the greatest hazard.
17   The fact that Electrolux is aware that most people
18   are using flexible foil ducting, and that most
19   people are not cleaning the interior of their dryer.
20   And, that they are aware that most people are not
21   getting the manuals, reading the manuals, and/or not
22   reading all of the manual.
23   Q.    Okay.  Opinion 5:  "Electrolux failed to
24   provide effective warnings in their manuals

181

1    regarding the lint fire hazard, the prohibition from
2    using flexible foil ducting, and the requirement to
3    have the interior of the dryer and exhaust cleaned
4    every year."
5          What's your basis for that opinion?
6    A.    Again, all the standards, the literature,
7    the guidelines, the recommendations, all state you
8    should provide conspicuous noticeable warnings.
9    They should be prominently placed in the manual.
10   They should be explicit.  They should be specific.
11   The should -- following the warning should prevent
12   the hazard.
13         And, in comparison, the warnings that
14   Electrolux put in the manual regarding this hazard
15   were not prominently placed, were not conspicuously
16   presented, were not explicit, were not specific, and
17   following the warnings may not prevent the fire.
18   Q.    And No. 6 is cumulative, it appears, in your
19   opinion:  So, "Electrolux should have provided
20   prominently placed, conspicuous, legible, explicit
21   and specific warnings in their dryer manuals and the
22   dryer was defective and unreasonable dangerous
23   without them."
24   A.    Exactly.

46 (Pages 178 to 181)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

182

1   Q.    Okay.  And, the basis for that opinion is?
2   A.    They didn't do it.  The standards, the
3   guidelines, the recommendations, and so forth, say
4   this is how you deal with critical safety related
5   information.  So by not providing the conspicuous,
6   prominently placed, legible, explicit, specific, it
7   failed to meet the standard of care.  It rendered it
8   defective and unreasonably dangerous.
9   Q.    Okay.  Opinion 7: "Electrolux failed to
10  provide an adequate warning system, which included
11  conspicuous and explicit on-product warnings, which
12  met contemporary industry standards, guidelines, and
13  practices regarding the lint fire hazard associated
14  with the improper maintenance and installation of
15  the dryer."
16        And, what is your basis for that opinion?
17  A.    The first six opinions are all building to
18  that one.  So, we went through the fact that it's
19  the greatest fire hazard.  They were aware that
20  people weren't reading the manuals, getting the
21  manuals, or reading all the manuals.
22        The standards say it needs to be on the
23  product.  The warnings in their manual were
24  inadequate, and they should have provided them on

183

1   the product.  They should have provided them in the
2   manual prominently, conspicuously, et cetera.
3   Therefore, they failed to provide an adequate
4   warning system that met those standards, guidelines,
5   and practices.  And, their actions failing to do
6   that was improper.  I think that get -- I mean
7   Opinion 8 is just a continuation of it.
8   Q.    Okay.  Then jumping to No. 9: "Electrolux's
9   failure to provide an adequate warning system
10  regarding the lint buildup fire hazard deprived
11  Joseph and Ursy Vitale of critical safety
12  information they needed to safely use the dryer."
13        What's your basis for that opinion?
14  A.    Well, they failed to provide an adequate
15  warning system, and Joseph and Ursy Vitale testified
16  that they were not aware that lint could build up --
17  I should say Joseph and/or Ursy Vitale testified
18  that they were not aware that lint could build up
19  behind the drum, or near the heat source, and create
20  a fire hazard.  They were not aware of the need to
21  have the dryer cleaned professionally every year to
22  prevent a dryer fire.
23        So, Electrolux's failure to provide an
24  adequate on-product warning -- or I should say

184

1   Electrolux's failure to provide an adequate warning
2   system, that included the on-product warning,
3   deprived them of that information.  And, that
4   information was absolutely critical for the safe use
5   of the product.
6   Q.    Okay.  Jumping ahead to 11: "Electrolux's
7   failure to assess the efficacy of their warnings and
8   instructions was improper, unreasonably dangerous,
9   contrary to common industry practices, and was a
10  cause of the fire."
11  A.    Yes.
12  Q.    What's your basis for that opinion?
13  A.    Well, most of it -- well, there's two parts,
14  I guess.  One is the testimony of King, Ripley,
15  Ricklefs, that I cited in the analysis.
16        And two, the proper thing to do from a
17  product design standpoint is to assess your product
18  both prelaunch and after launch, and then if you
19  identify problems in either state, pre or post
20  launch, to change the product design and/or the
21  warnings so that you get the performance that you
22  want.
23        So, I'm assuming that Electrolux didn't want
24  to burn people's houses down, so they should have

