## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH VITALE, et al | : |
|         Plaintiffs, | : |
| | :   CIVIL ACTION |
|    v. | : |
| | :   NO. 15-cv-01815-RAL |
| ELECTROLUX HOME | : |
| PRODUCTS, INC: | : |
|         Defendant. | : |

## M E M O R A N D U M

**RICHARD A. LLORET, M.J.**                                    **AUGUST 14, 2018**

Before me are several motions *in limine* filed by both plaintiffs Joseph and Ursy A. Vitale (collectively "the Vitales") and defendant Electrolux Home Products, Inc.

This is a subrogation action in which the Vitales, through their homeowners insurance carrier Allstate, seek to recover sums paid out pursuant to an insurance claim settlement. The Vitales filed the underlying insurance claim after a fire at their home. The Vitales, through Allstate, allege that the damage resulted from an allegedly defective gas clothes dryer (the "subject dryer") designed, manufactured, distributed, and/or sold by Electrolux.

The Vitales filed an Omnibus Motion to Preclude Certain Evidence (ECF No. 47) and a Motion *in Limine* to Exclude Industry Standard Evidence and the Dryer Design Opinions of Randall Bills, P.E. (ECF No. 70). Electrolux filed eleven separate motions *in limine* (ECF Nos. 36, 41, 43, 44, 46, 48, 49, 50, 51, 52, and 53) addressing eleven discrete evidentiary requests. I will address the Vitales' motions before turning to Electrolux's motions.

# EVIDENTIARY RULES

My decisions on the parties' motions *in limine* are guided by the following evidentiary rules.

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401(a) and (b). Rule 402 directs that "evidence which is not relevant is not admissible." Fed. R. Evid. 402. The "basic standard of relevance is thus a liberal one." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993).

Second, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A "danger of unfair prejudice" may result from evidence that "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980).

I reserve discussion of more specific evidentiary concerns for the individual motions, addressed in detail below.

## PLAINTIFFS' MOTIONS

### 1. ECF No. 47 – Plaintiffs' Omnibus Motion to Preclude Certain Evidence

The Vitales move to exclude: (1) evidence of administrative agency inaction with respect to the dryer model that allegedly caused the damage to their home; (2) evidence that the dryer in question was designed and manufactured in voluntary compliance with

industry standard ANSI Z21.5.1; (3) evidence of depreciation and actual cash value calculations made by Allstate in adjusting and settling the Vitales' insurance claim; and (4) evidence that the Vitales possessed a policy of insurance.

(1) The Vitales' motion to preclude evidence of administrative agency inaction is **GRANTED**. I caution the parties that I may revisit this ruling should the Consumer Products Safety Commission (CPSC) complete its investigation prior to trial. The Vitales seek to preclude any mention by Electrolux of the fact that no administrative agency has issued a recall or other consumer warning regarding the subject dryer.

Because the Vitales allege that the subject dryer was defective, the lack of any administrative action aimed to protect consumers from the subject dryer is relevant to Electrolux's defense that the subject dryer is not defective. Fed. R. Evid. 401 requires only that the proposed evidence have "any tendency" to make a fact of consequence more or less probable. The evidence satisfies Rule 401's minimal requirement, but Rule 403 is a different story.

While one could draw an inference from the lack of administrative action that the product is safe, the reality is that the inference has faint probative value. The lack of a defect is just one of any number of reasons that might explain a lack of administrative action. Explaining the basis of the inference of safety would require an explanation of the jurisdiction and mandate of the CPSC. It would require delving into the likelihood that the product defect would come to the CPSC's attention and meet the CPSC's threshold for investigation. Defending against the inference would require an explanation of the reasons for the absence of agency action that do not center on the safety of the product. This evidentiary issue promises to focus a great deal of trial time and jury attention on the inner workings of the CPSC, while providing at best an

indeterminate evidentiary "payoff" for what should be the focal point of the trial: whether the product was defective. No doubt there will be more direct and forceful proof of the product's safety, or lack of safety, introduced by the parties. *See* Fed. R. Evid. 403 (a court may exclude relevant evidence when the probative value is substantially outweighed by the risk of jury confusion and wasted time).

The Vitales point to the CPSC's enabling act as support for their contention that evidence of a lack of recall is inadmissible. The statute states that "[t]he failure of the Commission to take any action . . . with respect to the safety of a consumer product shall not be admissible in evidence in litigation . . . ." 15 U.S.C. § 2074(b). The parties inform me that the CPSC has initiated an investigation to determine whether a recall notice should be issued for Electrolux dryers, including the model of the subject dryer. Pls.' Mot. in Lim. (ECF No. 47-1, at 4). This brings into play the possibility that the defendants might attempt to introduce the CPSC's refusal to take action after investigating the product, rather than a complete failure to investigate the product. Such an evidentiary predicate promises to be more fruitful, and may change the balancing under Rule 403. *See Cummins v. BIC USA, Inc.*, 727 F.3d 506, 513 (6th Cir. 2013) (section 2074(b) bars evidence of the "complete failure by the CPSC to engage in activity on a product," not an investigation followed by a decision not to take action).

I recognize that a district court should be cautious about granting a motion to exclude under Rule 403 before trial. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 783 n.50 (3d Cir. 1994). Under the present circumstances, it seems appropriate to grant the motion to preclude at this time, but to permit the parties to revisit the issue if circumstances concerning the CPSC investigation change.

(2) The Vitales' motion to preclude evidence that the dryer in question was designed and manufactured in voluntary compliance with industry standard ANSI Z21.5.1 is **DENIED**. In addition to strict liability, the Vitales allege that Electrolux was negligent, breaching "a duty to exercise reasonable care in the design . . . of the subject dryer." Compl., ¶ 46 (ECF No. 1-4). Evidence presented to show that Electrolux designed the subject dryer in voluntary compliance with contemporaneous industry standards is relevant to show that Electrolux acted reasonably in the design of the subject dryer.

In *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), the Pennsylvania Supreme Court rearticulated the principles governing products liability actions in Pennsylvania's state courts. *Tincher* permits an examination of a manufacturer's conduct and reasonableness during the design of a product in determining whether liability attaches in a products liability context. *Id.* at 389. The holding in *Tincher* blurred the bright line demarcation between negligence theories and strict products liability theories, "counsel[ing] in favor of [the] admissibility" of evidence of compliance with industry standards to defend against strict liability claims. *Rapchak v. Haldex Brake Prod. Corp.*, No. 2:13-CV-1307, 2016 WL 3752908, at *3 (W.D. Pa. July 14, 2016).

In light of *Tincher*, and given that the Vitales assert both negligence and strict liability theories, plaintiffs' motion to preclude introduction of compliance with contemporaneous industry standards is denied.

(3) The Vitales' motion to preclude evidence of depreciation and actual cash value calculations made by Allstate in adjusting and settling the Vitales' insurance claim is **GRANTED in part** and **DENIED, in part, without prejudice**. The Vitales contend that evidence of depreciation and actual cash value is irrelevant. Electrolux, on the other hand, argues that any award of damages must take these discounts into account.

In Pennsylvania, the general measure of damages for reparable harm to real property is "the lesser of the cost of repair or the market value of the affected property." *Pa. Dep't of Gen. Servs. v. U.S. Mineral Prod. Co.*, 898 A.2d 590, 596 (Pa. 2006). Damages for destroyed personal property are measured by the "fair market value" of the item at the time it was destroyed, taking into account the age and condition of the item. *See id.* at 612–13. Black's Law Dictionary defines "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market" and lists "actual cash value" as a synonym. *Value*, *Black's Law Dictionary* (10th ed. 2014). "Actual cash value" can be calculated several ways, including the cost of replacement minus depreciation, or by an assessment of the damaged property's fair market value. *Actual Cash Value (ACV)*, INTERNATIONAL RISK MANAGEMENT INSTITUTE, INC. (IRMI), https://www.irmi.com/term/insurance-definitions/actual-cash-value (last visited June 15, 2018). To avoid the trap of circular definitions, Pennsylvania law requires an examination of the policy of insurance to define the relevant terms. *See Kane v. State Farm Fire & Cas. Co.*, 841 A.2d 1038, 1049–50 (Pa. Super. 2003).

Here, as the Vitales note, the fire damage to their real property was repaired, making the cost of repair the appropriate measure of damages. Accordingly, depreciation has no bearing on establishing that Allstate properly calculated the cost of repairing the Vitales' real property and issued appropriate payments. Evidence of depreciation may not be introduced to rebut or counter evidence establishing the damages to the Vitales' real property.