185

1   been fixing their warnings and instructions because
2   they knew they weren't effective.
3         Carl King testified that most of the fires
4   he investigates, the dryer hasn't been cleaned.  And
5   most of the dryer fires, Electrolux is aware most of
6   their users or installers are using flexible foil
7   venting to install the dryers.  They knew it.  They
8   either testified to it, or it was in their material.
9   But, yet, they did nothing to assess how effective
10  their warnings were.
11        Ripley, Ricklefs, King, were all responsible
12  for product design, and none of them were aware of
13  any testing, any user testing, any testing.
14  Bringing in the human factors consultant, looking at
15  the service data to figure out, maybe, the warnings
16  needed to be changed, or updated.  They did nothing.
17  They did absolutely nothing.  And, that's improper.
18        And because they did nothing to assess them,
19  they didn't change them.  And because they didn't
20  change them, they continued to provide inadequate
21  warnings, and the inadequate warnings was a cause of
22  the fire.
23  Q.    Okay.  Opinion 12: "Electrolux's failure to
24  exercise reasonable diligence in the use of their

47 (Pages 182 to 185)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

**186**

1    service, warranty, and claims data to assess and
2    improve the effectiveness of their product warnings
3    was unreasonably dangerous, improper, and a cause of
4    the fire."
5         What's your basis for that opinion?
6    A.    Again, it's the testimony -- well, first of
7    all, it's the proper thing to do based upon product
8    safety guidelines, product safety management, human
9    factors literature, guidelines, recommendations, the
10   warnings literature, guidelines and recommendations.
11   It's what companies do.
12        For example, we talked about the IdeaScan
13   scanner when I was with IBM.  My actions were
14   directly the result of the increase in the number of
15   claims.  If the legal department had sequestered
16   that information, and didn't provide it to the rest
17   of the product development team, they wouldn't have
18   known.  If they didn't know, they wouldn't have made
19   any changes because they wouldn't have known there
20   was a problem.  But because that information was
21   shared with the product development team, they
22   brought a usability person in -- that was myself --
23   to come in, and address the problem.  And I
24   addressed it by changing the warnings, and

**187**

1    instructions, to get people to realize that there's
2    a problem, get them to realize what they have to do
3    to eliminate the problem, and then it worked.  And
4    then when we went to the next design, we eliminated
5    the problem.
6         So, Electrolux didn't do these things.  Karl
7    King didn't share the data.  Ripley never saw the
8    data.  Ricklefs never saw the data.  I think -- let
9    me get into my analysis here because we've got --
10   oh, David Fuller, the quality engineer, Electrolux's
11   Quality Engineer, didn't know.  He testified that no
12   one ever communicated to him the number of reported
13   fires, or personal claims, involving an Electrolux
14   dryer while he was employed as the Quality Engineer
15   for dryers.
16        This is absurd.  I mean, the guy is
17   responsible for the quality of the product, and Carl
18   King, and the law department, aren't telling him.
19   Q.    Okay.  Anything else on 12?
20   A.    I think that's a good covering.
21   Q.    Okay.  Opinion 13:  "Because alternative
22   safeguards were available to mitigate the fire
23   hazard associated with lint buildup within the
24   dryer, the only adequate warning system that

**188**

1    Electrolux could have provided was in conjunction
2    with one or both of the safeguards."
3         Did I read that correctly?
4    A.    I think so.
5    Q.    Okay.  What's your basis for that opinion?
6    A.    First is Michael Stoddard opined that the
7    indicator light, in conjunction with the cycle
8    counter, and/or airflow monitor, was feasible and
9    available.  And, all of the product safety
10   literature, warnings literature, and human factors
11   literature combined state that you do not provide
12   warnings when safeguards are available.  Warnings
13   are third in the hierarchy.
14        They're proper use is a supplement to
15   guarding, not a substitute for guarding.  Therefore,
16   if Michael Stoddard is saying these things were
17   feasible and available, the only adequate warning
18   should have been as a supplement to the safeguard,
19   not as a substitute for the safeguard, which
20   Electrolux did improperly.
21   Q.    And, I think we talked about this earlier,
22   but just to confirm.  You're relying upon
23   Mr. Stoddard's opinions, and his intended testimony,
24   that both the light, and the airflow monitor, were