As for the Vitales' personal property, a ruling excluding evidence of depreciation or actual cash value cannot be made without an examination of the policy of insurance. The Vitales' motion does not specify how Allstate calculated the amounts paid to adjust

the personal property loss. Assuming that Allstate adjusted the personal property loss pursuant to the terms and conditions of the policy of insurance, the policy would illuminate the relevance of evidence of depreciation or actual cash value. If such concerns were factored into the adjustment of the personal property portion of the Vitales' claim, such evidence would be highly probative of the accuracy of the amounts paid and Allstate's attendant right to recover the amounts paid as the subrogee of the Vitales. Without an examination of the policy of insurance and its terms dictating the adjustment of the personal property portion of the Vitales' claim, a ruling on the admissibility of evidence of depreciation or actual cash value is premature. The Vitales' motion is denied, without prejudice, as it pertains to the personal property adjustment.

(4) The Vitales' motion to preclude evidence of insurance is **DENIED, without prejudice and subject to the conditions discussed below**.

The Vitales move for exclusion of any mention of insurance. In support, they rely on a quote from a case decided in this district court prior to the 1975 adaptation of the Federal Rules of Evidence.[1] As observed in the advisory committee notes to the 1972 proposed Federal Rule of Evidence 411, courts have rejected evidence of *liability*

---

[1] The Vitales rely on *White Hall Bldg. Corp. v. Profexray Div. of Litton Indus., Inc.*, 387 F. Supp. 1202, 1206 (E.D. Pa. 1974), aff'd sub nom. *Quaglia v. Profexray Div. of Litton Indus., Inc.*, 578 F.2d 1375 (3d Cir. 1978), and aff'd, 578 F.2d 1377 (3d Cir. 1978), which articulates the rationale later expressed by the committee drafting Federal Rule of Evidence 411. To wit: "The law recognizes that the presence of an insurance company on either side of a case may affect a jury's decision on the merits, and consequently the law prohibits even the mention of the fact of insurance in a case if at all possible." *Id.* The court in *White Hall* expressed concern that the presence of insurance would preclude or reduce plaintiff's recovery because the jury would be able to easily discern that insurance coverage would provide the same remedy as a jury verdict. Here, insurance may arise in several different contexts, not just as an alternative to a jury award to redress tortious behavior. For example, fact or expert witnesses employed or retained by the insurer are almost inevitably going to testify. Given the nature of this case, a blanket prohibition on any mention of insurance would be impracticable.

insurance "with substantial unanimity." Fed. Rule Evid. 411. Such a prohibition does not extend to the broadest limits, precluding any mention of the concept of insurance. In fact, Rule 411 prohibits introduction of insurance only where used to prove that a person acted wrongfully. *See, e.g.*, *Ventura v. Kyle*, 825 F.3d 876, 883 (8th Cir. 2016), cert. denied, 137 S. Ct. 667, 196 L. Ed. 2d 525 (2017). It is difficult to see here how the introduction of evidence establishing the existence of insurance coverage would be used to create an inference of liability on the part of the Vitales. Rather, it appears that plaintiffs wish to preclude the mention of insurance coverage to retain the strategic advantage gained by bringing suit in the name of the insureds rather than in the name of the insurance carrier.

This is a subrogation action. As a subrogation action, the real party in interest is Allstate, not its insureds. That said, Pennsylvania's Rules of Civil Procedure permit Allstate to bring an action in the name of its insureds, even where the insureds are not the real party in interest. Pa. R. Civ. P. 2002(d). Additionally, Pennsylvania's "collateral source" rule "provides that payments from a collateral source [such as insurance] shall not diminish the damages otherwise recoverable from the wrongdoer." *Johnson v. Beane*, 541 Pa. 449, 664 A.2d 96, 100 (1995). These two principles act in tandem to minimize potential prejudice in cases involving a subrogated insurer. *See Beechwoods Flying Serv., Inc. v. Al Hamilton Contracting Corp.*, 504 Pa. 618, 622–23, 476 A.2d 350, 352 (1984) (reaffirming Pennsylvania's adherence to the "collateral source" rule and Pa. R. Civ. P. 2002(d) as measures appropriate "to avoid prejudicing a subrogated insurer in the eyes of a jury in actions for reimbursement.").

Here, the Vitales move to preclude any mention of insurance or Allstate's payment of an insurance claim. This blanket preclusion casts too wide a net. Not only

would such a ruling preclude admission of liability insurance (which is not at issue here) for the proper purposes of proving bias, prejudice, agency, ownership, or control, Fed. R. Evid. 411, it would preclude mention of insurance simply when recounting the nuts and bolts of the investigation in the case, creating confusing gaps in the narrative flow of the trial. *Cf. Old Chief v. United States*, 519 U.S. 172, 189 (1997):

> People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard. A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best.

Plaintiffs will be required to call Allstate employees or contractors as witnesses to prove damages. It is unclear how plaintiffs would establish the purpose of the Allstate employees' testimony without divulging who they are and why they happened to be involved in the case. Moreover, Electrolux would be unable to conduct meaningful cross-examination of any Allstate witnesses were any mention of insurance absolutely prohibited.

I am mindful of the very real possibility of prejudice to plaintiffs should the jury be apprised of Allstate's involvement in this matter, as well as the protections against such prejudice afforded by the Pennsylvania Rules of Civil Procedure and the collateral source rule. However, I must also consider the possibility that evidence of insurance may properly be admitted to show bias, prejudice, ownership, or control, along with the potential for jury confusion resulting from the parties' inability to lay a proper foundation for witnesses employed by Allstate.

I will grant the Vitale's motion, insofar as it seeks to ban the mention of insurance coverage, as such. To prevent the inappropriate preclusion of evidence of insurance offered for permissible purposes, and to address the practical difficulties engendered by presenting witnesses who cannot identify their employer, I deny the balance of the Vitales' motion, without prejudice. I direct the parties to jointly develop a protocol for the treatment of witnesses employed by Allstate, including agreed-to procedures for identifying any such witnesses to the jury. Additionally, the parties are cautioned not to aver to the existence of insurance coverage or to Allstate's role as a subrogated insurance carrier. To be clear, the parties must carefully vet any mention of insurers or insurance likely to come up at trial, and either come up with a mutually agreed protocol, or submit their disputes to me *in limine* for resolution, no later than one week before the first day of trial.

2. **ECF No. 70 – Plaintiffs' Motion *in Limine* to Exclude Industry Standard Evidence and the Dryer Design Opinions of Randall Bills, P.E.**

The portion of this motion addressing industry standard ANSI Z21.5.1 is **DENIED** for the reasons stated when addressing Plaintiffs' Motion *in Limine* docketed at ECF No. 47.

The Vitales also move to exclude the dryer design opinions of Electrolux's expert witness, Randall Bills, P.E. The Vitales argue that Mr. Bills' opinion is inadmissible because it is not reliable, as required by Federal Rule of Evidence 702. The motion is **DENIED**. Electrolux's request for oral argument on this issue (ECF No. 73) is **DENIED** as moot.

Federal Rule of Evidence 702 requires expert witness testimony to be: (1) helpful to the trier of fact; (2) based on sufficient facts or data; (3) the product of reliable

principles and methods; and (4) the product of a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. Under Rule 702, the trial judge assumes a "gatekeeping role," admitting testimony that "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The Third Circuit has recognized a "trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). First, a witness must possess specialized expertise that qualifies them to testify as an expert. *Id.* Second, the testimony must be reliable, meaning that it must be scientifically valid and not based on subjective belief or unsupported speculation. *Id.* (citing to *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)). Finally, the expert testimony "must be relevant for the purposes of the case and must assist the trier of fact" – it must fit the case in which it is offered. *Schneider*, 320 F.3d at 404.

The inquiry into admissibility of expert testimony is a flexible one, designed to meet overarching concerns of relevance and reliability. *Daubert*, 509 U.S. at 594-95. It is axiomatic that exclusion of expert testimony is an extreme sanction, frequently rendered unnecessary because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

While no challenge is directed to qualifications, the Vitales challenge the reliability and fit of Mr. Bills' testimony. They contend that Mr. Bills will offer deficient testimony, arguing that "[i]t is not clear that Mr. Bills used any science-based method in arriving at his . . . opinions" regarding the correlation between compliance with industry standards and a lack of product defects, that Mr. Bills did not base his opinions on facts, and that Mr. Bills' opinions do not "fit" this case. Pls.' Mot. in Lim. (ECF No. 70-2, at 7-

10). I find that whatever merit these challenges have goes to the weight to be accorded Mr. Bills' testimony, not to its admissibility.