**189**

1    feasible at the time the Vitales' dryer was
2    manufactured.  Is that right?
3    A.    Sort of.  I'm relying upon Mr. Stoddard to
4    say the cycle counter, and the airflow monitor, were
5    feasible and available.
6    Q.    Okay.
7    A.    Electrolux has already shown that the
8    indicator lights were feasible and available.  They
9    used them on the dryer.
10   Q.    But, did they use them on dryers that were
11   manufactured in 2004, the Vitale dryer, that you're
12   aware of?
13   A.    The Vitales' dryer had an indicator light on
14   it.  It just wasn't associated with the cycle
15   counter, or the airflow monitor.  So the indicator
16   light technology was available, and was actually
17   used by Electrolux on the dryer.  Its use, in
18   conjunction with the cycle counter, and the airflow
19   monitor, is what you're questioning.
20   Q.    Right.
21   A.    Yes.
22   Q.    Okay.
23   A.    So I am not relying upon whether or not the
24   indicator light could have been used because

**48 (Pages 186 to 189)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

190

1  Electrolux has used it.  I am relying on Mike as to
2  whether the cycle counter, and airflow monitor,
3  could have been used.
4  Q.     Okay.  Opinion 14:  "In conjunction with the
5  indicator light(s), Electrolux should have ensured
6  conspicuous, specific, and explicit on-product
7  warnings were provided on their Frigidaire
8  ball-hitch style freestanding dryers, including the
9  incident dryer."
10 A.     Yeah, that should be GE.  Sorry about that.
11         MS. YEMMA:  Off the record.
12         (Discussion held off the record.)
13 BY MS. YEMMA:
14 Q.     So I had read 14, and we made the correction
15 Frigidaire to GE.
16         So, what's your basis for Opinion No. 14?
17 A.     The basis is that the warnings necessary to
18 inform users of what the indicator light was, and to
19 alert them to the hazard that the indicator light
20 was working with the cycle counter, or airflow
21 monitor, to avoid it.
22 Q.     Okay.  And, then, 15, we talked about this a
23 short while ago.  "The warnings should have been
24 placed on top of the dryer and the back of the

191

1  dryer, where relevant (see below), and repeated
2  within the manuals, checklist, and operating
3  instructions for the dryer."
4         And when you say "see below", do you mean on
5  the prior page?
6  A.     Yes, ma'am.
7  Q.     Okay.  And, what's your basis for Opinion
8  No. 15?
9  A.     On top of the dryer is the indicator light
10 warning.  If they weren't going to put the indicator
11 light, and the cycle counter, they needed to provide
12 the warning that's in Illustration 3 on top of the
13 dryer where it was prominently placed, readily
14 visible, conspicuous, every time the dryer was
15 encountered.
16         On the back of the dryer for the foil --
17 flexible foil warning, we'll call it, Illustration
18 4, because that's where the venting system is hooked
19 up.  That's where the information was relevant for
20 the installer.  So, it needed to be placed where it
21 was relevant, and was placed where and when the
22 information was needed.
23 Q.     Okay.  And, I think that also covers Opinion
24 16.  Right?

192

1  A.     Yes.
2  Q.     Okay.  So 17, that opinion is, "It would
3  have been reasonable for Electrolux to provide an
4  adequate warning system, including two conspicuous,
5  specific and explicit on-product warnings, with
6  their GE branded dryer.  The cost in terms of money,
7  effort, and time to do so would have been minimal
8  and insignificant."
9         What's your basis for that opinion?
10 A.     Two things:  The cycle counter, and
11 indicator light, that's Mike Stoddard's opinion, so
12 I'm relying on him for that.
13         Second, for my labels, Electrolux, we know
14 put them on the Laundry Center.  So, I've got
15 opinions regarding them that deal with another case,
16 but Electrolux did show that they could put warnings
17 related to these topics on the dryer.  And, Brian
18 Ripley testified that he could have put another
19 warning on the dryer, too.
20         And, that's my basis, as far as costs go.  I
21 mean, this isn't an expensive adventure for them.
22 Q.     Have you done any type of cross analysis?
23 A.     Not for this case because Electrolux has
24 already done it with their Laundry Center.

193

1         But, in other cases, we're talking about a
2  single label costing, maybe, a dollar, if that.  For
3  Electrolux, when they're building, I don't know, a
4  couple hundred thousand dryers a year, we're talking
5  cents for the labels.
6  Q.     So the label that's on the Laundry Center --
7  and I realize the Vitale dryer was a freestanding
8  dryer -- are you critical of the language of that
9  on-product label?
10         MR. HUGHES:  Are you talking about
11 the warning label on Laundry Centers?
12         THE WITNESS:  Yes.
13         MS. YEMMA:  The warning label,
14 right.
15         MR. HUGHES:  I think we are kind of
16 straying a little bit past the opinions that
17 are in his report with respect to the
18 adequacy of the warning content on the
19 Laundry Centers, which we noted in other
20 cases he's been critical of, that you're
21 aware of.
22         But, I don't think that's included
23 in your report in the analysis.
24         THE WITNESS:  No.