First, the Vitales argue that Mr. Bills appears to base his opinions regarding compliance with industry standards on conclusory statements provided by Electrolux, rather than "any science-based method." A review of Mr. Bills' export report, *see* ECF No. 70-3, shows otherwise. Mr. Bills based his opinions on a destructive examination of the Vitales' dryer, a review of the documents generated pursuant to this litigation[2], the industry standard ANSI Z21.5.1-2002 and related materials, public sector reports, the contents of four depositions taken prior to March 31, 2016, and an article titled "Thermal Degradation and Ignition Characteristics of Clothes Dryer Lint." *Id.* at 3-5. Included in the materials reviewed by Mr. Bills was the deposition of Carl King. Mr. King testified to Electrolux's in-house testing of the subject dryer, testing conducted in accordance with, and to ensure compliance with, ANSI Z21.5.2-2002. *Id.* at 35. Mr. King's sworn deposition testimony provides a sufficiently reliable source for Mr. Bills' opinion that the dryer design conformed with ANSI Z21.5.2-2002. Any perceived or alleged infirmities in this portion of Mr. Bills' testimony can be properly exposed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Second, the Vitales argue that Mr. Bills' opinions are not based on facts. In support, the Vitales identify a litany of perceived holes in the data, or the explanation of the data, relied upon by Mr. Bills in his expert report. *See* Pls.' Mot. in Lim. (ECF No. 70-2, at 7-9). The Vitales even go so far as to speculate that "the test data that [Mr. Bills]

---

[2] Mr. Bills issued his report on March 31, 2016. ECF No. 73-2, at 1. It appears that he reviewed the universe of litigation documents available as of that date, and the Vitales do not identify any documents that Mr. Bills failed to review.

claims to have relied on here appears to be the very same test data" excluded in a matter before the Western District of New York in 2010.[3] The adequacy of the facts underpinning Mr. Bills' opinions goes to the weight to be afforded his opinions, rather than the admissibility of the opinions. His opinions suffice to withstand a threshold challenge under Rule 702. Cross-examination provides an adequate venue in which to challenge Mr. Bills' opinions. If the factual predicates for his opinion are as deficient as the Vitales intimate, I expect the Vitales' attorneys will enjoy a profitable cross-examination of Mr. Bills before a jury.

Third, the Vitales challenge the "fit" of Mr. Bills' testimony to the facts of this particular case. Expert testimony "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Here, Mr. Bills offered a list of seventeen conclusions, each of which addressed the clothes dryer that forms the basis of the Vitales' complaint. ECF No. 70-3, at 1-2. Each of the conclusions directly concerns the dryer, addressing the design of the dryer, the installation of the dryer, possible points of origin for the fire, and the use of the dryer – all relevant to this matter. In addition to being relevant, Mr. Bills' conclusions, if credited, would undeniably be useful to a trier of fact in determining how the fire started, where the fire started, why the fire started, and whether the clothes dryer had any role in the ignition and/or spread of the fire.

For the reasons stated above, the Vitales' Motion *in Limine* to exclude aspects of the testimony of Electrolux's expert, Randall Bills, P.E., is **DENIED**.

---

[3] *See The Automobile Ins. Co. of Hartford a/s/o Sherry Demrick v. Electrolux Home Products Inc.*, 2010 WL 3655743 (W.D.N.Y. 2010).

## DEFENDANT ELECTROLUX'S MOTIONS *IN LIMINE*

### 3.  **ECF No. 36 – Defendant's Motion to Preclude Testimony of Michael R. Stoddard, Jr. and William J. Vigilante, Jr., Ph.D.**

Electrolux moves to preclude the testimony of the Vitales' proffered experts. Def.'s Mot. in Lim. (ECF No. 36-1). The Vitales identified Michael Stoddard as an expert in the product at issue and William Vigilante as an expert in human factors and ergonomics. *See* Pretrial Mem. (ECF No. 42, at 3-5).

The standards applicable to preclusion of an expert's opinion have been discussed. I must ensure that all expert evidence is both relevant and reliable. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). There is "a strong preference for admitting any evidence that may assist the trier of fact." *Id.* Rule 702 imposes a trilogy of restrictions, relating to qualification, reliability, and fit. *Schneider*, 320 F.3d at 404. Electrolux argues that both Mr. Stoddard and Mr. Vigilante fail to meet each of the three prongs of Rule 702, questioning the experts' qualifications, the reliability of their respective methodologies, and the fit of their opinions to the facts of this case. I disagree.

### A.  **Mr. Stoddard is Qualified to Render the Opinions He Offers and Those Opinions are Both Reliable and Fit the Facts of this Case.**

Electrolux argues that Mr. Stoddard is not qualified to render opinions in the following four areas: (1) clothes dryer design; (2) the composition and use of plastics in the dryer; (3) the adequacy of the warnings and/or instructions that accompanied the dryer; and (4) Electrolux's internal corporate policies and procedures. Electrolux further argues, as to each of these areas, that even if Mr. Stoddard is qualified to render opinions in these areas, his opinions would be unreliable and untethered to the facts of this case.

### 1. Mr. Stoddard's Opinion on Clothes Dryer Design.

Turning first to Mr. Stoddard's opinions on clothes dryer design, I find Mr. Stoddard qualified to render an opinion, that his opinion is sufficiently reliable to pass muster under *Daubert,* and that his opinion fits the facts of the case. Electrolux argues that Mr. Stoddard's education, which includes a Bachelor of Science degree in Arson Investigation and an Associates' degree in electromechanical technology, makes him qualified to render an opinion as to the cause and origin of the fire, but not the design of the dryer. Def.'s Mot. in Lim. (ECF 36-1 at 8-10).

In support of this position, Electrolux cites to *Donegal Mutual Insurance Co. a/s/o Vanessa Schantz v. Electrolux*, No. 1:08-cv-2171 (M.D. Pa. Dec. 22, 2010) ("Exhibit C" to Electrolux's motion). In that case, the Court held that Mr. Stoddard was not qualified to offer an opinion regarding the defective design of an Electrolux dryer. *Id.* The Court precluded Mr. Stoddard's testimony, reasoning that Mr. Stoddard was not "sufficiently qualified to give his opinion as to *why* the [product] failed. [Plaintiff] has not pointed to sufficient academic training or on-the-job experience which would qualify Mr. Stoddard to provide an opinion as to whether the [product] failed as a result of a design defect or otherwise." *Id.* at 7 (emphasis in original).

The Vitales argue that Rule 702 does not require an expert to have an engineering degree or employment experience with a product manufacturer in order to opine on a particular product. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 9). Rather, Mr. Stoddard's opinions are supported by multiple factors in Rule 702, including his education, certifications, his more than 800 examinations of Electrolux dryers, his more than 1,000 hours of testing performed on Electrolux dryers, his authorship of eighty-

plus reports on Electrolux dryers, and his attendance at numerous training seminars related to appliances and dryers. *Id.* at 7-8.

The Vitales distinguish this case from *Donegal*, *supra*, noting that *Donegal* involved a failure of a drum bearing and that that case was over seven years old. *Id.* at 10. The Vitales argue that since that time, Mr. Stoddard has conducted hundreds of tests, investigations, and research in the field of dryer design and failures. *Id.* The Vitales also correctly noted that *Donegal* runs contrary to *Rager v. G.E.*, 2010 WL 5393857, which was issued on the same day, by the same judge, but reached a contrary decision.[4] *Id.*

I find that Mr. Stoddard is qualified to testify as to the cause and origin of the fire which, in this case, includes the allegedly defective design of the Electrolux clothes dryer. Mr. Stoddard's qualifications satisfy the liberal policy of admissibility under Rule 702 and *Daubert*. Mr. Stoddard designed and tested clothes dryers, including alternative designs to Electrolux's ball-hitch dryers. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 8). Mr. Stoddard inspected hundreds of dryers, including Electrolux dryers and various dryer models from other manufacturers. *Id.* I find that Mr. Stoddard possesses specialized skill or knowledge in the area of dryer design that is "greater than the average layman." *Id.* at 4 (citing *Elcock*, 233 F.3d at 741). Therefore, he is qualified

---

[4] In *Rager*, the expert concluded that the fire was caused by lint that ignited at the electric heating element, which continued to ignite "secondary fuels in the dryer." According to the expert's "lint ignition theory, this process occurs because of a design defect in GE dryers." *Rager*, 2010 WL 5393857, at *7. The Court held that the expert was qualified to testify, reasoning that "[the expert] has been a fire cause and origin analyst for over thirty years and has conducted at least 3,000 fire investigations. He is certified by the National Association of Fire Investigations . . . in the last ten years he has dedicated approximately twenty hours per week to investigating fires, identifying and examining exemplar dryers, and testing dryers . . . he has conducted over one thousand hours of testing dryers to see whether lint will ignite and what happens when lint does ignite." *Id.* at *9.

to testify as to the cause and origin of the fire, including that the fire was allegedly caused by the defective design of the Electrolux dryer.

In addition to being qualified to offer the opinion, the opinion itself is reliable and fits the facts of this case. Electrolux argues that Mr. Stoddard's testing and methodologies were flawed for a number of trifling reasons,[5] Def.'s Mot. in Lim. (ECF No. 36-1 at 15-17), none of which I find convincing.

I find that Mr. Stoddard's testimony concerning the allegedly defective design of the dryer is reliable under *Daubert*. Mr. Stoddard's opinion concerning the cause and origin of the fire is based on the methods and procedures of science, not on subjective or unsupported speculation. His investigation was guided by the NFPA 921: Guide for Fire and Explosion Investigations, which "is a consensus document addressing all aspects of fire science, and has been recognized by numerous federal courts as providing a reliable methodology for fire investigation." Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 15) (citing to *State Farm Fire & Cas. Co. v. Steffen*, 948 F. Supp. 2d 434, 442 (E.D. Pa. 2013)). Mr. Stoddard's investigation also included a dozen separate categories of tests performed by Mr. Stoddard, which satisfies *Daubert's* "testability" factor.