**49 (Pages 190 to 193)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

WILLIAM J. VIGILANTE, JR., Ph.D., CPE

194

1         MS. YEMMA:  But, he does reference
2    it.  He references the label.
3         So, are you instructing him not to
4    answer that question?
5         MR. HUGHES:  Yes.  I think that's
6    outside of his report.
7         MS. YEMMA:  Okay, that's fine.  No
8    problem.
9         MR. HUGHES:  Let me put it on the
10   record clearly:  It's outside the opinions
11   in his report related to this case.
12        MS. YEMMA:  Fair enough.  Okay.
13   BY MS. YEMMA:
14   Q.   Moving to 18:  "Had an adequate warning
15   system, including two conspicuous, explicit, and
16   specific on-product warnings, been provided,
17   Electrolux would have ensured that Joseph and Ursy
18   Vitale were provided with the information they
19   needed to make an informed decision as to their use
20   and maintenance of the incident dryer and avoided
21   the fire."
22   A.   Yes.
23   Q.   And, what's the basis for that opinion?
24   A.   Two things:  One, is the warnings and human

195

1    factors literature that shows if you provide a
2    warning system, like I described it, it will be
3    effective in informing people, and changing behavior
4    towards safety, that is, avoiding fire.
5         And two, Ursy Vitale testified that had a
6    conspicuous warning been placed on the front of the
7    dryer, she would have seen it, and heeded it.  And,
8    I'm paraphrasing her testimony.  But, I do reference
9    her testimony on page 33 of my report with respect
10   to that opinion.
11   Q.   Okay.  And, anything else with regard to 18?
12   A.   I think that does it.
13   Q.   So Opinion 19, "Without adequate warning to
14   the contrary, Joseph and Ursy Vitale's lack of
15   knowledge with respect to the need to have the dryer
16   cleaned every year and the prohibition of using
17   flexible foil ducting was foreseeable to
18   Electrolux."
19        What's your basis for that opinion?
20   A.   A couple things:  One, we know that they
21   didn't provide adequate warning.
22        Two, we know Joseph and Ursy Vitale did not
23   know that lint can build up near the heat source,
24   and create a fire.  They were not aware of the need

196

1    to clean the interior of the dryer -- have the
2    interior of the dryer cleaned on a yearly basis by a
3    professional.  We know that they took steps to clean
4    the dryer, and around the dryer.  We know they took
5    steps to clean the transition duct, and the house
6    vent, on a yearly basis.  So that goes to the
7    support that had they known, they would have gotten
8    it done.
9         We know that Electrolux is aware that most
10   of their users are using flexible foil venting.
11   Carl King testified that most of the dryers he sees
12   in his fires involve dryers that haven't been
13   cleaned.  We have been through the literature from
14   everything from the CPSC to UL to a bunch of other
15   organizations that acknowledge that people don't
16   know, and do not clean the interior of the dryer.
17        Electrolux, on their own website, stated
18   that most people don't know that lint can build up
19   around the heating element, and cause a fire.
20        We know from the CPSC, the NFPA, and the
21   U.S. Fire Administration data that the majority of
22   dryer fires are caused by a lint buildup, and that,
23   I should say, the largest percentage are due to lint
24   buildup in the first item ignited as lint, dust and

197

1    so forth.  And we know, based upon the data
2    collected, that most people are not cleaning the
3    dryers, the interior of their dryers.
4         So as I go through the last section of my
5    report, the Vitales' actions were consistent with
6    people's actions, and the fire and safety data
7    that's available with respect to how people use and
8    maintain dryers.
9    Q.   Okay.  And, Opinion 20:  Electrolux knew or
10   should have known that user's (such as Joseph and
11   Ursy Vitale) knowledge did not extend to the fire
12   hazard associated with the use of flexible foil
13   ducting and not having the interior of the dryer and
14   house exhaust system cleaned yearly by an Electrolux
15   authorized service technician."
16        Dr. Vigilante, what's your basis for that
17   opinion?
18   A.   The same type of information.  Electrolux,
19   again, was aware that people weren't cleaning the
20   dryers.  They were aware most users were using
21   flexible foil.  Electrolux's own employees
22   testified -- and I got them listed everywhere from
23   Shelley Claussen, Steve Joerger, to David
24   Fuller, to Mike Ricklefs, to Brian Ripley.  I don't