I find that Mr. Stoddard employed a reliable methodology that satisfies the flexible policy of admissibility under Rule 702 and *Daubert*. *See In re TMI Litig.*, 193 F.3d 613, 665 (3d. Cir. 1999) ("the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule

---

[5] For example, Electrolux contends that Mr. Stoddard's testing was not representative of consumer usage because he continually dried brand new towels ten times. Doc. No. 36-1 at 16. Electrolux has not produced data suggesting that the newness of towels or the number of times they are dried makes a material difference to lint accumulation or dryer functioning. It is not self-evident that either factor makes a difference. Electrolux is free to make these points during cross-examination.

702."). Electrolux's various arguments attacking the conclusions drawn from Mr. Stoddard's investigation are appropriate for cross-examination, but do not warrant preclusion under *Daubert*.

### 2. Mr. Stoddard's Opinion on Plastics Used in the Dryer.

For the reasons discussed regarding Mr. Stoddard's opinions as to dryer design, I find that Mr. Stoddard is qualified to testify regarding the use of plastics in the dryer because he has the specialized expertise required under Rule 702 and *Daubert*. Mr. Stoddard's opinions are supported by his education, training, and experience, as well as his examination of over 800 Electrolux dryers and over 1,000 hours of testing related to Electrolux dryers. I find further support for Mr. Stoddard's qualifications in his testing of identical plastics to determine the flammability, melting, and spreading within the dryer cabinet, which he then compared to steel component parts. This satisfies the liberal policy of admissibility under *Daubert*. I find that Mr. Stoddard is qualified to render an opinion regarding the use of plastics in the dryer.

As for reliability, Electrolux points to a case from the Western District of Wisconsin where, according to Electrolux, Mr. Stoddard's testimony regarding plastics was deemed inadmissible. *See* Def.'s Mot. in Lim. (ECF No. 36-1 at 14) (citing to *American Family Mutual Insurance Co. v. Electrolux Home Properties, Inc.*, No. 11-cv-678 (W.D. Wisconsin)) (attached as "Exhibit E" to Electrolux's motion). The issue was whether Mr. Stoddard's testimony concerning fire containment was relevant based on the facts of the fire at issue. The Court ultimately deferred ruling on the matter until the record was developed, noting that Electrolux was "free to re-assert its relevance objection after the record has been more fully developed." *American Family*, No. 11-cv-678 at 8.

Electrolux's reliance on *American Family* is misplaced. There, the issue was not whether Mr. Stoddard's opinion concerning the use of plastics was reliable. In fact, the Court held that this testimony *was* reliable, reasoning:

> I am satisfied from Stoddard's reports that there is a sufficient link between his testing and review of alternate designs and his opinion regarding the risk posed by Electrolux's choice of certain plastics for some of the dryer components.

*Id.* Electrolux's argument is without merit.

I find that the Rule 702 factors weigh in favor of admitting Mr. Stoddard's testimony concerning the use of plastics in the dryer. Mr. Stoddard's method consists of a testable hypothesis – Mr. Stoddard tested the burn characteristics of HB-rated plastics and 5V-rated plastics and concluded that the use of alternative materials would be effective in containing the fire to the cabinet in most conditions. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 16) (citing to Mr. Stoddard's report at 172-176). This is sufficiently reliable under *Daubert's* flexible standard. I find that Mr. Stoddard's methods are reliable and preclusion is not warranted. To the extent Electrolux argues that Mr. Stoddard's opinions on fire containment are irrelevant because he failed to account for the dryer door being open, this issue can be adequately addressed during cross-examination. Preclusion is not warranted.

### 3. Mr. Stoddard's Opinion on the Adequacy of Warnings and Instructions.

Mr. Stoddard will testify that he "designed and tested several alternative designs that would have prevented the accumulation of lint by the dryer's heat source, prevented the plastic component parts from igniting or spreading the fire, or warned the user that

cleaning the area was necessary." Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 3) (citing to Mr. Stoddard's report at 87-110).

Electrolux argues that Mr. Stoddard is not qualified to testify regarding whether the warnings and instructions are defective and how users understand product warnings because he does not have any formal education in psychology, human factors, or product warnings and instructions. Def.'s Mot. in Lim. (ECF No. 36-1 at 11). Electrolux cites to *Donegal*, *supra*, where the Court held that Mr. Stoddard was not qualified to opine as to the adequacy of warnings because he did not have any "specialized experience in human factor engineering that would allow him to give an opinion beyond that of the average lay person." *Id.* (citing to *Donegal Mutual Insurance Co.*, No. 1:08-cv-2171 at 7).

The Vitales argue that Mr. Stoddard does not offer an opinion related to the field of human factors – this testimony is reserved for Dr. Vigilante. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 11). Rather, Mr. Stoddard will testify that Electrolux did not need warnings because they should have changed the design to eliminate the hazard or placed a guard protecting against the hazard. *Id.* Mr. Stoddard will testify that, only as a last resort under the safety hierarchy, should Electrolux have relied on warnings. *Id.* The Vitales also cite to *Pineda v. Ford Motor Company*, 520 F.3d 237, 245 (3d Cir. 2008), where the court held that a design expert could testify that providing warnings was a solution to a safety engineering problem. There, the Court expressly noted that the testimony was not about language, font, or color (which would require a "warnings expert"), but was about a possible solution to an engineering safety problem. *Id.* at n. 12.

I find that Mr. Stoddard possesses the "broad range of knowledge, skills, and training to qualify as an expert" concerning the adequacy of the warnings/instructions.

*Pineda*, 520 F.3d 237 at 244 (citing *Paoli*, 35 F.3d at 741). As the Third Circuit explained, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate. *Id.* (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). Mr. Stoddard's testimony does not concern the language, font, color, or any other features of the warnings/instructions that would require a human factors expert. Plaintiff will rely on Dr. Vigilante for this testimony. Therefore, I find that Mr. Stoddard is qualified to render an opinion concerning the adequacy of warnings and/or instructions as a solution to a safety engineering problem.

### 4. Mr. Stoddard's Opinions Regarding Electrolux's Internal Corporate Policies and Procedures.

Mr. Stoddard opines that Electrolux's engineers failed to make any attempt to reduce the risk of fire or improve the fire containment properties of the clothes dryer. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 13) (citing to Mr. Stoddard's report[6]). Electrolux argues that Mr. Stoddard has no formal education in corporate management, and he is not qualified to render an opinion on internal corporate policies and procedures. Def.'s Mot. in Lim. (ECF No. 36-1 at 11).

The Vitales argue that Mr. Stoddard is qualified to speak to general principles of product design, including safety hierarchy. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 13). The Vitales rely on Mr. Stoddard's education and experience, and that he attended a training course offered by Whirlpool on the proper application of safety principles to product design. *Id.*

---

[6] These opinions appear on page 185 of Mr. Stoddard's report.

Mr. Stoddard's long experience and training qualify him to give an opinion that the product is defective, including that it was defectively designed. But he is not a design engineer, nor has he had experience in the day-to-day work of designing products for manufacture and sale. Electrolux claims that Mr. Stoddard's practical experience does not qualify him to make judgments about what allegedly went wrong in the design process.

Mr. Stoddard makes the following five assertions in his report:

[1]    " . . . Electrolux has no formal internal product safety standards or training, . . . ";

[2]    "Electrolux's engineers failed to make any attempt to reduce the risk of fire in these Ball-Hitch clothes dryers.";

[3]    " . . . [E]ven if [Electrolux] had tried to reduce the risk of lint fires through any engineering design, safeguard or through improvements to user warning and instruction, they made no attempt to improve the fire containment properties of the clothes dryers they manufactured.";

[4]    "It is clear that Electrolux was . . . negligent in failing to attempt any such engineering improvements . . . ."

Mr. Stoddard's Report at P. 185.

I will define the limits of Mr. Stoddard's testimony with respect to each numbered item:

[1] Mr. Stoddard's practical experience in examining Electrolux dryers, and his review of Electrolux internal documents and other sources of evidence, supplies him with an ample basis for opining that "Electrolux has no formal internal product safety standards or training." Electrolux may dispute this assertion through cross-examination, as well as by introducing its own evidence. Mr. Stoddard's experience does not qualify him to opine about whether having "formal internal product safety standards or training" is a standard of care in the world of dryer product design, nor does his

22

experience qualify him to opine as to any causal link between the absence of a formal internal product safety standards and the design flaws in the product.

[2] Mr. Stoddard may opine that the documents and other information he has reviewed, coupled with the condition of the product he examined, does not reveal that specific fire containment features, identified by Mr. Stoddard as feasible, were incorporated into the design of the subject dryer.