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**WILLIAM J. VIGILANTE, JR., Ph.D., CPE**

198

1  think any of them had ever hired anybody to come in,
2  and professionally clean their dryer.
3       Jeorger testified he wasn't aware that lint
4  could accumulate behind the dryer drum and cause a
5  fire hazard.
6       Shelley Claussen, she testified why would
7  she clean -- remove the drum, and clean behind it?
8  She never had any problems with her dryer.  That's
9  her testimony.
10      The Vitales testified they never had a
11 problem with their dryer, so why should they be any
12 different than Shelley Claussen.  And, Claussen was
13 the Engineering Service Manager for over 10 years at
14 Electrolux.  Her group had input into the
15 literature, and the warnings, that accompanied the
16 dryer, and she didn't know.  So, how are the Vitales
17 going to know if the person, who is responsible for
18 the manuals and the warning, doesn't know.
19      David Fuller testified that each year, he
20 cleaned his dryer, but he did not disassemble it.
21 He did not remove the drum, or clean the lint
22 buildup within the heater pan to prevent lint from
23 building up near the heat source.
24      Fuller testified he was not aware that lint

199

1  could build up in the heater pan.  Fuller also
2  testified that he was not aware that yearly cleaning
3  requirement was recommended to prevent lint building
4  near the heat source where it could ignite, and
5  cause a fire.
6       Again, Fuller is the Electrolux Quality
7  Engineer inside of dryers.  So, even he didn't know.
8  Q.    Going back to Shelley Claussen, do you know
9  specifically what Shelley's job was at Electrolux?
10 A.    I know her title was Engineering Service
11 Manager for over 10 years at Electrolux.  And her
12 group had input into the end-user literature and
13 warnings that accompanied their dryers.
14 Q.    Apart from what you just read, do you know
15 specifically what her job was?
16      I know you know the title, but do you know
17 what her job was?
18 A.    I would have to go into my summary of her
19 deposition to see if it's in there, if that's okay
20 with you.
21 Q.    Okay.
22 A.    Shelley Claussen testified that she had
23 input into the literature for dryers.  Her group
24 would format them, and lay them out.  Her employees

200

1  may work with Ripley on rephrasing, or rewording,
2  the engineers content.  1995 to 2000, she was in the
3  Quality Department.  She helped -- she finished
4  product quality audits, helped in the reliability
5  lab, did tests based upon engineer's test plan.  She
6  was the ISO Coordinator for the East Webster City
7  Plant.
8  Q.    Is that your summary?  Is that from the
9  deposition in the State Farm consolidated matter?
10 A.    Yes, ma'am.
11 Q.    All right.  Was there any other bases you
12 wanted to give for Opinion 20?
13 A.    Other than what's in my report, I think I'm
14 good.
15 Q.    Okay.  And then your last Opinion No. 21:
16 "As with product users in general, Joseph and Ursy
17 Vitale relied upon Electrolux to provide them with a
18 reasonably safe product and adequate warning to
19 understand how to safely use the incident dryer."
20      What's your basis for that opinion?
21 A.    It's basic product safety design guidelines
22 in the human factors literature, and the warnings
23 literature, and it's cited in the report.
24      MS. YEMMA:  Okay.  I'm just going

201

1  to look through my notes very quickly.
2       MR. HUGHES:  Sure.  Go ahead.
3       MS. YEMMA:  Okay, thanks.
4       (Brief recess.)
5       MR. HUGHES:  Back on the record.  I
6  have just a quick statement for the record.
7       At the beginning of the deposition,
8  there was an issue about whether or not two
9  documents generated by Dr. Vigilante were
10 discoverable, and subject to production.
11 Counsel and I have talked about it off the
12 record.  It's plaintiff's position that the
13 documents are not discoverable.  They are
14 Dr. Vigilante's notes and criticisms of both
15 Dr. Purswell's report, as well as Randy
16 Bills' report.
17      Plaintiffs have not issued at this
18 time a rebuttal report in this matter.  So,
19 we are not producing it.
20      There is a hard drive, produced by
21 Dr. Vigilante, which contains additional
22 materials that he relied upon.  Again, it's
23 plaintiff's position that his notes on Dr.
24 Purswell's report, as well as his notes on

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**