[3] Mr. Stoddard may also opine that the information he has reviewed does not indicate that Electrolux attempted to incorporate such fire containment features into the design of the dryer.

[4] Mr. Stoddard may opine that the absence of specific fire containment features identified by him [see No. 2, above] was negligent.

Electrolux's Motion *in Limine* to preclude the testimony of Mr. Stoddard is **DENIED**, except that Mr. Stoddard may not testify as to whether having formal internal product safety standards or training is a standard of care in the world of dryer product design, nor may Mr. Stoddard opine as to any causal link between the absence of a formal internal product safety standards and the design flaws in the product.

### B. Mr. Vigilante is Qualified to Render the Opinions He Offers and Those Opinions are Both Reliable and Fit the Facts of this Case.

Dr. Vigilante is an expert in Human Factors and Ergonomics Consulting. He will testify that the "dryer was defective because it failed to adequately warn the user that lint can accumulate behind the dryer drum and to have the interior of the dryer cabinet (including behind the dryer drum) cleaned by a professional every 12 months." Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 3) (citing to Dr. Vigilante's report at 38-39). It is Dr. Vigilante's opinion that the warning system was inadequate under industry

standards. *Id.* Electrolux argues that Dr. Vigilante's opinion regarding an "adequate warning system" is unreliable, and that Dr. Vigilante failed to tie his opinions to the facts of the case in a meaningful way. Def.'s Mot. in Lim. (ECF No. 36-1 at 17-23).

Electrolux argues that Dr. Vigilante's opinion is based on a "thought experiment" which is not a reliable methodology. *Id.* at 19. Electrolux criticizes Dr. Vigilante's "speculative leap" that the Vitales would have followed his proposed warnings and avoided the fire, reasoning that there is no evidence that the Vitales would have seen his proposed warnings, read them, heeded the warnings, or complied with them. *Id.* at 20. Electrolux also argues that Dr. Vigilante's opinion lacked application of ergonomics methodology. *Id.* at 21. Electrolux cites to *Curry v. Royal Oak Enters, LLC*, where the court held that the ergonomic expert was unreliable because he "used little, if any, methodology, beyond his own intuition" and because he "conducted no tests." 2013 U.S. Dist. Lexis 88760, at *14 (E.D. Pa. 2013). Finally, Electrolux asserts that Dr. Vigilante's opinions were unsubstantiated because he did not conduct any tests or surveys to support his presumption that alternate warning labels would protect consumers from dryer fires caused by lint accumulation. Def.'s Mot. in Lim. (ECF No. 36-1 at 21-11) (citing to *Mause v. Global Household Brands*, Inc., 2003 U.S. Dist. Lexis 18958, at *12 (E.D. Pa. 2003)).

The Vitales argue that Dr. Vigilante relied on the scientific method to reach his conclusions — he hypothesized that the dryer's warnings may be inadequate and that the warnings he proposed may be adequate. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 21). He gathered the relevant data and tested it against his hypothesis. *Id.* He tested the existing warning system and his proposed warnings against core principles in the field of ergonomics and according to industry standards. *Id.* The Vitales argue that this

method has been found reliable in the Third Circuit. *Id.* at 23. The Vitales also distinguish this case from *Curry, supra*, noting that the expert in *Curry* was a trained chemist, and was not qualified to give an opinion on warnings. *Id.* at 24.

The Vitales also argue that the alleged lack of "live" tests or surveys does not render Dr. Vigilante's opinion inadmissible. Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 37-1 at 23) (citing to *Jenks v. New Hampshire Motor Speedway*, 2012 WL 405479, at *3 (D.N.H. Feb. 8, 2012)). Further, the ergonomics literature and industry standards upon which Dr. Vigilante relied is based on studies of "real life" testing and it is reliable to rely on these principles. The Vitales distinguish the facts of this case from *Mause* noting that, in that case, the expert did not base his opinion regarding the warnings on any industry standard or literature in the field of human sciences.

I find that Dr. Vigilante's opinion is based on a reliable methodology under *Daubert's* liberal standard. Dr. Vigilante's opinions are not based on a "thought experiment,"[7] but rather are based on methods and procedures of science, including industry standards and principles of ergonomics. His method consisted of a testable hypothesis – he opined that the subject dryer's warnings were insufficient and that the warnings he proposed were sufficient, gathered the relevant data, and tested it against his hypothesis. This methodology is sufficiently reliable under Rule 702 and *Daubert*. To the extent Electrolux argues that there is no evidence that the Vitales would have followed Dr. Vigilante's proposed warnings, this is properly addressed on cross-examination and does not warrant preclusion.

---

[7] "Thought experiment" is thrown about as a pejorative. The theory of relativity was largely developed as an extended thought experiment. It happened to be a very good thought experiment, which was borne out by subsequent testing.

Electrolux's Motion *in Limine* to preclude the testimony of Dr. Vigilante is

**DENIED**.

### 4.  <u>ECF No. 41 – Defendant's Motion to Conduct Deposition of Ron Parsons and Continue Trial</u>

Electrolux moves for leave to conduct a deposition of the Vitales' non-testifying expert, Ronald Parsons, and to continue the trial date to allow time for the deposition. Def.'s Mot. in Lim. (ECF 41-1). In response, the Vitales filed an opposition to Electrolux's motion and a cross-motion requesting leave to amend their Complaint to include claims of abuse of legal process against Electrolux. Pls.' Resp. to Def.'s Mot. in Lim. (ECF 55-2, at 1).

Mr. Parsons has not been designated as a testifying expert. Def.'s Mot. in Lim. (ECF 41-1, at 1). The Vitales have designated Michael Stoddard as a testifying expert. Def.'s Mot. in Lim. (ECF 41-1, at 1). Mr. Stoddard will testify as to the contents of an expert report that he co-authored with Mr. Parsons. Def.'s Mot. in Lim. (ECF 41-1, at 1). Because Mr. Parsons was not designated as a testifying expert, Electrolux initially chose not to depose Mr. Parsons, and was content to rely upon deposition testimony from Mr. Parsons in earlier matters involving similar dryers. Def.'s Mot. in Lim. (ECF 41-1, at 2).

However, Electrolux has since become aware of a motion filed in an unrelated litigation challenging the competency, credibility, and truthfulness of sworn testimony offered by Mr. Parsons in a number of earlier lawsuits, including some involving dryers similar to those at issue here. Def.'s Mot. in Lim. (ECF 41-1, at 2). Electrolux now seeks to depose Mr. Parsons to inquire into "matters affecting his competency, credibility and bias." Def.'s Mot. in Lim. (ECF 41-1, at 2).

For the reasons discussed below, Electrolux's motion is **DENIED** in full, and the Vitales' cross-motion is **DENIED**.

As Electrolux correctly observes, the Federal Rules of Civil Procedure permit parties to "depose any person who has been identified as an expert and whose opinions may be presented at trial." Def.'s Mot. in Lim. (ECF 41-1, at 3) (citing to Fed. R. Civ. P. 26(b)(4)(A)). However, Electrolux does not sufficiently identify which portions, if any, of Mr. Stoddard's expert opinion can be properly attributed to Mr. Parsons. Instead, Electrolux simply draws the conclusion that Mr. Parsons, by dint of signing the report, must have rendered at least some part of the opinions contained therein.

While this conclusion is not irrational, it does not justify the deposition of a non-testifying expert. As Rule 26 plainly states, the deposition of a non-testifying expert may be taken "only . . . on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(ii). Electrolux has access to Mr. Stoddard, a designated expert perfectly capable of providing Electrolux facts and opinions on issues regarding the underlying dryer fire. Mr. Stoddard clarified the provenance of the opinions contained in the expert report in a sworn affidavit submitted to the court. Mr. Stoddard stated that he wrote the expert report, that all opinions expressed in the report were held by him, and that Mr. Parsons "cross-signed" the report, a standard quality control practice of forensic consulting firms. Mr. Stoddard further avers that Mr. Parsons' participation in this matter was limited to reviewing Mr. Stoddard's finalized report. Given Mr. Stoddard's sworn affirmations, Mr. Parsons' involvement in producing the report does not amount to the "exceptional circumstances" under which a non-testifying expert may be deposed. *Id.*

Electrolux next argues that a deposition of Mr. Parsons is required to probe issues of his character. I disagree. Electrolux relies entirely on allegations contained in a motion filed in an unrelated litigation in another district court to argue that Mr. Parsons should be open to a deposition. Rule 26 does not permit the deposition of a non-testifying expert, as an ordinary matter, and cannot reasonably be read to permit a deposition solely to develop impeachment material for a non-testifying expert. Because Mr. Parsons will not testify in a trial of this matter, Electrolux has no need to develop, and no opportunity to utilize, impeachment material. Electrolux may not depose Mr. Parsons solely to inquire into issues regarding his character.

Electrolux's final argument – that the deposition of Mr. Parsons should be permitted despite being requested after the expiry of the discovery period – is denied as moot in light of my ruling that Mr. Parsons may not be deposed for more substantive reasons.

I also deny the Vitales' cross-motion seeking leave to add claims that Electrolux has abused the legal process by submitting this Motion *in Limine*. The Vitales' underlying argument, that Electrolux seeks Mr. Parsons' deposition for the ulterior purpose of obtaining impeachment material for use in unrelated future matters, is speculative and does not satisfy the elements of an abuse of process claim. To establish an abuse of process claim under Pennsylvania law, the Vitales would need to show that Electrolux (1) used a legal process against them, "(2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused" to the Vitales. *Credico v. Hubiak*, No. 3306 EDA 2016, 2017 WL 1505246, at *5 (Pa. Super. Ct. Apr. 21, 2017) (citing to *Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. 1993)). The Vitales lay out this standard and provide additional case law elaborating on this

standard, but fail to state a claim. The Vitales do not explain (1) how a legal process was used against them, (2) that Electrolux intended to accomplish some improper purpose, or (3) that harm has been caused, beyond a statement that Electrolux filed a motion to which the Vitales responded, incurring costs. Because it appears that the Vitales do not have a valid cause of action for abuse of legal process, I deny their cross-motion seeking leave to amend their Complaint to include these claims.

**5. ECF No. 43 – Defendant's Motion *in Limine* to Preclude Testimony and Evidence Related to the Location of Electrolux Manufacturing Plants**

Electrolux moves to preclude testimony and evidence relating to Electrolux's Webster City, Iowa and Juarez, Mexico manufacturing plants. Electrolux's motion is **GRANTED**.

Electrolux opened a manufacturing plant in Juarez, Mexico in 2008. In 2011, Electrolux moved its dryer manufacturing operations to the Juarez plant, and closed its Webster City, Iowa plant. Def.'s Mot. in Lim. (ECF 43-1, at 1-2). Electrolux argues that any discussion of the opening or closure of these manufacturing plants is irrelevant under Rule 401 or, in the alternative, excludable under Rule 403's balancing test. The Vitales counter with allegations of a conspiracy by Electrolux to shield itself from "mounting litigation claims" by relocating to Mexico, adopting a safer bulkhead dryer design, laying off all employees associated with the old ball-hitch design, and destroying key records relating to the ball-hitch design. Pls.' Resp. to Def.'s Mot. in Lim. (ECF 59-2, at 2). The Vitales argue that the move to Mexico provides evidence of Electrolux's internal risk-utility analysis. I disagree.

The opening of one manufacturing plant and the closure of another has only the slightest hint of relevance to the issues in this case. That limited relevance is not only

attenuated, it is premised on a conspiracy theory for which the Vitales appear to offer only summary assertions in support.

Any evidence of the move to Juarez presents little probative value, which is substantially outweighed by the danger of unfairly prejudicing Electrolux. Evidence that Electrolux closed a U.S. plant and moved to a foreign jurisdiction promises to unfairly prejudice Electrolux by tempting the jury to punish Electrolux for putting U.S. workers out of work, rather than helping them to decide the actual issue in the case on the merits. "The prejudice against which Rule 403 guards is *unfair* prejudice – prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009); *see Old Chief*, 519 U.S. at 180 ("unfair prejudice" refers to the capacity of evidence to "lure" a jury into finding guilt on improper basis). The issue also promises to be a waste of time, since evidence of the reasons for the move will consume substantial trial time, with no promise that the sum of all the details will actually shed light on whether the product was well or defectively designed.

Because the twin dangers of unfair prejudice and waste of time substantially outweigh the limited probative value of any evidence of the company's move to Juarez, Electrolux's motion is **GRANTED**.

**6. ECF No. 44 – Defendant's Motion *in Limine* to Exclude Evidence of a Japanese Government Investigation into Electrolux Products**

Electrolux's motion to preclude evidence of an investigation of dryer fires in Japan is **GRANTED**.

Electrolux moves to preclude evidence of dryer fires in Japan and subsequent investigations by Japanese government agencies. Electrolux argues that the Japanese dryer fires did not occur under circumstances substantially similar to those surrounding the fire in the Vitales' dryer, making such evidence inadmissible under Rule 401 of the Federal Rules of Evidence. Electrolux additionally argues that this evidence is inadmissible under Rule 402, fails Rule 403's balancing test, and does not satisfy any exception to the rule against hearsay. Def.'s Mot. in Lim. (ECF No. 44-1). The Vitales counter that evidence of the Japanese fires is admissible to prove "the defect, Electrolux's knowledge of the defect, the feasibility of certain design alternatives, and [Electrolux's] negligence." Pls.' Resp. to Def.'s Mot. in Lim., at 7- 12 (ECF No. 65).[8]

As noted by the parties, Judge Pappert recently addressed this same issue. *Cloud v. Electrolux Home Products, Inc.*, 15-cv-00571, ECF No. 136-1, at 7-9 (E.D. Pa. Jan. 30, 2017). I agree with Judge Pappert's assessment. I am convinced by Electrolux's argument that the Japanese dryer fires did not occur under substantially similar circumstances to the fire in this case. I similarly agree with Judge Pappert that admission of this evidence for purposes of proving feasibility of design alternatives invites a "trial within a trial." Introduction of this evidence would require comparing the circumstances under which Electrolux proposed any design alternative for the Japanese market to the circumstances surrounding products available in the U.S. market, not to mention a detailed examination and comparison of the products themselves.

As for the products themselves, there is evidence to indicate that the product(s) available in Japan were not substantially similar to the product at issue here. The Vitales

---

[8] Plaintiffs did not number the pages in their document and this filing somehow escaped the ECF stamp. This citation is to pages 7-12 of the PDF document filed at ECF No. 65 and downloaded for review.

contend that the Japanese government's investigation resulted in findings consistent with the allegations of defect here: the dryers allowed lint to accumulate in close proximity to a heat source, igniting adjacent combustible plastic component parts. Pls.' Resp. to Def.'s Mot. in Lim., at 4-5 (ECF No. 65). However, significant differences between the products undercut these broad similarities. Electrolux states that modifications made by the Japanese distributor prior to sale in Japan render the products dissimilar. Additionally, Electrolux identifies a number of installation issues unique to the Japanese fires. These include: running the dryer on a reduced power supply, thus diminishing the air flow capacity of the dryer; using screens to cover exhaust hoods; using venting exceeding the length recommended by Electrolux; and the use of enriched liquefied natural gas to operate the dryers, increasing the dryers' heating value without the necessary design accommodations. Def.'s Mot. in Lim. (ECF No. 44-1, at 1-2). I agree with Electrolux that modifications made in Japan, along with installation practices peculiar to the Japanese market, make the Japanese products substantially dissimilar to their domestically available brethren. Because the Japanese products are not substantially similar to the product at issue here, evidence of Japanese fires presents a danger of unfair prejudice that substantially outweighs the rather faint relevance that might be attributed to the evidence, whether introduced to prove the existence of a defect, Electrolux's knowledge of a defect, or Electrolux's alleged negligence.

As for proving the existence of a feasible design alternative, the evidence of the Japanese fires is unhelpful for other reasons. The Vitales offer evidence that Electrolux responded to the Japanese investigation by proposing a design modification – a switch that automatically shut down the dryer once it detected restricted air flow. Pls.' Resp. to Def.'s Mot. in Lim., at 5-6 (ECF No. 65). As Judge Pappert observed, admitting evidence

of the Japanese fires to prove the feasibility of a design alternative runs afoul of Rule 403. *Cloud*, 15-cv-00571, ECF No. 136-1, at 8-9. Assuming, arguendo, that evidence of Electrolux's response to the Japanese fires might be relevant, under Rule 401, it should be excluded under Rule 403 because its probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, undue delay, and wasting time.

Based on the above, Electrolux's motion to preclude evidence of an investigation of dryer fires in Japan is **GRANTED**.

## 7. <u>ECF No. 46 – Defendant's Motion *in Limine* to Preclude Evidence of "The Australian Thesis"</u>

Electrolux's motion to preclude evidence of the Australian Thesis is **GRANTED**.

Electrolux moves to preclude evidence of "The Australian Thesis." Despite its interesting moniker, the Australian Thesis offers little intrigue. The thesis is the work of two graduate students from Lulea Institute of Technology in Sweden. For their Master's thesis, the two students obtained permission from an Electrolux entity to study a "common platform dryer" developed exclusively for the Australian market in 2006. Basing themselves at the University of South Australia, the two Swedish students conducted studies comparing the Australian dryer design to older Electrolux models. According to the Vitales, the students reached the conclusion that Electrolux changed the design of their dryers "to reduce the risk of catching fire comparing to its antecedents." Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 60-2, at 2) (quoting Frederik Kogerfelt and Emelie Svensson, User-Centred Fire Risk Assessment of Common Platform Dryer (undated) 2006:139 ClV. ISSN: l4O2 - 1617. ISRN:LTU - EX - - 06/139 - -SE ("The Australian Thesis") at pp. ii-iii).

Electrolux argues that the thesis is inadmissible under Rule 401 due to a lack of substantial similarity between the products studied by the students and the product at issue. Def.'s Mot. in Lim. (ECF No. 46-1, at 2). Electrolux further contends that the thesis is inadmissible under Rule 402, fails a Rule 403 balancing test, and cannot overcome a hearsay objection. *Id.* at 3-5.

In opposition, the Vitales argue that the thesis is relevant, and therefore admissible, to show the availability of an alternative design and to show that Electrolux "knew or should have known [that the alternative design] was safer." Pls.' Resp. to Def.'s Mot. in Lim. (ECF No. 60-2, at 4).

I am not convinced by the Vitales' argument. The thesis does not purport to identify an alternative to the design employed in the Vitales' dryer. The Australian Thesis addresses a product that is not substantially similar to the product giving rise to this matter.

In addition, the Vitales have not explained how they plan to authenticate the document, how they plan to introduce the document, and how they will overcome the hearsay objection certain to be raised by Electrolux. Electrolux's motion to preclude evidence of "The Australian Thesis" is **GRANTED**.

**8.** **ECF No. 48 and ECF No. 50 – Defendant's Motion *in Limine* to Preclude Evidence of any and all Electrolux Claims Data and Defendant's Motion *in Limine* to Preclude Electrolux Warranty Data Evidence**

Electrolux moves to preclude from evidence any and all Electrolux claims data, Def.'s Mot. in Lim. (ECF No. 48), and to preclude warranty data evidence, Def.'s Mot. in Lim. (ECF No. 50). The motions are **GRANTED in part**.

The claims data consists of data compiled by Electrolux in the process of addressing reports of "property damage and/or personal injury stemming from fires

involving Electrolux-manufactured dryers." Def.'s Mot. in Lim. (ECF No. 48-1, at 3).

Similarly, the warranty data records requests for service and complaints of customers

related to the functioning of their dryer, but does not record complaints of property

damage caused by dryers. The records are kept and maintained in the ordinary course of

business. According to Electrolux, the database into which claim information is input

contains "over two- to three hundred different fields" collecting data points about each

claim. Def.'s Mot. in Lim. (ECF No. 48-1, at 3). Electrolux argues that these fields do not

provide information specific enough to determine whether individual claims are

substantially similar to the incident involving the Vitales. The Vitales counter that

Electrolux attempts to limit the data to circumstances identical to the Vitales', rather

than just substantially similar. I agree with the Vitales for the same reasons expressed

by Judge Pappert in *Cloud*, 15-cv-00571, ECF No. 136-1, at 9-11.

In *Cloud*, Judge Pappert limited the admissibility of the claims and warranty data

to "prior incidents involving (1) ball-hitch dryers, (2) that caught fire, (3) under

circumstances where there was evidence or allegations of lint accumulation." *Id.* at 9.

Judge Pappert ruled that such evidence was admissible to show defect, reasoning that

these three predicates were substantially similar to the theories of defect advanced by

the Plaintiffs, and to the circumstances of the property damage giving rise to the matter.

*Id.* at 9-10. Judge Pappert's reasoning applies here. The Vitales have alleged theories of

defect premised on Electrolux's knowledge that the ball-hitch dryer design was

dangerous and defective. Claims and warranty data related to fires involving lint

accumulation in dryers using the same design is both relevant to and probative of the

theories advanced, without creating the risk of unfair prejudice. Accordingly, the Vitales

may introduce evidence of claims or warranty data that shows ball-hitch dryers catching

fire under conditions with evidence of lint accumulation. Further, the Vitales may introduce claims and warranty data from customers reporting fires occurring prior to the expiry of Electrolux's recommended lint-removal maintenance period to show that warnings regarding maintenance schedules were inadequate.

I caution the parties, as did Judge Pappert, that the contents of the claims and warranty reports consisting of statements made by customers to Electrolux may be admitted only if qualified under an exception to the rule against hearsay. Fed. R. Evid. 805. Assertions made by customers reporting damage or defect will likely be offered for the truth of the matter asserted. As such, they must meet a hearsay exception. Such arguments will be heard as they arise at trial.

Electrolux's motions to preclude from evidence any and all Electrolux claims data, Def.'s Mot. in Lim. (ECF No. 48), and to preclude warranty data evidence, Def.'s Mot. in Lim. (ECF No. 50) are **GRANTED in part**.

9. **ECF No. 49 – Defendant's Motion *in Limine* to Preclude Evidence of Fires Involving Dryers Other than the Dryer Involved in the Subject Incident**

Electrolux moves for an order "precluding evidence of other fires." Def.'s Mot. in Lim. (ECF No. 49, at 1). The motion is **GRANTED in part**. Electrolux argues that evidence of other dryer fires cannot be shown to be substantially similar to the fire at issue here. Electrolux contends that evidence of other fires is inadmissible because "establish[ing] that the specific factual circumstances of each prior fire are substantially similar to those of the subject incident . . . is simply not feasible." *Id.* at 3. According to Electrolux, substantial similarity cannot be established because "[t]here are simply far too many variable circumstances" distinguishing each fire, including installation, repairs, positioning, care, use, and more. *Id.* at 4. I disagree.

As discussed above, substantial similarity does not require identical circumstances. Rather, prior incidents are substantially similar if they involve (1) ball-hitch dryers, similar to the model owned by the Vitales, (2) that caught fire, (3) under circumstances where there was evidence or allegations of lint accumulation. Evidence of such prior incidents will be admissible to prove notice and defect, with the temporal condition that any such incidents must have occurred prior to the fire at the Vitales' home.

In *Cloud*, Judge Pappert expressed concern regarding the plaintiffs' attempt to introduce evidence of prior lawsuits brought against Electrolux involving similar products. *Cloud*, 15-cv-00571, ECF No. 136-1, at 11-12. Judge Pappert noted that introduction of prior lawsuits would lead to a danger of unfair prejudice, causing jurors to speculate as to the outcome of the lawsuits. This is especially true in light of the sheer volume of litigation initiated against Electrolux pursuant to dryer fires.[9] Were a jury made aware of the various actions, they may improperly determine that there is "fire," in the form of liability, because there is "smoke," in the form of lawsuits. That is an improper and unfairly prejudicial inference. To avoid the danger of unfair prejudice to Electrolux, the Vitales are precluded from offering evidence of lawsuits brought against Electrolux involving dryer fires.

Electrolux's motion to preclude evidence related to prior incidents of fire is

**GRANTED in part**.

---

[9] As of October 2013, there were 35 actions against Electrolux entities pending in 21 district courts. *In re: Electrolux Dryer Prod. Liab. Litig.*, 978 F. Supp. 2d 1376 (U.S. Jud. Pan. Mult. Lit. 2013) (addressing motion to centralize litigation in the Northern District of Illinois). As Judge Pappert observed in *Cloud*, a class action was pending in California, along with a consolidated mass tort action containing more than 200 claims in the Northern District of Illinois, and multiple additional consolidated actions throughout the country. *Cloud*, 15-cv-00571, ECF No. 136-1, at 11-12.

**10.** **ECF No. 51 – Defendant's Motion *in Limine* to Preclude Evidence Regarding Flexible Foil Venting Sold by an Electrolux Company**

Electrolux moves to preclude evidence related to flexible foil venting sold by an Electrolux company. Def.'s Mot. in Lim. (ECF No. 51, at 1). The motion is **DENIED**.

Electrolux anticipates that the Vitales will introduce evidence that Electrolux, or an Electrolux entity, sold flexible foil venting for dryers. Electrolux anticipates the Vitales using this evidence to show that Electrolux confused consumers by selling Electrolux-branded flexible foil venting while simultaneously prohibiting the use of flexible foil venting in the installation of its dryers.

Electrolux argues that evidence of their prohibition on the use of flexible foil venting and contemporaneous sale of flexible foil venting is irrelevant to the matter at bar. I disagree. Electrolux asserts comparative negligence by the Vitales as an affirmative defense. Answer, at 7 (ECF No. 9). Among other actions Electrolux claims contributed to the fire at the Vitales' home is the use of flexible foil venting in the installation of the Vitales' dryer.

In *Cloud*, Judge Pappert denied Electrolux's identical motion under somewhat different facts. *Cloud* involved a fire in an Electrolux-branded dryer, for which the installation instructions specifically forbade the use of flexible foil venting. Here, Electrolux argues, the Vitales owned a GE-branded dryer, manufactured by Electrolux and accompanied by installation instructions that permitted the use of flexible foil venting if used according to the manual. This is a distinction without a difference.

Electrolux argues that the Vitales used flexible foil venting improperly, rather than arguing that they used it impermissibly, as in *Cloud*. Here, Electrolux plans to argue that the Vitales used the flexible foil venting in a manner that allowed lint to

accumulate. In *Cloud*, they argued that the plaintiffs used flexible foil venting, which allowed lint to accumulate. This wrinkle may ultimately diminish the impact of evidence showing that Electrolux sold flexible foil venting,[10] but it does not merit preclusion. The fact remains that Electrolux sold dryers, whether labeled as Electrolux products or branded with a GE logo, that allegedly created a risk of lint accumulation and fire when installed with flexible foil venting. That Electrolux itself sold flexible foil venting bears directly on the merits of its affirmative defense of comparative negligence. In addition to being relevant, evidence of flexible foil venting sold by Electrolux presents little danger of confusing the jury or creating unfair prejudice, let alone unfair prejudice substantially outweighing the probative value of the evidence.

Electrolux's motion to preclude evidence that it sold flexible foil venting is **DENIED**.

**11. ECF No. 52 – Defendant's Motion *in Limine* to Preclude Evidence of the Bulkhead Dryer Design**

Electrolux moves to preclude evidence of the bulkhead dryer design. This motion is **DENIED**.

The Vitales bring products liability claims against Electrolux sounding in strict liability. Under *Tincher*, a products liability cause of action requires proof of either the risk-utility of a product or satisfaction of the consumer expectation test. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 401 (Pa. 2014). To make a case under the risk-utility test, a plaintiff must prove that the risks, i.e. the known dangers, of a product outweighed the utility of the product, which can be demonstrated by adducing evidence

_____

[10] It may also defang the comparative negligence defense to the point that Electrolux does not even offer it. That will be for Electrolux to decide. What Electrolux does not get to do is pretend that putting flexible tubing on its dryers is unheard of.

of an available alternative design that was economically and practically feasible. *See id.* at 407.

Here, evidence of the bulkhead dryer design is relevant, probative, and likely vital to the Vitales' case. The Vitales plan to proffer evidence that an alternative design existed that may have eliminated the safety risks allegedly presented by the ball-hitch design of the Vitales' dryer – the bulkhead design. The Vitales will likely offer evidence that other manufacturers utilized the design prior to the design and manufacture of the Vitales' dryer. The employment of the bulkhead design by other manufacturers can demonstrate that the alternative design was available, and that other competing manufacturers used the design, tending to show that the design was practically and economically feasible.

Electrolux also contests the admission of evidence that later Electrolux products utilized the bulkhead design. The fact that Electrolux eventually adopted the bulkhead design is probative of all factors of the risk-utility test, including availability, economic feasibility, and practical feasibility. In *Cloud*, Judge Pappert anticipated some concern that evidence of Electrolux's later adaptation of the bulkhead design may lead to objections under Rule 407, which bars evidence of subsequent remedial measures as direct proof of negligence, defect, or design defect. *Cloud*, 15-cv-00571, Memorandum ECF No. 128-1, at 2. As noted in *Cloud*, evidence of subsequent remedial measures, such as adopting the bulkhead design, is admissible for the purposes of showing that design changes were feasible. *Id.* (citing to *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 43 n. 7 (3d Cir. 2009)).

Electrolux argues that evidence of the bulkhead design would lead to jury confusion, prolong the trial, and cause unfair prejudice to Electrolux. I disagree. There

is little danger of unfair prejudice occasioned by the admission of evidence related to the bulkhead dryer design. Jury confusion would be unlikely given the purpose for which the Vitales will use this evidence. The Vitales will introduce evidence of the bulkhead design to show (1) the general availability of a design alternative to Electrolux's ball-hitch dryer design, and (2) the widespread use of the bulkhead design by competing manufacturers, which tends to show that the design was both economically and practically feasible. These two simple concepts would be unlikely to confuse a jury. As for prolonging the trial, the question under Rule 403 is not whether a trial will be longer or shorter. The Rule speaks in terms of waste of time. A trial may be very long because crucial evidence as to the central issue in the case takes a long time to develop. That is not a waste of time. The Vitales' design defect claim is at the core of the case. It requires them to put on evidence satisfying the risk-utility test. Evidence of the availability and widespread use of the bulkhead design allows a jury to infer that the design is useful and does not pose an outsized risk. Such evidence does not promise to consume a great deal of time. It is not disputed that Electrolux sold a dryer with a bulkhead design. Neither is it disputed that other manufacturers sold bulkhead dryers. If the evidence becomes unnecessarily cumulative, there is a remedy for that. *See* Rule 403.

Electrolux has not demonstrated how this evidence will cause unfair prejudice. To Electrolux's concerns regarding "seed[s] of suspicion" in the minds of the jury and their continuing manufacture of ball-hitch design dryers, Electrolux may present evidence to counter and rebut evidence of the bulkhead design, including evidence that they continue to manufacture ball-hitch design dryers and alternative explanations for the adoption of the bulkhead dryer design.

Electrolux's motion seeking to preclude evidence of the bulkhead dryer design is

**DENIED**.

12. **ECF No. 53 – Defendant's Motion *in Limine* to Preclude Evidence Relating to Electric Dryers**

Electrolux moves to preclude evidence related to electric dryers, arguing that the design differences between gas dryers, like the one owned by the Vitales, and electric dryers render them not substantially similar. Electrolux seeks to preclude "any and all references, testimony, and/or introduction of evidence related to electric dryers." Def.'s Mot. in Lim. (ECF No. 53-1, at 1). According to Electrolux, the design differences between gas and electric dryers are so significant as to make evidence regarding electric dryers wholly irrelevant, and the introduction of such evidence would be more prejudicial than probative. The Vitales counter by arguing that their theories of design defect[11] apply equally to both gas and electric clothes dryers. Critically, the Vitales contend that their design defect theories hinge on the ball-hitch design, not the fuel source of the dryer. Because Electrolux designed and manufactured ball-hitch dryers fueled both by gas and electricity, evidence related to electric ball-hitch dryers is relevant to and probative of the issues in this case.

As proof of the significant differences between the gas and electric dryers, Electrolux points to "different control features and functions, air flow configurations, and basic sources of energy." Def.'s Mot. in Lim. (ECF 53-1, at 2). The Vitales contend that the substantial similarities arise in the context of the dryers' propensity to allow lint accumulation in proximity to the heat source, which can then ignite nearby combustible

---

[11] The Vitales allege that the dryer was defective because (1) the design allowed lint to accumulate in close proximity to a heat source, (2) the plastic components used near the heat source were combustible, allowing fire to spread beyond the dryer unit itself, and (3) the dryer contained inadequate warnings.

plastic components, which in turn allows fire to spread beyond the unit's cabinet and into the owner's home. I find the Vitales' contentions much more convincing. Electrolux bears the burden of demonstrating irrelevance under Rule 401. The evidence is relevant, under the forgiving standard of Rule 401, because it has a tendency to make a fact of consequence more likely. In light of the allegations of design defect, evidence relating to ball-hitch dryers, whether fueled by gas or electricity, is relevant and admissible here.

Electrolux next argues that "any probative value [of electric dryer evidence] is outweighed by the danger of unfair prejudice." Def.'s Mot. in Lim. (ECF No. 53-1, at 3). However, the standard under Rule 403 requires the probative value of evidence to be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Electrolux contends that significant design differences make "any evidence relating to electric dryers . . . an 'improper basis' upon which the jury may draw significant conclusions." Def.'s Mot. in Lim. (ECF No. 53-1, at 4). Electrolux has not satisfactorily explained to me why electric, versus gas, heat makes a difference when the case focuses on lint accumulation near a source of heat. Perhaps they will have more success explaining to a jury why the distinction matters. The jury will be trusted to draw conclusions about the ball-hitch design, whether incorporated in electric or gas dryers, after due consideration of any nuances Electrolux cares to prove.

Electrolux's motion to preclude evidence related to electric clothes dryers is **DENIED**.

## <u>CONCLUSION</u>

For the reasons set forth above, the Vitales' Omnibus Motion to Preclude Certain Evidence (ECF No. 47) is **GRANTED in part** and **DENIED in part**. The Vitales'

Motion *in Limine* to Exclude Industry Standard Evidence and the Dryer Design Opinions of Randall Bills, P.E. (ECF No. 70) is **DENIED**.

As for Electrolux's motions *in limine* (ECF Nos. 36, 41, 43, 44, 46, 48, 49, 50, 51, 52, and 53), I issue the following rulings: ECF No. 36 is **DENIED**, except that Mr. Stoddard may not testify as to whether having formal internal product safety standards or training is a standard of care in the area of dryer product design, nor may Mr. Stoddard opine as to any causal link between the absence of a formal internal product safety standards and the design flaws in the product.; ECF No. 41 is **DENIED**, and the Vitales' cross-motion in response is **DENIED**; ECF No. 43 is **GRANTED**; ECF No. 44 is **GRANTED**; ECF No. 46 is **GRANTED**; ECF No. 48 and ECF No. 50 are **GRANTED in part**; ECF No. 49 is **GRANTED in part**; ECF No. 51 is **DENIED**; ECF No. 52 is **DENIED**; and ECF No. 53 is **DENIED**.

**BY THE COURT:**

/s/ *Richard A. Lloret*
RICHARD A. LLORET
U.S. Magistrate Judge